## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and
CITY OF SOMERVILLE,

    *Plaintiffs*,

        v.

DONALD J. TRUMP, President of the United
States, PAMELA J. BONDI, Attorney General of
the United States, EMIL J. BOVE, Acting Deputy
Attorney General, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI L. NOEM,
Secretary of the United States Department of
Homeland Security, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
SEAN P. DUFFY, Secretary of the United States
Department of Transportation, UNITED STATES
DEPARTMENT OF TRANSPORTATION, and
UNITED STATES OF AMERICA,

    *Defendants*.

Case No.  25-10442

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    The Massachusetts cities of Chelsea and Somerville bring this action to prevent the
federal Executive Branch from defunding their police forces and other essential public safety
functions as part of a politicized attack on "sanctuary jurisdictions."  The federal administration's
threatened defunding would undermine Plaintiffs' efforts to enhance the safety of their own
communities through well-considered law enforcement efforts and policy judgments and would
violate the U.S. Constitution.

2.    Like many local governments across the country, Plaintiffs Chelsea and Somerville
have adopted policies that limit the circumstances under which they and their law enforcement

agencies expend their already-constrained resources to assist with federal immigration enforcement efforts. Often referred to as "sanctuary cities," local jurisdictions like Plaintiffs enact these policies to best serve their communities. By avoiding unnecessary entanglement with federal immigration efforts, sanctuary policies help ensure that all residents feel safe interacting with local law enforcement and officials, regardless of their immigration status. Victims of crime can report incidents to the police without fear that doing so will expose themselves or their loved ones to immigration enforcement; witnesses are more likely to cooperate with police for the same reason. Sanctuary policies also allow local law enforcement to efficiently allocate often-scarce resources to high-priority enforcement issues in their communities. For all of these reasons, Plaintiffs have determined that their sanctuary policies enhance public safety for their residents.

3.    However, Defendants—President Donald J. Trump ("Trump") and other federal officials—have mounted an aggressive campaign to undermine the authority of local governments to make these local determinations. Through a series of actions that began within hours of Trump's second inauguration, Defendants have attempted to commandeer local governments to play an active role in Defendants' "mass deportation" plan—trampling on the rights of Plaintiffs and other localities like them in the process.

4.    On January 20, 2025, his first day back in office, Trump unleashed a slew of Executive Orders ("EOs") on wide-ranging issues. Among these Executive Orders was EO 14148, titled "Initial Recissions of Harmful Executive Orders and Actions," which rescinded a number of Biden-era Executive Orders, including EO 13993, an EO that itself had rescinded Trump's 2017 Executive Order targeting sanctuary jurisdictions.

5.    That same day, Trump issued Executive Order 14159 (hereinafter, the "Executive Order," attached as Exhibit A), titled "Protecting the American People Against Invasion," a focus

of this suit.  Section 17 of the Executive Order, titled "Sanctuary Jurisdictions," purports to give the Attorney General and the Secretary of Homeland Security the power to undertake "any lawful action" to ensure that sanctuary cities "do not receive access to Federal funds."

6.      On January 21, 2025, just one day later, Acting Deputy Attorney General Emil Bove published a memorandum to all Department of Justice ("DOJ") employees (the "Bove Memo," attached as Exhibit B), which expressly noted that "Federal law prohibits states and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests."  More specifically, the Bove Memo provided that DOJ "shall investigate incidents involving any such misconduct for potential prosecution," and expressly listed three statutes:  18 U.S.C. § 371 ("Conspiracy to Commit Offense or Defraud the United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").

7.      The Bove Memo, consistent with the Executive Order, explicitly sought to punish sanctuary jurisdictions by "ensur[ing]" that they "do not receive access to Federal funds."  This directive was further confirmed when Trump initiated a highly publicized "funding freeze" on all federal grants and loans, via a memo issued by the White House's Office of Management and Budget ("OMB") on January 27, 2025.  The very first exemplar of cuts in the OMB memo cited the Executive Order concerning sanctuary jurisdictions, thereby signaling the Trump Administration's (the "Administration's") crystal-clear intention to prevent sanctuary jurisdictions from accessing federal funds to which they are entitled.

8.      Although the funding freeze was quickly challenged in the courts and rescinded by the Administration only two days later (though the overall effort to review funding was not

rescinded), the intense confusion it caused remains.   What is clear, however, is that the Administration intends that sanctuary jurisdictions "not receive access to Federal funds."

9.      This intent was again reflected in a January 30, 2025 order issued by Trump's new secretary for the Department of Transportation ("DOT"), Sean Duffy, who made clear in an order (the "DOT Order," attached as Exhibit C) that for "all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts," it would now be the policy of the DOT to effectively de-"prioritize" such funding for sanctuary jurisdictions by prioritizing "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary."  In a world of limited resources, as is the case with local entities trying to secure DOT funding, de-prioritization is functionally the same as cutting off funding.  At the same time, the DOT Order would oddly "give preference to communities with marriage and birth rates higher than the national average." Neither provision on its face appears to bear any relationship, whatsoever, to the responsibilities of DOT.

10.      On newly appointed Attorney General Pamela Bondi's first day in office, Bondi signed a memo further implementing the Executive Order an expanding on the Bove Memo, and took direct aim at sanctuary cities (the "Bondi Memo," attached as Exhibit D, and together with the Bove Memo, the "DOJ Memos").   The Bondi Memo unequivocally states, "Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice," and called for prosecuting violations of the same three statutes referenced in the Bove Memo. Toward that end, the Bondi Memo instituted an ***immediate pause on all DOJ funds***.

11.      On February 6, 2025, the DOJ sued the State of Illinois, the City of Chicago, Cook County, and various local representatives over their alleged sanctuary policies.  Then on February

12, 2025, the DOJ sued New York and various local representatives over New York's "Green Light Law," which is geared to encourage New York residents to apply for a driver's license regardless of their immigration status. These lawsuits are a blatant attempt by the federal government to undermine the constitutionally protected authority of local jurisdictions.

12.     Trump further issued another Executive Order on February 19, 2025, titled "Ending Taxpayer Subsidization of Open Borders," (the "Subsidization Executive Order," attached as Exhibit E) in which he ordered, at Section 2(a)(ii), that "the head of each executive department or agency (agency) shall . . . ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." The Subsidization Executive Order was geared toward all federal agencies and targets funds that, *inter alia*, aid sanctuary policies.

13.     Defendants' campaign against sanctuary cities relies on two categories of threats and intimidation: 1) threatening to, and taking actions towards, withholding federal funds from cities that refuse to bend to Defendants' will, even if those funds have nothing to do with Defendants' stated aims and even if Congress has given no directive toward that end; and 2) threatening criminal and civil prosecution of those who are deemed insufficiently compliant. In this manner, Defendants' attack on sanctuary cities improperly seeks to control and undermine what is fundamentally *local* decision-making; usurps the role of Congress and its Spending Power; injects significant uncertainty into the landscape due to its vagueness; and violates Plaintiffs' constitutional rights.

14.     Defendants' illegal campaign of bullying and intimidation—to force local jurisdictions to sacrifice local public safety resources, their values, and their determinations about

what is best for their residents—is particularly harmful for smaller cities like Plaintiffs, whose residents would be grievously harmed by any termination of federal funding.  Plaintiffs rely on various key sources of federal funding—in the range of tens of millions of dollars—to fill critical budgetary needs in the management of their respective cities.  In addition, as smaller jurisdictions, their ability to defend against criminal and civil prosecutions is limited.

