# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and
CITY OF SOMERVILLE,

      *Plaintiffs*,

          v.

DONALD J. TRUMP, President of the United
States, PAMELA J. BONDI, Attorney General
of the United States, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI L.
NOEM, Secretary of the United States
Department of Homeland Security, UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY, SEAN P. DUFFY, Secretary of
the United States Department of
Transportation, UNITED STATES
DEPARTMENT OF TRANSPORTATION,
SCOTT TURNER, Secretary of the United
States Department of Housing and Urban
Development, UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, and UNITED
STATES OF AMERICA,

      *Defendants*.

Case No. 1:25-cv-10442

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

## INTRODUCTION

1.      "Just as the separation and independence of the coordinate branches of the Federal

Government serve to prevent the accumulation of excessive power in any one branch, a healthy

balance of power between the State and the Federal Government will reduce the risk of tyranny

and abuse from either front." *Printz v. United States*, 521 U.S. 898, 921 (1997) (quoting *Gregory

v. Ashcroft*, 501 U.S. 452, 458 (1991)).  The Massachusetts cities of Chelsea and Somerville bring

this action to prevent the Executive Branch from depriving them of vital federal funding, including funding that supports transportation, healthcare, education, and public safety, as part of the Trump Administration's (the "Administration's") politicized attack on "sanctuary jurisdictions." The Administration's threatened defunding of sanctuary jurisdictions violates the U.S. Constitution and undermines Plaintiffs' efforts to preserve and enhance the safety of their communities through well-considered law enforcement efforts and policy judgments.

2.      Like many local governments across the country, Chelsea and Somerville have adopted policies that limit the circumstances under which they and their law enforcement agencies expend their already-constrained resources to assist with federal immigration enforcement efforts. These local jurisdictions, often referred to as "sanctuary cities," enact such policies based on their well-reasoned judgment on how best to serve their communities. By avoiding unnecessary entanglement with federal immigration efforts, sanctuary policies help ensure that all residents, regardless of their immigration status, feel safe interacting with local law enforcement and officials. This has a number of public safety benefits: victims of crime can report incidents to the police without fear that doing so will expose themselves or their loved ones to immigration enforcement. Witnesses are more likely to cooperate with police for the same reason. Local law enforcement can efficiently allocate often scarce resources to high-priority policing issues in their communities. For all of these reasons, Plaintiffs have determined that their sanctuary policies enhance the well-being and public safety of their residents.

3.      However, Defendants—President Donald J. Trump ("Defendant Trump") and other Administration officials—have mounted an aggressive campaign to undermine the authority of local governments to make these local determinations. Through a series of actions that began within hours of Defendant Trump's second inauguration and have only escalated since, Defendants

have attempted to commandeer local governments to play an active role in Defendants' "mass deportation" plan—trampling on the rights of Plaintiffs and other localities like them in the process.

4.    Plaintiffs challenge three unconstitutional and unlawful executive orders that Defendant Trump has issued to defund sanctuary cities: (1) Executive Order 14,159, titled "Protecting the American People Against Invasion" (the "Day One Executive Order," attached as Exhibit A); (2) Executive Order 14,218, titled "Ending Taxpayer Subsidization of Open Borders" (the "Subsidization Executive Order," attached as Exhibit B); and (3) Executive Order 14,287, titled "Protecting American Communities from Criminal Aliens" (the "Designation Executive Order," attached as Exhibit C and together with the Day One Executive Order and the Subsidization Executive Order, the "Executive Orders").

5.    Plaintiffs also challenge corresponding actions from executive agencies: (1) a memorandum from U.S. Attorney General Pamela Bondi (the "Bondi Memo," attached as Exhibit D); (2) an order from the Department of Transportation ("DOT") Secretary Sean Duffy (the "DOT Order," attached as Exhibit E); (3) a letter to all recipients of DOT funding from Secretary Duffy (the "DOT Letter," attached as Exhibit F); (4) DOT's General Terms and Conditions for its Safe Streets and Roads for All ("SS4A") grants for fiscal year ("FY") 2023 (the "SS4A Conditions," attached as Exhibit G); (5) a memorandum from the Department of Homeland Security ("DHS") Secretary Kristi Noem, titled "Restricting Grant Funding for Sanctuary Jurisdictions" (the "Noem Memo," attached as Exhibit H); (6) DHS's updated Standard Terms and Conditions for its FY2025 grants (the "DHS Conditions," attached as Exhibit I); and (7) a letter from the Department of Housing and Urban Development ("HUD") Secretary Scott Turner (the "HUD Letter," attached as Exhibit J).  These directives are cumulatively referred to in this Complaint as the "Agency Directives."

3

6.     Defendants' illegal attack on sanctuary cities relies on threats and intimidation: 1) threatening and taking actions to withhold federal funds from cities that refuse to bend to Defendants' will, even if those funds have nothing to do with Defendants' stated aims and even if Congress has given no directive toward that end; and 2) threatening and pursuing criminal and civil prosecution of those who are deemed insufficiently compliant.  In this manner, Defendants' attack on sanctuary cities improperly seeks to not only undermine, but fully control what is fundamentally *local* decision-making; usurps the role of Congress and its Spending Power; injects significant uncertainty into local governance due to its vagueness; and thereby violates Plaintiffs' constitutional rights.

7.     The City of San Francisco and fifteen other cities and counties have brought a similar action in the U.S. District Court for the Northern District of California, challenging the Administration's attack on sanctuary cities.  On April 24, 2025, Judge William H. Orrick granted a preliminary injunction to prevent the defendants "from directly or indirectly taking any action to withhold, freeze, or condition federal funds" from the plaintiffs, based on the first sentence of Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and portions of the Bondi Memo.  Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Apr. 24, 2025), ECF No. 111.  Judge Orrick issued a more detailed order on May 3, 2025 to the same effect.  *See* Further Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 3, 2025), ECF No. 126 at 65.

8.     On May 9, 2025, in response to the plaintiffs' concerns that the subsequently-issued Designation Executive Order would be "used as an end run around" the injunction, Judge Orrick made clear that the injunction applies "to *any* Executive Order or agency directive that purports to

attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened" by the challenged sections of the Day One Executive Order and the Subsidization Executive Order. *See* Order Clarifying Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 9, 2025), ECF No. 136 at 8. These orders apply only to the named plaintiffs in that action.

9.    Defendants' illegal campaign against sanctuary cities aims to force local jurisdictions to sacrifice public safety resources and to supplant their well-founded determinations about what is best for their residents. This unlawful and unconstitutional assault is particularly harmful for smaller cities like Plaintiffs, whose residents are grievously harmed by any termination of federal funding. Plaintiffs rely on federal funding—in the range of tens of millions of dollars annually—to fill critical budgetary needs in the management of their respective cities. These funds have been approved by Congress, and the Executive Branch may not condition their award as they seek to do here. In addition, smaller jurisdictions are limited in their ability to defend against criminal and civil prosecutions.

10.    There is no question that Plaintiffs Chelsea and Somerville are being directly targeted by this Administration's unlawful campaign. On May 29, 2025, pursuant to the Designation Executive Order, a list of "Sanctuary Jurisdictions" was released by DHS. This list, titled "Sanctuary Jurisdictions Defying Federal Immigration Law" names both Chelsea and Somerville among hundreds of other jurisdictions (the "Designation List," attached as Exhibit K). Their inclusion on this list signals the imminent pulling of federal funds and bringing of enforcement action.

11.     The challenged Executive Branch actions have caused and will continue to cause harm to Plaintiffs, in violation of the U.S. Constitution.  Specifically, Defendants' conduct intrudes on the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment guarantees of due process and its void-for-vagueness doctrine.  Further, the Agency Directives violate the Administrative Procedure Act ("APA") because they are arbitrary and capricious, contrary to the Constitution, and in excess of statutory authority.

12.     Plaintiffs accordingly seek declaratory relief, as well as preliminary and permanent injunctions barring Defendants from implementing or enforcing the Executive Orders and Agency Directives.  Plaintiffs further reserve the right to amend their claims should the Administration take further action supplementing or revising its unlawful attack on "sanctuary jurisdictions."

## JURISDICTION AND VENUE

13.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 e*t seq*.  Pursuant to 5 U.S.C. § 702, sovereign immunity is waived for the United States.

14.     Pursuant to 28 U.S.C. § 1391(e), venue properly lies within the District of Massachusetts because, *inter alia*, Plaintiffs each reside in this judicial district (and no real property is involved in the action).

## PARTIES

15.     Plaintiff City of Chelsea is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and self-identifies as a "sanctuary city."

16.     Plaintiff City of Somerville is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and self-identifies as a "welcoming community."

17.     Defendant Donald J. Trump is the President of the United States.  He issued and signed the Executive Orders that restarted the Administration's attacks against sanctuary jurisdictions.  This action sues President Trump in his official capacity.

18.     Defendant Pamela J. Bondi is the Attorney General of the United States.  The Attorney General is a cabinet-level position of the U.S. federal government overseeing DOJ.  Attorney General Bondi is responsible for executing relevant provisions of the Executive Orders, and she issued and administers the implementation of the Bondi Memo.  This action sues Attorney General Bondi in her official capacity.

19.     Defendant United States Department of Justice is an executive agency of the United States federal government.  DOJ initiated some of the key Executive Branch actions at issue in this lawsuit, namely the implementation of the Day One Executive Order through two DOJ memos.

20.     Defendant Kristi L. Noem is the Secretary of the U.S. Department of Homeland Security ("DHS").  Secretary Noem is responsible for executing relevant provisions of the Executive Orders, and she issued and administers the Noem Memo and the DHS Conditions.  This action sues Secretary Noem in her official capacity.

21.     Defendant United States Department of Homeland Security is an executive agency of the United States federal government.  DHS is responsible for executing relevant provisions of the Day One Executive Order, the Noem Memo, the DHS Conditions, and the Designation Executive Order.

22.     Defendant Sean P. Duffy is the Secretary of the United States Department of Transportation.  Secretary Duffy is responsible for administering the implementation of the DOT Order, DOT Letter, and SS4A Conditions.  This action sues Secretary Duffy in his official capacity.

23.     Defendant United States Department of Transportation is an executive agency of the United States federal government.  DOT is responsible for initiating several of the Executive Branch actions at issue in this lawsuit: the DOT Order, DOT Letter, and SS4A Conditions.

24.     Defendant Scott Turner is the Secretary of the United States Department of Housing and Urban Development.  Secretary Turner is responsible for administering the implementation of the HUD Letter.  This action sues Secretary Turner in his official capacity.

25.     Defendant United States Department of Housing and Urban Development is an executive agency of the United States federal government.  HUD initiated one of the challenged Executive Branch actions at issue in this lawsuit: the HUD Letter.

26.     Defendant United States of America is sued under 28 U.S.C. §§ 1331 and 1346, and its sovereign immunity is waived under 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### A.     The City of Chelsea

27.     The City of Chelsea, Massachusetts is located across the Mystic River from Boston, Massachusetts.   Chelsea was first settled in 1624, established as a town in 1739, and incorporated as a city in 1857.  The City of Chelsea presently employs approximately 1,600 individuals.

