# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and
CITY OF SOMERVILLE,

     *Plaintiffs*,

        v.

DONALD J. TRUMP, President of the United
States, PAMELA J. BONDI, Attorney General
of the United States, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI L.
NOEM, Secretary of the United States
Department of Homeland Security, UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY, SEAN P. DUFFY, Secretary of
the United States Department of
Transportation, UNITED STATES
DEPARTMENT OF TRANSPORTATION,
SCOTT TURNER, Secretary of the United
States Department of Housing and Urban
Development, UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, and UNITED
STATES OF AMERICA,

     *Defendants*.

Case No. 1:25-cv-10442

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

ORAL ARGUMENT REQUESTED

LEAVE TO FILE EXCESS PAGES
GRANTED ON JUNE 2, 2025

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 5

    A.  Plaintiffs Limit the Use of Local Resources for Federal Civil Immigration Enforcement. 5

    B.  The First Trump Administration's Attack on "Sanctuary Jurisdictions"........................... 7

    C.  The Second Trump Administration Renews the Attack. ..................................... 8

    D.  The Executive Orders and Agency Directives Imminently Harm Plaintiffs. .................. 12

LEGAL STANDARD.................................................................................................... 15

ARGUMENT .............................................................................................................. 15

    A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .................................... 15

        1.  The Executive Orders and Agency Directives Violate the Separation of Powers...... 15

        2.  The Executive Orders and Agency Directives Violate the Spending Clause. ............ 18

        3.  The Executive Orders and Agency Directives Violate the Tenth Amendment and Its Anticommandeering Doctrine.................................................................................... 21

        4.  The Executive Orders and Agency Directives Violate the Fifth Amendment by Their Violations of Due Process and by Their Vagueness.................................................. 24

        5.  The Agency Directives Violate the Administrative Procedure Act............................ 27

    B.  Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions................... 29

    C.  The Balance of the Equities and the Public Interest Favor a Preliminary Injunction....... 34

CONCLUSION............................................................................................................ 35

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Asseo v. Pan Am. Grain Co.*,
  805 F.2d 23 (1st Cir. 1986)................................................................................6

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................................................................27

*Berge v. Sch. Comm. of Gloucester*,
  107 F.4th 33 (1st Cir. 2024).............................................................................15

*Biden v. Texas*,
  597 U.S. 785 (2022)........................................................................................28

*City & Cnty. of San Francisco v. Trump*,
  2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ...................................................5, 12

*City & Cnty. of San Francisco v. Trump*,
  2025 WL 1282637 (N.D. Cal. May 3, 2025)..................................12, 16, 18, 22, 30

*City & Cnty. of San Francisco v. Trump*,
  2025 WL 1358492 (N.D. Cal. May 9, 2025) .......................................................12

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .................................................................7, 16, 32

*City & Cnty. of San Francisco v. Barr*,
  965 F.3d 753 (9th Cir. 2020) ...........................................................................7

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ...........................................................................7

*City of Los Angeles v. Barr*,
  941 F.3d 931 (9th Cir. 2019) ...........................................................................8

*City of Los Angeles v. Sessions*,
  2018 WL 6071072 (C.D. Cal. Sept. 13, 2018), *aff'd sub nom. City of Los Angeles v. Barr*,
  941 F.3d 931 (9th Cir. 2019) ...........................................................................33

*City of Philadelphia v. Att'y Gen. of United States*,
  916 F.3d 276 (3d Cir. 2019)............................................................................7

*City of Providence v. Barr*,
  954 F.3d 23 (1st Cir. 2020)...................................................................2, 7, 16, 17

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................20, 24, 25, 26

*Coal. for Basic Human Needs v. King*,
  654 F.2d 838 (1st Cir. 1981) ...................................................................................31

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) ....................................................................................................29

*Dorce v. Wolf*,
  506 F. Supp. 3d 142 (D. Mass. 2020) .....................................................................34

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)..............................................................................................4, 24

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)............................................................................................21, 34

*Hill v. Colorado*,
  530 U.S. 703 (2000)..................................................................................................25

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928)..................................................................................................15

*Louisiana Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986)..................................................................................................16

*Lunn v. Commonwealth*,
  78 N.E.3d 1143 (Mass. 2017) ..................................................................................21

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
  496 F. Supp. 3d 600 (D. Mass. 2020) .....................................................................28

*Massachusetts vs. Nat'l Insts. of Health*,
  2025 WL 702163 (D. Mass. Mar. 5, 2025)........................................30, 32, 33, 34

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)..............................................................................................4, 24

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015)....................................................................................21

*Murphy v. NCAA*,
  584 U.S. 453 (2018)..............................................................................................4, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)........................................................................19, 20, 21, 22

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
   287 F.3d 1 (1st Cir. 2002) ...........................................................................15

*New York v. United States*,
   505 U.S. 144 (1992) ..............................................................................21, 34

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................15, 34

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ......................................................................................19

*Pennsylvania v. West Virginia*,
   262 U.S. 553 (1923) ..................................................................................30

*PFLAG, Inc. v. Trump*,
   2025 WL 685124 (D. Md. Mar. 4, 2025) .....................................................28

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
   699 F.3d 962 (7th Cir. 2012) .....................................................................31

*Printz v. United States*,
   521 U.S. 898 (1997) ..................................................................................22

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
   No. 1:25-cv-11048 (D. Mass. Apr 21, 2025) ..................................................3

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................................4, 18, 19, 20

*Trump v. United States*,
   603 U.S. 593 (2024) ..................................................................................16

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) ..................................................................................27

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) .....................................................................15

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................15

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................................................16

## CONSTITUTIONS

U.S. Const. art. I...........................................................................................4, 15

Mass. Const. amend. art. LXXXIX..............................................................................5

**STATUTES**

5 U.S.C. § 551 ........................................................................................................27

5 U.S.C. § 705 ........................................................................................................28

5 U.S.C. § 706 .....................................................................................................4, 28

Pub. L. 117-58 § 24112(d)(3) ................................................................................17

## PRELIMINARY STATEMENT

Like many local governments across the country, Plaintiffs Chelsea and Somerville have adopted policies that limit their participation in federal immigration enforcement efforts.  Plaintiffs do not obstruct or impede the activities of federal immigration officers in any way; they have simply made the policy choice—consistent with their assessment of how best to serve their local communities and employ their limited resources—not to actively assist in these efforts.

Public safety considerations are at the core of this decision.  As both the Chelsea and Somerville Police Chiefs attest, by avoiding unnecessary entanglement with federal immigration efforts, Plaintiffs' policies help ensure that all residents—regardless of immigration status—feel safe interacting with local law enforcement and officials.  Victims of crime can report incidents to the police without fear that doing so will expose themselves or their loved ones to immigration enforcement; witnesses are more likely to cooperate with police for the same reason.  This critical trust between residents and local police helps keep the community safe for everyone, by preventing criminal activity from flourishing unchecked.  Plaintiffs' policies also allow their police departments to efficiently allocate scarce resources to high-priority *criminal* enforcement issues in their communities, rather than to *civil* immigration enforcement.

As self-governing cities under the Massachusetts Constitution, Chelsea and Somerville are permitted to make this policy choice, and the United States Constitution protects them from attempts by the federal government to coerce them into assisting with federal immigration enforcement.  Yet this is precisely what Defendants—President Donald J. Trump and other federal officials—are doing.  These efforts have become increasingly aggressive over the last four months and now pose an imminent threat to Plaintiffs' ability to govern and serve their residents.  Plaintiffs now ask for this Court's intervention to preliminarily enjoin Defendants' unconstitutional campaign to undermine the authority of local governments to make these purely local decisions.

As the First Circuit has stated in ruling in favor of local governments on a similar challenge during President Trump's first administration, "[w]hen the federal government deals with state and local governments, it must turn square corners." *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020).

Defendants' unconstitutional campaign against what are commonly known as "sanctuary cities" began on Inauguration Day.  On January 20, 2025, with the stroke of a pen, Defendant Trump started a cascade of events aiming to seize the Spending Power that the Constitution entrusts to Congress alone, in violation of the Separation of Powers.  He targeted municipalities like Plaintiffs whose policy views diverge from his, with Executive Order 14,159 (the "Day One Executive Order") characterizing "so-called 'sanctuary' jurisdictions" as those that "seek to interfere with the lawful exercise of Federal law enforcement operations," even though Plaintiffs do no such thing.  Am. Compl., Ex. A.[1]  Defendant Trump has since issued two additional executive orders targeting sanctuary cities: in February, he issued Executive Order 14,218 (the "Subsidization Executive Order"), *id.*, Ex. B, and most recently, in April, he issued Executive Order 14,287 (the "Designation Executive Order," together with the Day One Executive Order and the Subsidization Executive Order, the "Executive Orders"), *id.*, Ex. C.  Pursuant to the Designation Executive Order, on May 29, 2025, the U.S. Department of Homeland Security ("DHS") published a list titled "Sanctuary Jurisdictions Defying Federal Immigration Law" (the "Designation List"), expressly naming Plaintiffs Chelsea and Somerville and making them official targets of Defendant Trump's illegal campaign.  *See id.*, Ex. K.