15.    This action challenges the Executive Order, the Bondi Memo implementing it, the DOT Order, and the Subsidization Executive Order, which are the centerpieces of Defendants' illegal and unconstitutional assault on sanctuary cities.  These Executive Branch actions have caused and will continue to cause harm to Plaintiffs—in violation of numerous Constitutional principles, including the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment guarantees of due process and its void-for-vagueness doctrine—unless addressed by this Court.  Further, the Bondi Memo and DOT Order, which represent agency action, violate the Administrative Procedure Act ("APA"), because they are arbitrary and capricious, contrary to the Constitution, and in excess of statutory authority.

16.    Plaintiffs accordingly seek declaratory relief, as well as a preliminary and permanent injunction barring Defendants from implementing or enforcing the Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order.  Plaintiffs further reserve the right to amend their claims should the Administration (including DOJ and DOT) take further action supplementing or revising their scheme targeting "sanctuary jurisdictions."

## JURISDICTION AND VENUE

17.    The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 e*t seq*.  Pursuant to 5 U.S.C. § 702, sovereign immunity is waived for the United States.

18.     Pursuant to 28 U.S.C. § 1391(e), venue properly lies within the District of Massachusetts because, *inter alia*, Plaintiffs each reside in this judicial district (and no real property is involved in the action).

## PARTIES

19.     Plaintiff City of Chelsea is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and self-identifies as a "sanctuary city."

20.     Plaintiff City of Somerville is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and currently self-identifies as a "welcoming community."

21.     Defendant Donald J. Trump is the President of the United States.  He is responsible for issuing and signing the Executive Orders that restarted the Administration's attacks against sanctuary jurisdictions.  President Trump is sued in his official capacity.

22.     Defendant Pamela J. Bondi is the Attorney General of the United States.  The Attorney General is a cabinet-level position of the U.S. federal government overseeing the DOJ.  Attorney General Bondi is responsible for executing relevant provisions of the Executive Order and issuing the second DOJ memo implementing the Executive Order.  Attorney General Bondi is sued in her official capacity.

23.     Defendant Emil J. Bove is the Acting Deputy Attorney General of the United States, the second-highest ranking official within DOJ.  Acting Deputy Attorney General Bove issued the first DOJ memo implementing the Executive Order.  He is sued in his official capacity.

24.     Defendant United States Department of Justice is an executive agency of the United States federal government.  DOJ is responsible for initiating some of the key Executive Branch actions at issue in this lawsuit, namely implementation of the Executive Order through two DOJ memos.

25.     Defendant Kristi L. Noem is the Secretary of Department of Homeland Security ("DHS"). Secretary Noem is responsible for executing relevant provisions of the Executive Order. Secretary Noem is sued in her official capacity.

26.     Defendant United States Department of Homeland Security is an executive agency of the United States federal government. DHS is responsible for executing relevant provisions of the Executive Order.

27.     Defendant Sean P. Duffy is the Secretary of DOT. Secretary Duffy is responsible for issuing the DOT Order. He is sued in his official capacity.

28.     Defendant United States Department of Transportation is an executive agency of the United States federal government. DOT is responsible for initiating one of the Executive Branch actions at issue in this lawsuit, namely the DOT Order.

29.     Defendant United States of America is sued under 28 U.S.C. §§ 1331 and 1346, and its sovereign immunity is waived under 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

**A.     The City of Chelsea**

30.     The City of Chelsea, Massachusetts is located directly north of the Mystic River across from the East Boston neighborhood of Boston, Massachusetts. Chelsea was first settled in 1624, established as a town in 1739, and incorporated as a city in 1857. The City of Chelsea presently employs approximately 1,600 individuals.

31.     Chelsea occupies a land area of just 2.5 square miles, making it the smallest city in Massachusetts. According to the U.S. Census, Chelsea's population, as estimated in July 2023, numbers 38,319 residents, approximately 45% of which are foreign-born persons, the highest percentage for any city in Massachusetts. These statistics also make Chelsea one of the most densely populated cities in Massachusetts, second only to Somerville.

32.     Chelsea is a diverse, working-class community that has twice been awarded the All-America City Award by the National Civic League in recognition of the ability of its residents to work together to identify and tackle community-wide challenges.  According to the U.S. Census, approximately 65% of the city's residents identify as Hispanic or Latino, and roughly 73% of the city's population is diverse, which includes residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other groups.  Approximately 21% of Chelsea's residents are living below the poverty line.

33.     Chelsea received approximately $14.5M in federal funding for fiscal year 2024.  Of that funding, approximately $11.3M was passed through the state.  All such grants were reimbursement-based.

34.     Chelsea anticipates receiving approximately $8.5M in federal funding for fiscal year 2025, of which approximately $8.47M will be passed through the state and all of which will be reimbursement-based.

35.     Chelsea regularly receives funds from DOJ's Byrne JAG program, which funds local law enforcement agencies as well as numerous other areas.  The program website explains that the program's funding supports "prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, crime victim and witness initiatives, mental health programs and related law enforcement and corrections programs."  Chelsea has also consistently received funds from the Bulletproof Vest Partnership ("BVP") program, which is administered through DOJ's Office of Justice Programs ("OJP").  All of these funds support Chelsea's goal of maintaining a safe community by supporting its police department.

36.    Chelsea also received $2M for a Downtown Broadway Infrastructure Improvement Project through the Department of Housing and Urban Development ("HUD").  The project began in summer 2024 and is set to be completed in 2027.  This project will be the biggest reconstruction effort in three decades in Downtown Broadway, which sits on the primary arterial street of Chelsea, and will revitalize Chelsea's "downtown" area.

37.    Chelsea also receives significant Title I federal grant funding, approximately $4.1M for 2025, under the federal Elementary and Secondary Education Act.  The purpose of those funds is to provide financial assistance to districts and schools with higher numbers of children from low-income families to help ensure that they are able to meet challenging state academic standards.  Without such federal grant funding, glaring educational inequities would be exacerbated.

38.    Chelsea began its budgeting process for fiscal year 2026 in late 2024 and anticipates finalizing its budget by May 2025.  Given the complete uncertainty the Administration has caused with regard to federal funding, Chelsea cannot make informed decisions about how to structure its budget.  Chelsea has also partially expended certain reimbursement-based federal grants, but now faces the possibility that it will not be reimbursed for these significant expenditures given the Administration's unlawful and unconstitutional conduct.

39.    Chelsea has self-identified as a "sanctuary city" since its June 4, 2007 resolution, which resolved that the "City of Chelsea go on record as a Sanctuary City."  The resolution noted that "Sanctuary Cities promote a community as a safe haven for refugees and immigrants who are currently residing in that community from other countries; and . . . do not initiate or welcome raids that are not related to public safety and other heinous crimes."

40.    In 2017, the Chelsea Police Department ("Chelsea Police" or "CPD") promulgated General Order 2017-03, titled "Specific Role and Impact of the CPD in the Enforcement of Federal

Civil Immigration Law By the Department of Homeland Security (DHS-ICE-ERO) With the Secure

Communities Program" (the "Chelsea Police Policy") which CPD later amended in August 2024.

Thoughtfully drawing from the dynamics of the local community, the Chelsea Police Policy states:

> We fully realize that federal civil immigration enforcement or
> perceived enforcement by the Chelsea Police Department could
> have a "chilling effect" in our local immigrant community and could
> limit cooperation with police by members of the community at large.
> As stated, we depend on the cooperation of all of our residents and
> stakeholders including immigrants, legal and undocumented, in
> solving all sorts of crimes and in the maintenance of public order.
> Without assurances that they will not be subjected to an immigration
> investigation and possible deportation, many immigrants with
> critical information would not come forward, even when heinous
> crimes are committed against them and/or their families. . . .
>
> The specific immigration status of an individual or group of
> individuals in and of itself, is not and shall not be a matter of local
> police concern or subsequent enforcement action by the CPD unless
> there exists through reliable and credible information a potential
> threat to public safety and/or national security.