28.     Chelsea occupies a land area of just 2.5 square miles, making it the smallest city in Massachusetts.  According to July 2023 figures from the U.S. Census, Chelsea's population numbers 38,319 residents, approximately 45% of which are foreign-born persons, the highest percentage for any city in Massachusetts.  Chelsea is one of the most densely populated cities in Massachusetts, second only to Somerville.

29.     Chelsea is a diverse, working-class community that has twice been awarded the All-America City Award by the National Civic League in recognition of its residents' ability to work together to identify and tackle community-wide challenges.  According to the U.S. Census,

approximately 65% of Chelsea's residents identify as Hispanic or Latino, and roughly 73% of the city's population comprises residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other diverse groups.  Approximately 21% of Chelsea's residents live below the poverty line.

30.     Chelsea has received, receives, and/or anticipates receiving federal funds from a broad range of federal agencies, including DOT, DOJ, DHS, and HUD.  Chelsea's fiscal year runs from July 1 to June 30.  For FY2024 (*i.e.*, the year running from July 1, 2023 to June 30, 2024), Chelsea's overall budget was $231 million, including approximately $132 million for Chelsea's School Department. For FY2025, Chelsea's overall budget was approximately $245 million, including approximately $140 million for our School Department.  Chelsea just finalized its budget for FY2026 in the amount of roughly $262 million.

31.     Chelsea received approximately $14.5 million in federal funding for FY2024.  Of that funding, approximately $11.3 million was passed through the state.  Virtually all such grants were reimbursement-based, meaning Chelsea must spend its own funds and later submit requests for reimbursement from the grant.

32.     Chelsea anticipates receiving approximately $8.5 million in federal funding for FY2025, of which approximately $8.47 million will be passed through the state and virtually all of which will be reimbursement-based.

33.     Chelsea receives significant Title I federal grant funding, totaling approximately $4.1 million for 2025, under the federal Elementary and Secondary Education Act.  The purpose of those funds is to provide financial assistance to districts and schools that provide services to greater concentrations of children from low-income families to help ensure that they are able

satisfy the Commonwealth's exacting academic standards.  Without such federal grant funding, glaring educational inequities would be exacerbated.

34.     Since 2017, Chelsea has received almost $1 million in various DHS grants, including the AFG Regional Training Grant, the FEMA Emergency Aid Grant, and the Urban Area Security Initiative ("UASI") grant.  Chelsea's current UASI grant is earmarked for between $300,000 and $400,000 to fund Chelsea's network infrastructure, police training, METRO SWAT equipment, and more.  Chelsea also has a pending FEMA Building Resilient Infrastructure and Communities ("BRIC") Grant, for which the contract signing is planned for late December 2025 and construction is set to begin in the summer of 2026.  This project would significantly enhance the infrastructure in Chelsea.

35.     Chelsea has been awarded a $280,000 Safe Street and Roads for All, or SS4A, grant from DOT for FY2023 (for which, as described below, DOT has imposed new conditions).  These funds are being used to design and implement a traffic safety plan which aims to bring traffic fatalities in the city down to zero.  Chelsea has not been reimbursed yet for any amount of this $280,000 grant.  The city is also planning to apply for an additional SS4A grant for the upcoming fiscal year; it hopes to use those funds to address particularly unsafe intersections in the city. Additionally, Chelsea is the lead recipient of a $2.5 million Reconnecting Communities Grant from DOT that will be administered through the Massachusetts Department of Transportation. This grant, shared with the city of Boston, will improve the connection between Chelsea and the East Boston neighborhood while also improving climate resilience in the corridor.

36.     Chelsea regularly receives funds from DOJ's Byrne JAG program, which, among other things, funds local law enforcement agencies.  The program website explains that its funding supports "prosecution, indigent defense, courts, crime prevention and education, corrections and

community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, crime victim and witness initiatives, mental health programs and related law enforcement and corrections programs." Chelsea has also consistently received funds from the Bulletproof Vest Partnership ("BVP") program, which is administered through DOJ's Office of Justice Programs ("OJP"). All of these funds support Chelsea's goal of maintaining a safe community by supporting its police department.

37.    Chelsea also receives significant funds in Community Development Block Grant ("CDBG") funds to support its most vulnerable residents. This program is administered by HUD. These funds support a variety of critical programs and services, including housing rehabilitation, economic development, public facilities and infrastructure, and social services such as retention of youth in schools and food delivery to elderly residents. For FY2024, Chelsea received approximately $924,000 in CDBG funds.

38.    Chelsea began its budgeting process for FY2026 in late 2024 and anticipates finalizing its budget in mid-2025. Given the uncertainty the Administration has caused with regard to federal funding, Chelsea cannot make informed decisions about how to structure its budget. Chelsea has also partially expended certain reimbursement-based federal grants, but now faces the possibility that it will not be reimbursed for these significant expenditures given the Administration's unlawful and unconstitutional conduct.

39.    Chelsea has self-identified as a "sanctuary city" since its June 4, 2007 resolution, which resolved that the "City of Chelsea go on record as a Sanctuary City." The resolution traced Chelsea's long history as a city "with a rich and diverse ethnic and cultural identity," noting that "[f]or decades Italian, Irish, Hispanic, Polish, African-American, Russian, Jewish, Asian, African and French people have made Chelsea their home." It stated that "[t]he City of Chelsea respects

all persons regardless of race, class, ethnicity or legal status," and that "[e]very Chelsea resident has the right to live, work and play without fear." The resolution went on to recognize that a number of jurisdictions around the country had declared themselves to be sanctuary cities, which "promote a community as a safe haven for refugees and immigrants who are currently residing in that community from other countries; and . . . do not initiate or welcome raids that are not related to public safety and other heinous crimes." The resolution declared Chelsea a sanctuary city, called upon workplaces to treat immigrant workers fairly, and urged "just and fair immigration reform."

40.    In 2017, the Chelsea Police Department ("Chelsea Police" or "CPD") promulgated General Order 2017-03, titled "The Specific Role and Impact of the CPD in the Enforcement of Federal Civil Immigration Law By the Department of Homeland Security (DHS-ICE-ERO)." CPD amended the policy in August 2024 and revised it again in both February and May of 2025 (as revised, the "Chelsea Police Policy"). Thoughtfully drawing from the dynamics of the local community, the current Chelsea Police Policy states:

> We fully realize that federal civil immigration enforcement or perceived enforcement by the Chelsea Police Department could have a "*chilling effect*" in our local immigrant community and could limit cooperation with police by members of the community at large. As stated, we depend on the cooperation of all of our residents and stakeholders including immigrants, legal and undocumented, in solving all sorts of crimes and in the maintenance of public order. Without assurances that they will not be subjected to an immigration investigation and possible deportation, many immigrants with critical information would not come forward, even when heinous crimes are committed against them and/or their families. . . .

> The specific immigration status of an individual or group of individuals in and of itself, is not and shall not be a matter of local police concern or subsequent enforcement action by the CPD unless there exists through reliable and credible information a potential threat to public safety and/or national security.

41.    Likewise, the Chelsea Police Policy later states, "Accordingly, the Chelsea Police Department shall not undertake immigration-related investigations and shall not routinely inquire into the specific immigration status of any person(s) encountered during normal police operations," except for in circumstances of arrests for violent felonies, already convicted felons, terrorism-related offenses, human trafficking, and criminal gang activities.  Moreover, the Chelsea Police Policy states that officers "shall not directly participate in any such ICE tactical operation(s) solely for the *civil enforcement* of federal immigration laws as part of any Detention or Arrest Team," except for in direct response to a request for immediate assistance on a temporary basis for officer safety purposes (*e.g.*, directing traffic around officers) or for assistance in the apprehension of an individual with an outstanding Massachusetts arrest warrant.

42.    In addition, CPD complies with the decision of the Massachusetts Supreme Judicial Court ("SJC") in *Lunn v. Commonwealth* regarding civil immigration detainers.  In *Lunn*, the SJC held: "There is no Federal statute that confers on State officers the power to make this kind of an arrest" in regard to ICE detainers, which request that custodians hold individuals for up to 48 hours after they would otherwise be entitled to release.  78 N.E.3d 1143, 1146 (Mass. 2017).  Moreover, "nothing in the statutes or common law of Massachusetts authorizes court officers to make a civil arrest in these circumstances." *Id.*

43.    Nothing in Chelsea's resolution or in the Chelsea Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations," or "refuse[s] to comply with 8 U.S.C. § 1373," which are the hooks as outlined in the Day One Executive Order and Bondi Memo, respectively.  Nor do Chelsea's policies "seek to shield illegal aliens from deportation" or "obstruct the enforcement of Federal immigration laws," which are the definitions provided in the Subsidization Executive Order and the Designation Executive Order, respectively.  In fact,

Chelsea's resolution and the Chelsea Police Policy make clear that they allow the efforts of federal immigration enforcement officers to occur unimpeded. Further, they reflect no attempt to conceal, harbor, or shield any individual from detection.

44. Chelsea therefore should not be considered a "sanctuary jurisdiction" under the definitions of the Executive Orders or Bondi Memo. But such facts have not stopped the Administration from labeling jurisdictions with policies like Chelsea's as "sanctuary jurisdictions," publicly castigating and threatening them with loss of federal funds and targeting them with lawsuits. On May 29, 2025, DHS targeted Chelsea on the Designation List, condemning it as a "jurisdiction[] that obstruct[s] the enforcement of Federal immigration laws."

45. The Administration has initiated numerous Immigration and Customs Enforcement ("ICE") raids in Chelsea. These widely published raids have caused Chelsea's residents to live in a state of fear and chaos while their neighbors are rounded up with little to no notice or process. These have included "collateral" arrests for which there is no suggestion or indication that the arrested individuals, who might be a roommate or might just happen to be in the wrong place at the wrong time, pose any threat to "national security" or "public safety," the primary purported rationales of the executive actions at issue.

46. On Wednesday, January 22, 2025, a Fox News correspondent joined in a "ride-along" with ICE agents during one such raid. In the resulting news segment, the ICE agents were shown gathered outside of the popular Market Basket supermarket in Chelsea and subsequently made a number of arrests in the vicinity. Chelsea Police are not alleged to have interfered in any such ICE conduct. Such arrests included a "collateral" arrest of a roommate of a "main target," confirming the broadened focus of federal immigration enforcement efforts despite the false rhetoric of targeting only threats to national security or public safety.

47.    On March 18, 2025, there was another ICE raid in Chelsea.  According to a news report, federal agents were "seen at staging areas outside the Market Basket, Chelsea City Hall, and a third location" and at least ten individuals were detained.  A local immigrant support organization closed its offices in response to the raid to prevent its visitors from being targeted by ICE agents.  Again, neither Chelsea nor its police interfered with such raids.