These Executive Orders are massively broad in their sweep.  As Defendant Trump is trying to do in other contexts, he is using the full coercive power of the federal government against

---

[1] The Declaration of Oren Sellstrom, attached to this Motion, authenticates each of the exhibits attached to the Amended Complaint.  Plaintiffs therefore do not reattach these exhibits again.

Chelsea and Somerville and other similarly situated local governments.[2]  His Executive Orders threaten to remove *all* federal funding from those jurisdictions that do not meet his unilaterally imposed conditions.  For Plaintiffs, this is an enormous financial threat: in its last full fiscal year, Chelsea received over $14 million in federal funding, and Somerville received close to $20 million. This federal funding supports a wide variety of critical services and projects for the cities' residents, including housing rehabilitation, food delivery to elderly residents, roadway safety projects, educational services, and more—none of which has any connection to federal immigration enforcement.

Also similar to his strategy in other contexts, Defendant Trump is adopting a "whole-of-government" approach to bringing Chelsea and Somerville to their knees, with numerous executive agencies acting quickly to implement his Executive Orders.[3]  For example, the Department of Transportation ("DOT") has issued an order (the "DOT Order") prioritizing funding for projects that require local "compliance or cooperation with Federal immigration enforcement," and is now mandating that funding recipients certify compliance with these terms to remain eligible for funding.  *Id.*, Ex. E; *see also id.*, Exs. F, G.  Somerville now faces the choice of signing such an agreement or losing a nearly $4 million grant award for roadway safety which, again, has nothing to do with federal immigration enforcement.  *See id.*, Ex. M.

Similarly, the Department of Justice ("DOJ") has issued a memorandum (the "Bondi

---

[2] *See e.g.*, *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs., et al.*, No. 1:25-cv-11048 (D. Mass. Apr 21, 2025), ECF No. 1 (challenging Defendant Trump's broad freezing of Harvard's research funding on constitutional grounds); *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec., et al.*, No. 1:25-cv-11472 (D. Mass. May 23, 2025), ECF No. 1 (challenging Defendant Trump's total revocation of Harvard's ability to enroll international students and sponsor international scholars).

[3] *See e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just., et al.*, No. 1:25-cv-00716 (D.D.C. Mar 11, 2025), ECF No. 1 (challenging Defendant Trump's sweeping executive order targeting the law firm and barring its attorneys from access to government buildings and officials).

Memo") initiating a pause on DOJ funding and stating that sanctuary jurisdictions "should not receive access" to DOJ grants. *See id.*, Ex. D. DHS, in addition to publishing the Designation List, has issued a memorandum (the "Noem Memo") directing its components to cease funding to sanctuary jurisdictions, and DHS has updated its general terms and conditions for FY2025 grants (the "DHS Conditions") to require grant recipients to comply with federal immigration enforcement. *See id.*, Exs. H-I. And the Department of Housing and Urban Development ("HUD") has announced that grant agreements will now require compliance with the Subsidization Executive Order and the agency will "take steps to ensure that Federal resources are not used to support 'sanctuary' policies." *See id.*, Ex. J (the "HUD Letter"). These executive agency directives are cumulatively referred to in this motion (the "Motion") as the "Agency Directives."

Defendants' illegal attack on sanctuary cities blatantly violates the Constitution. Specifically, by attempting to unilaterally withhold Congressionally allocated funds, the Executive Orders and Agency Directives violate core Separation of Powers principles. U.S. Const., art. I, §§ 1, 8 (granting Congress all legislative and spending powers). Even if Congress *had* imposed the conditions the Executive Branch now seeks to impose—which it has not—the conditions would still violate the Spending Clause because, *inter alia*, they are unrelated to the federal interest in the programs at issue and are unduly coercive. *See South Dakota v. Dole*, 483 U.S. 203, 207-08, 210-11 (1987). For similar reasons, the challenged actions also violate the Tenth Amendment's anti-commandeering principle, *see Murphy v. NCAA*, 584 U.S. 453, 463 (2018), and the Fifth Amendment's guarantee of due process, *see Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (requiring due process before termination of protected interest); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying the void-for-vagueness doctrine). Finally, the Agency Directives violate the Administrative Procedure Act ("APA") because they are arbitrary and capricious, contrary to the Constitution, and in excess of statutory authority. *See* 5 U.S.C. § 706.

One federal court has already preliminarily enjoined a number of the challenged actions, but its ruling is limited to the sixteen plaintiff-jurisdictions that brought that action. *See City & Cnty. of San Francisco v. Trump* ("*San Francisco II")*, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) (enjoining Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and the Bondi Memo). Plaintiffs Chelsea and Somerville now ask this Court for similar relief: a preliminary injunction to immediately enjoin Defendants from implementing or enforcing the Executive Orders, the Agency Directives, or any other materially similar directive to withhold, condition, or freeze federal funds to "sanctuary jurisdictions." The harms to Plaintiffs from this unconstitutional campaign are mounting daily and will only increase in number, further damaging Plaintiffs and their communities, unless Defendants are enjoined by this Court.

## FACTUAL BACKGROUND

**A.    Plaintiffs Limit the Use of Local Resources for Federal Civil Immigration Enforcement.**

Plaintiffs—the Cities of Chelsea and Somerville in Massachusetts—have "the right of self-government in local matters." Mass. Const. amend. art. LXXXIX. To that end, both Chelsea and Somerville have enacted policies that limit participation in federal immigration enforcement, as a way to ensure public safety, maintain community trust, and preserve scarce resources. *See* Declaration of Chelsea Police Chief Keith Houghton ("Houghton Decl.") ¶¶ 8-9, 19 (describing how Chelsea's policies "are an integral part of . . . community engagement and trust-building"); Declaration of Somerville Police Chief Shumeane Benford ("Benford Decl.") ¶¶ 9-10, 17 ("[I]f [the Somerville Police Department] actively participate[d] in federal immigration enforcement . . . . the public trust that we have worked so hard to build would be severely undermined, particularly in immigrant communities, setting us back decades . . . I believe any such change in our current

policies would be contrary to public safety and make our residents less safe.").[4]

Chelsea self-identifies as a "sanctuary city"; Somerville calls itself a "welcoming community." Their policies are similar and share two key features. First, Plaintiffs do not routinely inquire into the specific immigration status of any individual. *See* Declaration of Chelsea City Manager Fidel Maltez ("Maltez Decl.") ¶ 10; Benford Decl. ¶ 11. Second, Plaintiffs generally limit local officials from participating in federal immigration enforcement for purely civil immigration violations. *See* Houghton Decl. ¶ 13; Benford Decl. ¶ 11. Neither feature interferes with immigration enforcement. *See* Maltez Decl. ¶ 11; Houghton Decl. ¶ 16; Declaration of Somerville Mayor Katjana Ballantyne ("Ballantyne Decl.") ¶ 11; Benford Decl. ¶ 15.

Importantly, Plaintiffs' policies do not prohibit local law enforcement from cooperating and assisting with federal immigration officials during *criminal* investigations, nor do they prohibit cooperation when there is a serious threat to public safety or national security. *See* Houghton Decl. ¶¶ 11-13, 15; Benford Decl. ¶¶ 11, 14. And outside the immigration context, both cities routinely partner with federal law enforcement officials on criminal matters. *See* Houghton Decl. ¶ 15; Benford Decl. ¶ 14. They simply do not, as a matter of course, assist federal authorities with *civil* immigration matters. Both cities also follow Massachusetts state law, which strictly limits the ability of police in Massachusetts to comply with immigration detainers, which are requests from federal Immigrations and Customs Enforcement (ICE) to hold individuals after they would otherwise be entitled to release from local custody. Houghton Decl. ¶ 14 (citing *Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017)); Benford Decl. ¶ 13 (same).

---

[4] This assessment is buttressed by a wealth of social science evidence. *See, e.g.*, Nick Miroff, *Study Finds No Crime Increase in Cities That Adopted 'Sanctuary' Policies, Despite Trump Claims*, Washington Post (Oct. 21, 2020), https://www.washingtonpost.com/national/sanctuary-city-study-immigration-crime/2020/10/21/5810d13a-12fa-11eb-82af-864652063d61_story.html. This Court may consider such materials on a motion for preliminary injunction. *See Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 25-26 (1st Cir. 1986).