41.     Likewise, the policy later states, "Accordingly, Chelsea Police Department shall

not undertake immigration-related investigations and shall not routinely inquire into the specific

immigration status of any person(s) encountered during normal police operations," except for in

circumstances of arrests for violent felonies, already convicted felons, terrorism-related offenses,

human trafficking, and criminal gang activities.   Moreover, the policy states that officers "shall

not directly participate in any such ICE tactical operation(s) solely for the civil enforcement of

federal immigration laws as part of any Detention or Arrest Team," except for in direct response

to a request for immediate assistance on a temporary basis for officer safety purposes (*e.g.*,

directing traffic around officers) or for assistance in the apprehension of an individual with a

Massachusetts warrant for their arrest.

11

42.     Nothing in Chelsea's resolutions or in the Chelsea Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations," or "refuse[s] to comply with 8 U.S.C. § 1373," which are the hooks in the Executive Order and Bondi Memo, respectively. In fact, Chelsea's resolutions and policies make clear that they allow the efforts of federal immigration enforcement officers to occur unimpeded. Further, they reflect no attempt to conceal, harbor, or shield any individual from detection. Chelsea therefore should not be considered a "sanctuary jurisdiction" under the definitions of the Executive Order or Bondi Memo.

43.     The Administration has already initiated Immigration and Customs Enforcement ("ICE") raids in at least Chelsea, causing the citizens of the Plaintiff Cities (which are a stone's throw from one another) to live in a state of fear and chaos where their neighbors are rounded up with little to no notice or process. These have included "collateral" arrests where there is no suggestion or indication that the arrested individuals, who might be a roommate or might just happen to be in the wrong place at the wrong time, pose any threat to "national security" or "public safety," the primary purported rationales of the Executive Order and DOJ Memos.

44.     On Wednesday, January 22, 2025, a Fox News correspondent joined in a "ride-along" with ICE agents during one such raid; in the resulting news segment, the ICE agents were shown gathered outside of the popular Market Basket supermarket in Chelsea and subsequently made a number of arrests in the vicinity, none of which Chelsea Police appear to have interfered with. Such arrests included a "collateral" arrest of a roommate of a "main target," confirming the broadened focus of federal immigration enforcement efforts despite the false rhetoric of targeting only threats to national security or public safety. And beyond the raids experienced, a severe chill and climate of fear has been cast over Plaintiffs' communities, preventing individuals from going to work, school, church, the supermarket, or other places where they regularly must go.

B.    **The City of Somerville**

45.    The City of Somerville, Massachusetts is located directly south of the Mystic River and is nestled among the Cities and Towns of Boston, Cambridge, Arlington, Medford, and Everett. Somerville was first settled as part of Boston's Charlestown in 1630. Somerville later separated from Charlestown and became its own town in 1842 and incorporated as a city in 1872. The City of Somerville presently employs approximately 2,200 individuals.

46.    Somerville occupies a land area of just 4.1 square miles. According to the U.S. Census, Somerville's population, as estimated in July 2023, numbers 80,407 residents. These statistics make Somerville the most densely populated city in Massachusetts. Approximately 25% of Somerville's residents are foreign-born persons and approximately 10% are living below the poverty line.

47.    Somerville was named the "best-run city in Massachusetts" by the Boston Globe in 2006. Somerville has been awarded the All-America City Award by the National Civic League three times, including most recently in 2015. In 2020, Somerville's police officers were awarded the Medal of Valor by the Massachusetts Police Association for acts of heroism during an August 6, 2020 hostage situation in which police officers saved the life of a woman who was being held hostage at gunpoint in Somerville.

48.    Somerville has a diverse population, with U.S. Census data showing that roughly 30% of its population comprises residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other groups. English is not the first language of more than 50% of students in the Somerville Public School system, and almost 25% of students in the Somerville Public School system are still learning English. A healthy number of Somerville's main street businesses that both serve the community and support the local economy are immigrant-owned—and in some areas, more than half of storefront businesses are immigrant-owned.

13

49.    In fiscal year 2024, Somerville had a total budget of approximately $356M and received approximately $19.4M in federal funds.  Approximately $11.5M of that federal funding was passed through the state.

50.    In fiscal year 2025, Somerville has an annual total budget of $383M.  As of now, Somerville has received approximately $7.9M in federal funds for fiscal year 2025, of which approximately $6.8M was passed through the state.  Additionally, Somerville is eligible to receive approximately $15.5M in reimbursements on active and open federal grants.

51.    Somerville also participates in congressionally directed spending projects.  From fiscal year 2022 to fiscal year 2024, the city applied and/or contracted for approximately $14.7M in federal funding.  For several applications, amounting to approximately $5M, the contracts have been executed and the funds are to be reimbursed.  For another application for $2.5M, the contract is in development.  And for yet another $7M in city projects, Somerville is awaiting a funding decision.

52.    Like Chelsea, Somerville receives funds annually from the Bulletproof Vest Partnership program administered by DOJ's Office of Justice Programs, which it depends upon for officer safety and the safety of their communities.

53.    As another example of a recent, significant grant that is now threatened by the Executive Order and the Administration's actions, Somerville was recently awarded $4M from DOT's Safe Streets and Roads for All program in order to improve roadway safety.

54.    Somerville moreover has outstanding federal grant requests—totaling nearly $20M—to the Environmental Protection Agency under two different programs. The first is under the Community Change Grant, in order to improve energy efficiency and indoor air quality in multi-family homes in Somerville, and the second, under the Solid Waste Infrastructure for

Recycling Grant, will help to increase and optimize Somerville's waste management infrastructure. These are critical health- and infrastructure-related grants.

55.    The federal funds Somerville receives support a variety of community and public safety services.    For example, Somerville's homelessness prevention agencies depend on Emergency Solutions Grant Funding and other Community Development Block public service awards for their shelter operations, food pantry operations, and other core programs.    These programs provide critical support for residents who may otherwise have no way to escape life-threatening single-digit temperatures, to receive emergency medical care, or to feed themselves.

56.    Somerville began the budgeting process for fiscal year 2026 in early 2025, with the budget expected to be finalized this May.    However, Somerville cannot effectively structure its budget for fiscal year 2026, given the complete uncertainty that the Administration has created around federal funding.    With daily upheavals and reversals of those upheavals coming from the Administration, Somerville is unable to make informed decisions about the upcoming fiscal year.

57.    Somerville first identified as a sanctuary city in a 1987 resolution and revised that resolution in 1989.    In 2014, pre-dating the first Trump Administration, Somerville passed a Trust Act Ordinance to "ensure that all immigrants are able to fully participate in the civic and economic life of their neighborhoods and nurture and grow the spirit of unity in [its] City."    Two years later, in 2016, Somerville issued a "Reaffirmation of Sanctuary City Resolution," resolving that "the Somerville Board of Aldermen goes on record reaffirming our commitment as a Sanctuary/Trust Act City."    And in 2019, Somerville passed a "Welcoming Community Ordinance" that "further codifies existing policy and serves to reinforce the city's ongoing commitment to the immigrant community and Sanctuary City status."    The ordinance provides, "The Somerville Police

Department shall not take part in or assist with federal immigration enforcement operations," but makes clear, "Nothing in this ordinance shall be construed to violate any valid federal law."

58.    In 2022, the Somerville Police Department ("Somerville Police" or "SPD") promulgated General Order 143 entitled "Enforcement of Federal Immigration Law" (the "Somerville Police Policy").  Similar to the Chelsea Police Policy, the Somerville Police Policy begins by explaining the purpose of the policy: to encourage "all community members and stakeholders … to seek and obtain police assistance and police protection regardless of their specific immigration status without fear of status checks."  The policy notes that the police department "relies upon the cooperation of all persons located in the City of Somerville to achieve important goals such as protecting life and property, investigating and preventing crime, and resolving community problems."  Particularly in instances of domestic violence and sexual assault, "[i]t is essential that these victims do not feel apprehensive about coming forward with knowledge to aid investigators…."  The Policy goes on to state that "[t]he specific immigration status of an individual or group of individuals shall not [be] a matter of concern" for the police "unless reliable and credible information about a potential threat to public safety and/or national security exists."