48.    Federal agents have continued to target Chelsea residents, similarly without interference from Chelsea or its police.  On Sunday, May 11, 2025 (Mother's Day), federal agents broke a car's window and dragged a man outside after he had gone to church with his family.  Several minors have also been detained by ICE in recent weeks.   And beyond the raids, a severe chill and climate of fear has been cast over Chelsea, preventing certain individuals from going to work, school, church, the supermarket, or other places where they regularly must go.

## B.    The City of Somerville

49.    The City of Somerville, Massachusetts is located directly south of the Mystic River and is nestled among the cities and towns of Boston, Cambridge, Arlington, Medford, and Everett.  Somerville was first settled as part of Boston's Charlestown in 1630.  Somerville later separated from Charlestown and became its own town in 1842.  It incorporated as a city in 1872.  The City of Somerville presently employs approximately 2,200 individuals.

50.    Somerville occupies a land area of just 4.1 square miles.  According to the U.S. Census, Somerville's population, as estimated in July 2023, numbers 80,407 residents.  Somerville is the most densely populated city in Massachusetts.  Approximately 25% of Somerville's residents are foreign-born persons and approximately 10% live below the poverty line.

51.    Somerville was named the "best-run city in Massachusetts" by the Boston Globe in 2006.  Somerville has been awarded the All-America City Award by the National Civic League three times, including most recently in 2015.  In 2020, Somerville's police officers were awarded

the Medal of Valor by the Massachusetts Police Association for acts of heroism during an August 6, 2020 situation in which Somerville Police Officers saved the life of a woman who was being held hostage at gunpoint in Somerville.

52.    Somerville has a diverse population, with U.S. Census data showing that roughly 30% of its population comprises residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other diverse groups.  English is not the first language of more than 50% of students in the Somerville Public School system, and almost 25% of students in the Somerville Public School system are still learning English.  A healthy number of Somerville's main street businesses that both serve the community and support the local economy are immigrant-owned.

53.    Somerville has received, receives, and/or anticipates receiving federal funds from a broad range of federal agencies, including DOT, DOJ, DHS, and HUD. In FY2024, Somerville had a total budget of approximately $337 million and received approximately $19.4 million in federal funds.  Approximately $11.5 million of that federal funding was passed through the state. Virtually all of this funding was reimbursement-based.

54.    In FY2025, Somerville has an annual total budget of $365 million.  As of now, Somerville has received approximately $12.2 million in federal funds for FY2025, of which approximately $9.7 million was passed through the state.  Additionally, Somerville is eligible to receive approximately $7.6 million in reimbursements on active and open federal grants.

55.    Somerville also participates in congressionally directed spending projects.  From FY2022 to FY2024, the city applied and/or contracted for approximately $14.7 million in federal funding.  For several applications, amounting to approximately $5 million, the contracts have been executed and the funds are to be reimbursed.  For another application for $2.5 million, the contract is in development.

56.    Like Chelsea, Somerville has historically received funds from the Bulletproof Vest Partnership program administered by DOJ's Office of Justice Programs, which it depends upon for officer safety and the safety of their communities.

57.    As another example of a recent, significant grant that is now threatened by the Executive Orders and the Administration's actions, Somerville was awarded $3,984,000 for FY2023 from DOT's SS4A program, in addition to the approximately $117,000 it received for FY2022, in order to improve roadway safety for pedestrians and bicyclists.  Planned actions under both of these grants have been effectively stalled as a result of the actions of the new Administration.

58.    Somerville has outstanding federal grant requests—totaling nearly $20 million—to the Environmental Protection Agency under two different programs.  The first, under the Community Change Grant, aims to improve energy efficiency and indoor air quality in multi-family homes in Somerville, and the second, under the Solid Waste Infrastructure for Recycling Grant, will help to increase and optimize Somerville's waste management infrastructure.  These are critical health- and infrastructure-related grants.

59.    Finally, Somerville has been awarded $48,000 from FEMA's FY2022 Assistance to Firefighters Grant (AFG) program.  Somerville also requested $678,000 for FEMA's FY2024 AFG program.  The city received a total of approximately $1 million in UASI awards in 2023 and 2024.

60.    The federal funds Somerville receives support a variety of community and public safety services.  For example, Somerville's homelessness prevention agencies depend on Emergency Solutions Grant funding and other Community Development Block Grant public service awards for their shelter operations, food pantry operations, and other core programs.  These

programs provide critical support for residents who may otherwise have no way to escape life-threatening, cold-weather conditions, sometimes forcing them to battle single-digit temperatures, to receive emergency medical care, or to feed themselves.

61.    Somerville began the budgeting process for FY2026 in early 2025, and the budget is expected to be finalized mid-2025.  However, Somerville cannot effectively structure its budget for FY2026, given the complete uncertainty that the Administration has created around federal funding.  With daily upheavals and reversals coming from the Administration, Somerville is unable to make informed decisions about the upcoming fiscal year.

62.    Somerville first identified as a sanctuary city in a 1987 resolution, which it revised in 1989.  In 2014, pre-dating the first Trump Administration, Somerville passed a Trust Act Ordinance to "ensure that all immigrants are able to fully participate in the civic and economic life of their neighborhoods and nurture and grow the spirit of unity in [its] City."  Two years later, in 2016, Somerville issued a "Reaffirmation of Sanctuary City Resolution."  It provides that "the Somerville Board of Aldermen goes on record reaffirming our commitment as a Sanctuary/Trust Act City."  And in 2019, Somerville passed a "Welcoming Community Ordinance" that "further codifies existing policy and serves to reinforce the city's ongoing commitment to the immigrant community and Sanctuary City status."  The ordinance provides, "The Somerville Police Department shall not take part in or assist with federal immigration enforcement operations," but makes clear, "Nothing in this ordinance shall be construed to violate any valid federal law."

63.    In 2022, the Somerville Police Department ("Somerville Police" or "SPD") promulgated General Order 143 entitled "Enforcement of Federal Immigration Law" (the "Somerville Police Policy"), which was further revised in 2024 and most recently on March 19, 2025. Similar to the Chelsea Police Policy, the Somerville Police Policy's purpose is: to encourage "all

community members and stakeholders … to seek and obtain police assistance and police protection regardless of their specific immigration status without fear of status checks." The Somerville Police Policy notes that the police department "relies upon the cooperation of all persons located in the City of Somerville to achieve important goals such as protecting life and property, investigating and preventing crime, and resolving community problems." Particularly in instances of domestic violence and sexual assault, "[i]t is essential that these victims do not feel apprehensive about coming forward with knowledge to aid investigators…." The policy goes on to state that "[t]he specific immigration status of an individual or group of individuals shall not be a matter of concern" for the Somerville Police "unless reliable and credible information about a potential threat to public safety and/or national security exists."

64.    Accordingly, the policy states that SPD "shall not undertake immigration-related investigations and shall not inquire into the specific immigration status of any person(s) encountered during normal police operations." Moreover, the Somerville Police Policy states, "No officer or employee of the Somerville Police Department may participate in an operation led by a federal agency to detain persons for deportation purposes, except in response to a request to assist with support services deemed necessary to ensure officer safety or to prevent a breach of the peace during a federal operation." It goes on, "Somerville Police Officers WILL NOT have a direct role in an operation initiated by federal authorities to arrest or detain an individual sought for an immigration violation."

65.    The Somerville Police Policy also references the SJC's *Lunn* decision and notes that "consistent with Massachusetts law, no officer or employee of the Somerville Police Department may arrest or detain an individual solely based on an ICE detainer or ICE administrative warrant."

66.     More recently, in late November 2024, Somerville approved a resolution, titled "Reaffirming Somerville's Commitment as a Welcoming Community for Justice, Equity, and Inclusion," which resolved, *inter alia*, that "regardless of external pressures or challenges faced by sanctuary cities, the Somerville City Council remains committed to its values of inclusion, equity, and justice, and will not waver in supporting our immigrant neighbors, who are integral to the strength and diversity of our community."

67.     The City of Somerville is dedicated to maintaining its vibrant and diverse community, a goal that cannot be accomplished without supporting all of its residents. Somerville's policies strive to increase trust within the community such that residents feel safer reporting crimes, coming forward as victims of crimes, and sharing information as witnesses of crimes. The city's policies also enable residents to feel safe when they access city and school services.

68.     Somerville's diligent efforts to create a safe and inclusive community have benefited its residents. In Somerville's "Public Safety for All Survey," launched in September 2022, the city asked residents "about their perceptions of public safety, how it could be improved, and where it must be improved." The survey provided clear evidence that residents feel both safe in their communities and respected by local police officers.

69.     Somerville has stated that it will continue to support its community and *all* of its residents. As Mayor Katjana Ballantyne stated in her State of the City Address, "We are resilient, creative, and determined. Somerville welcomes all."

70.     Nothing in Somerville's resolutions/ordinances or in the Somerville Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations" or "refuse[s] to comply with 8 U.S.C. § 1373." Nor do Somerville's resolutions and policies "obstruct the

enforcement of Federal immigration laws" or "seek to shield illegal aliens from deportation." In fact, the resolutions and policies make clear that Somerville allows the efforts of federal immigration enforcement officers to occur unimpeded, and they reflect no attempt to conceal, harbor, or shield from detection any individual. Somerville should therefore not be considered a "sanctuary jurisdiction" under the definitions of the Executive Orders or Agency Directives. But again, such facts have not stopped the Administration from labeling jurisdictions with policies like Somerville's as "sanctuary jurisdictions," publicly castigating and threatening them with loss of federal funds, and targeting them with lawsuits. On May 29, 2025, DHS targeted Somerville on its Designation List for federal defunding and enforcement measures.

71.    ICE raids have notably occurred in Somerville as well, without interference from Somerville or its police. As highly publicized by various news media, including internationally, a Tufts University graduate student, Rümeysa Öztürk, was taken into custody in Somerville on March 25, 2025, when plainclothes immigration enforcement officers suddenly surrounded her on a public street, as captured on video. The widely shared video placed Somerville at the epicenter of the Administration's aggressive efforts to enforce its immigration initiatives, including against a graduate student whose only "transgression" appears to be that she was co-author of an editorial, the politics of which the Administration disagreed with, in her student newspaper. Like Chelsea, beyond the raids experienced, a severe chill and climate of fear has been cast over Somerville (particularly in light of that highly publicized arrest), discouraging individuals and families from going to work, school, church, the supermarket, or other places where they regularly must go.

**C.    Round One: The First Trump Administration's Unconstitutional and Unlawful Assault on Sanctuary Cities**

72.    At the start of his first term in January 2017, Defendant Trump issued Executive Order 13,768, titled "Enhancing Public Safety in the Interior of the United States." This executive

order targeted what it called "sanctuary jurisdictions," *i.e.*, jurisdictions that "willfully refuse" to comply with 8 U.S.C. § 1373, a statute concerning the sharing of the immigration statuses of individuals with the Immigration and Naturalization Service (now ICE). EO 13,768 threatened to revoke federal grant funding from those sanctuary jurisdictions and separately to take enforcement action against those jurisdictions. DOJ subsequently conditioned the receipt of certain federal funds on compliance with 8 U.S.C. § 1373.