**B.    The First Trump Administration's Attack on "Sanctuary Jurisdictions"**

The Administration's attack on "sanctuary jurisdictions" began in Defendant Trump's first term as President.  Almost immediately upon entering office in January 2017, Defendant Trump issued Executive Order 13,768 ("EO 13,768"), titled "Enhancing Public Safety in the Interior of the United States."  EO 13,768 targeted jurisdictions that "willfully refuse[d] to comply with 8 U.S.C. § 1373," a statute concerning the sharing of the immigration statuses of individuals with the Immigration and Naturalization Service (now ICE).  The Executive Order labeled these jurisdictions as "sanctuary jurisdictions" and advanced threats that the federal government would pull federal grant funding from such jurisdictions.  A few months later, the DOJ followed suit and subsequently conditioned the receipt of certain federal funds on compliance with 8 U.S.C. § 1373.

Federal district courts across the country enjoined both EO 13,768 and the DOJ's conditions based on various constitutional grounds, finding that the executive actions violated the Separation of Powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment; these injunctions were subsequently upheld, on various bases, by nearly all federal courts of appeals, including the First Circuit.  *See City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), *City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020).  Further, the First Circuit expressly criticized the reasoning of the only court of appeals to come out the other way, the Second Circuit.  *See Providence*, 954 F.3d at 37, 39 (noting that a "close reading of the [Byrne JAG] statutory text casts grave doubt on the Second Circuit's extravagant interpretation" and "find[ing] equally unconvincing the Second Circuit's [other] asserted justification[s]".).

**C.    The Second Trump Administration Renews the Attack.**

Shortly after beginning his second term in January 2025, Defendant Trump launched a renewed attack on sanctuary jurisdictions.  Just hours after his inauguration, Defendant Trump issued the **Day One Executive Order**.  *See* Am. Compl., Ex. A.  Section 17 of the Day One Executive Order demands that the Attorney General and Secretary of DHS "*ensure* that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, *do not receive* access to Federal funds."  *Id.* (emphases added).

Later, on February 19, 2025, Defendant Trump issued the **Subsidization Executive Order**.  *See id.*, Ex. B.  Section 2(a)(ii) of the Subsidization Executive Order requires that federal agency heads "ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."  *Id.*

On April 28, 2025, Defendant Trump launched a third attack at sanctuary jurisdictions: the **Designation Executive Order**.  *See id.*, Ex. C.  Under Section 3 of the Designation Executive Order, which outlines the "Consequences for Sanctuary Jurisdiction Status," heads of executive agencies and departments "*shall* identify appropriate Federal funds to sanctuary jurisdictions . . . for suspension or termination."  *Id.* (emphasis added).  Jurisdictions that "remain sanctuary jurisdictions" after notice of their designation face enforcement measures from DOJ and DHS. *Id.*[5]  The Administration's message is clear: funding to sanctuary jurisdictions must, and will, stop.

Federal agencies have also acted swiftly to implement these Executive Orders:

---

[5] A fact sheet released in association with the Designation Executive Order, which states that Defendant Trump is "following through on his promise to rid the United States of sanctuary cities," quotes a post from Defendant Trump's Truth Social Account: "No more Sanctuary Cities!  They protect the Criminals, not the Victims.  They are disgracing our Country, and are being mocked all over the World.  Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"  *See* Am. Compl., Ex. N.

Department of Transportation (DOT): On January 29, 2025, Defendant DOT Secretary Sean Duffy released the DOT Order, which stated that for "all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts," DOT "*shall* prioritize projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." *See id.*, Ex. E (emphasis added).   On March 17, 2025, DOT issued updated grant conditions for a key local funding source: the Safe Streets and Roads for All ("SS4A") Program, including the following language for FY2023 grants: "Recipient *will* cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *See id.*, Ex. G (the "SS4A Conditions") (emphasis added).   On April 24, 2025, DOT sent a letter to Plaintiffs and other recipients of DOT funding.  *See id.*, Ex. F (the "DOT Letter").   The DOT Letter cements the agency's policy that continued receipt of DOT funds is expressly tied to "cooperation generally with Federal authorities . . . including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the [DHS] in the enforcement of Federal immigration law." *Id.*

Department of Justice (DOJ): On February 5, 2025, Attorney General Pamela Bondi issued the Bondi Memo, which provides that "the Department of Justice shall pause the distribution of all [DOJ] funds" and declares that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." *See id.*, Ex. D.   It further defines "sanctuary jurisdictions," providing that "[s]o-called 'sanctuary jurisdictions' include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws," without specifying

which "other" laws it was referencing. *Id.* Additionally, the Bondi Memo reiterates earlier threats to prosecute sanctuary cities; beginning in early February, DOJ has filed suit against various jurisdictions to invalidate their "sanctuary" policies.[6] These lawsuits make clear that the Trump Administration's view of what qualifies as non-compliance with federal immigration enforcement is both exceedingly broad and undefined in scope.[7]

Department of Homeland Security (DHS): On February 19, 2025, DHS Secretary Kristi Noem issued the Noem Memo, which demands a review of federal awards to determine if awards are going to "sanctuary jurisdictions" and instructs that if such awards are identified, funding must "cease." *See id.*, Ex. H. Further, the Noem Memo indicates that "[c]omponents should also make appropriate criminal referrals to the [DOJ]." *Id.* On April 18, 2025, DHS released the DHS Conditions, setting forth updated general terms and conditions for the agency's FY2025 grants. *See id,,* Ex. I. Under Section C.IX, titled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," grant recipients must agree to: "compl[iance] with the requirements of 8 U.S.C. §§ 1373 and 1644," "compl[iance] with other relevant laws related to immigration," "honor[ing] requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer," "provid[ing] access to detainees," and "not leak[ing] or otherwise publiciz[ing] the existence of an immigration enforcement operation." *Id.* Under C.XXXI, titled "Presidential

---

[6] *See United States v. Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; *United States v. New York, et al.*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025), ECF No. 1; *United States v. Colorado, et al.*, No., 1:25-cv-01391-KAS (D. Colo. May 2, 2025), ECF No. 1; *United States v. Rochester, et al.*, No. 6:25-cv-06226 (W.D.N.Y. Apr. 24, 2025), ECF No. 1; *United States v. Newark, et al.*, No. 2:25-cv-05081 (D.N.J. May 22, 2025), ECF No. 1.
[7] *See*, *e.g.*, *United States v. Illinois, et al.*, No. 1:25-cv-1285, ECF No. 1 (asserting that local jurisdictions violate the Constitution if they prohibit: detaining an individual on the basis of a detainer or civil immigration warrant, providing information such as custodial status and release date about noncitizens in their custody, assisting with immigration enforcement activities, or inquiring about an individual's citizenship or immigration status).

Executive Orders," grant recipients "must comply with the requirements of Presidential Executive Orders related to grants." *Id.* Most recently, on May 29, 2025, DHS released the Designation List, identifying cities, states, and counties that it declares are "deliberately and shamefully obstructing the enforcement of federal immigration laws" and "demand[ing] that these jurisdictions immediately review and revise their policies to align with Federal immigration laws." *See id.*, Ex. K. The jurisdictions named on this list are, pursuant to the Designation Executive Order, targeted for the suspension or termination of federal funds.[8]

Department of Housing and Urban Development (HUD): HUD joined in on the attack on April 4, 2025, when Defendant HUD Secretary, Scott Turner, issued the HUD Letter, which stated that HUD will ensure all programs comply with the Subsidization Executive Order and "take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens." *See id.*, Ex. J.

Each of these directives is more than mere guidance or suggestion—they are commands (e.g., "*shall*") to disfavor and defund jurisdictions based on federal immigration policies that are wholly unrelated to the funding at issue. These actions are actualizing the Administration's campaign promises and turning them into swift action against sanctuary jurisdictions.

While these actions were unfolding, in a similar litigation, Judge William H. Orrick of the

---

[8] On June 1, 2025, DHS removed the Designation List from its website, apparently after facing pushback from some localities. *See* Ted Hesson, *DHS Removes List of 'Sanctuary' Cities After Sheriffs Push Back on Non-Compliant Label*, REUTERS (June 1, 2025), https://www.reuters.com/world/us/dhs-removes-list-sanctuary-cities-after-sheriffs-push-back-non-compliant-label-2025-06-01/. While no official reason for the removal of the Designation List was provided, Defendant Noem's public statements make clear that DHS is forging ahead: "Some of the cities have pushed back. They think because they don't have one law or another on the books that they don't qualify, but they do qualify. They are giving sanctuary to criminals." Associated Press, *List of 'Sanctuary Jurisdictions' Removed from US Government Website Following Criticism*, ABC NEWS (June 1, 2025), https://abcnews.go.com/US/wireStory/list-sanctuary-jurisdictions-removed-us-government-website-criticism-122401810.