59.    Accordingly, the policy states that the Police Department "shall not undertake immigration-related investigations and shall not inquire into the specific immigration status of any person(s) encountered during normal police operations."  Moreover, the policy states, "No officer or employee of the Somerville Police Department may participate in an operation led by a federal agency to detain persons for deportation purposes, except in response to a request to assist with support services deemed necessary to ensure officer safety or to prevent a breach of the peace during a federal operation."  The policy further confirms, "Somerville Police Officers WILL NOT

have a direct role in an operation initiated by federal authorities to arrest or detain an individual sought for an immigration violation."

60.    The policy also makes specific reference to the *Lunn v. Commonwealth* case from the Massachusetts Supreme Judicial Court (the "SJC") regarding civil immigration detainers. In *Lunn*, the SJC held in regard to ICE detainers, which request that custodians hold individuals for up to 48 hours after they would otherwise be entitled to release: "There is no Federal statute that confers on State officers the power to make this kind of an arrest." 78 N.E.3d 1143, 1146 (Mass. 2017). Moreover, "nothing in the statutes or common law of Massachusetts authorizes court officers to make a civil arrest in these circumstances." *Id.* Accordingly, the Somerville Police Policy notes with respect to *Lunn*, "Consistent with Massachusetts law, no officer or employee of the Somerville Police Department may arrest or detain an individual solely based on an ICE detainer or ICE administrative warrant."

61.    More recently, in late November 2024, Somerville approved a resolution, titled "Reaffirming Somerville's Commitment as a Welcoming Community for Justice, Equity, and Inclusion," which resolved, *inter alia*, that "regardless of external pressures or challenges faced by sanctuary cities, the Somerville City Council remains committed to its values of inclusion, equity, and justice, and will not waver in supporting our immigrant neighbors, who are integral to the strength and diversity of our community." Somerville currently identifies as a "welcoming community."

62.    The City of Somerville is dedicated to maintaining its vibrant and diverse community, a goal that cannot be accomplished without supporting *all* of its residents. Somerville's policies strive to increase trust within the community such that residents feel safer reporting crimes, coming forward as victims of crimes, and sharing information as witnesses of

crimes.  The city's policies also enable residents to feel safer when they access city and school services.

63.    Somerville's diligent efforts to create a safe and inclusive community have benefited its residents.  In Somerville's "Public Safety for All Survey," launched in September 2022, the city asked residents "about their perceptions of public safety, how it could be improved, and where it must be improved."  The survey provided clear evidence that immigrant residents feel both safe in their communities and respected by local police officers.

64.    Somerville has stated that it will continue to support its community and *all* of its residents.  As Mayor Katjana Ballantyne stated in her State of the City Address, "We are resilient, creative, and determined.  Somerville welcomes all."

65.    Nothing in Somerville's resolutions/ordinances or in the Somerville Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations" or "refuse[s] to comply with 8 U.S.C. § 1373." In fact, the resolutions/ordinances/policies make clear that they allow the efforts of federal immigration enforcement officers to occur unimpeded.  Further, they reflect no attempt to conceal, harbor, or shield from detection any individual.  Somerville should therefore not be considered a "sanctuary jurisdiction" under the definitions of the Executive Order or Bondi Memo.

## C.    Round One: The First Trump Administration's Unconstitutional Assault on Sanctuary Cities

66.    At the start of his first term in January 2017, Trump issued EO 13768, titled "Enhancing Public Safety in the Interior of the United States," targeting what it called "sanctuary jurisdictions," jurisdictions that "willfully refuse" to comply with 8 U.S.C. § 1373, a statute concerning the sharing of the immigration statuses of individuals with the Immigration and Naturalization Service (now ICE).  EO 13768 threatened to pull federal grant funding from those

sanctuary jurisdictions and separately to take enforcement action against those jurisdictions.  DOJ subsequently conditioned the receipt of certain federal funds on compliance with 8 U.S.C. § 1373.

67.    Shortly thereafter, in light of EO 13768's and the DOJ conditions' numerous Constitutional deficiencies—including violations of the Separation of Powers, the Spending Clause, the Fifth Amendment, and the Tenth Amendment—EO 13768 and the DOJ conditions were preliminary enjoined by numerous district courts across the country.  These rulings were later affirmed by the vast majority of the Circuit courts to address the EO and DOJ conditions, including the First, Third, Seventh, and Ninth Circuits (with only the Second Circuit coming out the other way).  While certain petitions for writs of certiorari were pending before the U.S. Supreme Court, President Biden ("Biden") began his term, having defeated Trump in the 2020 Presidential election. On his first day in office, January 20, 2021, Biden issued Executive Order 13993, titled "Revision of Civil Immigration Enforcement Policies and Priorities," revoking Trump's EO 13768 concerning sanctuary jurisdictions.  Given the executive action, the parties to the pending certiorari petitions, which included DOJ, thereafter filed joint stipulations to dismiss those cases in March 2021.

**D.    Round Two: A New Unconstitutional Executive Order Is Issued by the Second Trump Administration and Implemented by DOJ, and Plaintiffs Suffer Immediate Harm**

**1.    The New Executive Order Targets Sanctuary Jurisdictions**

68.    Trump wasted no time in launching a renewed attack on sanctuary cities after his reelection in 2024 and subsequent inauguration in 2025.  On the first day of Trump's second term, January 20, 2025, just hours after his inauguration, Trump unleashed a slew of Executive Orders on wide-ranging issues.  Among those Executive Orders was EO 14148, titled "Initial Recissions of Harmful Executive Orders and Actions," which rescinded a number of Biden-era Executive

Orders, including a Biden EO that had itself rescinded Trump's original EO regarding sanctuary jurisdictions.

69.     Trump then issued Executive Order 14159, titled "Protecting the American People Against Invasion," the focus of this suit.  Starting from the demonstrably false premise that "many" undocumented individuals are "committing vile and heinous acts against innocent Americans," and spewing other vitriol about "illegal aliens," the Executive Order states its so-called aim of achieving "the total and efficient enforcement" of immigration laws.  Among the methods the Executive Order states it will use to achieve this goal is to bring sanctuary cities to heel and to force them to assist in Defendants' efforts.   Section 17 of the Executive Order, titled "Sanctuary Jurisdictions," provides, in full:

> The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

70.     The intent and force of the Executive Order is clear: to deprive local jurisdictions of their constitutionally protected decision-making authority and unlawfully compel them to carry out federal immigration enforcement.   It does so by "ensur[ing]" that they "do not receive access to Federal funds" and by threatening criminal and civil actions against them.  The Attorney General and the Secretary of Homeland Security are delegated authority "to the maximum extent possible under the law," and are effectively given unfettered discretion under the Executive Order.

2.      **DOJ Implements the Executive Order: Conditioning Grants, Threatening Prosecution, and Freezing Funds—And DOT Joins In**

71.     The Administration acted swiftly to implement the Executive Order.  The very next day, on January 21, 2025, Acting Deputy Attorney General Emil Bove published a memorandum to all DOJ employees, which makes clear how broadly—and illegally—the Executive Order is intended to extend.  Starting from the same faulty legal premise that resulted in court orders against the first Trump Administration, the Bove Memo takes direct aim at sanctuary cities: "The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives."  In fact, the Supremacy Clause requires no such thing.