73.     Shortly thereafter, in light of the many Constitutional deficiencies—including violations of the Separation of Powers, the Spending Clause, the Fifth Amendment, and the Tenth Amendment—that were evident on the face of EO 13,768 and the DOJ conditions, numerous district courts preliminarily enjoined the actions. These rulings were later affirmed by the vast majority of the Circuit courts to address the EO and DOJ conditions, including the First, Third, Seventh, and Ninth Circuits. While certain petitions for writs of certiorari were pending before the U.S. Supreme Court, President Biden began his term, having defeated Defendant Trump in the 2020 Presidential election. On his first day in office, January 20, 2021, President Biden issued Executive Order 13,993, titled "Revision of Civil Immigration Enforcement Policies and Priorities," revoking Defendant Trump's EO 13,768 concerning sanctuary jurisdictions. Given the executive action, the parties to the pending *certiorari* petitions, which included DOJ, thereafter filed joint stipulations to dismiss those cases in March 2021.

**D.    Round Two: New Unconstitutional Executive Orders Are Issued by the Second Trump Administration and Plaintiffs Suffer Immediate Harm**

**1.     The First New Executive Order Targets Sanctuary Jurisdictions**

74.     Defendant Trump wasted no time in launching a renewed attack on sanctuary cities after his reelection in 2024 and subsequent inauguration in 2025. On the first day of his second term, January 20, 2025, just hours after his inauguration, Defendant Trump unleashed a slew of

executive orders. Among them was EO 14,148, titled "Initial Recissions of Harmful Executive Orders and Actions," which rescinded a number of Biden-era executive orders, including Biden's EO 13,993 that had itself rescinded Defendant Trump's original EO regarding sanctuary jurisdictions (EO 13,768).

75.     That same day, Defendant Trump issued Executive Order 14,159, titled "Protecting the American People Against Invasion" (the "Day One Executive Order"). Starting from the demonstrably false premise that "[m]any" undocumented individuals are "committing vile and heinous acts against innocent Americans," and spewing other vitriol about "illegal aliens," the Day One Executive Order states its aim of achieving "the total and efficient enforcement" of immigration laws. Among the methods the Day One Executive Order states it will use to achieve this goal is to bring sanctuary cities to heel and to force them to assist in Defendants' efforts. Section 17 of the Day One Executive Order, titled "Sanctuary Jurisdictions," provides, in full:

> The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

76.     The intent and force of the Day One Executive Order is clear: to deprive local jurisdictions of their constitutionally protected decision-making authority and to unlawfully compel them to carry out federal immigration enforcement. It does so by "ensur[ing]" that sanctuary jurisdictions "do not receive access to Federal funds" and by threatening criminal and civil actions against them. The Day One Executive Order delegates executive authority to the Attorney General and the Secretary of Homeland Security to carry out its provisions.

2.    **DOJ Implements the Day One Executive Order: Conditioning Grants and Threatening Prosecution—and DOT Joins In**

77.    The Administration acted swiftly to implement the Day One Executive Order.  The very next day, on January 21, 2025, Acting Deputy Attorney General Emil Bove published a memorandum to all DOJ employees, making clear how broadly—and illegally—the Day One Executive Order is intended to extend (the "Bove Memo," attached as Exhibit L).  Starting from the same faulty legal premise that resulted in court orders against the first Trump Administration, the Bove Memo takes direct aim at sanctuary cities: "The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives."  In fact, the Supremacy Clause requires no such thing.

78.    The Bove Memo goes on to state, in terms both excessively broad and unconstitutionally vague, that "Federal law prohibits states and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests."  The overbreadth of this statement is stunning.  While federal law may prohibit local actors from *obstructing* the enforcement of federal immigration law—which Plaintiffs do not do and have never done—the Bove Memo claims that local actors also violate federal law if they fail to comply with "immigration-related commands and requests."  No such law exists.

79.    The Bove Memo provides that DOJ "shall investigate incidents involving any such misconduct for potential prosecution," and expressly lists three statutes:  18 U.S.C. § 371 ("Conspiracy to Commit Offense or to Defraud United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").  The memo notes that "the Department of Justice will take all steps necessary to protect the public."  The Bove Memo also indicates that DOJ's Civil Division will work with the "newly established Sanctuary Cities

Enforcement Working Group" "to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws."

80.     On January 23, 2025, then-acting DHS Secretary Benjamine Huffman, issued an order titled "Finding of Mass Influx of Aliens."  In that order, Huffman "request[ed] the assistance of State and local governments in all 50 states" in administering federal immigration law. Although this order is framed as a "request," the Bove Memo mandates compliance with requests from the Executive Branch.

81.     The Bove Memo was quickly followed by Defendant Trump's highly publicized "funding freeze" on all federal grants and loans, accomplished via a memo issued by the White House's Office of Management and Budget ("OMB") on January 27, 2025.  As the very first example of executive actions that "safeguard valuable taxpayer resources," the OMB memo lists the Day One Executive Order concerning sanctuary jurisdictions, highlighting the Administration's crystal-clear intention to prevent sanctuary jurisdictions from accessing federal funds.

82.     While a federal court swiftly stopped the funding freeze, and OMB rescinded its call for a funding freeze only two days later, the Administration has since stated that only the original memo calling for the blanket freeze had been rescinded, not its overall effort to use the termination of federal funding as means to force local governments to assist with the Executive Branch's policy goals.

83.     The Administration again repeated its threats to withdraw federal funds in a January 29, 2025 order issued by Defendant Trump's new DOT secretary, Sean Duffy, who stated that for "all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts," it would now

be DOT policy to de-"prioritize" such funding for sanctuary jurisdictions by prioritizing "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." In a world of limited resources, as is the case with local governments trying to secure DOT funding, de-prioritization is tantamount to withholding funding. Further, the DOT Order would oddly "give preference to communities with marriage and birth rates higher than the national average." Neither provision on its face bears any relationship whatsoever to the responsibilities of DOT.

84.    The relentless assault on sanctuary cities, using federal funding as a weapon to compel compliance, continued apace. On February 5, 2025, the new U.S. Attorney General, Defendant Pamela Bondi, was confirmed by the U.S. Senate. On her first day in office, Defendant Bondi signed a memo that took direct aim at sanctuary cities. Titled "SANCTUARY JURISDICTION DIRECTIVES," the memo unequivocally stated that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." It further defined "sanctuary jurisdiction" to include "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws," without specifying which "other" laws it was contemplating. Section 1373(a) provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Under these sanctuary jurisdiction directives, the Bondi Memo provided that "the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures."

26

85.     The Bondi Memo's language is consistent with the directive in the Day One Executive Order to withhold federal funds from "so called 'sanctuary' jurisdictions" and reveals DOJ's intention to broadly condition all DOJ funding on compliance with "applicable federal immigration laws."  It additionally stated that future grants would be "tailor[ed]" to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration."

86.     The Bondi Memo also reiterated DOJ's earlier threat to prosecute sanctuary cities.  It called for prosecuting violations of the same three statutes referenced in the Bove Memo—18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373—and notably expanded the scope of investigations to include any incident in which there is an "effort to obstruct" an "immigration-related directive from the Executive Branch."  In that same vein, and on the same day, Defendant Bondi issued another memo to all DOJ employees that called for the prosecution of "state and local actors" if they resist, obstruct, or "otherwise fail[] to comply with lawful immigration-related commands and requests."

### 3.    DOJ Follows Through on Its Threats of Enforcement: Illinois, Chicago, New York, Rochester, Colorado, Newark, Jersey City, Paterson, and Hoboken Become the First Targets

87.     To substantiate its threats and attempt to stifle dissent, DOJ moved quickly to initiate enforcement.  On February 6, 2025, DOJ filed a civil complaint against the State of Illinois and the City of Chicago, among other defendants, in *United States v. Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1.  The Illinois complaint demonstrates just how broadly and unlawfully Defendants are asserting their power under the Supremacy Clause, claiming that local jurisdictions violate the Constitution if they prohibit: detaining an individual on the basis of a detainer or civil immigration warrant, *see id.* ¶ 8; providing information such as custodial status and release date about noncitizens in their custody, *see id.* ¶ 9; assisting with immigration

enforcement activities, *see id.* ¶ 43; or inquiring about an individual's citizenship or immigration status, *see id.* ¶ 44.

88.     Less than a week later, DOJ filed a second lawsuit, this time challenging one of New York's laws.  On February 12, 2025, DOJ filed a civil complaint against the State of New York and various local representatives, in *United States v. New York, et al.*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025), ECF No. 1.  Similar to the Illinois complaint, the New York complaint broadly asserts power under the Supremacy Clause, claiming that New York's "Green Light Law" violates the Constitution by: prohibiting the New York DMV from sharing DMV "records or information" with immigration officials in the absence of a court order or warrant, *see id.* ¶ 30; informing individuals whose information has been requested by immigration officials of the request, *see id.* ¶ 32; and imposing limitations on those who have access to or receive such "records or information," *see id.* ¶ 33.

89.     The New York lawsuit was not the last of DOJ's enforcement actions.  When Defendant Bondi announced the lawsuit, she proclaimed: "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one.  Strike two is New York.  And if you are a state not complying with federal law, you're next.  Get ready."

90.     Following through on these threats, DOJ filed three more lawsuits: *United States v. Rochester, et al.*, No. 6:25-cv-06226 (W.D.N.Y. Apr. 24, 2025), *United States v. Colorado, et al.*, No. 1:25-cv-01391-KAS (D. Colo. May 2, 2025), and *United States v. Newark, et al.*, No. 2:25-cv-05081 (D.N.J. May 22, 2025).  Similar to DOJ's earlier lawsuits, the federal government is taking direct aim at cities' and states' sanctuary city laws and policies.

4.    **The Attack Continues: A Second Executive Order Is Signed and Other Agencies Join In**

91.    Defendant Trump issued another executive order on February 19, 2025, titled "Ending Taxpayer Subsidization of Open Borders," in which he ordered, under Section 2(a)(ii), that "the head of each executive department or agency (agency) shall . . . ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

92.    On the same day the Subsidization Executive Order was issued, DHS Secretary Kristi Noem issued a memo titled "Restricting Grant Funding for Sanctuary Jurisdictions."  The Noem Memo directs "[a]ll [DHS] components . . . to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions," and directs that "[t]o the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions."  Further, the Noem Memo calls for "criminal referrals" to DOJ.  Each agency component was directed to provide a report of "actions taken to comply" with the memo "[w]ithin 30 days."

93.    On March 20, 2025, in response to the Noem Memo, the Federal Emergency Management Agency ("FEMA") released its own Memo, titled "Approval of FEMA-Administered Grant Disbursements."  The FEMA Memo states as its purpose: "To seek approval on the review process and parameters of grant programs administered by [FEMA] to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions."  To further that purpose, the FEMA Memo "recommends applying conditions or restrictions on FEMA administered non-disaster preparedness grant programs that

go to a sanctuary jurisdiction . . . (a) where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or, (b) where [the] statute does not limit how FEMA implements the program." The FEMA Memo indicates that such "conditions or restrictions" should be "placed on all <u>open</u> and <u>future</u> awards" for applicable programs. The FEMA Memo specifically recommends that conditions be placed on Urban Area Security Initiative ("UASI") grants, among other grants.