U.S. District Court of the Northern District of California issued a preliminary injunction on April 24, 2025, enjoining the defendants—which include many of the same defendants as this action—"from directly or indirectly taking any action to withhold, freeze, or condition federal funds" from the plaintiffs, based on Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and the Bondi Memo—each of which is also challenged in this Motion. *San Francisco II,* 2025 WL 1186310, at *3. The court issued a more detailed order on May 3, 2025 to the same effect. *See San Francisco II*, 2025 WL 1282637, at *39 (N.D. Cal. May 3, 2025). And subsequently, on May 9, 2025, in response to Defendant Trump issuing the Designation Executive Order just a few days after the unfavorable ruling, the court clarified that the injunction would apply "to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened" by the challenged sections of the Day One Executive Order and the Subsidization Executive Order. *See San Francisco II*, 2025 WL 1358492, at *5 (N.D. Cal. May 9, 2025).

**D.    The Executive Orders and Agency Directives Imminently Harm Plaintiffs.**

Plaintiffs rely on significant infusions of federal grant funds, including from DOJ, DOT, DHS, and HUD, in order to manage their respective municipalities. *See* Maltez Decl. ¶¶ 13, 16-22; Houghton Decl. ¶ 18; Ballantyne Decl. ¶¶ 17, 19; Declaration of Kate Hartke ("Hartke Decl.") ¶¶ 3, 8-12.

Chelsea received approximately $14.5 million in federal funding for its 2024 fiscal year ("FY2024") and anticipates receiving approximately $8.5 million in federal funding for its 2025 fiscal year ("FY2025"). *See* Maltez Decl. ¶¶ 16-17. The vast majority of these grants are reimbursement-based, which means that Chelsea spends money on the services first and is subsequently reimbursed by the relevant federal agency. *See* Maltez Decl. ¶ 18. Similarly,

Somerville received approximately $19.4 million in federal funding for FY2024 and has thus far has received $12.2 million for FY2025. *See* Hartke Decl. ¶¶ 8-9. Somerville is eligible to receive approximately $7.6 million in reimbursements on active and open federal grants. *See id.* ¶ 9. Similar to Chelsea, the vast majority of federal funding received by Somerville is reimbursement-based. *See id.* ¶ 7.

The Executive Orders and Agency Directives are causing immediate and irreparable harm to Plaintiffs. Given that Plaintiffs have been expressly named on the Designation List, there is no question that their federal funds are under direct and imminent attack, making it impossible for them to forecast revenues and expenditures, which is critical to advance their primary missions of providing key services to their constituents. *See* Maltez Decl. ¶¶ 24-33; Ballantyne Decl. ¶ 19; Hartke Decl. ¶¶ 13-21. Plaintiffs are faced with the imminent loss of all federal funding, which makes up a significant portion of each Plaintiff's overall budget and is the sole or primary source of funding for many critical public services. *See* Maltez Decl. ¶¶ 13, 16-17, 24-25; Ballantyne Decl. ¶¶ 17, 19; Hartke Decl. ¶¶ 3, 8-9, 13-14.

Because almost all of Plaintiffs' federal funding is reimbursement-based, Defendants' actions place Plaintiffs in an untenable position: they must either expend millions of dollars on public services with no assurances the federal government will reimburse them; or they must stop providing needed services to their residents. Plaintiffs can no longer rely on reimbursement, meaning that if they spend money to provide services now, they will have to contend with closing that funding gap themselves when federal funding is withheld. *See* Maltez Decl. ¶¶ 28, 30-32; Ballantyne Decl. ¶ 19; Hartke Decl. ¶ 13-14. Doing so would require diverting funds from other critical services or depleting city reserves. *See* Maltez Decl. ¶ 30; Ballantyne Decl. ¶ 19; Hartke Decl. ¶ 21. It would also force cuts in necessary city staff and programs. *See* Maltez Decl. ¶¶ 30-31; Hartke Decl. ¶ 21.

These harms are both concrete and escalating.  For example, Somerville relies on DOT grant funding from the SS4A Grant Program to improve road safety in its community.  *See* Hartke Decl. ¶¶ 15-16.  Somerville was awarded a SS4A grant in the amount of nearly $4 million (specifically, $3,984,000) for FY2023 to improve road safety for bicyclists, and thereby safety for all road users (including pedestrians of all ages and motorists), under the Somerville Bicycle Network Plan.  *See id.* ¶ 16.  However, on May 13, 2025, DOT notified Somerville that the terms and conditions for FY2023 grants had been updated.  *See id.*; Am. Compl., Ex. M.  Now, among other new language, Somerville is required to agree to actively cooperate with federal immigration law enforcement to receive this nearly $4 million grant, which runs directly counter to Somerville's policies.  *See* Am. Compl., Ex. G, art. 24.  Specifically, DOT has advised Somerville that it must certify that it "*will* cooperate with Federal officials in the enforcement of Federal law, including *cooperating with* and not impeding U.S. Immigration and Customs (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  *Id.* (emphases added); *see also id.*, Ex. M.  Chelsea has similarly received a SS4A grant for FY2023 and plans to apply for an additional SS4A grant for the upcoming fiscal year; it hopes to use those funds to address particularly unsafe intersections in the city as a means of reducing traffic fatalities to zero under a "Vision Zero" plan.  *See* Maltez Decl. ¶¶ 26, 33.

The newly imposed SS4A Conditions starkly illustrate the impossible choices now confronting Plaintiffs: they must either abandon critical projects and services—in Somerville's case, a street safety project worth close to $4 million—or abandon the policies they have determined make their residents and communities safer.  These harms from the Executive Orders and Agency Directives will continue to escalate, damaging Plaintiffs and their communities, unless Defendants are enjoined by this Court.

14

**LEGAL STANDARD**

A "preliminary injunction preserve[s] the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 n.6 (1st Cir. 2024) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts evaluate these factors together, with the first factor, the likelihood of success on the merits, weighing most heavily in the calculus. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits."). The second factor of irreparable harm "has been referred to as a sliding scale, working in conjunction with the moving party's likelihood of success on the merits." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors, the balance of the equities and the effect on public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

1.    *The Executive Orders and Agency Directives Violate the Separation of Powers.*

The Executive Orders, and the Agency Directives implementing them, violate the Separation of Powers by attempting to unilaterally withhold Congressionally allocated funds. Article I of the Constitution grants all legislative and spending powers to Congress, and only to Congress. U.S. Const. art. I, §§ 1, 8. In some circumstances, Congress may delegate its powers, but it must do so clearly and unmistakably. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). As the U.S. Supreme Court has recently explained: "No matter the context, the

President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  Similarly, "[w]hen an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *Providence*, 954 F.3d at 31 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Executive power is at "its lowest ebb" when it acts contrary to Congress's express or implied will. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Where, as here, Congress properly appropriates funds without attaching any conditions related to immigration enforcement, and without delegating authority to impose such conditions, the Executive Branch cannot impede disbursement.  *See Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986); *Providence*, 954 F.3d at 45 (finding that DOJ "took an impermissible shortcut" by imposing immigration enforcement cooperation provisions on grant funds, "conditions that Congress had not vested the DOJ with authority to impose").  The Executive Orders usurp Congressional authority by mandating that "so-called 'sanctuary' jurisdictions" "do not receive" federal funds.  Am. Compl., Exs. A-C.  By imposing conditions on sanctuary jurisdictions' receipt of federal funds, the Executive Branch is unconstitutionally withholding funds in service of its own policy goals.  *See Youngstown*, 343 U.S. at 588 (finding that the president's attempt to use Congressional powers to implement "presidential policy" was unconstitutional); *San Francisco II*, 2025 WL 1282637, at *28 (noting that the Administration "has acted unilaterally to attempt to withhold from every sanctuary city in the country millions of dollars already appropriated by Congress, in direct contravention of our nation's laws."); *City & Cnty. of San Francisco v. Trump*, 897 F.3d at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

16

The Agency Directives implementing the Executive Orders similarly violate the Separation of Powers.  For example, Defendant Duffy cannot order DOT funds to be disbursed or not disbursed based on "local compliance or cooperation with Federal immigration enforcement"; nor can he withhold funds from all recipients who do not cooperate with "the enforcement of Federal immigration law" or condition funds such as the SS4A funds on affirmative cooperation with federal immigration enforcement.  *See* Am. Compl., Exs. E-G; *see also* Pub. L. 117-58 § 24112(d)(3) (Nov. 15, 2021) (Bipartisan Infrastructure Law underpinning SS4A program and containing no immigration-related conditions).[9]