72.     The Bove Memo goes on to state, in terms both excessively broad and unconstitutionally vague, that "Federal law prohibits states and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests."  The overbreadth of this statement is stunning: while federal law may prohibit local actors from *obstructing* the enforcement of federal immigration law—which Plaintiffs do not do and have never done—the Bove Memo claims that local actors also violate federal law if they fail to comply with "immigration-related commands and requests."  No such law exists.

73.     The Bove Memo provides that DOJ "shall investigate incidents involving any such misconduct for potential prosecution," and expressly lists three statutes:  18 U.S.C. § 371 ("Conspiracy to Commit Offense or Defraud the United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").  The memo notes that "the Department of Justice will take all steps necessary to protect the public."

74.    The Bove Memo also indicates that the Civil Division will work with the "newly established Sanctuary Cities Enforcement Working Group" "to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws."

75.    On January 23, 2025, then-acting DHS Secretary Benjamine Huffman, issued an order titled "Finding a Mass Influx of Aliens."  In that order, Huffman "request[ed] the assistance of State and local governments in all 50 states" in administering federal immigration law. Although this order is framed as a "request," the Bove Memo mandates compliance with requests from the Executive Branch.

76.    The Bove Memo was quickly followed by Trump's highly publicized "funding freeze" on all federal grants and loans, via a memo issued by the White House's Office of Management and Budget on January 27, 2025.  As the very first example of "safeguard[ing] valuable taxpayer resources," the OMB memo lists the Executive Order concerning sanctuary jurisdictions, signaling again the Administration's crystal-clear intention to prevent sanctuary jurisdictions from accessing federal funds to which they are entitled.

77.    While a federal court swiftly stopped the funding freeze, and OMB rescinded its call for a funding freeze only two days later, the Administration has since stated that only the original memo calling for the blanket freeze had been rescinded, not its overall effort to use the termination of federal funding as means to force local governments to assist with the Executive Branch's policy goals.

78.    The Administration's intent was subsequently reflected in a January 30, 2025 order issued by Trump's new DOT secretary, Sean Duffy, who stated that for "all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts," it would now be DOT policy to de-

"prioritize" such funding for sanctuary jurisdictions by prioritizing "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary."

79.    The relentless assault on sanctuary cities, using federal funding as a weapon to compel compliance, continued apace.  On February 5, 2025, Trump's pick for Attorney General, Defendant Pamela Bondi, was confirmed by the U.S. Senate.  On her first day in office, Bondi signed a memo that took direct aim at sanctuary cities. Titled "SANCTUARY JURISDICTION DIRECTIVES," the memo immediately "***pause[d] the distribution of all [DOJ] funds*** until a review has been completed."   The Bondi Memo unequivocally stated, "Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."  It also further defined "sanctuary jurisdiction," providing that "so-called 'sanctuary jurisdictions' include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws," without specifying which "other" laws it was contemplating.  Section 1373(a) provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

80.    The Bondi Memo's language is consistent with the directive in the Executive Order to withhold federal funds from "so called 'sanctuary' jurisdictions" and reveals the DOJ's intention to condition all department grants on compliance with "applicable federal immigration laws."  The Bondi Memo conditioned DOJ grants on compliance with 8 U.S.C. § 1373.  It additionally stated

that future grants would be "tailor[ed]" to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration."

81.    The Bondi Memo also reiterated DOJ's earlier threat to prosecute sanctuary cities. It called for prosecuting violations of the same three statutes referenced in the Bove Memo—18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373—and notably expanded the scope of investigations to include any incident in which there is an "effort to obstruct" an "immigration-related directive from the Executive Branch."  Along that vein, Bondi released another memo on the same day that similarly called for the prosecution of "state and local actors" if they resist, obstruct, or "otherwise fail[] to comply with lawful immigration-related commands and requests."

82.    To substantiate its threats, DOJ has moved quickly to initiate enforcement.  On February 6, 2025, DOJ filed a civil complaint against the State of Illinois and the City of Chicago, among other defendants, in *United States v. Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1.  The Illinois complaint demonstrates just how broadly Defendants are asserting their power under the Supremacy Clause, claiming that local jurisdictions violate the Constitution if they prohibit: detaining an individual on the basis of a detainer or civil immigration warrant, *see id.* ¶ 8; providing information such as custodial status and release date about noncitizens in their custody, *see id.* ¶ 9; assisting with immigration enforcement activities, *see id.* ¶ 43; or inquiring about an individual's citizenship or immigration status, *see id.* ¶ 44.

83.    Less than a week later, DOJ filed a second lawsuit, this time challenging one of New York's laws.  On February 12, 2025, DOJ filed a civil complaint against the State of New York and various local representatives, in *United States v. New York, et al.*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025), ECF No. 1.  Similar to the Illinois complaint, the New York complaint broadly asserts power under the Supremacy Clause, claiming that New York's "Green Light Law"

violates the Constitution by: prohibiting the New York DMV from sharing DMV "records or information" with immigration officials in the absence of a court order or warrant, *see id.* ¶ 30; informing individuals whose information has been requested by immigration officials of the request, *see id.* ¶ 32; and imposing limitations on those who have access to or receive such "records or information," *see id.* ¶ 33.

84.    The New York lawsuit will hardly be the last of DOJ's enforcement actions.  When Bondi announced the lawsuit, she indicated "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one.  Strike two is New York.  And if you are a state not complying with federal law, you're next. Get ready."

85.    Trump later issued another Executive Order on February 19, 2025, titled "Ending Taxpayer Subsidization of Open Borders," in which he ordered, at Section 2(a)(ii), that "the head of each executive department or agency (agency) shall . . . ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."  The Subsidization Executive Order was geared toward all federal agencies and targets funds that, *inter alia*, aid sanctuary policies.

86.    Further, Trump, as well as executive officers and individuals in Trump's orbit, have made various public statements that align with the Administration's intent to go after sanctuary jurisdictions, both before and after Trump began his second term:

   a. On September 21, 2024, Trump promised in a speech in North Carolina, "As soon as I take office, we will immediately surge federal law enforcement to every city that is failing . . . I will ask Congress to pass a law outlawing sanctuary cities nationwide, and we demand the full weight of the federal government on any jurisdiction that refuses to cooperate with ICE."

   b. After Trump's reelection, on November 20, 2024, Tom Homan, Trump's "border czar," expressly threatened sanctuary cities during an appearance on television,

stating that "they need to get the hell out of the way cuz we're comin', we're gonna do it."

c. On January 22, 2025, Trump was interviewed by Sean Hannity of Fox News, during Hannity asked Trump about "sanctuary cities" and referenced the "federal funds" they receive. Trump, in response, stated, "Yes, we're trying to get rid of them, and we're trying to end them," referring either to the federal funds or to the sanctuary cities themselves (or both). When specifically asked by Hannity, "But would you cut off their money?" Trump confirmed that he might well "have to do that" because "sometimes that's the only thing you can do."

d. On January 31, 2025, Defendant Kristi J. Noem, the newly confirmed Secretary of DHS, appeared on Fox News and said in response to a question about whether the Administration would impose consequences on sanctuary cities, "Of course we will." Continuing, she stated, "The reality is, these sanctuary cities, their laws have caused us problems. They are limiting some of our tools that we want in our toolbox, but we're going to continue to go in and use our operations."

e. On February 3, 2025, Tom Homan reiterated his threats against sanctuary cities and seemingly claimed to control the courts, stating: "We're going to sue 'em . . . Look, we've got the Supreme Court; that's what President Trump wanted to do. He will end sanctuary cities."

87. Individually and cumulatively, these actions by Defendants amount to a concerted effort to intimidate and attack Plaintiffs and others like them to ignore their locally determined policies and priorities, bend to the will of the federal government, and assist with Defendants' mass deportation plans—all in derogation of Plaintiffs' rights.