94.     On March 17, 2025, DOT revised the Terms and Conditions of its FY2023 SS4A Grant Program. The revised SS4A Conditions now include the following language: "Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." Notably, these conditions go beyond a simple mandate not to interfere, instead requiring affirmative cooperation with federal immigration enforcement (with no limitation with respect to civil matters), in order to receive critical funds.

95.     On April 4, 2025, HUD Secretary, Scott Turner, joined in on the attack, issuing the HUD Letter. The HUD Letter indicates that Defendant Turner "directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's [Subsidization] Executive Order." Leaving no room for interpretation, the HUD Letter explicitly announces that "going forward, grant agreements will include language that will require compliance with [the Subsidization Executive Order], and the Department will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens."

96.    On April 18, 2025, DHS issued version three of its general terms and conditions for the agency's FY2025 grants.  At least two conditions outlined in the DHS Conditions are pertinent to the present action.  Under Section C.IX, titled, "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," grant recipients must agree to: "comply with the requirements of 8 U.S.C. §§ 1373 and 1644"; "comply with other relevant laws related to immigration"; "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer"; "provide access to detainees"; and "not [to] leak or otherwise publicize the existence of an immigration enforcement operation."  Recipients must certify compliance with the aforementioned terms and agree "that [they] will require any subrecipients or contractors to certify in the same manner that they will comply" with the terms before receiving any funding under the grant.  Under C.XXXI, titled, "Presidential Executive Orders," grant recipients "must comply with the requirements of Presidential Executive Orders related to grants."

97.    On April 24, 2025, Defendant Duffy sent the DOT Letter to all recipients of DOT funding, including Plaintiffs.  The DOT Letter furthers the agency's efforts to deny federal funds to sanctuary jurisdictions.  In that letter, Defendant Duffy wrote, "It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations."  Those legal obligations purportedly "require cooperation generally with Federal authorities . . . including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  The letter cites to "reported instances" in which recipients of DOT funds have "declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in

31

violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement." The DOT Letter cements the agency's policy that continued receipt of DOT funds is tied to cooperation with federal immigration authorities: "Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

98.    On the same day, in a case similar to the present litigation, the U.S. District Court for the Northern District of California granted a preliminary injunction to prevent the federal government "from directly or indirectly taking any action to withhold, freeze, or condition federal funds" from various plaintiffs, based on the first sentence of Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and portions of the Bondi Memo, Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Apr. 24, 2025), ECF No. 111, following up with a more detailed order a few days later, *see* Further Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 3, 2025), ECF No. 126 at 65.

99.    On May 13, 2025, DOT notified Somerville of the revised SS4A Conditions in connection with its nearly $4 million FY2023 SS4A grant. This notice, provided in conjunction with a finalized contract ready for execution, informed the city that the new conditions must be agreed to or the project could not move forward. *See* Notice to Somerville Regarding Revised SS4A Conditions (attached as Exhibit M). Nothing in the notice to Somerville explained how the SS4A grant was tied in any way to immigration.

5.    **The Administration Continues Its Crusade Against Sanctuary Cities: A Third Executive Order**

100.    Despite the ruling against the Administration in the Northern District of California, Defendant Trump continued the attack unabated, issuing yet another executive order targeting sanctuary cities on April 28, 2025.

101.    In the Designation Executive Order, Defendant Trump orders the Attorney General, along with the Secretary of DHS, in Section 2(a), to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" within 30 days.  Section 2(b) of the Designation Executive Order declares that the Attorney General and Secretary of DHS "shall notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement."  Section 3 goes on to explain the "Consequences for Sanctuary Jurisdiction Status."  All jurisdictions identified in Section 2(a) shall face "suspension or termination" of federal funds identified by the OMB director.  Additionally, any jurisdictions that "remain sanctuary jurisdictions" after being provided notice under Section 2(b) shall face "necessary legal remedies and enforcement measures" from the Attorney General and Secretary of DHS.  The Administration made the goal of the Designation Executive Order crystal clear when it released a related fact sheet on the White House website that included a social media post from Defendant Trump's Truth Social account: "No more Sanctuary Cities!  They protect the Criminals, not the Victims.  They are disgracing our Country, and are being mocked all over the World.  Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"  The fact sheet further indicated that "Trump [was] following through on his promise to rid the United States of sanctuary cities" (the "Designation Fact Sheet," attached as Exhibit N).

6.    **The Message Is Clear: The Administration Seeks to Crush Sanctuary Jurisdictions**

102.    Defendant Trump, as well as executive officers and individuals in his orbit, have made various public statements that align with the Administration's intent to destroy sanctuary jurisdictions and their policy choices, both before and after Defendant Trump began his second term:

a.    On September 21, 2024, Defendant Trump promised in a speech in North Carolina, "As soon as I take office, we will immediately surge federal law enforcement to every city that is failing . . . I will ask Congress to pass a law outlawing sanctuary cities nationwide, and we demand the full weight of the federal government on any jurisdiction that refuses to cooperate with ICE."

b.    After Defendant Trump's reelection, on November 20, 2024, Tom Homan, Defendant Trump's "border czar," expressly threatened sanctuary cities during an appearance on television, stating that "they need to get the hell out of the way cuz we're comin', we're gonna do it."

c.    On January 22, 2025, Defendant Trump was interviewed by Sean Hannity of Fox News, who asked about "sanctuary cities" and referenced the "federal funds" they receive. Defendant Trump, in response, stated, "Yes, we're trying to get rid of them, and we're trying to end them," referring either to the federal funds or to the sanctuary cities themselves (or both). When specifically asked by Hannity, "But would you cut off their money?" Defendant Trump confirmed that he might well "have to do that" because "sometimes that's the only thing you can do."

d.    On January 31, 2025, Defendant Noem, the newly confirmed Secretary of DHS, appeared on Fox News and said in response to a question about whether the Administration would impose consequences on sanctuary cities, "Of course we will." Continuing, she stated, "The reality is, these sanctuary cities, their laws have caused us problems. They are limiting some of our tools that we want in our toolbox, but we're going to continue to go in and use our operations."

e.    On February 3, 2025, Tom Homan reiterated his threats against sanctuary cities and seemingly claimed to control the courts, stating: "We're going to sue 'em . . . Look, we've got the Supreme Court; that's what President Trump wanted to do. He will end sanctuary cities."

103.    And since this lawsuit was originally filed in late February, the Administration has continued to broadcast its intention, to attack, and in some cases, eliminate, sanctuary cities:

a. On March 5, 2025, Defendant Trump reprised his blatant attack on sanctuary cities, stating: "We are going to end sanctuary cities for some of these jurisdictions that aren't cooperating with law enforcement . . . They are guarding criminals, they are taking the rights away from the citizens of this state and this city and we are going to be ending sanctuary cities if we find it necessary to do in certain major areas and we may just end the entire thing all together because it is just a way of protecting criminals."

b. On April 10, 2025, Defendant Trump posted the following to his Truth Social account: "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"

**7.    DHS Leaves No Room for Speculation: Plaintiffs Chelsea and Somerville Are Named as Targets and Ordered to Change Their Policies**

104.    On May 29, 2025, pursuant to the Designation Executive Order, DHS released the Designation List.  The Designation List begins by parroting the definition of "sanctuary jurisdictions" provided by the Designation Executive Order, as "states and local jurisdictions that obstruct the enforcement of federal immigration laws."  It further explains that the list was "created to identify sanctuary jurisdictions, which are determined by factors like compliance with federal law enforcement, information restrictions, and legal protections for illegal aliens."  Beyond the identification of jurisdictions, the Designation List includes the following command: "DHS demands that these jurisdictions immediately review and revise their policies to align with Federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens."

105.    Included on the Designation List are Plaintiffs Chelsea and Somerville, as well as hundreds of other jurisdictions, including those jurisdictions currently being sued by DOJ for their purported sanctuary policies.

106.    Individually and cumulatively, these actions by Defendants amount to a concerted effort to intimidate and attack Plaintiffs (and others like them) to override their locally determined

policies and priorities, to force them to bend to the will of the federal government, and to assist with Defendants' mass deportation plans—all in derogation of Plaintiffs' rights.

### 8. Plaintiffs Are Harmed by the Executive Branch's Unlawful and Unconstitutional Assault

107.     As a direct result of these unlawful Executive Branch actions, Plaintiffs have been harmed and will continue to be harmed absent relief from the Court.  Federal defunding and other enforcement actions against Plaintiffs are imminent in light of both Chelsea's and Somerville's being named on the Designation List.

108.     Plaintiffs rely on various sources of federal funding—in the range of tens of millions of dollars—to fill critical budgetary needs in the management of their respective cities. Plaintiffs face the very real and imminent termination of federal funding, which will immediately result in a slew of harms to Plaintiffs:

    a.     Many of the federal grant funds that Plaintiffs receive are reimbursement-based, which means that Plaintiffs are immediately in the red if no federal grant monies are forthcoming, and face a "fiscal cliff";

    b.     Plaintiffs are grossly impeded in their abilities to spend funds for their communities in light of both the actual and imminent termination of access to federal funding;

    c.     Plaintiffs face breaches of a number of existing contracts that they entered into in reliance on approved federal grant monies, such as construction-related contracts;

    d.     Plaintiffs face the termination of critical services they provide to their respective communities in connection with those federal grant monies; and

    e.     Plaintiffs further face the termination of significant numbers of staff on their respective payrolls.

109.     For example, Plaintiffs receive and rely on certain critical DOT grants to improve infrastructure and safety in their communities.  These DOT grants are in turn tied to express contracts with general contractors and subcontractors.  If Plaintiffs have the rug of federal funding pulled out from underneath them—as the Administration has promised it will imminently do—

Plaintiffs will be forced to breach those existing contracts and subject themselves to suits for breach of contract and related claims.

110.   Somerville was awarded nearly $4 million from DOT's Safe Street and Roads for All, or SS4A, program for FY2023 in order to improve roadway safety for bicyclists and pedestrians, in addition to a roughly $117,000 grant they received for FY2022. Chelsea was similarly awarded a significant grant from that same SS4A program for the purpose of bringing traffic fatalities to zero in their Vision Zero plan, in the amount of $280,000 for FY2023. The SS4A Conditions have been imposed for FY2023 funds by DOT in such a manner that these significant funds are now under direct threat. Loss of these funds necessarily results in severe harm, endangering the lives of motorists, bicyclists, and pedestrians.

111.   Plaintiffs Chelsea and Somerville have similarly received millions in various DHS grants over the past five years; each city still actively draws down from these grants. When these grants are withdrawn by DHS, Plaintiffs will lose access to important public safety equipment, including anti-terrorism measures and tactical vans.