Likewise, the Bondi Memo's attempt to "pause" the distribution of all DOJ funds to purportedly ensure that jurisdictions receiving funds comply with undefined "applicable federal immigration laws" lacks any Congressional authorization.  *See* Am. Compl., Ex. D; *Providence*, 954 F.3d at 31 (holding the DOJ lacked statutory authority to impose similar conditions on properly allocated Congressional funds).  Tellingly, as the First Circuit noted, "Throughout 2015 and 2016, members of Congress introduced various bills that would have made compliance with section 1373 a condition of federal funding for states and localities.  None of these bills became law."  *Providence,* 954 F.3d at 29 (citing *Chicago*, 888 F.3d at 277-78 (collecting bills)).  More

---

[9] In enacting the SS4A program, Congress ensured that the first statutory consideration is whether the project "is likely to significantly reduce or eliminate transportation-related fatalities and serious injuries involving various road users, including pedestrians, bicyclists, public transportation users, motorists, and commercial operators."  *Id.* § 24112(d)(3)(A).  Plaintiffs' projects more than accomplish that goal, by focusing on reducing roadway fatalities to zero (Chelsea) and enhancing bicycle infrastructure for safety purposes (Somerville).  Moreover, the final, broader consideration in the statute that the project "achieve[] such other conditions as the Secretary considers to be necessary" does not save Defendants, as the immigration-related conditions are hardly related to the purposes of the SS4A program.  *Id.* § 24112(d)(3)(G); *see also Providence*, 954 F.3d at 36-39 (rejecting government's argument that statutory language that grantees must comply with "all applicable laws" encompasses conditions that are unrelated to the grant program at issue).

recent attempts have similarly been unsuccessful.[10]  This is therefore an attempt by Executive officers to take matters into their own hands and *legislate.*  That is Congress's exclusive domain.

Similarly, Defendant Noem cannot restrict DHS funds from going to sanctuary jurisdictions, and Defendant DHS cannot require grant recipients to agree to an undefined body of "relevant laws related to immigration."  Am. Compl., Exs. H, I.  Nor can Defendant Turner or HUD condition funding based on compliance with the Subsidization Executive Order or withhold funds from jurisdictions with "'sanctuary' policies."  *Id.*, Ex. J.  Each Defendant lacks Congressional authorization to control the power of the purse; the Executive Orders and Agency Directives represent blatant attempts by the Executive Branch to usurp the powers of Congress in violation of the Separation of Powers.

2.    *The Executive Orders and Agency Directives Violate the Spending Clause.*

Even if Congress had attached any such immigration enforcement-cooperation provisions to federal funding—which it has not—those conditions would be unconstitutional under the Spending Clause.  Congress's Spending Power is not limitless: any and all conditions imposed must be (1) unambiguous, (2) uncoercive, and (3) related to the federal interest, and they (4) must not induce unconstitutional action.  *See South Dakota v. Dole*, 483 U.S. 203, 207-08, 210-11 (1987).  Even assuming the Executive Branch had been delegated proper authority, the Executive Orders and Agency Directives nonetheless violate all four limitations on the Spending Power.  *See San Francisco II*, 2025 WL 1282637, at *30 (holding that Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and the Bondi Memo violate the Spending Clause because they are ambiguous, contain no "nexus to the affected funds," and are coercive).

---

[10] *See, e.g.*, No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. § 3 (2024) (bill seeking to make "sanctuary jurisdictions ineligible for certain federal funds").

*First*, conditions must be identified unambiguously, prior to the acceptance of funding, to ensure that states and local jurisdictions can "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The conditions within the Executive Orders fail this test: None adequately defines "so-called 'sanctuary' jurisdictions," "so-called 'sanctuary' policies," or "sanctuary jurisdictions." They refer broadly and vaguely to jurisdictions that "seek to interfere" with federal immigration enforcement, or "seek to shield illegal aliens from deportation…." *See* Am. Compl., Exs. A-C. But those terms are undefined. Nor do the Executive Orders identify specifically which "Federal funds" or "Federal payments" are at issue, including whether they encompass funding that has already been awarded. *See id.* Therefore, at the time Plaintiffs applied for and accepted these grants, they were unable to make that choice "knowingly, cognizant of the consequences of" their decision to accept the federal funding, making these after-the-fact conditions unconstitutional. *See Halderman*, 451 U.S. at 17.[11]

*Second*, spending conditions must not be "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211. When the "financial inducement" is high enough, and loss of funding is significant, this represents an impermissible "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (holding that conditioning a sizeable portion of states' budgets on compliance violates the Spending Clause). Here, the Executive Orders and Agency Directives threaten *all* federal grants Plaintiffs receive—a "financial

---

[11] The Agency Directives suffer the same fate: while "paus[ing]," de-"prioritiz[ing]," and conditioning funding, they do not clearly state how a jurisdiction is expected to comply nor do they specify which agency funding is at issue. As one example, the DOT Letter requires all recipients of DOT funds to "comply with Federal law enforcement directives" and to "cooperate with Federal officials" but makes no attempt to define what compliance or cooperation look like. Am. Compl., Ex. F. Similarly, the SS4A Conditions broadly require that "Recipient will cooperate with Federal officials in the enforcement of Federal law." *Id.*, Ex. G.

inducement" in the form of tens of millions of dollars annually. The conditioning of *all* federal funding—funding that Plaintiffs rely upon to fulfill critical budgetary needs—crosses well past the line from pressure into compulsion. The Administration has demonstrated little hesitation in pulling federal funding from entities that it disagrees with on a political level, demonstrating that these threats are real and concrete.[12] With "a gun to the head," Plaintiffs would be compelled to bend to the will of these orders; such conditions are therefore unconstitutional. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 581; *see also Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 533 (N.D. Cal. 2017) (finding that an Executive Order that threatens to withhold "all federal grants" is "unconstitutionally coercive").

*Third*, the conditions must be related to the federal interest in the program. *Dole*, 483 U.S. at 207-08. The conditions imposed by the Executive Orders and Agency Directives, namely cooperation with federal civil immigration enforcement and compliance with certain immigration statutes, have no connection to the threatened federal funds—which as to Plaintiffs encompass everything from social services for retaining youth in school, to economic development projects, to homelessness prevention. *See* Maltez Decl. ¶¶ 13, 19-22; Hartke Decl. ¶¶ 3, 10-12. For instance, it stretches all bounds of the imagination to identify a connection between federal immigration enforcement on one hand, and DOT's SS4A funding for the construction of safe streets on the other hand. Congress has certainly not identified one. *See supra* note 9.

*Finally*, spending conditions may not be used to induce funding recipients "to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. Yet from DOJ's

---

[12] *See, e.g.*, Kayla Epstein & Bernd Debusmann, *Trump Administration Seeks to Pull Estimated $100m in Harvard Funding*, BBC News (May 26, 2025), https://www.bbc.com/news/articles/c20n1n1kygzo (reporting that the Trump Administration is cutting $100 million in federal funds to Harvard after having already frozen $2.2 billion in federal grants and having already cut an additional $450 million in federal grants).

affirmative litigation against sanctuary cities, *see supra* note 6, it is clear that the Administration considers compliance with the conditions imposed by the Executive Orders and Agency Directives to require Plaintiffs to (or direct others to) detain individuals based on civil immigration detainers, which would directly contravene Massachusetts law and the Constitution. *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017) (holding, in the context of civil immigration detainers, that "[t]here is no Federal statute that confers on State officers the power to make this kind of an arrest" and that "nothing in the statutes or common law of Massachusetts authorizes . . . a civil arrest in these circumstances"); *see also Morales v. Chadbourne*, 793 F.3d 208, 216-17 (1st Cir. 2015) ("[I]t is beyond debate that an immigration officer . . . would need probable cause to arrest and detain individuals for the purpose of investigating their immigration status."). The Trump Administration violates the Spending Clause in requiring Plaintiffs to commit unlawful acts.

3.    *The Executive Orders and Agency Directives Violate the Tenth Amendment and Its Anticommandeering Doctrine.*

As the Supreme Court has repeatedly emphasized, the cornerstone of our nation's system of federalism is that the federal government possesses only limited powers, with the remainder belonging to the States and to the people. *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 533. The Framers established this system of dual sovereignty to "secure[] to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992); *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (indicating that this division of authority "was adopted by the Framers to ensure protection of our fundamental liberties"). The grant of only specific, enumerated powers to the federal government means that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" are to be held by governments "more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison)).