**3.    Plaintiffs Are Harmed by Defendants' Illegal Intimidation Campaign.**

88. As a direct result of these unlawful Executive actions, Plaintiffs have been harmed. Beyond the freezing of DOJ funds, the Executive Orders, the implementing DOJ Memos, and the DOT Order create significant uncertainty for Plaintiffs in a manner that is paralyzing for municipal action.

89. Plaintiffs rely on various sources of federal funding—in the range of tens of millions of dollars—to fill critical budgetary needs in the management of their respective cities.

Plaintiffs face the very real and imminent termination of federal funding, which has already happened with respect to DOJ funds and will immediately result in a slew of harms to Plaintiffs:

     a.    Many of the federal grant funds that Plaintiffs receive are reimbursement-based, which means that Plaintiffs are immediately in the red if no federal grant monies are forthcoming, and face a "fiscal cliff";

     b.    Plaintiffs are grossly impeded in their abilities to spend funds for their communities in light of both the actual and imminent termination of access to federal funding;

     c.    Plaintiffs face breaches of a number of existing contracts that they entered into in reliance on approved federal grant monies;

     d.    Plaintiffs face the termination of significant numbers of city staff on their respective payrolls; and

     e.    Plaintiffs further face the termination of certain critical services they provide to their respective communities in connection with those federal grant monies.

90.    For example, Plaintiffs receive and rely on certain critical DOT grants to improve infrastructure and safety in their communities. These DOT grants are in turn tied to express contracts with general contractors and subcontractors. If Plaintiffs have the rug of federal funding pulled out from underneath them—as the Administration has promised it will imminently do—Plaintiffs will be forced to breach those existing contracts and subject themselves to suits for breach of contract and related claims.

91.    Somerville was recently awarded $4M from DOT's Safe Street and Roads for All program in order to improve roadway safety. Chelsea was similarly awarded a significant grant from that same program recently for the same purpose.

92.    Plaintiffs additionally receive and rely on DOJ grants to help fund their police departments and promote public safety in their communities. Chelsea regularly receives funds from DOJ's Byrne JAG program as well as its Bulletproof Vest Partnership program administered through DOJ's Office of Justice Programs. Somerville similarly receives funding annually from the BVP program; these funds are reimbursement-based and so cutting off access to federal funds

immediately harms Plaintiffs and puts them in the red with respect to those grants, as they have not been fully expended. All of these funds support Plaintiffs' goal of maintaining safe communities by supporting their police departments. The Administration has constantly parroted the phrase "public safety," but Plaintiffs' loss of access to these important federal funding sources endangers their communities and further puts the lives of law enforcement officers at risk.

93.    As just one illustration of the critical services that Plaintiffs would be forced to terminate—for lack of federal grant funding—are initiatives combating homelessness in their communities through, *inter alia*, prevention, rapid re-housing, and emergency shelters. This is even more critical for Plaintiffs in light of the brutally cold winters in the greater Boston area. If Plaintiffs are forced to terminate those critical services, the result will be that people living in their communities *will* die. Plaintiffs can envision no example of greater concretized harm than this.

94.    Plaintiffs have also already conducted internal analyses in the imminent event of broader federal grant funding being frozen, and they have determined that they would each need to terminate significant portions of city staff on their payrolls (a consistently accruing expense), which lack of personnel would immediately damage Plaintiffs' ability to effectively govern and manage their respective cities.

95.    As a result of the extreme uncertainty and the Administration's threats of imminent funding freezes—as well as the existing freeze of DOJ funding—Plaintiffs have been deprived of their long-standing expectations that federal funding sources will honor their commitments, which are critical for responsible decision-making and local resource allocation. Plaintiffs make significant expenditures relating to federal, reimbursement-based grant funding (the bulk of Plaintiffs' federal funding), but there is no longer any guarantee of reimbursement under the

Executive Order and Bondi Memo, which each purports to "ensure that . . . sanctuary jurisdictions . . . do not receive access to Federal funds."

96.    Giving the time-limited nature of many of the funds committed to Plaintiffs, Plaintiffs face a severe squeeze.  If they spend and are not reimbursed by the federal government, they are harmed.  Yet, if they refrain from spending out of fear of non-reimbursement and cannot complete certain projects in time, they will forfeit those funds and are still harmed.  No matter what Plaintiffs do, they are injured by the Trump Administration's actions.

97.    The necessary effects of the imminent termination of federal funding fly in the very face of the Administration's stated rationale of "enhancing public safety" and would in fact fundamentally impair Plaintiffs' abilities to protect the public safety.  What the Administration is doing is punishing sanctuary cities by vindictively withdrawing funding—and issuing destabilizing threats—even if those funds have nothing to do with their stated aims and even if Congress has given no directive toward that end.  The Administration cannot legislate, as that is the domain of Congress, and the Executive Orders and implementing memos represent blatantly unconstitutional efforts to harm Plaintiffs and their communities.

98.    Plaintiffs seek declaratory and injunctive relief so that their local efforts are no longer stymied by the federal government and so that they may continue their important work without the fear of a fiscal cliff or crisis, and without fear of significant layoffs to city personnel who provide needed and critical services.  They seek relief so that they can continue to provide essential services to their communities, including to combat the worst outcomes for the most vulnerable populations (such as the homeless, or school children who rely on safe roads to get to school), instead of having to cut such services.  They seek relief so that they can continue on their important projects, such as Chelsea's multi-million-dollar project to revitalize its downtown area

or Somerville's multi-million-dollar project to improve the safety of its roadways and the sanitary functioning of its sewers.  And above all, they seek relief so that they can continue to ensure the public safety of all individuals and families in their communities, regardless of their immigration status.  This Court must not allow the Executive Order, nor the Bondi Memo implementing it, nor the DOT Order, nor the Subsidization Executive Order, to stand.

## CAUSES OF ACTION

## COUNT ONE
(Separation of Powers)

99.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

100.    The Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives" and grants Congress alone the power to spend for the general welfare of the United States.  U.S. Const. art. I, secs. 1, 8.  These clauses vest Congress with legislative powers and establishes that it is Congress, not the President or any Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds.

101.    When Congress does delegate its spending powers, it must do so clearly and unmistakably, while providing specific guidance as to the conditions the Executive Branch may attach to receipt of federal funds.  A federal agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When the [Executive] takes measures incompatible with the express or implied will of Congress,

[its] power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

102.    As such, the Executive Branch cannot place conditions on funds already allocated by Congress, without Congress's express authorization.  The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order violate the Separation of Powers by imposing conditions on funding—which Congress did not authorize—namely that Plaintiffs do not interfere with federal immigration enforcement and that they comply with 8 U.S.C. § 1373 and other, unspecified federal immigration laws.

103.    Moreover, the Executive Order authorizes the Attorney General and the Secretary of DHS to impose penalties on states and localities, again without any regard to whether Congress authorized either entity to impose them.

104.    The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order authorize conditions and penalties that Congress did not envision.  As applied to Plaintiffs, this overreach by the Executive Branch creates uncertainty and deeply disrupts Plaintiffs' ability to budget daily governance needs and implement their law enforcement priorities.

## COUNT TWO
(Spending Clause)

105.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

106.    The Spending Clause provides, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."  U.S. Const. art. I, sec. 8, cl. 1.  This clause vests the

spending power in Congress alone, authorizing it to raise and spend money for the "general Welfare" of the United States.

107.    There are four significant limitations on the Spending Power.  First, any conditions imposed must be identified unambiguously.  *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Second, the conditions must not be coercive.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012).  Third, the conditions must be related to the federal interest in the program.  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Fourth, the conditions must not induce unconstitutional actions on the part of the recipient.  *Id.* at 210-11.