112.   Plaintiffs additionally receive and rely on DOJ grants to help fund their police departments and promote public safety in their communities. Chelsea regularly receives funds from DOJ's Byrne JAG program as well as its BVP program administered through DOJ's OJP. Somerville has also historically received funding through the Byrne JAG and BVP programs. All of these funds support Plaintiffs' goal of maintaining safe communities by supporting their police departments.

113.   Plaintiffs also receive and rely on HUD grants to help fund housing and community development activities. Chelsea receives significant funds in Community Development Block Grant (CDBG) grants, which support critical programs and services, including housing

rehabilitation, economic development, public facilities and infrastructure, and social services such as retention of youth in schools and food delivery to elderly residents. Somerville receives funds through the CDBG, HOME Investment Partnerships Program, and Emergency Solutions Grant (ESG) grant programs. These funds help support critical programs, such as new housing construction for low-income households, homelessness prevention, revitalizing struggling business districts, family stabilization and job readiness for Somerville's neediest residents, and temporary shelter for homeless individuals and families.

114.    An illustration of the critical services that Plaintiffs would be forced to terminate—for lack of federal grant funding—are initiatives combating homelessness in their communities through, *inter alia*, prevention, rapid re-housing, and emergency shelters. This is especially critical for Plaintiffs in light of the brutally cold winters in the greater Boston area. If Plaintiffs are forced to terminate those critical services, people living in their communities will suffer as a result, with life-threatening consequences. Like with the ramifications surrounding the DOT funds that now have new conditions on them, Plaintiffs can envision no example of greater concretized harm than this.

115.    If all federal funds are cut off, as the challenged executive actions provide for, Plaintiffs would also need to terminate significant portions of staff on their payrolls (a consistently accruing expense), and the lack of personnel would immediately damage Plaintiffs' ability to effectively govern and manage their respective cities.

116.    As a result of the extreme uncertainty and the Administration's threats of imminent funding freezes—particularly now that Chelsea and Somerville have been expressly targeted by the Designation List—Plaintiffs have been deprived of their long-standing expectations that federal funding sources will honor their commitments and not impose unconstitutional conditions,

which are critical for responsible decision-making and local resource allocation. Plaintiffs make significant expenditures relating to federal, reimbursement-based grant funding (the bulk of Plaintiffs' federal funding), but there is no longer any guarantee of reimbursement under the slew of unlawful executive actions, which all purport to deprive Plaintiffs and similarly situated jurisdictions of any and all federal funding.

117.    Plaintiffs face a severe squeeze due to the time-limited nature of many of the funds committed to them. If they spend and are not reimbursed by the federal government, they are harmed. And, if they refrain from spending out of fear of non-reimbursement and cannot complete certain projects in time, they will forfeit those funds and are still harmed. No matter what Plaintiffs do, they are injured by the Administration's actions.

118.    The necessary effects of the imminent termination of federal funding fly in the very face of the Administration's stated rationale of "enhancing public safety" and would in fact fundamentally impair Plaintiffs' abilities to protect the public safety. What the Administration is doing is punishing sanctuary cities because of those cities' well-founded local decisions, by vindictively withdrawing and threatening to withdraw funding, even if those funds have nothing to do with the Administration's stated aims and even if Congress has given no directive toward that end. The Administration cannot legislate, as that is the domain of Congress, and the Executive Orders and the implementing Agency Directives are blatantly unconstitutional efforts to harm Plaintiffs and their communities.

119.    Plaintiffs seek declaratory and injunctive relief so that their local decision-making will not be stymied by the federal government and so that they may continue their crucial work to support residents' health and safety without the fear of a fiscal cliff or crisis, and without fear of significant layoffs to city personnel who provide critical services. They seek relief so that they

can continue to provide essential services to their communities, including the most vulnerable populations—such as shelter for homeless families, or redesigned roadways so that schoolchildren can safely get to school—instead of having to cut such services and projects. They seek relief so that they can continue their important multi-year projects for which they have secured promises of federal funding. And above all, they seek relief so that they can continue to ensure the public safety of all individuals and families in their communities, regardless of their immigration status. This Court must not allow the challenged Executive Orders and Agency Directives to stand.

## CAUSES OF ACTION

### COUNT ONE
(Separation of Powers)

120.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

121.    The Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives" and grants Congress alone the power to spend for the general welfare of the United States. U.S. Const. art. I, secs. 1, 8. These clauses vest Congress with legislative powers and establishes that it is Congress, not the President or any Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds.

122.    When Congress does delegate its spending powers, it must do so clearly and unmistakably, while providing specific guidance as to the conditions the Executive Branch may attach to receipt of federal funds. A federal agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When the [Executive] takes measures incompatible with the express or implied will of Congress,

[its] power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

123.    As such, the Executive Branch cannot place conditions on funds already allocated by Congress, without Congress's express authorization.  The challenged Executive Orders and Agency Directives violate the Separation of Powers by imposing conditions on funding—which Congress did not authorize—namely that Plaintiffs do not interfere with federal immigration enforcement and that they comply with 8 U.S.C. § 1373 and other unspecified federal immigration laws.

124.    Moreover, the Day One Executive Order authorizes the Attorney General and the Secretary of DHS to impose penalties on states and localities, again without any regard to whether Congress authorized either entity to impose them.  Similarly, the Designation Executive Order instructs the Attorney General and Secretary of DHS to pursue legal remedies and enforcement measures against "sanctuary jurisdictions" that do not bend to the Executive's will.

125.    The Executive Orders and Agency Directives authorize conditions and penalties that Congress did not envision.  They are a blatant attempt by the Executive Branch to usurp the powers of Congress.  As applied to Plaintiffs, this sweeping overreach by the Executive Branch creates uncertainty and deeply disrupts Plaintiffs' ability to budget daily governance needs and implement their law enforcement priorities.

## COUNT TWO
(Spending Clause)

126.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

127.    The Spending Clause provides, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and

general Welfare of the United States." U.S. Const. art. I, sec. 8, cl. 1. This clause vests the spending power in Congress alone, authorizing it to raise and spend money for the "general Welfare" of the United States.

128. There are four significant limitations on the Spending Power. First, any conditions imposed must be identified unambiguously. *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Second, the conditions must not be coercive. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012). Third, the conditions must be related to the federal interest in the program. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Fourth, the conditions must not induce unconstitutional actions on the part of the recipient. *Id.* at 210-11.

129. Even if Congressional authority for the challenged conditions existed, the Executive Orders and Agency Directives violate the Spending Clause because they do not comply with the limitations placed on the Spending Power:

a.    The conditions imposed by the Executive Orders and Agency Directives are ambiguous, as they fail to specify with clarity which laws Plaintiffs will be required to comply with. Further, several of the challenged actions do not specify which grants will be conditioned. The conditions placed on federal grants are also constitutionally infirm because they were not established unambiguously prior to the funds being awarded; as such, Plaintiffs were unable to make knowing, cognizant decisions about whether to apply for and accept the federal grants. *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 24-25.

b.    The amount of federal funds being threatened—tens of millions of dollars—is unconstitutionally coercive. The Administration's conduct is particularly harmful for smaller cities like Plaintiffs, whose residents would be grievously harmed by any termination of federal funding. Plaintiffs rely on various key sources of federal funding to fill critical budgetary needs in the management of their respective cities. In addition, as smaller jurisdictions, their abilities to defend against criminal and civil prosecutions are relatively limited.

c.    There is no connection between the conditions imposed mandating non-interference with federal immigration enforcement (including compliance with 8

U.S.C. § 1373) and the federal funds being threatened (*e.g.*, the DOT funds), as is constitutionally required.  *See Dole*, 483 U.S. at 211.

d.    The conditions imposed would also require Plaintiffs to act unconstitutionally by detaining individuals based on civil detainers without a finding of probable cause and in contravention of Massachusetts law.

130.    As applied to Plaintiffs, the conditions placed on federal grants in the Executive Orders and Agency Directives, the threatened loss of federal funds, the lack of nexus between the Executive Branch directives and the federal funds being threatened, and the unconstitutional actions that the conditions induce represent unconstitutional coercion in violation of the Spending Clause.

## COUNT THREE
(Tenth Amendment – Anti-Commandeering)

131.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

132.    The Tenth Amendment of the U.S. Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Accordingly, "[t]he Constitution simply does not give Congress the authority to require the States to regulate," much less give the Executive Branch such authority.  *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)).  Therefore, the federal government cannot compel state or local governments to enact or enforce a federal regulatory program.  On their face, the Executive Orders and related Agency Directives violate the Tenth Amendment by attempting to use the spending power to force Plaintiffs into carrying out federal immigration laws and policies.

133.    The Executive Orders and Agency Directives purport to grant executive officers the authority to penalize state and local governments that are deemed to interfere with the

enforcement of federal law.  In so doing, they enable the federal government to force state and local governments to adopt policies and practices that support federal policies, to the subordination of their own interests.  For example, the SS4A Conditions require Plaintiffs to cooperate with federal immigration enforcement in order to get DOT funding for safe streets and roads: there is no logical nexus between the two, and this coercive effort by the federal government plainly constitutes commandeering of local governments.

134.    By withholding federal funds and directing enforcement against Plaintiffs unless they comply with federal immigration laws and policies and cooperate with federal immigration enforcement, Defendants are compelling Plaintiffs to enact a federal regulatory program in violation of the anti-commandeering principle of the Tenth Amendment.

**COUNT FOUR**
(Fifth Amendment – Due Process)

135.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

136.    Under the Fifth Amendment, the federal government may not deprive Plaintiffs of property without "due process of law."

137.    Plaintiffs have a protectable property interest in the federal funding for which they have applied and been approved.  A large portion of the sources of federal funding, including the DOT grants secured by Plaintiffs, are reimbursement-based, which means that Plaintiffs are spending money in reliance on the promise of federal reimbursement.  The retraction of those promises results in direct harm to Plaintiffs.

138.    The Day One Executive Order deprives Plaintiffs of their procedural due process rights because it grants the Attorney General and the Secretary of Homeland Security unbounded discretion to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access

to Federal funds." Further, those executive officials are empowered to "undertake any other lawful actions, criminal or civil, that they deem warranted."

139.    Similarly, the Subsidization Executive Order empowers "the head of each executive department or agency" to "ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." And the Designation Executive Order grants the Attorney General and Secretary of DHS authority to list cities as explicit targets of the Administration, declaring by edict that the Cities are not in compliance with federal law, all without providing a procedure to challenge this designation.

140.    The Agency Directives also have the effect of depriving Plaintiffs of their procedural due process rights as each purports to unilaterally deny Plaintiffs funds from the respective agency. The Bondi Memo declared that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." The Noem Memo similarly writes, "each [DHS] component must cease providing federal funding to sanctuary jurisdictions" and is backed by the DHS Conditions which deny federal awards to any recipient that does not agree to cooperate with federal immigration enforcement. The DOT Order de-prioritizes funding for sanctuary jurisdictions, while the DOT Letter clarifies the Agency's intention to withhold funds from all recipients that do not cooperate with "the enforcement of Federal immigration law." The SS4A Conditions require affirmative cooperation with federal immigration enforcement to receive funds.