The Tenth Amendment prohibits the federal government from "commandeering" state and local officials to "regulate in accordance with federal standards" or to "enforce federal law." *See Murphy v. NCAA*, 584 U.S. 453, 463 (2018). It matters not whether the federal government "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own"; either way, Congress—and much less the Executive Branch—lacks authority to "require the States to regulate" according to the federal government's will. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578 (quoting *New York*, 505 U.S. at 178). For example, when the federal government attempted to require state police officers to administer background checks, the Supreme Court ruled that this was an unconstitutional overstep of federal executive power. *See Printz v. United States*, 521 U.S. 898, 933 (1997).

The Trump Administration unconstitutionally seeks to commandeer Plaintiffs and similarly situated municipalities to bend to its will. On their face, the Executive Orders and Agency Directives violate the Tenth Amendment by attempting to improperly wield federal funds to force Plaintiffs, whose priorities differ from those of the federal government, to carry out federal immigration laws and policies.[13] The impending loss of *all* federal funding, if Plaintiffs do not change their local policies to match the will of the President, is a "gun to the head" and unconstitutionally coercive. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 581; *see San Francisco II*, 2025 WL 1282637, at *31 (holding that the Executive Orders "coerce the Cities and Counties to adopt federal immigration enforcement laws" in violation of the Tenth Amendment). Plaintiffs

---

[13] Section 17 of the Day One Executive Order references "ensur[ing] that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." Am. Compl., Ex. A. The Subsidization Executive Order overbroadly demands that executive agencies "ensure . . . that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," *id.*, Ex. B, and similarly, the Designation Executive Order instructs executive departments and agencies to "identify appropriate Federal funds to sanctuary jurisdictions…for suspension or termination." *Id.*, Ex. C.

are forced to choose between, on one hand, forfeiting significant portions of their city budgets, eliminating vital community programs, and facing a fiscal cliff, or on the other hand, bending to Defendants' will in contravention of their own local judgments and in a manner that would also put their communities at risk.

Furthermore, the Agency Directives threaten DOT, DOJ, DHS, and HUD funding, which are significant sources of funding for Plaintiffs. *See* Maltez Decl. ¶¶ 20-22; Ballantyne Decl. ¶ 17; Hartke Decl. ¶¶ 10-16. As illustration, the DOT Order "*require[s]* local compliance or cooperation with Federal immigration enforcement" to avoid being de-"prioritize[d]" with respect to DOT grants, Am. Compl., Ex. E (emphasis added); the DOT Letter imposes a "legal obligation" on grant recipients to cooperate with immigration enforcement, *id.*, Ex. F, and the SS4A Conditions require certification of compliance of said conditions, namely that "Recipient *will* cooperate with Federal officials in the enforcement of Federal law, including *cooperating with* and not impeding U.S. Immigration and Customs," in order to receive previously awarded funds for safe streets, *id.*, Ex. G (emphases added). These are blatant attempts at commandeering via mandatory conditions and threats. The other agencies' actions similarly seek to require compliance with 8 U.S.C. § 1373 and other federal immigration laws. *See supra* Argument Section A.1 (discussing how the Bondi Memo, Noem Memo, DHS Conditions, and HUD Letter each attempt to force compliance with federal immigration laws). While Plaintiffs *do* comply with federal immigration law, it is also apparent that the Administration, in its broad sweep, has erroneously labeled them as noncompliant, as being named as targets on the Designation List confirms.

By withholding federal funds and directing enforcement against Plaintiffs unless they comply with federal immigration law and policies, Defendants are subordinating Plaintiffs' constitutionally protected government interests and violate the anticommandeering principle of the Tenth Amendment.

4.      *The Executive Orders and Agency Directives Violate the Fifth Amendment by Their Violations of Due Process and by Their Vagueness.*

The Executive Orders and Agency Directives violate the Fifth Amendment in two ways. *First*, the Fifth Amendment provides that the federal government may not deprive Plaintiffs of property without due process of law.  Plaintiffs have a protectable property interest in the federal funding they have already been granted on a reimbursement basis and upon which they rely for crucial budgetary needs.  *See Santa Clara*, 250 F. Supp. 3d at 536 ("A state or local government has a legitimate claim of entitlement to congressionally appropriated funds, which are akin to funds owed on a contract.").

The Executive Orders violate Plaintiffs' procedural due process rights by granting agency heads unbounded authority to attack sanctuary jurisdictions, respectively by "ensur[ing] that so-called 'sanctuary' jurisdictions…do not receive access to Federal funds," Am. Compl., Ex. A, "ensur[ing] . . . that Federal payments . . . do not . . . abet so-called 'sanctuary' policies," *id.*, Ex. B, and "identif[ying] appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination" *id.*, Ex. C.  The Executive Orders and the Agency Directives, which took immediate effect, do not provide Plaintiffs with an opportunity to be heard or proper adjudicative fact-finding, and therefore violate of the Fifth Amendment guarantee of due process.  *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" (citation omitted)).

*Second*, each of the Executive Orders and Agency Directives is unconstitutionally vague in violation of the Fifth Amendment's void-for-vagueness doctrine.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

Vagueness concerns arise for "two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Here, the Executive Orders and Agency Directives (1) "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct [they] prohibit[]," and (2) "authorize[] or even encourage[] arbitrary and discriminatory enforcement."  *Id*.

The Executive Orders are impermissibly vague, for reasons already highlighted.  *See supra* Argument Section A.2 (explaining ill-defined and ambiguous language included in the Executive Orders); *Santa Clara*, 250 F. Supp. 3d at 534-35 (finding that EO 13,768, which had even referenced 8 U.S.C. § 1373, did "not clearly define 'sanctuary jurisdictions'" such that "the conduct that will subject a jurisdiction to defunding under the Order is not fully outlined").  Not even the Administration can parse the vagueness.  Despite the addition of Chelsea and Somerville to the Designation List, interfering with federal immigration enforcement is *not* what Plaintiffs' sanctuary policies do; there is a clear difference between "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations," per the Day One Executive Order, versus not affirmatively aiding in civil immigration enforcement matters.  *See* Maltez Decl. ¶¶ 10-11; Houghton Decl. ¶¶ 10-16; Ballantyne Decl. ¶¶ 10-11; Benford Decl. ¶¶ 10-15.  Likewise, the Subsidization Executive Order's attempt to define "so-called 'sanctuary' policies," as jurisdictions "that seek to shield illegal aliens from deportation," Am. Compl., Ex. B, is similarly vague and is not what Plaintiffs' policies do.  *See* Maltez Decl. ¶ 11; Houghton Decl. ¶ 16; Ballantyne Decl. ¶ 11; Benford Decl. ¶ 15.

There is a high risk of "arbitrary and discriminatory enforcement" associated with the Executive Orders.  *Hill*, 530 U.S. at 732.  The usage of "so-called," the lack of reference to specific statutes in the orders, and the unfettered discretion the Attorney General and Secretary of DHS have to designate targets under the Designation Executive Order, reflects the Administration's intentional vagueness in giving itself flexibility to target jurisdictions it disagrees with, while

25

failing to set any discernable legal standard.  DOJ's affirmative litigation against sanctuary cities, as well as DHS's broad Designation List, make clear that whatever the vague terminology contained in the Executive Orders means, the Administration is weaponizing that ambiguity.

The Agency Directives fare no better.  The Bondi Memo, the Noem Memo, and the DHS Conditions are unconstitutionally vague, because although they identify refusal to comply with 8 U.S.C. § 1373, or both 8 U.S.C. § 1373 and § 1644, as one basis for defining "sanctuary jurisdictions," they also refer, without further specificity, to "other applicable federal immigration laws," or "other relevant laws" as other potential bases.  *See* Am. Compl., Exs. D, H, I.  Without a clear statement of which among the broad universe of immigration laws may be at issue, Plaintiffs are not provided with adequate notice, and there is a significant risk of arbitrary enforcement.  *See Santa Clara*, 250 F. Supp. 3d at 535 (explaining that "standardless guidance and enforcement provisions" were "likely to result in arbitrary and discriminatory enforcement").  Although Plaintiffs fully comply with 8 U.S.C. § 1373 and § 1644, the risk of arbitrary enforcement remains high because Administration officials hold idiosyncratic interpretations of what compliance with such statutes entails.  *See, e.g.*, *id.* (recognizing that "[p]ast DOJ guidance and various court cases interpreting Section 1373 have not reached consistent conclusions as to what [it] requires").