108.    Even if Congressional authority for the conditions is found, the Executive Orders and related memos violate the Spending Clause because they do not comply with the limitations placed on the Spending Power:

   a.    The conditions imposed by the Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order are ambiguous, as they fail to specify with clarity which laws Plaintiffs will be required to comply with, nor do they specify which grants will be conditioned.  Furthermore, the conditions placed on federal grants are constitutionally infirm because they were not established unambiguously prior to the funds being granted; as such, Plaintiffs were unable to make knowing, cognizant decisions about whether to accept the federal grants.  *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 24-25.

   b.    The amount of federal funds being threatened—tens of millions of dollars—is unconstitutionally coercive.  The Administration's conduct is particularly harmful for smaller cities like Plaintiffs, whose residents would be grievously harmed by any termination of federal funding.  Plaintiffs rely on various key sources of federal funding to fill critical budgetary needs in the management of their respective cities.  In addition, as smaller jurisdictions, their abilities to defend against criminal and civil prosecutions are relatively limited.

   c.    There is no connection between the conditions imposed mandating non-interference with federal immigration enforcement (including compliance with 8

U.S.C. § 1373) and the federal funds being threatened (*e.g.*, the DOT funds), as is constitutionally required. *See Dole*, 483 U.S. at 211.

d.      The conditions imposed would also require Plaintiffs to act unconstitutionally by detaining individuals based on civil detainers without a finding of probable cause and in contravention of Massachusetts law.

109.    As applied to Plaintiffs, the retroactive conditions placed on federal grants in the Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order, the threatened loss of federal funds, the lack of nexus between the Executive Branch directives and the federal funds being threatened, and the unconstitutional actions the conditions induce, represent unconstitutional coercion in violation of the Spending Clause.

## COUNT THREE
(Tenth Amendment – Anti-Commandeering)

110.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

111.    The Tenth Amendment of the U.S. Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Accordingly, "[t]he Constitution simply does not give Congress the authority to require the States to regulate," much less give the Executive Branch such authority. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 522-23 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)). Therefore, the federal government cannot compel state or local governments to enact or enforce a federal regulatory program. On their face, the Executive Orders and related memos violate the Tenth Amendment by attempting to use the spending power to force Plaintiffs into carrying out federal immigration laws and policies.

112.    The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order purport to grant executive officers the authority to penalize state and local governments

that are deemed to interfere with the enforcement of federal law, and thus they enable the federal government to force state and local governments to adopt policies and practices that support or align with federal policies, to the subordination of state and local government interests.

113.    By withholding federal funds and directing enforcement against Plaintiffs unless they comply with federal immigration laws and policies, Defendants are attempting to compel Plaintiffs to enact a federal regulatory program in violation of the anti-commandeering principle of the Tenth Amendment.

## **COUNT FOUR**
(Fifth Amendment – Due Process)

114.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

115.    Under the Fifth Amendment, the federal government may not deprive Plaintiffs of property without "due process of law."

116.    Plaintiffs have a protectable property interest in the federal funding for which they have applied and been approved.  A large portion of the sources of federal funding are reimbursement-based, which means that Plaintiffs have spent money in reliance on federal funding, which promises already have been—and will further imminently be—pulled out from underneath them, resulting in direct harm to Plaintiffs.

117.    The Executive Order deprives Plaintiffs of their procedural due process rights because it grants the Attorney General and the Secretary of Homeland Security unbounded discretion to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds."  Further, those executive officials are empowered to "undertake any other lawful actions, criminal or civil, that they deem warranted."

118.     Similarly, the Subsidization Executive Order empowers "the head of each executive department or agency" to "ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

119.     Those Executive Orders, as well as the Bondi Memo and DOT Order, do not provide Plaintiffs or other similarity situated jurisdictions with any path to seek review or to challenge actions taken under their authority.  This pre- and post-deprivation opportunity to be heard violates the Fifth Amendment's guarantee of due process.

120.     The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order deprive Plaintiffs of their interests through the express conditions these directives place on pre-existing federal funds.  Plaintiffs have been deeply disrupted for weeks now as a result of their inability to spend further funds for the credible fear of the Administration's imminent pulling of federal funding, which has occurred now with respect to DOJ funds.  Moreover, there was no notice as to this deprivation, and no way to review or challenge the government's decision to withhold this property.

## COUNT FIVE
(Fifth Amendment – Void for Vagueness)

121.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

122.     Also falling under the Fifth Amendment is the void-for-vagueness doctrine.  A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

123.     The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive

Order are unconstitutionally vague.   It is impossible for cities to determine if they fit into what the Executive Order terms "so-called 'sanctuary' jurisdictions," whether they are subject to its penalties, or what penalties might be imposed if they are determined to be sanctuary jurisdictions. The Executive Order purports to define sanctuary jurisdictions as those jurisdictions "which seek to interfere with the lawful exercise of Federal law enforcement operations," but this is no clearer. The Executive Order also gives the Attorney General and the Secretary of the Department of Homeland Security virtually unfettered discretion to determine whether jurisdictions comply or do not comply with the Executive Order.

124.     The Bondi Memo fares no better.  While it identifies 8 U.S.C. § 1373 as a basis for "sanctuary jurisdiction" status, the memo vaguely references "other" federal immigration laws as a basis, without spelling out which laws these are.  As a result, there is a high risk of arbitrary enforcement, as DOJ can self-servingly conjure some violation of federal immigration law (whether true or not), with no notice to Plaintiffs or similarly situated jurisdictions, as a basis for withholding significant funds to which those jurisdictions are already entitled.  Also, while Plaintiffs' position is that they fully comply with 8 U.S.C. § 1373, there is a significant risk of arbitrary enforcement in whether "refus[ing] to comply" accords with the DOJ's interpretation of compliance, rather than Plaintiffs' correct interpretation.

125.     The DOT Order similarly states that it will prioritize "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary."  This suggests that DOT has the aim of de-prioritizing sanctuary jurisdictions, but it is vague in referencing compliance/cooperation with immigration enforcement and with "other goals and objectives," to the point that it fails to provide notice to Plaintiffs and others regarding what

specific conduct would cause DOT to de-prioritize (*i.e.*, defund) their projects.

126.    Like the Executive Order, the Subsidization Executive Order vaguely references "so-called 'sanctuary' policies" without defining them, except to modify such policies by adding, "that seek to shield illegal aliens from deportation," which is not only vague but also *not* what Plaintiffs' sanctuary policies seek to do.  Similarly, the reference to "by design or effect" is vague because it fails to describe how that effect may come about.  As a result of these sources of vagueness, there is a high risk of arbitrary enforcement against Plaintiffs and other localities.

127.    The Executive Order, Bondi Memo, and DOT Order, and Subsidization Executive Order are unconstitutionally vague within the meaning of the Due Process Clause of the Fifth Amendment because they fail to clarify what is required of Plaintiffs and what consequences may occur, and thus encourage arbitrary enforcement by failing to describe their applicability and effects with sufficient particularity.

## COUNT SIX
(Declaratory Relief – The Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order Are Unconstitutional)

128.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

129.    Plaintiffs seek declaratory relief that the Executive Order, the Bondi Memo implementing it, the DOT Order, and the Subsidization Executive Order are unconstitutional because they violate the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment and its Due Process Clause (and related void-for-vagueness doctrine).

130.    An actual controversy presently exists between Plaintiffs and Defendants as to whether the Executive Order, Bondi Memo, DOT Order, and Subsidization Executive Order are

constitutional.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT SEVEN
(Declaratory Relief – Plaintiffs Are Not "Sanctuary Jurisdictions" Under the Executive Order)

131.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

132.     Plaintiffs further seek a declaration that their policies, on their face, do not "seek to interfere with the lawful exercise of Federal law enforcement operations," per the language of the Executive Order.

133.     Nothing in Plaintiffs' respective resolutions or ordinances or implementing policies states any intention to interfere with the lawful exercise of federal immigration enforcement, but Defendants ignore that reality.