141.    The Executive Orders and Agency Directives do not provide Plaintiffs or other similarity situated jurisdictions with any path to seek review or to challenge actions taken under

their authority.   This pre- and post-deprivation opportunity to be heard violates the Fifth Amendment's guarantee of due process.

142.    The Executive Orders and Agency Directives deprive Plaintiffs of their interests through the express conditions these directives place on federal funds.  Plaintiffs have been deeply disrupted for months now as a result of their inability to spend further funds for the credible fear of the Administration's imminent pulling of federal funding.  Moreover, there was no notice as to this deprivation, and no way to review or challenge the government's decision to withhold this property.

**COUNT FIVE**
(Fifth Amendment – Void for Vagueness)

143.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

144.    Also falling under the Fifth Amendment is the void-for-vagueness doctrine.  A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

145.    The Executive Orders and Agency Directives are unconstitutionally vague.   It is impossible for cities to determine if they fit into what the Day One Executive Order terms "so-called 'sanctuary' jurisdictions," whether they are subject to its penalties, or what penalties might be imposed if they are determined to be sanctuary jurisdictions.  The Day One Executive Order purports to define sanctuary jurisdictions as those jurisdictions "which seek to interfere with the lawful exercise of Federal law enforcement operations," but this is no clearer (and is also *not* what Plaintiffs' policies seek to do).  The Day One Executive Order also gives the Attorney General and the Secretary of DHS virtually unfettered discretion to determine whether jurisdictions comply or

do not comply with the Day One Executive Order.

146.     Like the Day One Executive Order, the Subsidization Executive Order vaguely references "so-called 'sanctuary' policies" without defining them, except to modify such policies by adding, "that seek to shield illegal aliens from deportation," which is not only vague but also *not* what Plaintiffs' sanctuary policies seek to do.  Similarly, the reference to "by design or effect" is vague because it fails to describe how that effect may come about.  As a result of these sources of vagueness, there is a high risk of arbitrary enforcement against Plaintiffs and other localities.

147.     The Designation Executive Order suffers from similar defects.  It defines "sanctuary jurisdictions" as those jurisdictions that "obstruct the enforcement of Federal immigration laws."  Plaintiffs and similarly situated jurisdictions are provided with no guidance as to what will be considered "obstruct[ion]" of federal immigration enforcement.  Further, the Designation Executive Order grants the Attorney General and the Secretary of DHS complete discretion to decide which jurisdictions belong on the "list" of sanctuary jurisdictions and empowers those agents to "pursue all necessary legal remedies and enforcement measures" against the jurisdictions which "remain in defiance of Federal law."

148.     The Bondi Memo fares no better.  While it identifies 8 U.S.C. § 1373 as a basis for "sanctuary jurisdiction" status, the memo vaguely references "other" federal immigration laws as a basis, without spelling out which laws these are.  As a result, there is a high risk of arbitrary enforcement, as DOJ can self-servingly conjure some violation of federal immigration law (whether true or not), with no notice to Plaintiffs or similarly situated jurisdictions, as a basis for withholding significant funds to which those jurisdictions are already entitled.  Also, while Plaintiffs' position is that they fully comply with 8 U.S.C. § 1373, there is a significant risk of arbitrary enforcement in whether "refus[ing] to comply" accords with DOJ's interpretation of

compliance, rather than Plaintiffs' correct interpretation.

149.    The DOT Order similarly states that it will prioritize "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." This sets forth DOT's aim of de-prioritizing sanctuary jurisdictions, but it is vague in referencing compliance/cooperation with immigration enforcement and with "other goals and objectives," to the point that it fails to provide notice to Plaintiffs and others regarding what specific conduct would cause DOT to de-prioritize (*i.e.*, defund) their projects. The DOT Letter does not provide any clarification, instead noting that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law." This open-ended mandate does nothing to clarify Plaintiffs' obligations. While it provides a singular example of non-compliance—"issu[ing] driver's licenses to individuals present in the United States in violation of Federal immigration law"—it makes no attempt to define compliance with the new policy. The SS4A Conditions suffers from similar defects, requiring recipients to "cooperate" with immigration enforcement without further explanation.

150.    The Noem Memo provides a somewhat more expansive definition of "sanctuary jurisdictions," suggesting various additional ways that a jurisdiction may fall into the category. Similar to the Bondi Memo, the Noem Memo points to 8 U.S.C. § 1373, but DHS, like DOJ, puts forth a clearly erroneous interpretation of what the statute requires, giving rise to a significant risk of arbitrary enforcement. Further, similar to other Agency Directives challenged by this action, the Noem Memo points to "other relevant laws" without clarifying exactly which laws DHS will look to for identifying "sanctuary jurisdictions."

151.    The DHS Conditions are also unconstitutionally vague because they state that

grant recipients must agree to "comply with other relevant laws related to immigration." Although the DHS Conditions identify subsections of 8 U.S.C. § 1324 as one such "relevant law[]," Plaintiffs have no notice of what "other" laws DHS requires compliance with. Further, by requiring "compl[iance] with the requirements of Presidential Executive Orders related to grants," the DHS Conditions also compound the vagueness inherent in the Executive Orders. DHS asserts that it expects grant recipients to comply with the Executive Orders, which are themselves vague and unlawful.

152.    The HUD Letter is also unconstitutionally vague because it states that "going forward, grant agreements will include language that will require compliance with [the Subsidization Executive Order], and [HUD] will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens." The HUD Letter suffers from the same flaw as the DHS Conditions; by expecting grant recipients to comply with executive directives that are themselves vague and unlawful, the HUD Letter only furthers the confusion. Further, the HUD Letter makes no attempt at defining what constitute "'sanctuary' policies."

153.    The Executive Orders and Agency Directives are unconstitutionally vague within the meaning of the Due Process Clause of the Fifth Amendment because they fail to clarify what is required of Plaintiffs and what consequences may occur, and thus encourage arbitrary enforcement by failing to describe their applicability and effects with sufficient particularity. This confused patchwork of vague definitions and provisions appears intentional so that the Administration can target whomever they want on whatever grounds they can scrounge up.

## COUNT SIX
(Declaratory Relief – The Executive Orders and Agency Directives Are Unconstitutional)

154.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

155.    Plaintiffs seek declaratory relief that the Executive Orders and Agency Directives are unconstitutional because they violate the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment and its Due Process Clause (and related void-for-vagueness doctrine).

156.    An actual controversy presently exists between Plaintiffs and Defendants as to whether the Executive Orders and Agency Directives are constitutional.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT SEVEN
(Declaratory Relief – Plaintiffs Are Not "Sanctuary Jurisdictions" Under the Day One Executive Order)

157.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

158.    Plaintiffs further seek a declaration that their policies, on their face, do not "seek to interfere with the lawful exercise of Federal law enforcement operations," per the language of the Day One Executive Order.

159.    Nothing in Plaintiffs' respective resolutions or ordinances or implementing policies states any intention to interfere with the lawful exercise of federal immigration enforcement, but Defendants ignore that reality.

160.    An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs are a "sanctuary jurisdiction" as defined by the Day One Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT EIGHT
(Declaratory Relief – Plaintiffs' Policies Are Not "Sanctuary Policies" Under the Subsidization Executive Order)

161.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

162.     Plaintiffs further seek a declaration that their resolutions, ordinances, and implementing policies, on their face, do not "seek to shield illegal aliens from deportation" as defined by the Subsidization Executive Order.

163.     None of Plaintiffs' respective resolutions or ordinances or implementing policies states any intention to "shield illegal aliens from deportation."

164.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' policies are "'sanctuary' policies" as defined by the Subsidization Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT NINE
(Declaratory Relief – Plaintiffs Are Not "Sanctuary Jurisdictions" Under the Designation Executive Order or the Designation List)

165.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set herein.

166.     Plaintiffs further seek a declaration that their policies, on their face, do not "obstruct the enforcement of Federal immigration laws," as outlined in the Designation Executive Order and Designation List.

167.     None of Plaintiffs' policies states any intention to obstruct federal immigration enforcement; rather Plaintiffs' policies leave that *federal* responsibility to the *federal* government so that they may prioritize their *local* responsibilities.

168.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' policies "obstruct the enforcement of Federal immigration laws," as defined by the Designation Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT TEN

(Declaratory Relief – Plaintiffs Comply with 8 U.S.C. § 1373)

169.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

170.     Plaintiffs similarly seek a declaration that their resolutions or ordinances or implementing policies comply with 8 U.S.C. § 1373, and they should therefore not be considered a "sanctuary jurisdiction" as defined in the Bondi Memo and Noem Memo.

171.     Plaintiffs comply with 8 U.S.C. § 1373.  Neither Plaintiffs' sanctuary city resolutions/ordinances nor their police policies "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual," as Section 1373 requires.  That Plaintiffs' police departments do not routinely inquire about immigration status in ordinary matters or affirmatively assist in federal immigration enforcement operations like ICE raids (beyond ensuring officer safety) does not violate that federal statute.

172.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' resolutions/ordinances or implementing policies comply with 8 U.S.C. § 1373. A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT ELEVEN

(Declaratory Relief – Plaintiffs Are Not Criminally Liable Under the Bondi Memo)

173.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

174.    Plaintiffs also seek a declaration that they cannot be held criminally liable under the Bondi Memo, at least in terms of the limited statutes DOJ cites, merely by virtue of Plaintiffs' sanctuary policies and adherence thereto.

175.    The Bondi Memo cites 18 U.S.C. § 371 ("Conspiracy to Commit Offense or to Defraud United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").

176.    8 U.S.C. § 1373, is not a criminal statute.    18 U.S.C. § 371, is a conspiracy statute that requires the predicate commission of a crime that is the object of the conspiracy. Plaintiff have not committed, nor have they been accused of committing, a crime (nor have they entered into, or been accused of entering into, a criminal conspiracy).

177.    That leaves 8 U.S.C. § 1324, which also fails: Plaintiffs cannot be liable under that criminal statute as Plaintiffs neither bring, transport, nor induce aliens to enter into the United States.  Moreover, Plaintiffs do not, with knowledge or reckless disregard, "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection" aliens.  Nor do Plaintiffs aid and abet such crimes or conspire to commit such crimes.  This is all plain from Plaintiffs' resolutions/ordinances and police policies, which make clear that they will not affirmatively inquire about immigration status on a routine basis and will not affirmatively provide assistance unless legally required, but that do not obstruct or interfere with any lawful immigration commands.

178.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs can be held criminally liable under the Bondi Memo.  A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TWELVE
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

179.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

180.     Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is an agency action subject to review under the APA.

181.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

182.     The Bondi Memo is a final agency action because it announces a final decision to pause DOJ funding on a blanket basis at a certain time and thus marks the consummation of DOJ's decision-making process.  Further, the Bondi Memo is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DOJ to stop funding directed by Congress that would be provided but for the Bondi Memo.