The DOT Order is also impermissibly vague because it fails to define "local compliance or cooperation with Federal immigration enforcement" and what other "goals and objectives specified by the President . . . or the Secretary" will be considered.  Am. Compl., Ex. E; *see Santa Clara*, 250 F. Supp. 3d at 534-35 (finding EO 13,758 to be impermissibly vague because it did "not make clear what conduct might subject a state or local jurisdiction to defunding . . . making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid the Order's penalties").  The DOT Letter and SS4A Conditions follow suit, requiring all recipients of

DOT funding generally to "cooperate with the enforcement of Federal immigration law" and to "cooperate with Federal officials in the enforcement of Federal law," respectively.  Am. Compl., Exs. F, G.  Neither elaborates on what that entails or gives Plaintiffs any means to determine how to comply.[14]  Plaintiffs are left with no notice of what conduct would suddenly deprive them of critical DOT funding.

The HUD Letter suffers the same faults.  Although Defendant Turner states that HUD funding will henceforth be conditioned on "compliance with [the Subsidization Executive Order]," he makes no attempt to explain what constitutes compliance.  *Id.*, Ex. J.  Given the fact that the Subsidization Executive Order itself is impermissibly vague, the HUD Letter only compounds the problem.  Further, the HUD Letter fails to adequately define what kinds of policies the agency will consider "'sanctuary' policies," so Plaintiffs are left without proper notice.  *See id.*

The challenged actions contain an abundance of vague and indiscriminate terms, foreclosing opportunities for fair notice to Plaintiffs.  Although Defendants may suggest that further guidance will be forthcoming, Plaintiffs have communities to govern in the present.  They cannot wait for the Administration's gamesmanship when so much is at stake.  By failing to clarify what is required of Plaintiffs and what penalties may be imposed, the Executive Orders and Agency Directives are unconstitutionally vague in violation of the Fifth Amendment.

5.    *The Agency Directives Violate the Administrative Procedure Act.*

Federal agencies must not violate the APA.  Defendants DOJ, DOT, DHS, and HUD are agencies as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo, DOT Order, DOT Letter, SS4A Conditions, Noem Memo, DHS Conditions, and HUD Letter are final agency actions subject

---

[14] The example of compliance provided by the SS4A Conditions remains vague and open-ended: "including cooperating with and not impeding U.S. Immigration and Customs (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  Am. Compl., Ex. G.

to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).  These Agency Directives are not "merely tentative or interlocutory," *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016); rather they stand for the agencies' position that jurisdictions with policies in contrast to Defendant Trump's goals are to be defunded.  From the moment these Directives were promulgated, how the agencies approached federal funding determinations shifted.  *See Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (finding agency memorandum to be final agency action because it "bound DHS staff by forbidding them to continue the program in any way from that moment on" (citation omitted)).  The Agency Directives here are unlawful under the APA because (1) they are unconstitutional, (2) in excess of statutory authority, and (3) arbitrary and capricious.

*First*, the Bondi Memo, the DOT Order, DOT Letter, SS4A Conditions, Noem Memo, DHS Conditions, and HUD Letter are unconstitutional for the reasons explained *supra* in Argument Sections A.1-4, and therefore the APA demands that they be postponed.  *See* 5 U.S.C. § 705 (a reviewing court may "on such conditions as may be required and to the extent necessary to prevent irreparable injury . . . issue all necessary and appropriate process to postpone the effective date of an agency action . . . pending conclusion of the review proceedings."); *see also Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020) (postponing HUD rule that weakened disparate impact liability under Fair Housing Act).

*Second*, the Agency Directives are actions taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).  No law or provision of the Constitution authorizes a federal agency to withdraw properly obligated funds to impose extra-statutory conditions not authorized by Congress.  *See PFLAG, Inc. v. Trump*, 2025 WL 685124, at *15 (D. Md. Mar. 4, 2025) ("Attempts by the Executive Branch to place new conditions on federal funds are improper attempts to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." (citation omitted) (cleaned up)).

*Third*, the Agency Directives are arbitrary and capricious because none of the agencies provides a reasonable explanation for their actions.  5 U.S.C. § 706(2)(A).  "When an agency changes course . . . it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 222) (holding that "[i]t would be arbitrary and capricious to ignore such matters").  Plaintiffs have sought such funds on a reimbursement basis for years now, *see* Maltez Decl. ¶¶ 18, 30; Ballantyne Decl. ¶ 19; Hartke Decl. ¶ 7, 13, and therefore have developed substantial reliance interests on the regularity and trustworthiness of federal grant funding reimbursement for grants which they have already been awarded.  None of the agencies provide any explanation for their decisions to condition, withhold, or deprioritize funding.[15]  There is no obvious connection between immigration policy and the funding to be withdrawn, and each of the four agencies fails to explain any plausible link.  DOJ's purported pause of its funding, DOT's de-prioritization of its funding, DHS's cessation of funding, and HUD's conditioning of funding therefore each constitutes arbitrary and capricious agency action in violation of the APA.

## B.    Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions.

"Irreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'"  *Ross–Simons of Warwick, Inc. v. Baccarat*,

---

[15] The Bondi Memo fails to provide any explanation for the decision to condition and withhold funds that Congress had already appropriated for disbursement.  The DOT Order, DOT Letter, and SS4A Conditions also fail to provide any reasonable explanation for the decision to deprioritize DOT funds for sanctuary jurisdictions or to deny funds to recipients who do not cooperate with federal immigration enforcement.  DHS fails to provide any explanation for its "ceas[ing]" of funding through the Noem Memo and the newfound eligibility requirements in the DHS Conditions.  The HUD Letter fails to offer a reasonable explanation for the decision to condition funding on compliance with the Subsidization Executive Order or to withhold funding on the basis of "'sanctuary' policies."

Inc., 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted).  When the "likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief.'"  *Massachusetts vs. Nat'l Insts. of Health*, 2025 WL 702163, at \*31 (D. Mass. Mar. 5, 2025) (quoting *Vaqueria Tres Monjitas,* 587 F.3d 464, 485 (1st Cir. 2009)).  Nonetheless, while Plaintiffs have a high likelihood of success on the merits, Plaintiffs also identify a multitude of harms that are more than sufficient to satisfy this second factor.

"One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough."  *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923); *San Francisco II*, 2025 WL 1282637, at \*38 (granting preliminary injunction in light of "real and imminent" harm faced by plaintiffs).  Defendants have shown through a myriad of actions that their threats are more than empty words.  Not only do the actions during the first Trump Administration and Defendant Trump's second campaign make the Defendants' intentions to "end" sanctuary cities crystal clear, but these actions intensified when Defendant Trump entered office.  Executive order after executive order made clear that sanctuary cities are not to receive access to federal funds.  Executive agencies have issued a multitude of directives implementing these threats, requiring agencies to follow through—and they are doing so.  Plaintiffs' injury is not only "certainly impending," it has already begun.  Moreover, both Plaintiff Chelsea and Somerville are *named targets* in Defendants' campaign against sanctuary jurisdictions; there is little question that the harm to Plaintiffs will only increase as federal funds continue to be conditioned and withdrawn, and enforcement measures taken.  The Designation Executive Order *mandates* that for designated jurisdictions, the "head of *each* executive department of agency . . . *shall* identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for *suspension* or *termination*."  *See* Am. Compl., Ex. C (emphases added).

Further, the new conditions imposed by DOT, namely the SS4A Conditions, provide a

clear crystallization of the current harm; these new conditions are forcing Plaintiffs to bend to the Administration's will via coerced compliance with the immigration-related conditions or lose millions in funding that they have already been awarded toward safe streets in their communities. With the uncertainty of when these (and other) funds will be pulled, Plaintiffs are unable to effectively manage critical projects and serve their residents.

The axe is falling. Plaintiffs should not—and cannot—wait for the complete consummation of all of these threats to obtain relief. The Executive Orders and Agency Directives are causing immediate irreparable harm to Plaintiffs in terms of their abilities to fiscally manage their cities, which are core to their primary missions of providing key services to their constituents. *See* Maltez Decl. ¶¶ 24-33; Ballantyne Decl. ¶ 19; Hartke Decl. ¶¶ 13-21. Not only are Plaintiffs faced with the loss of all federal funding, but they are also currently grappling with how to manage their newly formed budgets and current spending—which are reliant on the continued receipt of federal grants—amid the extreme uncertainty and chaos of the current federal administration. *See* Maltez Decl. ¶¶ 30-32; Ballantyne Decl. ¶ 19; Hartke Decl. ¶¶ 19-21; *see e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012) (upholding finding of irreparable harm where impending loss of federal funds threatened cuts to services and employees); *see also Coal. for Basic Human Needs v. King*, 654 F.2d 838, 841 (1st Cir. 1981) (finding irreparable harm where welfare recipients faced impending denial of planned assistance).