134.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs are a "sanctuary jurisdiction" as defined by the Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT EIGHT
(Declaratory Relief – Plaintiffs Comply with 8 U.S.C. § 1373)

135.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

136.     Plaintiffs similarly seek a declaration that their resolutions or ordinances or implementing policies comply with 8 U.S.C. § 1373, and they should therefore not be considered a "sanctuary jurisdiction" as defined under the Bondi Memo.

137.     Plaintiffs comply with 8 U.S.C. § 1373.  Neither Plaintiffs' sanctuary city resolutions/ordinances nor their police policies "prohibit, or in any way restrict, any government

entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual," as Section 1373 requires.  That Plaintiffs' police departments do not routinely inquire about immigration status in ordinary matters or affirmatively assist in federal immigration enforcement operations like ICE raids (beyond ensuring officer safety) does not constitute a violation of that federal statute.

138.    An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' resolutions/ordinances or implementing policies comply with 8 U.S.C. § 1373. A judicial determination resolving this controversy is necessary and appropriate at this time.

**COUNT NINE**
(Declaratory Relief – Plaintiffs Are Not Criminally Liable Under the DOJ Memos)

139.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

140.    Plaintiffs also seek a declaration that they cannot be held criminally liable under the DOJ Memos (the Bove and Bondi Memos), at least in terms of the limited statutes DOJ cites, merely by virtue of Plaintiffs' sanctuary policies and adherence thereto.

141.    The DOJ Memos cite 18 U.S.C. § 371 ("Conspiracy to Commit Offense or Defraud the United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").

142.    The last of these, 8 U.S.C. § 1373, is not a criminal statute.  The first of these, 18 U.S.C. § 371, is a conspiracy statute that requires the predicate commission of a crime that is the object of the conspiracy.  That leaves 8 U.S.C. § 1324: Plaintiffs cannot be liable under that criminal statute as Plaintiffs neither bring, transport, nor induce aliens to enter into the United

States.  Moreover, Plaintiffs do not, with knowledge or reckless disregard, "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection" aliens.  Nor do Plaintiffs aid and abet such crimes or conspire to commit such crimes.  This is all plain from Plaintiffs' resolutions/ordinances and police policies, which make clear that they will not affirmatively inquire about immigration status on a routine basis and will not affirmatively provide assistance unless legally required, but do not otherwise obstruct or interfere with any lawful immigration commands.

143.    An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs can be held criminally liable under the DOJ Memos.  A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TEN
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

144.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

145.    Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is an agency action subject to review under the APA.

146.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

147.    The Bondi Memo is a final agency action because it announces a final decision to pause DOJ funding on a blanket basis at a certain time and thus marks the consummation of the DOJ's decision-making process.  Further, the Bondi Memo is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority

held by DOJ to stop funding directed by Congress that would be provided but for the Bondi Memo.

148.     Under the APA, a "court shall. . . hold unlawful and set aside agency actions, findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

149.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983)).

150.     The Bondi Memo fails to provide any reasonable explanation for the decision to withhold all DOJ funds from Plaintiffs, a disproportionately broad action with immediate consequences to Plaintiffs.  It also fails to explain the decision to condition and withhold funds that Congress had already appropriated for disbursement.

151.     Also under the APA, a "court shall. . . hold unlawful and set aside agency actions, findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

152.     As described above, the Bondi Memo violates bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

153.     The APA also requires that a "court shall. . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

154.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress.  The blanket freeze of DOJ funds and the conditions placed on all DOJ grants are blatantly illegal.

155.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the Bondi Memo violates the APA because it is arbitrary and capricious, because it is contrary to constitutional rights, powers, privileges, or immunities; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

<u>**COUNT ELEVEN**</u>
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

156.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

157.    Defendant DOT is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the DOT Order is an agency action subject to review under the APA.

158.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

159.    The DOT Order is a final agency action because it announces a final decision to de-prioritize DOT funding to sanctuary jurisdictions and thus marks the consummation of the DOT's decision-making process.  Further, the DOT Order is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority

held by DOT to stop funding directed by Congress that would be provided but for the DOT Order.

160.    Under the APA, a "court shall. . . hold unlawful and set aside agency actions, findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

161.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained." *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 41).

162.    The DOT Order fails to provide any reasonable explanation for the decision to deprioritize DOT funds for sanctuary jurisdictions. There is a qualitative disconnect between the threatened DOT funding and immigration-related policies: sanctuary policies have nothing to do with transportation and the DOT Order fails to explain any link between them. Moreover, the DOT Order nonsensically prioritizes other projects such as those for "communities with marriage and birth rates higher than the national average."

163.    Also under the APA, a "court shall. . . hold unlawful and set aside agency actions, findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

164.    As described above, the DOT Order violates bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

165.    The APA also requires that a "court shall. . . hold unlawful and set aside agency

actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

166.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes DOT to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress.  DOT's de-prioritization of DOT funds for sanctuary jurisdictions, which in effect is defunding, is blatantly illegal.

167.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the DOT Order violates the APA because it is arbitrary and capricious, because it is contrary to constitutional rights, powers, privileges, or immunities; vacate Section 5(f) of the DOT Order under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the DOT Order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein.  Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

1.    Declare that the Section 17 of the Executive Order, the Bondi Memo implementing it, Section 5(f) of the DOT Order, and Section 2(a)(ii) of the Subsidization Executive Order are unlawful and unconstitutional on their face and as applied;

2.    Declare that Plaintiffs do not "seek to interfere with the lawful exercise of Federal law enforcement operations" per the language of the Executive Order merely by virtue of their sanctuary policies and adherence thereto;

3.    Declare that Plaintiffs do not violate 8 U.S.C. § 1373 merely by virtue of their sanctuary policies and adherence thereto;

4.    Declare that Plaintiffs cannot be held criminally liable under the DOJ Memos merely by virtue of Plaintiffs' sanctuary policies and adherence thereto;

5.    Declare that the Bondi Memo and Section 5(f) of the DOT Order violate the APA;

6.    Preliminarily and permanently enjoin Defendants from enforcing Section 17 of the Executive Order, or taking any other action in furtherance of any withholding or conditioning of federal funds based on the Executive Order or taking enforcement actions against Plaintiffs based on the policies identified in this Complaint;

7.    Preliminarily and permanently enjoin Defendants from implementing the funding pause or the unlawful funding conditions described in the Bondi Memo, or taking enforcement actions against Plaintiffs based on the policies identified in this Complaint;

8.    Preliminarily and permanently enjoin Defendants from implementing the de-prioritization of DOT funds for sanctuary jurisdictions as described in Section 5(f) of the DOT Order, or taking enforcement actions against Plaintiffs based on the policies identified in this Complaint;

9.    Preliminarily and permanently enjoin Defendants from enforcing Section 2(a)(ii) of the Subsidization Executive Order, or taking any other action in furtherance of any withholding or conditioning of federal funds based on the Subsidization Executive Order.

10.    Vacate the portions of the Bondi Memo and the DOT Order pertaining to sanctuary jurisdictions under 5 U.S.C. § 706;

11.    Award to Plaintiffs reasonable attorney's fees and costs incurred in pursuing this action, and pre-judgment and post-judgment interest at the highest lawful rates; and

12.    Grant such other and further relief as this Court deems just and appropriate.

45

Dated: February 24, 2025

Respectfully submitted,

*/s/ Oren Sellstrom*
Iván Espinoza-Madrigal (BBO# 708080)
Oren Sellstrom (BBO# 569045)
Mirian Albert (BBO# 710093)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 482-1145
iespinoza@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
malbert@lawyersforcivilrights.org

*Attorneys for Plaintiffs City of Chelsea and
City of Somerville*