183.     Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

184.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things,

that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

185.    The Bondi Memo fails to provide any reasonable explanation for the decision to withhold all DOJ funds from Plaintiffs, a disproportionately broad action with immediate consequences to Plaintiffs.  It also fails to justify the decision to condition and withhold funds that Congress had already appropriated for disbursement.

186.    The APA further provides that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

187.    As described above, the Bondi Memo violates bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

188.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

189.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress.  The freeze of DOJ funds and the conditions placed on all DOJ grants are blatantly illegal.

190.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the Bondi Memo violates the APA because it is arbitrary and capricious, because it is

contrary to constitutional rights, powers, privileges, or immunities; to vacate the Bondi Memo under 5 U.S.C. § 706; to provide preliminary relief under 5 U.S.C. § 705; and to preliminarily and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

## COUNT THIRTEEN
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

191.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

192.    Defendant DOT is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the DOT Order is an agency action subject to review under the APA.

193.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

194.    The DOT Order, DOT Letter, and SS4A Conditions are final agency actions because each announces a final decision: to de-prioritize DOT funding to sanctuary jurisdictions, to withhold funds from all recipients who do not cooperate with "the enforcement of Federal immigration law," and to require cooperation with immigration enforcement to receive funds. Thus, each marks the consummation of DOT's decision-making process. Further, the DOT Order, DOT Letter, and SS4A Conditions are actions determining rights or obligations or from which legal consequences will flow because each exercises a purported authority held by DOT to stop or condition funding directed by Congress that would be provided but for the DOT directives.

195.    Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

196.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

197.    The DOT Order, DOT Letter, and SS4A Conditions fail to provide any reasonable explanation for the decision to deprioritize DOT funds for sanctuary jurisdictions or to deny funds to recipients who do not cooperate with federal immigration enforcement. There is a qualitative disconnect between the threatened DOT funding and immigration-related policies: sanctuary policies have nothing to do with transportation or traffic safety and the DOT Order, DOT Letter, and SS4A Conditions fail to explain any link between them. As a further illustration of this disconnect, the DOT Order nonsensically prioritizes other projects such as those for "communities with marriage and birth rates higher than the national average."

198.    The APA further provides that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

199.    As described above, the DOT Order, DOT Letter, and SS4A Conditions violate bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

200.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

201.     Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes DOT to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress.  DOT's de-prioritization of DOT funds for sanctuary jurisdictions (the effect of which is defunding) and its efforts to deny funds to jurisdictions that do not cooperate with federal immigration policy are blatantly illegal.

202.     Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the DOT Order, DOT Letter, and SS4A Conditions violate the APA because each is arbitrary and capricious and because each is contrary to constitutional rights, powers, privileges, or immunities; to vacate portions of the DOT Order, DOT Letter, and SS4A Conditions under 5 U.S.C. § 706; to provide preliminary relief under 5 U.S.C. § 705; and to preliminarily and permanently enjoin Defendants from implementing or enforcing the DOT Order, DOT Letter, and the SS4A Conditions.

## COUNT FOURTEEN

(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

203.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

204.     Defendant DHS is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Noem Memo and DHS Conditions are agency actions subject to review under the APA.

205.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

206.     The Noem Memo and DHS Conditions are final agency actions because both announce a final decision to cease all funding of sanctuary jurisdictions and require cooperation

with federal civil immigration enforcement.  Further, the Noem Memo and DHS Conditions are actions determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DHS to stop funding directed by Congress that would be provided but for the Noem Memo or DHS Conditions.

207.    Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

208.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

209.    The Noem Memo and DHS Conditions fail to provide any reasonable explanation for the decision to cease DHS funds for sanctuary jurisdictions.  There is a qualitative disconnect between the threatened DHS funding and immigration-related policies: for example, the sanctuary policies have nothing to do with emergency relief grants and the Noem Memo and DHS Conditions fail to explain any link between them.

210.    Also under the APA, a "court shall . . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

211.    As described above, the Noem Memo and Section C of the DHS Conditions violate bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the

Fifth Amendment's procedural due process and vagueness doctrines.

212.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

213.    Defendants may exercise only authority granted to them by statute. No law or provision of the Constitution authorizes DHS to withdraw properly obligated federal funds on the basis of cooperation and compliance with federal civil immigration enforcement. DHS's ceasing of certain DHS funds for sanctuary jurisdictions is blatantly illegal.

214.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that both the Noem Memo and Section C.IX of the DHS Conditions violate the APA because they are arbitrary and capricious and because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the Noem Memo and Section C.IX of the DHS Conditions under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Noem Memo and DHS Conditions.

### COUNT FIFTEEN
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)

215.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

216.    Defendant HUD is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the HUD Letter is an agency action subject to review under the APA.

217.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from

which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

218.      The HUD Letter is a final agency action because it announces a final decision to withhold funds from all recipients who do not cooperate with the Subsidization Executive Order or who have "'sanctuary' policies." Thus, it marks the consummation of HUD's decision-making process. Further, the HUD Letter is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by HUD to condition funding directed by Congress that would be provided but for the HUD Letter.

219.      Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

220.      "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

221.      The HUD Letter fails to provide any reasonable explanation for the decision to condition funding on compliance with the Subsidization Executive Order. There is a qualitative disconnect between the threatened HUD funding and the immigration-related policies of the Subsidization Executive Order: sanctuary policies have nothing to do with housing and community development activities, and the HUD Letter fails to explain any link between them.

222.      Also under the APA, a "court shall . . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

223.    As described above, the HUD Letter violates bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

224.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

225.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes HUD to impose extra-statutory conditions not authorized by Congress.  HUD's efforts to deny funds to jurisdictions that do not cooperate with the Subsidization Executive Order are blatantly unlawful.

226.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the HUD Letter violates the APA because it is arbitrary and capricious and because it is contrary to constitutional rights, powers, privileges, or immunities; vacate the HUD Letter under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing HUD Letter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein.  Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

1.    Declare the following are unlawful and unconstitutional on their face and as applied:

   a.    Section 17 of the Day One Executive Order;

   b.    Section 2(a)(ii) of the Subsidization Executive Order;

   c.    Section 3 of the Designation Executive Order;

    d.  The Bondi Memo;

    e.  Section 5(f)(v) of the DOT Order;

    f.  The DOT Letter;

    g.  Article 24.2(a) of the SS4A Conditions;

    h.  The Noem Memo;

    i.  Sections C.IX and C.XXXI of the DHS Conditions; and

    j.  The HUD Letter.

2.    Declare that Plaintiffs do not "seek to interfere with the lawful exercise of Federal law enforcement operations" merely by virtue of their sanctuary policies and adherence thereto;

3.    Declare that Plaintiffs' policies do not "seek to shield illegal aliens from deportation";

4.    Declare that Plaintiffs do not "obstruct the enforcement of Federal immigration laws" merely by virtue of their sanctuary policies and adherence thereto;

5.    Declare that Plaintiffs do not violate 8 U.S.C. § 1373 merely by virtue of their sanctuary policies and adherence thereto;

6.    Declare that Plaintiffs cannot be held criminally liable under the Bondi Memo merely by virtue of Plaintiffs' sanctuary policies and adherence thereto;

7.    Declare that the following violate the APA:

    a.  The Bondi Memo;

    b.  Section 5(f)(v) of the DOT Order;

    c.  The DOT Letter;

    d.  Article 24.2(a) of the SS4A Conditions;

    e.  The Noem Memo;

    f.    Sections C.IX and C.XXI of the DHS Conditions; and

    g.    The HUD Letter.

8.    Preliminarily and permanently enjoin Defendants from implementing or enforcing, or taking any other action in furtherance of any withholding or conditioning of federal funds based on, the following orders and directives:

    a.    Section 17 of the Day One Executive Order;

    b.    Section 2(a)(ii) of the Subsidization Executive Order;

    c.    Section 3 of the Designation Executive Order;

    d.    The Bondi Memo;

    e.    Section 5(f)(v) of the DOT Order;

    f.    The DOT Letter;

    g.    Article 24.2(a) of the SS4A Conditions;

    h.    The Noem Memo;

    i.    Sections C.IX and C.XXXI of the DHS Conditions; and

    j.    The HUD Letter.

9.    Preliminarily and permanently enjoin Defendants from taking enforcement action against Plaintiffs based on the policies, orders, and directives identified in this Complaint.

10.    Issue preliminary relief under 5 U.S.C. § 706 and vacate the following agency orders and directives pertaining to sanctuary jurisdictions:

    a.    The Bondi Memo;

    b.    Section 5(f)(v) of the DOT Order;

    c.    The DOT Letter;

    d.    Article 24.2(a) of the SS4A Conditions;

      e.   The Noem Memo;

      f.   Sections C.IX and C.XXXI of the DHS Conditions; and

      g.   The HUD Letter.

11.    Award to Plaintiffs reasonable attorney's fees and costs incurred in pursuing this action, and pre-judgment and post-judgment interest at the highest lawful rates; and

12.    Grant such other and further relief as this Court deems just and appropriate.


Dated: May 31, 2025                 Respectfully submitted,

                             */s/ Oren Sellstrom*
                             Iván Espinoza-Madrigal (BBO# 708080)
                             Oren Sellstrom (BBO# 569045)
                             Mirian Albert (BBO# 710093)
                             LAWYERS FOR CIVIL RIGHTS
                             61 Batterymarch Street, Fifth Floor
                             Boston, MA 02110
                             Tel: (617) 482-1145
                             iespinoza@lawyersforcivilrights.org
                             osellstrom@lawyersforcivilrights.org
                             malbert@lawyersforcivilrights.org

                             *Attorneys for Plaintiffs City of Chelsea and City of Somerville*

## CERTIFICATE OF SERVICE

I, Oren Sellstrom, hereby certify that on this 31th day of May, 2025, I served the above-

captioned document via U.S. mail addressed as follows:


UNITED STATES OF AMERICA
c/o United States Attorney for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200, Boston, MA 02210

DONALD J. TRUMP, in his official capacity as President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

PAMELA J. BONDI, in her official capacity as Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

UNITED STATES DEPARTMENT OF JUSTICE
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

KRISTI L. NOEM, in her official capacity as Secretary of the United States Department of
Homeland Security
United States Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528-0485

UNITED STATES DEPARTMENT OF HOMELAND SECURITY
Office of General Counsel
245 Murray Lane SW, Mail Stop 0485
Washington, DC 20528-0485

SEAN P. DUFFY in his official capacity as Secretary of the United States Department of
Transportation
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

UNITED STATES DEPARTMENT OF TRANSPORTATION
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

SCOTT TURNER in his official capacity as Secretary of the United States Department of
Housing and Urban Development
United States Department of Housing and Urban Development
451 7th Street S.W.,
Washington, DC 20410

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
United States Department of Housing and Urban Development
451 7th Street S.W.,
Washington, DC 20410

I also sent a copy of the above-captioned document via electronic mail as follows:

Rayford Farquhar
Abraham George
United States Attorney's Office of the District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, MA 02210
Rayford.Farquhar@usdoj.gov
Abraham.George@usdoj.gov