Federal funding makes up a significant portion of Plaintiffs' budgets and is the sole or primary source of funding for certain critical public services. *See* Maltez Decl. ¶ 13; Ballantyne Decl. ¶¶ 17, 19; Hartke Decl. ¶ 3. For example, without certain DOJ or HUD grants, Plaintiffs must forgo critical public safety investments and housing and community development activities.[16]

---

[16] *See* Maltez Decl. ¶ 28 ("Now that all of our federal funding is being directly threatened . . . The city will either have to cut critical police officer positions including school resource officers, which

Plaintiffs are forced to decide between bending to Defendants' will or putting their residents' lives in jeopardy. "Obstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm." *Nat'l Insts. of Health*, 2025 WL 702163, at *30 (quoting *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)) (cleaned up).

Additionally, Plaintiffs have already spent millions of dollars on public services with the understanding that the federal government would reimburse those funds; with the uncertainty now created by the Executive Orders and Agency Directives, Plaintiffs can no longer rely on the promise of reimbursement and must contend with closing that funding gap themselves. *See* Maltez Decl. ¶¶ 28, 30-32; Ballantyne Decl. ¶ 19; Hartke Decl. ¶¶ 13-14. Doing so requires diverting funds from other critical services or depleting city reserves. *See* Maltez Decl. ¶ 30; Ballantyne Decl. ¶ 19; Hartke Decl. ¶ 21. The level of uncertainty surrounding the cities' fiscal management and lack of viable mitigation options are frustrating Plaintiffs' primary missions and causing them irreparable harm, necessitating injunctive relief. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d at 1244 ("A total loss of federal funding would be catastrophic, and the Counties' (and their residents') need for certainty renders damages inadequate.").

Defendants' actions irreparably harm Plaintiffs by damaging the safety of their communities, no matter how they respond.[17] Public officials, particularly public safety officers,

---

would impact public safety, or reallocate taxpayer dollars from other city programs."); Hartke Decl. ¶ 10 ("These funds support a variety of critical programs, such as new housing construction for low-income households, homelessness prevention, revitalizing struggling business districts, family stabilization and job readiness for Somerville's neediest residents, and temporary shelter for homeless individuals and families.").

[17] *See* Maltez Decl. ¶¶ 28-33 (noting the "impact [on] public safety" or the diversion of "taxpayer dollars from other city programs"); Houghton Decl. ¶¶ 18-19 ("Losing that federal funding would have a significant negative impact on Chelsea and mean reduced services to our residents . . . But the alternative would be equally bad, if not worse."); Hartke Decl. ¶ 14 ("[I]mportant citywide projects, such as street safety enhancements, have been put on hold due to the uncertainty

rely on the trust of all community members, regardless of immigration status, to ensure the safety of the community.  Without a trust in public officials, community members are less likely to report crimes, come forward as victims of crimes, or access public health and other critical services.[18] Defendants' requirement that Plaintiffs abolish longstanding policies forces Plaintiffs to undermine vital trust, which in turn endangers residents' lives and irreparably harms Plaintiffs and their communities.  *See Nat'l Insts. of Health*, 2025 WL 702163, at *31 (D. Mass. Mar. 5, 2025) (holding, in the context of cutting research funding, that executive action resulting in risk to human lives constitutes irreparable harm); *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (irreparable harm where city faced "Hobson's choice" to either "diminish[] community trust and undermine[] public safety" by implementing objectionable policies or forgo DOJ funds), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019).

Moreover, certain key programs being targeted involve DOJ funding for police departments and DOT funding for safe streets, which represent critical public safety efforts that ensure the safety and lives of Plaintiffs' residents.  *See* Maltez Decl. ¶¶ 21, 26-29, 33; Houghton Decl. ¶ 18; Ballantyne Decl. ¶¶ 17, 19; Hartke Decl. ¶¶ 15-18.  If Plaintiffs chose to uphold their policies and lose access to key federal funding, they will also be forced to cut necessary staff and programs, which in turn further harms their communities.  *See* Maltez Decl. ¶¶ 30-31; Hartke Decl.

---

surrounding federal grants—Somerville cannot afford to expend money that will not later be reimbursed."); Benford Decl. ¶ 17 ("If we lost that funding, that would reduce services to our residents.  On the other hand, if we were required to actively participate in federal immigration enforcement, that would be immensely problematic because it would constrain SPD's already stretched resources and take us away from local priorities we have set based on our knowledge of our City's public safety needs.  In addition, the public trust . . . would be severely undermined.").

[18] *See* Houghton Decl. ¶ 19 ("If Chelsea had to eliminate our sanctuary city policies, then this would destroy the trust that CPD has built up with the community . . . That in turn would mean people would not come to CPD to report crimes that they either witnessed or were victims of.  That would make it much harder for us to prevent crime and bring criminals to justice and would make our community much less safe."); Benford Decl. ¶ 17 ("I believe any such change in our current policies would be contrary to public safety and make our residents less safe.").

¶ 21.  These and the other ramifications noted herein are more than ample evidence of irreparable harm.  *See, e.g.*, *Nat'l Institutes of Health*, 2025 WL 702163, at *30 (finding "degradation of vital infrastructure [and] the loss of imperative staff" to constitute irreparable harm).

**C.      The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.**

The third and fourth factors, the balance of the equities and the effect on the public interest, "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  This final portion of the analysis weighs in favor of Plaintiffs, as Defendants can have no valid interest in violating the Constitution.  *See Doe*, 2025 WL 485070, at *14.  Moreover, it is "always in the public interest to prevent the violation of a party's constitutional rights."  *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (citation omitted).  Plaintiffs have already established with likelihood how the Executive Orders and Agency Directives violate the Constitution in a multitude of ways.  *See supra* Argument Section A.1-3.

Nonetheless, turning to a substantive analysis, the public interest in this context is best served when local governments can make their own determinations about how to best serve their residents.  "The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities . . . . To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals."  *New York*, 505 U.S. at 181; *see also Gregory*, 501 U.S. at 458 (noting that the "federalist structure of joint sovereigns . . . assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society . . . increases opportunity for citizen involvement in democratic processes . . . allows for more innovation and experimentation in government . . . [and] makes government more responsive by putting the States in competition for a mobile citizenry").

The Executive Orders and Agency Directives disregard well-founded local judgments in an attempt to undermine Plaintiffs' local sovereignties.  Further, the complete uncertainty created

by the challenged actions means that Plaintiffs, who rely on federal funding for critical budgetary needs, cannot effectively govern or provide essential public services.  *See* Maltez Decl. ¶¶ 13, 24-33; Ballantyne Decl. ¶ 17, 19; Hartke Decl. ¶¶ 3, 10-21.  Without the requested relief, Plaintiffs will suffer serious consequences in terms of public welfare, public safety, and community trust.  *See* Maltez Decl. ¶¶ 30-34; Houghton Decl. ¶¶ 18-20; Ballantyne Decl. ¶¶ 19-20; Benford Decl. ¶ 17; Hartke Decl. ¶¶ 21-22.

Notably, Defendants' ability to carry out their immigration enforcement will not be impacted by the requested injunction: federal agents may continue to carry out the Administration's federal immigration initiatives, unimpeded by Plaintiffs.  Further, the scope of the requested injunctive relief is narrowly tailored to the portions of the Executive Orders and Agency Directives that unlawfully target Plaintiffs and similarly situated jurisdictions.

In contrast, without the requested relief, Plaintiffs will continue to suffer under the unconstitutional attacks of this Administration.  Plaintiffs adopted their "sanctuary" policies because they determined that such policies enhance public safety in their communities and preserve scarce local resources.  *See* Houghton Decl. ¶¶ 9, 19-20; Ballantyne Decl. ¶¶ 11-12; Benford Decl. ¶¶ 9-10, 12, 14, 17.

In sum, where Defendants stand to lose nothing by complying with the law, Plaintiffs stand to lose critical public funding as well as the safety and well-being of their communities, risk prosecution, and will continue to suffer under the Administration's blatantly unconstitutional scheme unless an injunction issues.  The public interest is best served by requiring Defendants to abide by the Constitution and relevant federal statutes.

## **CONCLUSION**

In light of the foregoing, Plaintiffs respectfully request that this Court grant their Motion.

35

Dated: June 3, 2025

Respectfully submitted,

*/s/ Oren Sellstrom*

Iván Espinoza-Madrigal (BBO# 708080)
Oren Sellstrom (BBO# 569045)
Mirian Albert (BBO# 710093)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 482-1145
iespinoza@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
malbert@lawyersforcivilrights.org

*Attorneys for Plaintiffs City of Chelsea and City of Somerville*