# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and CITY OF
SOMERVILLE,

*Plaintiffs*,

*v.*

DONALD TRUMP, *et al.*,

*Defendants.*

Civil Action No. 1:25-cv-10442-NMG

Leave to File Excess Pages Granted on
June 18, 2025, ECF No. 18

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.    The Executive Orders and Agency Directives.................................................................2

II.    The Executive Has Broad Discretion In The Enforcement Of Immigration Law And Congress Intended For State/Local Governments To Work With The Federal Government In Carrying Out Immigration Enforcement....................................................................7

III.    This Litigation.................................................................................................................8

STANDARD OF REVIEW ..................................................................................................8

ARGUMENT.......................................................................................................................9

I.    The Court Should Deny Plaintiffs Injunctive Relief.......................................................9

    A.    Plaintiffs are unlikely to succeed on the merits of any of their challenges...................9

        1.    Plaintiffs cannot seek relief against the Executive Orders, which are plainly lawful.............................................................................................................9

        2.    The majority of Plaintiffs' remaining challenges to potential agency actions are not ripe nor are they final agency action. .....................................................12

        3.    Plaintiffs cannot succeed on their APA claims.................................................15

            a.    The HUD, DOJ, and DHS agency directives do not constitute final agency action....................................................................................................15

            b.    If there were final agency action, Plaintiffs' challenge would fail on the merits.............................................................................................17

            c.    Plaintiffs' challenge to the DHS conditions fails.................................19

            d.    This Court lacks jurisdiction over Plaintiffs' challenge to the DOT Conditions. .................................................................................................20

            e.    Even if this Court had jurisdiction, the challenge to the SS4A conditions would fail on the merits. .....................................................23

i

4.      Plaintiffs lack standing for all but one of their claims. .......................................24

5.      Plaintiffs fail to show a violation of the Spending Clause. ..............................27

6.      Plaintiffs fail to show a violation of separation of powers. ..............................30

7.      Plaintiffs fail to articulate a due process violation...............................................31

8.      Plaintiffs fail to articulate a Tenth Amendment violation................................33

B.      Plaintiffs have not proven irreparable harm......................................................34

C.      The balance of equities and the public interest weigh in the Federal Government's favor..............................................................................................................................37

D.      The Court should limit any injunctive relief to grants Plaintiffs specifically identify and only to any requirements that go beyond existing obligations to comply with federal law..................................................................................................................39

E.      Any injunctive relief should be stayed pending a determination of whether to appeal and be accompanied by a bond. .......................................................................39

CONCLUSION............................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*7-Eleven, Inc. v. Grewal,*
   60 F. Supp. 3d 272 (D. Mass. 2014) ................................................................37

*Abbott Laby's v. Gardner,*
   387 U.S. 136 (1967) ......................................................................... 12, 15

*Akebia Therapeutics, Inc. v. Azar,*
   443 F. Supp. 3d 219 (D. Mass. 2020),
   *aff'd*, 976 F.3d 86 (1st Cir. 2020) ........................................................ 36, 37

*Am. Sci. & Eng'g, Inc. v. Califano,*
   571 F.2d 58 (1st Cir. 1978) ......................................................................21

*Arizona v. United States,*
   567 U.S. 387 (2012) ....................................................................... 6, 34, 38

*Ass'n of Am. Univs. v. U.S. Dep't of Energy,*
   2025 WL 1414135 (D. Mass May 15, 2025) ......................................................22

*Atieh v. Riordan,*
   797 F.3d 135 (1st Cir. 2015) ......................................................................18

*Bd. of Regents of State Colls. v. Roth,*
   408 U.S. 564 (1972) ................................................................................31

*Bennett v. Ky. Dep't of Educ.,*
   470 U.S. 656 (1985) ................................................................................27

*Bennett v. Spear,*
   520 U.S. 154 (1997) ......................................................................... 12, 15

*Biden v. Missouri,*
   595 U.S. 87 (2022) ................................................................................27

*Bldg. Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ............................................................... 11, 31

*Boaz Hous. Auth. v. United States,*
   994 F.3d 1359 (Fed. Cir. 2021) ...................................................................21

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ................................................................................18

*Broderick v. di Grazia,*
    504 F.2d 643 (1st Cir. 1974) ........................................................................ 14

*Burgos v. Milton,*
    709 F.2d 1 (1st Cir. 1983) .......................................................................... 21

*California ex rel. Becerra v. Sessions,*
    284 F. Supp. 3d 1015 (N.D. Cal. 2018) ..................................................... 16

*California v. U.S. Dep't of Educ.,*
    2025 WL 760825 (D. Mass. Mar. 10, 2025),
    *denying stay pending appeal,* 132 F.4th 92 (1st Cir. Mar. 21, 2025),
    *granting stay,* 145 S. Ct. 966 (Apr. 4, 2025) ........................................... 21

*Charles C. Steward Mach. Co. v. Davis,*
    301 U.S. 548 (1937) ................................................................................... 29

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004) ...................................................................... 35

*City of Fall River v. Fed. Energy Regul. Comm'n,*
    507 F.3d 1 (1st Cir. 2007) .................................................................... 12, 38

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) ................................................................... 11

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ..................................................................................... 13

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Penn. 2017) .................................................... 16

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) .................................................................. 23, 24

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................................... 30

*Connecticut v. Massachusetts,*
    282 U.S. 660 (1931) ................................................................................... 36

*Daimler Chrysler v. Cuno,*
    547 U.S. 332 (2006) ................................................................................... 25

*Danielson v. Local 275, Laborers Int'l Union,*
    479 F.2d 1033 (2d Cir. 1973) .................................................................... 36

*Dep't of Homeland Sec. v. New York,*
 140 S. Ct. 599 (2020) ................................................................................................39

*Diaz v. Johnson,*
 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ..............................................................22

*Dist. Hosp. Partners, L.P. v. Burwell,*
 786 F.3d 46 (D.C. Cir. 2015) ....................................................................................37

*District of Columbia v. U.S. Dep't of Agric.,*
 444 F. Supp. 3d 1 (D.D.C. 2020) ..............................................................................39

*Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations,*
 643 F.3d 16 (1st Cir. 2011) .......................................................................................19

*Env't Def. Ctr. v. U.S. EPA,*
 344 F.3d 832 (9th Cir. 2003) .............................................................................28, 34

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas,*
 445 F.3d 13 (1st Cir. 2006) .........................................................................................8

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ..................................................................................................19

*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021) ..................................................................................................18

*FERC v. Mississippi,*
 456 U.S. 742 (1982) ..................................................................................................34

*Fla. Power & Light Co. v. Lorion,*
 470 U.S. 729 (1985) ..................................................................................................37

*Florida v. Dep't of Health & Hum. Servs.,*
 19 F.4th 1271 (11th Cir. 2021) .................................................................................39

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992) ..........................................................................................9, 10, 15

*FTC v. Standard Oil Co. of Cal.,*
 449 U.S. 232 (1980) ...........................................................................................15, 16

*Gizzo v. Ben-Habib,*
 44 F. Supp. 3d 374 (S.D.N.Y. 2014) .........................................................................32

*Goldberg v. Kelly,*
 397 U.S. 254 (1970) ..................................................................................................31

v

*Harper v. Werfel,*
   118 F.4th 100 (1st Cir. 2024),
   *petition for cert. docketed sub nom. Harper v. Faulkender*, No. 24-922 (U.S. Feb. 21, 2025)......................19

*Hilton v. Braunskill,*
   481 U.S. 770 (1987) ...........................................................................................................................40

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey,*
   844 F.3d 318 (1st Cir. 2016).............................................................................................................12

*Lancor v. Lebanon Hous. Auth.,*
   760 F. 2d 361 (1st Cir. 1985) ............................................................................................................37

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...........................................................................................................................39

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................................................................18, 19, 24

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ...........................................................................................................................17

*Massachusetts. v. Nat'l Inst. of Health,*
   2025 WL 702163 (D. Mass. Mar. 5, 2025) ......................................................................................21

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.,*
   2025 WL 1225481 (D. Mass. Apr. 14, 2025) ...................................................................................22

*Massachusetts v. Bowen,*
   487 U.S. 879 (1988) ...........................................................................................................................21

*Massachusetts v. Kennedy,*
   2025 WL 1371785 (D Mass. May 12, 2025) ....................................................................................22

*Matos ex rel. Matos v. Clinton Sch. Dist.,*
   367 F.3d 68 (1st Cir. 2004) ...............................................................................................................35

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1867) ...............................................................................................................9

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................................................................................18

*Myers v. United States,*
   272 U.S. 52 (1926) .............................................................................................................................11

*Narragansett Indian Tribe v. Guilbert,*
   934 F.2d 4 (1st Cir. 1991)..................................................................................................................35

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) .................................................................................. 33

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .........................................................................27, 28, 29

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
    538 U.S. 803 (2003) .......................................................................... 12, 14

*New Vision Photography Program, Inc. v. District of Columbia,*
    54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................ 32

*New York v. DOJ,*
    951 F.3d 84 (2d Cir. 2020) ................................................................... 3, 26

*New York v. United States,*
    505 U.S. 144 (1992) .........................................................................26, 27, 34

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) .................................................................................. 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................. 8, 38

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .........................................................................16, 17, 39

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .................................................................................. 38

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023) ..................................................................... 20

*Or. Nat. Desert Ass'n. v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ..................................................................... 15

*Perry v. Sindermann,*
    408 U.S. 593 (1972) .................................................................................. 31

*Portela-Gonzalez v. Sec'y of the Navy,*
    109 F.3d 74 (1st Cir. 1997) ....................................................................... 17

*Pub. Serv. Co. of N.H. v. Town of W. Newbury,*
    835 F.2d 380 (1st Cir. 1987) ..................................................................... 35

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.,*
    421 F.3d 1 (1st Cir. 2005) ......................................................................... 32

*Reno v. Flores,*
  507 U.S. 292 (1993) ..................................................................................11

*Respect Me. PAC v. McKee,*
  622 F.3d 13 (1st Cir. 2010) ........................................................................8

*River St. Donuts, LLC v. Napolitano,*
  558 F.3d 111 (1st Cir. 2009) ....................................................................18

*S & D Maintenance Co. v. Goldin,*
  844 F.2d 962 (2d Cir. 1988) .....................................................................32

*Sampson v. Murray,*
  415 U.S. 61 (1974) ....................................................................................35

*Seafreeze Shoreside, Inc v. U.S. Dep't of Interior,*
  2023 WL 3660689 (D. Mass. May 25, 2023) ..........................................36

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020) ..................................................................................11

*Sierra Club v. EPA,*
  353 F.3d 976 (D.C. Cir. 2004) .................................................................18

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
  699 F.3d 1 (1st Cir. 2012) ..........................................................................8

*South Dakota v. Dole,*
  483 U.S. 203 (1987) .....................................................................26, 28, 30

*Spokeo v. Robins,*
  578 U.S. 330 (2016) ..................................................................................25

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ....................................................................................25

*Texas v. United States,*
  523 U.S. 296 (1998) ..................................................................................12

*Toilet Goods Ass'n, Inc. v. Gardner,*
  387 U.S. 158 (1967) ..................................................................................14

*Town of Castle Rock v. Gonzalez,*
  545 U.S. 748 (2005) ..................................................................................31

*Trump v. New York,*
  592 U.S. 125 (2020) .............................................................................13, 25

*U.S. Term Limits, Inc. v. Thornton,*
  514 U.S. 779 (1995).................................................................................................34

*United States v. Pickard,*
  100 F. Supp. 3d 981 (E.D. Cal. 2015)....................................................................34

*United States v. Salerno,*
  481 U.S. 739 (1987).................................................................................................10

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981).................................................................................................39

*U.S. Dep't of Educ. v. California,*
  145 S. Ct. 966 (2025).................................................................................21, 22, 38

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982).................................................................................................36

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).........................................................................................8, 36, 37

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985)................................................................................36

## U.S. Constitution

U.S. Const. art. I, § 8, cl. 1...........................................................................................30

U.S. Const. art. II, § 1, cl. 1..........................................................................................11

U.S. Const. art. II, § 3..................................................................................................11

## Statutes

5 U.S.C. § 701(a)(2)......................................................................................................18

5 U.S.C. § 704...................................................................................................12, 15, 17, 19

5 U.S.C. § 706(1)..........................................................................................................39

5 U.S.C. § 706(2)(A)...............................................................................................17, 18

8 U.S.C. § 1101 *et seq.*....................................................................................................6

8 U.S.C. § 1226(c)(1) ................................................................................................7

8 U.S.C. § 1226(c)(2) ................................................................................................7

8 U.S.C. § 1231(a)(2) ................................................................................................7

8 U.S.C. § 1231(a)(4)(A) ..........................................................................................7

8 U.S.C. § 1231(a)(1)(B)(iii) ....................................................................................7

8 U.S.C. § 1324 ......................................................................................................5, 6

8 U.S.C. § 1373 ................................................................................................*passim*

8 U.S.C. § 1324 ......................................................................................................5, 6

8 U.S.C. § 1357(g)(10)(A) ......................................................................................39

8 U.S.C. § 1373(a) ....................................................................................................7

8 U.S.C. § 1373(b) ....................................................................................................7

8 U.S.C. § 1373(c) ...............................................................................................7, 39

8 U.S.C. § 1644 ...................................................................................................5, 6, 7

20 U.S.C. § 954(d)(1) ..............................................................................................33

23 U.S.C. § 315 ........................................................................................................23

23 U.S.C. § 402(d)(3) note ...............................................................................23, 24

28 U.S.C. § 1491(a)(1) ............................................................................................20

34 U.S.C. § 10102(a)(6) ..........................................................................................30

34 U.S.C. § 10153(A)(5)(D) ...................................................................................30

## **Rules**

Fed. R. Civ. Pro. 65(c) .............................................................................................40

**Executive Orders**

*Ending Taxpayer Subsidization of Open Borders*,
  Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025).........................................................*passim*

*Protecting American Communities from Criminal Aliens*,
  Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025)........................................................ 3, 8

*Protecting the American People Against Invasion*,
  Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).........................................................*passim*

**Regulations**

2 C.F.R. § 200.300.........................................................................................................................................23

## INTRODUCTION

On January 20, 2025, the President issued an Executive Order setting forth the policy of the United States that "[e]nforcing our Nation's immigration laws is critically important to the national security and public safety of the United States." *Protecting the American People Against Invasion*, Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). That Executive Order, along with subsequent Executive Orders, directed federal agencies to undertake "any lawful actions to ensure that" sanctuary jurisdictions, "which seek to interfere with the lawful exercise of Federal law, . . . do not receive access to federal funds." *Id.* § 17. In response, agencies issued various directives and memoranda indicating that they would evaluate their federal funding agreements to ensure consistency with the President's priorities.

Despite the ongoing nature of that decision-making process, Plaintiffs—the Massachusetts cities of Chelsea and Somerville—seek emergency relief in this Court, essentially claiming that they are entitled to future grant awards of federal funds, even if they use those funds in ways that conflict with the President's priorities and federal law. There are numerous problems with Plaintiffs' request for emergency relief. First, for the vast majority of the agency directives Plaintiffs challenge—including those issued by the Department of Justice ("DOJ"), Department of Housing and Urban Development ("HUD"), and Department of Homeland Security ("DHS")—Plaintiffs' claims are not ripe. Those agencies are still conducting their internal review to determine which specific grants should incorporate new conditions, so there is no final agency action for this Court to review, and it is impossible to evaluate the contours of Plaintiffs' claims. Indeed, for those agencies, Plaintiffs have not presented any evidence that their existing grant awards have been withheld or modified, or that future grant awards for which Plaintiffs intend to apply have been restricted in ways Plaintiffs consider unlawful. For that reason alone, Plaintiffs cannot establish an irreparable injury and their motion should fail.

Plaintiffs also challenge updated conditions issued by the Department of Transportation ("DOT") to its Safe Streets and Roads for All Grant Program ("SS4A"), which apply to previously awarded but not yet executed grants. Since that challenge is contractual in nature, it belongs in the

Court of Federal Claims under the Tucker Act, and this Court lacks jurisdiction over it. Even if this Court had jurisdiction, Plaintiffs' challenge would fail because Congress has afforded the Secretary of Transportation, and indeed, the other Defendant agencies, broad discretion to select among eligible recipients of funding. Plaintiffs' contrary theory—that this Court should compel agencies to execute prospective grant agreements that conflict with the President's priorities—would raise significant separation of powers concerns.

Finally, the balance of the equities weighs squarely against entering the intrusive relief Plaintiffs request. Plaintiffs' requested relief would constitute an extraordinary intrusion into the Executive's lawful prerogatives, effectively turning this Court into an overseer of nearly half a dozen federal agencies' funding programs.

At a minimum, any relief entered here should be significantly limited to expressly preserve agencies' lawful authorities to act under their own authorizing statutes, regulations, and grant terms— authorities that Plaintiffs' motion never purports to challenge. Any injunction should also be immediately stayed pending any appeal that is authorized and an appropriate bond required. The proper course, however, is to deny Plaintiffs' motion for a preliminary injunction entirely.

<div align="center">BACKGROUND</div>

## I.    The Executive Orders and Agency Directives

*Executive Order 14,159 (The Day One Executive Order).* On January 20, 2025, the President signed Executive Order 14,159, "Protecting the American People Against Invasion," which instructed "[e]xecutive departments and agencies (agencies)" to "employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens." Exec. Order No. 14,159, § 3(b), 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025) ("E.O. 14,159"), ECF No. 10-1. Additionally, this Order instructed the Attorney General and the Secretary of Homeland Security to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." *Id.* at § 17.

<div align="center">2</div>

*Executive Order 14,218 (The Subsidization Executive Order).* On February 19, 2025, the President signed Executive Order 14,218, "Ending Taxpayer Subsidization of Open Borders," which instructed the head of each agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," Exec. Order No. 14,218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025) ("E.O. 14,218"), ECF No. 10-2. That Executive Order sought to prevent taxpayer resources from supporting illegal immigration and to ensure taxpayer funded benefits do not go to illegal aliens. *Id.*

*Executive Order 14,287 (The Designation Executive Order).* On April 28, 2025, the President signed Executive Order 14,287, "Protecting American Communities from Criminal Aliens," which instructed the Attorney General and the Secretary of Homeland Security to publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions). Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025), ECF No. 10-3.

*Memorandum from Pamela Bondi.* On February 5, 2025, U.S. Attorney General Pamela Bondi issued "Sanctuary Jurisdiction Directives," which stated that DOJ "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." Memorandum from Pamela Bondi, Att'y Gen. to All Department Employees, re *Sanctuary Jurisdiction Directives* 1 (Feb. 5, 2025) ("Bondi Memo"), ECF No. 10-4. In addition, the memo details that DOJ will, *inter alia*, "exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations." *Id.* (citing *New York v. DOJ*, 951 F.3d 84, 111 (2d Cir. 2020)). The Bondi Memo defines "sanctuary jurisdictions" as "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." *Id.* at 2.

Additionally, the Bondi Memo explains that "[c]onsistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)" and instructs that "the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to

3

which these requirements apply." *Id.* The memo also suggests that "to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, . . ." and reiterated that DOJ will "seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions." *Id.* at 2–3.

**Department of Transportation Order.** For its part, DOT issued an Order to update the principles underpinning DOT policies, programs, and activities, including grantmaking. Off. of Sec'y of Transp., U.S. Dep't of Transp., DOT Order 2100.7, Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities (last updated Feb. 7, 2025), ECF No. 10-5 ("DOT Order"). As relevant here, Section 5(f)(v) of that Order provides that: "To the maximum extent permitted by law, DOT-supported or -assisted programs and activities . . . shall prioritize projects and goals that: require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." *Id.* at 2-3; *see generally* Declaration of Arlan Finfrock, Associate Administrator for Administration of the Federal Highway Administration ("Finfrock Decl.").

**Department of Transportation Letter.** On April 24, 2025, DOT Secretary Sean Duffy sent all recipients of DOT funding a letter reminding them of their responsibility to comply with federal law and the terms of their financial assistance agreements. The letter explained that recipients' legal obligations "require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices . . . ." Letter from Sean Duffy, Sec'y, U.S. Dep't of Transp., to All Recipients of U.S. Department of Transportation Funding 2 (Apr. 24, 2025), ECF No. 10-6 ("DOT Letter"). It further noted instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of federal law, or have otherwise impeded federal law enforcement. Those actions "undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and

security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people[.]" *Id.* at 2-3.

*Department of Transportation Updated Safe Streets For All Conditions.* On March 17, 2025, DOT revised its general terms and conditions for the Safe Streets and Roads For All ("SS4A") discretionary grant program. U.S. Dep't of Transp., General Terms & Conditions Under the Fiscal Year 2023 Safe Streets & Roads for All Grant Program: FHWA Projects (last revised Mar. 17, 2025), ECF No. 10-7. Those updated terms and conditions require recipients to "ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements[.]" *Id.* Art. 24.2(a). Namely, recipients must "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.*

*Memorandum from Kristi Noem.* On February 19, 2025, DHS Secretary Kristi Noem issued a memorandum entitled, "Restricting Grant Funding for Sanctuary Jurisdictions." Memorandum from Krist Noem, Sec'y, U.S. Dep't of Homeland Sec. (Feb. 19, 2025), ECF No. 10-8 ("Noem Memo"). That memo recognized that "partnership is an essential element of our national security and public safety mission." *Id.* at 1. It continued that "State and local governments that refuse to cooperate with, refuse to share information with, or even actively obstruct federal immigration enforcement reject these ideals and the history we share in common as Americans." *Id.* Those jurisdictions "should not receive a single dollar of the Department's money unless Congress has specifically required it." *Id.* The memo defines sanctuary jurisdictions as those that fail to comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644; violate other relevant laws, including 8 U.S.C. § 1324 (making it a crime to bring in and harbor certain aliens); fail to honor requests for cooperation; fail to provide access to detainees; and leak the existence of an enforcement operation. Finally, the memo directed components to review federal financial assistance awards to determine if Department funds are going to sanctuary jurisdictions. "To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component

must cease providing federal funding to sanctuary jurisdictions." *Id.* at 2. The memo further directed components to provide a report within thirty days with a summary of actions taken to comply with the memo.

*Department of Homeland Security Standard Terms and Conditions for Fiscal Year 2025.* DHS updated its standard terms and conditions for all new federal awards of federal financial assistance for which the federal award date occurs in FY 2025 on April 18, 2025. U.S. Dep't of Homeland Sec, FY 2025 DHS Standard Terms and Conditions *Version 3* (Apr. 18, 2025), ECF No. 10-9. As relevant here, those terms and conditions require recipients to agree that they will comply with the following requirements related to coordination and cooperation with the DHS and immigration officials: comply with 8 U.S.C. §§ 1373 and 1644; comply with other relevant laws related to immigration, including 8 U.S.C. § 1324; honor requests for cooperation; provide access to detainees; and not leak the existence of an immigration enforcement operation. The conditions also require recipients to comply with Presidential Executive Orders related to grants. *See generally* Declaration of David Richardson, Senior Official Performing the Duties of the Administrator at the Federal Emergency Management Agency ("Richardson Decl.").

*Department of Housing and Urban Development Letter.* On April 4, 2025, HUD Secretary Scott Turner issued a letter to HUD grantees and stakeholders to remind grantees of their legal obligations to comply with Executive Order 14,218 and laws that prohibit illegal aliens from receiving certain federal public benefits. Letter from Scott Turner, Sec'y, U.S. Dep't of Transp., to HUD Grantees & Stakeholders (Apr. 4, 2025), ECF No. 10-10. The letter relayed that the Secretary directed HUD senior leadership to review HUD's programs and institute mechanisms to ensure compliance with the President's Executive Order. Going forward, grant agreements will include language that will require compliance with Executive Order 14,218, and HUD will take steps to ensure that federal resources are not used to support sanctuary policies that actively prevent federal authorities from deporting illegal aliens. *See generally* Declaration of Claudette Fernandez, General Deputy Assistant Secretary for HUD's Office of Community Planning and Development ("Fernandez Decl.").

II. **The Executive Has Broad Discretion In The Enforcement Of Immigration Law And Congress Intended For State/Local Governments To Work With The Federal Government In Carrying Out Immigration Enforcement.**

The Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress has granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States, and to administer and enforce the immigration laws.

The INA contains several provisions that address the involvement of state and local authorities in the enforcement of immigration law. For example, 8 USC § 1373, prevents state and local actors from restricting the sharing of immigration-related information with the Executive:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

*Id.* § 1373(a). Section 1373(b) further proscribes any government entity from prohibiting or restricting "[m]aintaining," or "[s]ending," or "[e]xchanging" information regarding the immigration status of any individual. 8 U.S.C. § 1373(b). Section 1373(c) provides, in turn, that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). Similarly, 8 U.S.C. § 1644, entitled "Communication between State and local government agencies and Immigration and Naturalization Service" provides:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Thus, Congress envisioned that local governments would cooperate with the federal Government in the enforcement of immigration laws through information sharing. *See, e.g.*, 8 U.S.C. §§ 1231(a)(2), (a)(4)(A), (a)(1)(B)(iii); 8 U.S.C. § 1226(c)(1), (2).

### III.    This Litigation

On February 23, 2025, Plaintiffs City of Chelsea and City of Somerville filed their Complaint for declaratory and injunctive relief against President Trump and other federal officials, seeking to prevent the federal government from withholding or conditioning federal funds based on Executive Orders 14,159 and 14,218, the Bondi Memo, and the DOT Order. Plaintiffs filed an Amended Complaint on May 31, 2025, adding to their challenge Executive Order 14,287 as well as a variety of other agency directives. The Amended Complaint alleges violations of Separation of Powers, the Spending Clause, the Tenth Amendment, the Fifth Amendment, the Declaratory Judgment Act, and the Administrative Procedure Act ("APA"). On June 3, 2025, Plaintiffs moved for a preliminary injunction, seeking to enjoin Defendants from implementing, enforcing, or taking any other action in furtherance of any withholding or conditioning of federal funds based on the challenged Executive Orders and agency directives.

### STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam)

(quoting *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)). The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22.

## ARGUMENT

## I.    The Court Should Deny Plaintiffs Injunctive Relief.

This Court should deny Plaintiffs' request for injunctive relief because Plaintiffs are unlikely to succeed on the merits of their challenges. The vast majority of Plaintiffs' claims are not ripe for judicial review because the agencies at issue are still engaged in the process of deciding which specific grant programs, if any, should incorporate new conditions moving forward. And this Court lacks jurisdiction over Plaintiffs' challenge to the updated DOT conditions because it belongs in the Court of Federal Claims. Even if this Court were to reach the merits, the Executive Orders are lawful, and agencies have broad discretion to impose conditions on federal funding awards. Finally, Plaintiffs have not satisfied the remaining factors by showing irreparable harm, that the balance of equities tips in their favor, or that an injunction is in the public interest.

### A.    Plaintiffs are unlikely to succeed on the merits of any of their challenges.

#### 1.    Plaintiffs cannot seek relief against the Executive Orders, which are plainly lawful.

Plaintiffs seek a declaratory judgment that Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and Section 3 of the Designation Executive Order are unlawful and unconstitutional on their face and as applied. They also request that this Court enjoin Defendants, ostensibly including the President, from "implementing or enforcing, or taking any other action in furtherance of any withholding or conditions of federal funds based on" the challenged Executive Orders. Pls.' [Proposed] Order Granting Prelim. Inj. at 1-2, ECF No. 12-8. There are several problems with Plaintiffs' challenge. To begin, Plaintiffs lack a cause of action to sue the President. The actions of the President are not reviewable under the APA because the President is not an "agency" subject to APA review. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). There

is likewise no implied equitable cause of action to challenge the Executive Orders, and the President is not an appropriate subject of any injunction. *See id.*; *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). The same principles that foreclose injunctive relief also foreclose declaratory relief. *See Franklin*, 505 U.S. at 827 (Scalia, J. concurring in part and concurring in the judgment). And the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982); *Franklin*, 505 U.S. at 801.

Even with respect to the agency defendants, to succeed on their facial challenge to the Executive Orders, Plaintiffs would have to establish that the Orders would be unconstitutional in all applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that a facial challenge must establish that "no set of circumstances exists under which the [enactment] would be valid"). Plaintiffs cannot make such a showing here.

Section 17 of the Day One Executive Order directs the Attorney General and the Secretary of Homeland Security to "evaluate and undertake any *lawful actions* to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." E.O. 14,159 at § 17 (emphasis added). Section 2(a)(ii) of the Subsidization Executive Order provides that, to prevent taxpayer resources from supporting illegal immigration and to ensure taxpayer funded benefits do not go to illegal aliens, the head of each agency should "ensure, *consistent with applicable law*, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation[,]" E.O. 14,218 § 2(a)(ii) (emphasis added). And Section 3 of the Designation EO directs the Attorney General and the Secretary of Homeland Security to publish a list of jurisdictions that obstruct the enforcement of Federal immigration laws and pursue legal remedies against those that remain in defiance of federal law after receiving such notice.

Plaintiffs wholly ignore that the challenged Executive Orders specify that agencies should undertake "lawful actions," EO 14,159, or those that are "consistent with applicable law," E.O. 14,218

§ 2. Indeed, as the D.C. Circuit recognized, when "the Executive Order itself instructs the agency to follow the law," "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Bldg. Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)). And Plaintiffs cannot obtain their requested relief foreclosing agencies from relying on or implementing the President's Executive Orders because they have not demonstrated that an agency could *never* permissibly rely on the Executive Orders to condition or withhold funding. The standard is especially hard to meet in this context because Congress frequently authorizes the Executive to impose discretionary conditions on the receipt of federal grants, and Plaintiffs do not even attempt to make the required showing across every grant program administered by the defendant agencies. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1181 (9th Cir. 2019) ("We conclude that DOJ did not exceed its statutory authority in including two scoring factors related to illegal immigration as part of its implementation of the [COPS] grant program.").

As a Judge on the Fourth Circuit recently observed in a similar challenge, there are "serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it" to the extent that Plaintiffs are challenging an overall Executive Order rather than "any particular agency action implementing the Executive Order[.]" Order Staying Preliminary Injunction at 9, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) (Doc. 29) (Rushing, J., concurring). That is equally true here, where Plaintiffs seek to preclude *any* implementation of the EOs regardless of the agency or grant program at issue.

Ultimately, the EOs represent the President instructing subordinate agencies to evaluate certain funding, to the extent they have legal authority to do so, and to the extent such funding implicates the President's immigration policies. Such Presidential instructions to subordinate agencies are plainly lawful. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; *id.*, § 3). "Because no single person could fulfill that

responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).

Accordingly, the Day One, Subsidization, and Designation Executive Orders are lawful, and the Court cannot enjoin implementation of the Orders across all contexts and grant programs.

### 2. The majority of Plaintiffs' remaining challenges to potential agency actions are not ripe nor are they final agency action.

Plaintiffs' challenges to unconsummated agency action, *i.e.*, situations where agencies are only considering—but have not decided—what, if any grant conditions to add or alter and to which grant programs, are neither ripe under the Constitution or final agency action under the APA. "Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (first quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003), then quoting *Abbott Lab's v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

To determine whether administrative action is ripe for judicial review, courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation modified). And agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Lab's*, 387 U.S. at 149; *see also City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of ripeness). For an agency review to be final, it must be both (a) "the 'consummation' of the agency's decision-making process," and (b) a decision "by which 'rights or obligations have been determined,' or from which

'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *Abbott Laby's*, 387 U.S. at 148-49. Ripeness thus overlaps with the APA's independent requirement of final agency action. *See* 5 U.S.C. § 704.

With respect to the Bondi Memo; Noem Memo; DHS Conditions; and HUD Letter, Plaintiffs' claims are not ripe. Rather than challenge the agency's final decision to deny specific grant funds to Plaintiffs—a decision that has not yet occurred—Plaintiffs challenge agency directives that call for an evaluation of possible, lawful, prospective federal funding limitations.

How those general directives will be specifically applied to specific grant programs that might affect Plaintiffs is "no more than conjecture" at this time. *Trump v. New York*, 592 U.S. 125, 131 (2020) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For example, the Bondi memo directs the Associate Attorney General to create a report identifying grants that may be conditioned upon compliance with immigration laws, and then to take additional steps "to tailor future grants to promote a lawful system of immigration." Bondi Memo at 2. The HUD letter likewise reminds grantees of their legal obligations to comply with the President's Executive Orders and federal law, and explains that HUD leadership were directed to review its programs for consistency with those laws and Executive Orders. Federal agencies are permitted to internally evaluate their funding decisions. To be clear, none of these challenged agency directives has impacted any federal funding provided to either of the Plaintiffs—and they offer no evidence of any such impact.

The Noem Memo similarly directs components to review federal financial assistance awards to determine if Department funds are going to sanctuary jurisdictions and, to the extent consistent with relevant legal authorities and applicable terms and conditions of each award, cease providing federal funding to sanctuary jurisdictions.

And while DHS has published updated standard terms and conditions for its Fiscal Year 2025 federal awards, it is still in the process of deciding to which specific grants those immigration conditions will apply. Indeed, for a number of grants, it has decided *not* to apply those terms and conditions of which Plaintiff complain. *See* Ex. A. Memorandum from Cameron Hamilton to Kristi Noem, Sec'y, U.S. Dep't of Homeland Security, *Approval of FEMA-Administered Grant Disbursements*

13

(Mar. 25, 2025) ("March 25 Noem Memo") (stating that sanctuary jurisdiction conditions do not apply to, *inter alia*, disaster relief grants and grants to fire departments). Thus, no challenged conditions have been placed on specific grants through which Plaintiffs currently receive funds. Moreover, no Notices of Funding Opportunities ("NOFOs") have issued for Fiscal Year 2025 regarding future grant awards. A NOFO establishes DHS's guidance concerning various aspects of a particular grant program for a specific fiscal year. Those aspects include the program's objectives, the amount of money appropriated by Congress for the program, how prospective grantees may demonstrate eligibility for funding and apply for it, and the terms and conditions that apply to those programs. Until a NOFO issues, no funds are available to any prospective applicant. *See generally* Richardson Decl.

Since the decision-making process for DHS, DOJ, and HUD is still ongoing, the issues are not fit for judicial resolution. It is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g., Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir. 1974) (action for declaratory judgment that statement by Police Commissioner would deprive police officers of due process in future administrative proceedings was not ripe because "[a] court could only guess at how [the statement] might be translated into practice"). Moreover, withholding consideration will not cause Plaintiffs hardship because "the impact of the regulation could not be said to be felt immediately by those subject to it in conducting their day-to-day affairs and no irremediably adverse consequences [will] flow[] from requiring a later challenge." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 810 (2003) (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)) (cleaned up).

As a result, neither the Court nor Defendants can evaluate the contours of their claims, and no Article III "case or controversy" exists. Plaintiffs' allegations reduce to the theory that the mere existence of the agency documents that begin a process of review somehow interferes with their state and local sovereignty. But Plaintiffs' speculation about the possibility of some future harm stemming from the application of this executive guidance is insufficient to establish a case or controversy over which the Court may preside. Such conjecture does not provide a basis for the Court to issue the extraordinary remedy of a preliminary injunction. Therefore, the Court should deny Plaintiffs' motion.

### 3.    Plaintiffs cannot succeed on their APA claims.

#### a.    The HUD, DOJ, and DHS agency directives do not constitute final agency action.

For similar reasons that Plaintiffs' challenges to the HUD, DOJ, and DHS directives are not ripe, they are not final agency action either. *See* 5 U.S.C. § 704. Agency action is final only if two conditions are met: (1) the agency action marks "the 'consummation' of the agency's decisionmaking process"—it must not be of a merely tentative or interlocutory nature, and (2) the "action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences flow.'" *Bennett*, 520 U.S. at 177–78 (citations omitted). *Both* conditions must be satisfied for agency action to be considered "final" under the APA. *Id.* at 175.

Here, Plaintiffs' APA claim fails because the internal agency directives direct the Executive Branch to conduct an internal *evaluation* of federal funding decisions and an internal review of state and local governments' compliance with federal law. That is not "final action" under the APA. Courts have interpreted the "finality" element with an eye toward pragmatism. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (citing *Abbott Lab'ys*, 387 U.S. at 149). Courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations' of the subject party, or if 'immediate compliance [with the terms] is expected.'" *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (alteration in original) (citation omitted).

In *Standard Oil*, the Supreme Court held that the Federal Trade Commission's issuance of a complaint averring there was "reason to believe" that a party was in violation of the Federal Trade Commission Act was insufficient to satisfy the finality requirement. *Standard Oil*, 449 U.S. at 239, 243. The Supreme Court explained that "reason to believe" was merely a determination that adjudicatory proceedings would begin, and the actual issuance of the complaint was sufficient only to initiate the proceedings. *See id.* at 242. The complaint had no effect on the daily operations of defendant's business, nor did it legally compel a party to do something or refrain from doing something. *See id; see also Franklin*, 505 U.S. at 798 (finding no final agency action where "the Secretary's report to the

President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination").

Plaintiffs do not challenge any final action taken by DOJ, DHS, or HUD in this case. Rather, Plaintiffs seek to prohibit these agencies from taking future actions that could impact their federal funding. For example, the Bondi Memo merely indicates that the "Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)," Bondi Memo at 2, and that "[DOJ] shall investigate incidents involving" jurisdictions that "impede, obstruct, or otherwise fail to comply with lawful immigration-related directives" for potential prosecution, *id.* at 3. These are not "definitive statement[s] of position", but rather "a threshold determination that further inquiry is warranted . . . ." *See Standard Oil*, 449 U.S. at 241.

Indeed, cases finding final agency action have involved some concrete act beyond the announcement of a policy or plan. *See, e.g.*, *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018) (finding final agency action when funding was in fact dependent on the certification condition on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Penn. 2017) (finding final agency action when the Attorney General conditioned funding Byrne JAG on applicants certifying compliance with 8 U.S.C. § 1373). The key in these cases was *actual implementation*, which simply has not occurred here.

The agency memos generally describe future efforts to ensure that state and local authorities are complying with federal law or to put them on notice that changes are coming. The memos do not direct immediate denial of Plaintiffs' specific federal grants. Nor do the memos' instructions to identify and review state and local laws or policies have an immediate impact on Plaintiffs' daily operations. These entities have not been denied any grants, nor have they been subject to legal penalties pursuant to the memos. Further review and investigation are required before the agencies can take any final action. In other words, the agency's decision-making process is ongoing—not consummated—and there is no final agency action here.

Likewise, the "agency action" requirement articulated in *Bennett* precludes "broad programmatic attack[s]" on an agency's administration of a program. *Norton v. S. Utah Wilderness All.*,

542 U.S. 55, 64 (2004). Plaintiffs' claims cannot circumvent the programmatic challenge limitations set forth in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990). In *Lujan*, the Supreme Court announced a prohibition on programmatic challenges and determined that the challenged "program" was "not an agency action" within the meaning of § 702, much less a "final agency action" under § 704. *Id.* at 890. The Court emphasized that § 702 only allows for review of "'identifiable' agency action," and that the APA requires challenge to agency action on a "case-by-case" basis, rather than pursuing "wholesale improvement of [an agency] program by court decree." *Id.* at 890-894 (emphasis omitted). The Court's prohibition on programmatic challenges was motivated by institutional limits on Article III courts, which constrain their review to narrow and concrete actual controversies. *See id.* at 891–94. Thus, absent a discrete and final agency action, federal courts cannot review a general program or policy. *See Norton*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan*[.]").

Here, since Plaintiffs challenge the agencies' evaluation of funding, and no funding has yet been impacted, their suit cuts at the heart of anticipated, programmatic changes, which are squarely precluded from APA review. *See* 5 U.S.C. § 704; *see also Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("[D]isregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it."). Plaintiffs have submitted no evidence that DOJ, DHS, or HUD has issued a decision to terminate Plaintiffs' funding under an existing grant award or denied an application for a future grant award based on failure to certify compliance with immigration enforcement conditions. Therefore, Plaintiffs cannot succeed on their APA claim, and the Court should decline their request for a preliminary injunction.

### b. If there were final agency action, Plaintiffs' challenge would fail on the merits.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the "arbitrary and

capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). This deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Moreover, in general, agencies have broad discretion in creating, awarding, and terminating specific grants. In *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* As the Supreme Court has acknowledged, in such circumstances, it is squarely within an agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* So long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Plaintiffs are not likely to prevail on any of their APA claims because they seek to challenge decisions quintessentially "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how best to condition

appropriated funds to fulfill its legal mandates is classic discretionary agency action. *See Lincoln*, 508 U.S. at 193.

### c.  Plaintiffs' challenge to the DHS conditions fails.

As explained above, the challenge to the DHS conditions is not ripe because DHS has not decided to which grant programs the conditions will apply. *See generally* Richardson Decl. Thus, a preliminary injunction would short-circuit DHS's ongoing administrative processes would itself cause separation-of-powers complications. *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations*, 643 F.3d 16, 17 (1st Cir. 2011). And without final agency action, there can be no review under the APA. *See* 5 U.S.C. § 704; *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024), *petition for cert. docketed sub nom. Harper v. Faulkender*, No. 24-922 (U.S. Feb. 21, 2025).

Even if the Court were to reach the merits, the claim would fail. DHS's priorities in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency

> need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*Id.*

Plaintiffs' argument that DHS's actions were contrary to law rests on Plaintiffs' contention that Defendants violated the Constitution. Pls.' Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Br.") at 28, ECF No. 12-1. For the reasons discussed below, Plaintiffs have not established a likelihood of success that all applications of the challenged conditions would violate the Constitution, thus their APA contrary-to-law claim fails.

With respect to Plaintiffs' arbitrary and capricious claims, *see* Pls.' Br. at 29, as discussed above, the DHS grants at issue in this case come from the agency tasked with enforcing federal immigration law. Requiring recipients that receive DHS funding to comply with, and not impede, DHS's duty to enforce federal immigration law flows from DHS's core purpose. It is neither arbitrary nor capricious

for DHS to ensure that grantees will provide such cooperation when receiving funding specifically for those purposes. These are all "rational reasons" that support the agency's decision to add the new challenged conditions and withstand arbitrary and capricious review. *See Ohio v. Becerra*, 87 F.4th 759, 775 (6th Cir. 2023) (upholding HHS's implementation of a requirement that Title X projects offer pregnant patients with an opportunity to receive information and nondirective counseling on all options, including abortion).

While Plaintiffs may have valid concerns regarding the use of limited resources or law enforcement strategies, so too does the federal government. And the federal government's primary immigration enforcement agency is allowed to ensure that entities who receive DHS funding to promote national security do not act in a way that impedes DHS's efforts to do the same. Although Plaintiffs argue that the government failed to consider their reliance on the federal funding, *see* Pls.' Br. at 29, Plaintiffs' reliance on federal funding from these grants is limited in that they make up a small portion of overall federal funding, *see* Decl. of Fidel Maltez ("Maltez Decl.") ¶¶ 14, 16, 22, ECF No. 12-3; Decl. of Kate Hartke ("Hartke Decl.") ¶¶ 5, 12, ECF No. 12-6. The fact that Plaintiffs disagree with DHS's assessment of the efficacy or need for these conditions is not sufficient to establish a likelihood of success on their APA claims.

### d. This Court lacks jurisdiction over Plaintiffs' challenge to the DOT Conditions.

This Court lacks jurisdiction over Plaintiffs' challenge to the updated SS4A conditions because it arises from Plaintiffs' contracts with the Government, *see generally* Finfrock Decl. ¶ 15. That claim should therefore be heard in the Court of Federal Claims. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Thus, where a party seeks funding that it believes the Government is obligated to pay under a contract, their suit must proceed only in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (vacating district court judgment;

concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978) ("Irrespective of the terminology employed . . . the object of the instant suit is clearly to compel appellants [the agency] in their official capacities to specifically perform a contract") (alteration in original) (omission in original) (citation omitted). This prohibition on district court jurisdiction extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In April, the Supreme Court stayed a district court order to make payments based on grants because the Government was "likely to succeed in showing the District Court lacked jurisdiction" to bar termination of various education-related grants. *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). The Supreme Court held the injunction was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver of sovereign immunity; instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* (citation omitted). This Court should follow the Supreme Court's stay ruling. Nor does *Massachusetts v. Bowen*, 487 U.S. 879 (1988), require a different result. In *California*, the Supreme Court specifically considered and distinguished *Bowen* in finding that the Tucker Act applied to that case, *California*, 145 S. Ct. at 968, rejecting the expansive reading of *Bowen* adopted by another Judge in this District, *see California v. U.S. Dep't of Educ.*, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (adopting reasoning of *Massachusetts. v. Nat'l Inst. of Health*, 2025 WL 702163, at *7-8 (D. Mass. Mar. 5, 2025)), *denying stay pending appeal*, 132 F.4th 92 (1st Cir. Mar. 21, 2025), *granting stay*, 145 S. Ct. 966 (Apr. 4, 2025).

The United States recognizes that other Judges in this District have rejected the applicability of the Tucker Act by distinguishing the specific cases before them from the Supreme Court's ruling in *California*.[1] However, in *Massachusetts Fair Housing Center v. U.S. Department of Housing & Urban*

---

[1] *See Ass'n of Am. Univs. v. U.S. Dep't of Energy*, 2025 WL 1414135 (D. Mass May 15, 2025); *Massachusetts v. Kennedy*, 2025 WL 1371785 (D Mass. May 12, 2025).

*Development*, 2025 WL 1225481 (D. Mass. Apr. 14, 2025), Judge Stearns of this Court granted a motion to dissolve the court's Temporary Restraining Order based upon the Supreme Court's stay in *U.S. Department of Education v. California*. The court explained that even if the plaintiffs had a likelihood of success on the merits, the court "is merely deferring (as it must) to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." *Id.*

       This Court likewise lacks jurisdiction here because the purportedly non-monetary injunctive relief Plaintiffs seek—an order requiring that specific terms of their contracts be excised—is inseparable from the fundamentally contractual relief they seek—uninterrupted grant funding under those contracts. Like the *Department of Education* plaintiffs, Plaintiffs seek relief based upon a grant award; they have no statutory or constitutional right to such funding. Like the *Department of Education* plaintiffs, Plaintiffs assert a challenge under the APA, including on the ground that the agency action is arbitrary and capricious. And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" under the grant awards. *Dep't of Educ.*, 145 S. Ct. at 968. The theories of standing, relief, and irreparable harm that Plaintiffs assert hinge entirely on contractual routing of funding to them as provided for in the grant agreement. Accordingly, the equitable relief they request is inseparable from their contractual claims. *See Diaz v. Johnson*, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (rejecting the plaintiff's attempt "to couch his claims in the language of equitable and declaratory relief, [because] . . . at bottom what he seeks is monetary relief . . . [but plaintiff] cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"). Therefore, this Court lacks jurisdiction over Plaintiffs' challenge to the SS4A conditions.[2]

---

[2] Putting aside the justiciability issues with Plaintiffs' challenges to conditions incorporated in other agencies' grant agreements, to the extent those challenges sound in contract, they belong in the Court of Federal Claims for the same reasons.

### e. Even if this Court had jurisdiction, the challenge to the SS4A conditions would fail on the merits.

Plaintiffs argue that the immigration conditions imposed by DOT on the SS4A grant program, which seeks to prevent roadway fatalities and serious injuries, violate the APA and the separation of powers because the Secretary lacked authority to add such conditions. However, the Secretary is permitted to set terms for the projects DOT funds with grants. For example, 23 U.S.C. § 315, governing the Federal Highway Administration, provides that, "[except as otherwise provided,] the Secretary is authorized to prescribe and promulgate all needful rules and regulations for the carrying out of the provisions of this title." And 23 U.S.C. § 402(d)(3) note provides that, "[i]n awarding a grant under the [Safe Streets and Roads for All Grant] program, the Secretary . . . shall take into consideration the extent to which an eligible entity, and each eligible project proposed to be carried out by the eligible entity, as applicable . . . achieves such other conditions as the Secretary . . . considers to be necessary." *See also* 2 C.F.R. § 200.300 (requiring federal agencies to communicate to a recipient or subrecipient all relevant requirements and incorporate them in the terms and conditions of the Federal award). Authorizing the Secretary to include terms he "considers necessary" exudes deference to him.

Thus, this case is unlike *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), where the First Circuit affirmed the District Court's ruling invalidating conditions that DOJ had imposed on grant funds allocated to two Rhode Island municipalities. The First Circuit's analysis in that case was focused on the statutory language authorizing the grant at issue in that case, namely, the Byrne JAG program administered by DOJ. *See generally id.* at 36-39.

Here, the grants at issue are authorized by different statutes using different language for administration by a different agency with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis in *City of Providence*. Moreover, in *City of Providence*, the First Circuit recognized language that Congress used in other circumstances to delegate the power to impose grant conditions as lacking in the instant dispute. *Id.* at 41-42. Examples included language stating that an agency "may impose reasonable conditions on grant awards to ensure that the

States meet statutory, regulatory, and other program requirements," or tasking officials with "awarding and allocating funds . . . on terms and conditions determined . . . to be consistent" with the statute. *See id.* (alterations in original) (citations omitted). But the language the court found lacking in *City of Providence* is similar to the language used by Congress in the statutes at issue in this case. *See* 23 U.S.C. § 402(d)(3) note ("In awarding a grant under the [Safe Streets and Roads for All Grant] program, the Secretary . . . shall take into consideration the extent to which an eligible entity, and each eligible project proposed to be carried out by the eligible entity, as applicable . . . achieves such other conditions as the Secretary . . . considers to be necessary."). Here, DOT has explicit authority from Congress to decide the terms and conditions of its grants.

Also unlike in *City of Providence*, the Secretary specifically explained the connection between the immigration conditions and the DOT mission in his letter, which stated: "It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations." DOT Letter at 1. The Secretary further explained that actions that impede ICE investigations and Federal law enforcement in the area of immigration law "compromise the safety and security of the transportation systems supported by DOT financial assistance" among other things. *Id.* at 2-3. Thus, the Secretary determined that compliance with the immigration conditions is necessary to the programs pursuant to which DOT is providing the grants at issue. The Secretary also made clear that these restrictions were to extend only so far as is consistent with existing law by ordering the implementation of these provisions only "[t]o the maximum extent permitted by law." DOT Order at 2. The conditions therefore do not impose any new obligations, but rather require compliance with existing law. The Secretary's decision pursuant to his Congressionally authorized authority as to the terms under which Plaintiffs may receive federal grants, and consistent with the existing law, remains within the agency's discretion under *Lincoln*, 508 U.S. at 192-93.

### 4.    **Plaintiffs lack standing for all but one of their claims.**

Similarly, Plaintiffs cannot establish a likelihood of succeeding on the merits in this case because they lack Article III standing for all but one of their claims. Plaintiffs must establish an injury that is concrete, particularized, and imminent rather than "conjectural or hypothetical," *Spokeo v.*

*Robins,* 578 U.S. 330, 339 (2016) (citations omitted), and must do so for each claim and each form of relief they seek, *Daimler Chrysler v. Cuno*, 547 U.S. 332, 352 (2006). And for each type of relief requested, Plaintiffs must show that relief will in fact redress their injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Plaintiffs ask the Court to issue an injunction preventing Defendants from "taking any [] action . . . [to] withhold[,] [freeze,] or condition[] . . . federal funds" based on 10 specific Executive directives. Pls.' Proposed Order Granting Prelim. Inj., ECF No 12-8. But with the lone exception of the SS4A grant program, Plaintiffs have not suffered any injury yet because none of their funds have been impacted.

For the same reasons that the vast majority of Plaintiffs' claims are not ripe—namely, because the agencies have not yet decided which grant programs affecting Plaintiffs will be impacted— Plaintiffs lack standing, too. Moreover, any future Executive action "will reflect both legal and practical constraints," as any action will be lawful, "making any prediction about future injury just that—a prediction." *Trump*, 592 U.S. at 133. As it stands now, no action has been taken by HUD, DHS, or DOJ to withhold funding, so no injury has been suffered. Because neither Defendants, nor Plaintiffs, nor the Court know which grants will be affected, Plaintiffs cannot assert a concrete, particularized, imminent injury. Plaintiffs' hypothetical injury—that the federal Government may withhold funding or otherwise penalize them for being sanctuary locales—is too speculative for this Court to adjudicate or redress at this time. Specifically, it is too early to meaningfully assess the merits of any specific alleged injury with respect to Plaintiffs' claims—which may never actually arise.

For example, Plaintiffs allege that the Executive Orders and the agency directives violate "Separation of Powers" by decreasing spending without Congressional approval, and run aground of the Spending Clause by, *inter alia*, refusing to disburse already awarded funds and imposing conditions on funding that have no relation to the funds. Missing from Plaintiffs' equation, however, is the identification of any funding awarded to Plaintiffs that has been or will be decreased on this basis. No meaningful analysis can occur without these details. *See e.g., New York v. United States*, 505 U.S. 144, 167 (1992) (evaluating the relationship between the conditions and the purpose of the federal spending

to determine if such conditions violated Spending Clause); *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (same).

Similarly, Plaintiffs' declarations, requesting immediate relief because of alleged financial uncertainty in budget planning, are insufficient to establish a present, concrete injury. For example, City of Somerville Director of Grants and External Funds contends that preliminary relief is appropriate now because "[t]he *potential* loss of federal funding has complicated [its budgeting] process," and whether the City will receive grants, including formula grants, is now "*unpredictable* and *uncertain*." Hartke Decl. ¶¶19, 20 (emphasis added). Chelsea City Manager Fidel Maltez similarly puts forth that "[l]osing federal funds would be a devastating blow to Chelsea" and "[t]he City is now forced to contemplate what [it] will do in the face of no reimbursement and to make contingency plans for suspension/termination of federal funding." Maltez Decl. ¶¶ 25, 32. But they ask the Court to halt the agencies' funding *evaluation process* based on uncertainty as to the result of that process, as again no funding decisions have been made. Because no policies have been implemented, the Court cannot craft an order with any further specificity—any relief would be predictive and advisory, as opposed to remedial.

Likewise, Plaintiffs lack standing to bring hypothetical constitutional claims. Plaintiffs lodge a Tenth Amendment claim alleging that compliance with federal law would amount to coercion. However, critical to evaluating whether there is "coercion," is what amount of funding would be impacted. *See New York*, 951 F.3d at 116 (analyzing what percentage of a local government budget may be impacted by federal withholding to evaluate plaintiffs' Tenth Amendment commandeering claims). Therefore, neither the Court nor Defendants can meaningfully evaluate any such conditions or fund types at this stage, because those decisions have not been made.

Finally, Plaintiffs' claim that the directives violate the Fifth Amendment because they are too vague and thus, do not provide them with any meaningful notice, underscores the premature nature of Plaintiffs' motion: these Executive directives provide guidance for the agencies to begin their evaluation of federal funding decisions to certain localities, and then assess how they may implement any applicable funding changes. As already stated, such deliberative considerations have not imposed

26

any legally cognizable consequence on Plaintiffs to date. Therefore, as Plaintiffs cannot establish standing due to a lack of a concrete injury, the Court should not grant the extreme remedy of a preliminary injunction.

### 5. Plaintiffs fail to show a violation of the Spending Clause.

Plaintiffs are also unlikely to succeed on the merits of their Spending Clause claim. The Federal Government is empowered to decide when it will fund certain activities by the States and under what conditions. Plaintiffs' assumption that Spending Clause doctrine requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable is not supported by Supreme Court precedent. Rather, such precedent (and long practice) makes clear that agencies have power to set grant criteria on their own accord, while subject to Congressional direction if such direction has been given. For example, the Supreme Court upheld agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*, 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring facilities to ensure that staff are vaccinated against COVID-19 did not exceed applicable statutory authority); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements").

Moreover, the Supreme Court has made clear that, even where the Federal Government may not be able to *compel* them to do a particular activity, it may *encourage* States and municipalities to implement federal regulatory programs. *See New York*, 505 U.S. at 149. Thus, the Federal Government can, constitutionally, use conditions on federal funds to "induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 537 (2012). It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. at 205-08 (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one). "[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." *Env't Def. Ctr. v. U.S. EPA,* 344 F.3d 832,

847 (9th Cir. 2003) (citation omitted). The key is whether the financial inducement is "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation omitted).

Plaintiffs contend that the contested terms here cannot apply to any of the agencies' grant programs because those terms improperly "coerce" the States' compliance, as the Supreme Court found that new Medicaid initiatives improperly did in *NFIB*. Under the Plaintiffs' overbroad reading of *NFIB*, all widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the Federal Government. But that is not the law. To the contrary, *NFIB* stressed (and as Justice Ginsburg's concurrence in the judgment observed) that this coercion arose from the unexpected imposition on the states to accept a dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding Medicaid coverage. *NFIB*, 567 U.S. at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment, dissenting in reasoning). The Court held that the combination of the nature and size of the threatened funding loss distinguished that case from *Dole*. *Id.*

Here, however, no agency is purporting to impose retroactive conditions on existing grant agreements at issue in this case. *See generally* Finfrock Decl. ¶¶ 7, 12, 14 (new DOT conditions do not apply to previously executed grant agreements); Richardson Decl. ¶¶ 8, 15 (for preparedness and mitigation grants, terms in effect at the time of the award apply); Fernandez Decl. ¶ 14 (any new HUD conditions will not be applied to previously awarded and executed grants). Rather, applicants are already on notice of the revised terms prior to requesting funding from the subagencies. Nor do the conditions require states to expand any particular program broadly. As the Supreme Court in *NFIB* specifically noted:

> Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds. In the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own.

*NFIB*, 567 U.S. at 579 (citation omitted).

In *NFIB*, the Supreme Court underscored that the federal funds at stake in *Dole* constituted less than half of one percent of South Dakota's budget at the time and found the loss of those funds was not such coercion as to violate the Spending Clause. *Id.* at 581. By contrast, the Court found that the threatened loss of all Medicaid funds, which was approximately 20 percent of the average state's total, to induce the states to further expand their Medicaid program was so coercive as to violate the Spending Clause. *Id.* Because the monetary value of the "coercion" in *NFIB* was such an outsized percentage of the states' total budgets, *NFIB* should be viewed as the exception rather than the general rule.

As explained in *NFIB*, the Court has not "'fix[ed] the outermost line' where persuasion gives way to coercion." 567 U.S. at 585 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 591 (1937)). That point has not been passed here. While, for the reasons stated above, the scope of grants affected by the challenged directives remains unclear, in any event the grant programs at issue in this case are nowhere near as large a portion of federal grants to state budgets as Medicaid. For example, Chelsea's FY 2024 budget was $231 million dollars, and it received approximately $14.5 million in all federal funding that year, which represents only 6.28% of its budget. *See* Maltez Decl. ¶¶ 14, 16. Similarly, Somerville's budget in FY 2024 was $337 million, and it received approximately $19.4 million in federal funds for that fiscal year, which represents only 5.76% of its overall budget. *See* Hartke Decl. ¶¶ 5, 8. Of course, any particular grant on its own will represent a far smaller percentage of the city's overall budget. Thus, the facts of this case fall in the range of the inducements considered acceptable in *Dole*, rather than the threat of a loss of all Medicaid funds considered in *NFIB*.

Also, unlike the agency in *NFIB*, no agency is creating new grant programs, but instead the agencies are considering or in the process of modifying their standard terms and conditions that apply to existing grant programs. The new DHS and DOT immigration conditions in particular, on their face, require compliance with federal law and cooperation with federal law enforcement, but do not require Plaintiffs to expand any particular program broadly. The addition of terms affecting only a small fraction of the Plaintiffs' budget is not so coercive as to violate the Spending Clause.

29

6.    **Plaintiffs fail to show a violation of separation of powers.**

Even if Plaintiffs' claims were ripe and they had standing, they still fail to establish a likelihood of success on the merits of their claim that the EOs and agency directives violate separation of powers. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. Art. I, § 8, cl. 1. Congress therefore may, "[i]ncident to" its spending power, "attach conditions on the receipt of federal funds," *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 530 (N.D. Cal. 2017) (quoting *Dole*, 483 U.S. at 206), and "Congress can delegate some discretion to the President to decide how to spend appropriated funds" so long as "any delegation and discretion is cabined by [relevant] constitutional boundaries." *Id.* at 531.

Indeed, that is precisely what has happened here. Congress has authorized agencies administering certain grant programs—including those at issue here—to impose discretionary conditions on their receipt. Those statutory authorizations have taken a variety of forms, including authorizing an agency to ensure that a grant recipient complies "with all provisions of . . . applicable Federal laws," *see* 34 U.S.C. § 10153(A)(5)(D) (governing DOJ grant program), or allowing an agency to "plac[e] special conditions" on certain grants under appropriate circumstances. *See id.* § 10102(a)(6). Therefore, Plaintiffs cannot state a viable claim for violation of separation of powers.

Contrary to Plaintiffs' allegations, the Executive Orders and agency directives do not attempt to withhold funds or unilaterally impose conditions on federal funds without Congressional authorization. As explained *supra*, Section 17 of E.O. 14,159 simply calls for an evaluation and undertaking of any *lawful actions* to ensure that "sanctuary" jurisdictions do not receive access to Federal funds. Section 2(b) of EO 14,218 asks certain federal agencies to identify sources of funding for illegal aliens and recommend additional agency action to align federal spending with the Order. Relatedly, the Bondi Memo makes clear that all action will be done "consistent with law" and "appliable statutes, regulations, court orders, and terms[.]" Bondi Memo at 1. Regarding any grants, the Memo confirms that DOJ will require compliance with 8 U.S.C. § 1373(a) as a condition of grant eligibility only where "consistent with statutory authority and past practice[.]" *Id.* at 2. Further, DOJ may seek to tailor

future grants to promote a lawful system of immigration. *Id.* The same is true of the Noem memo, which directs components to cease funding sanctuary jurisdictions "to the extent consistent with relevant legal authorities and applicable terms and conditions of each award[.]" Noem Memo at 2. And the DOT Order likewise provides that DOT shall prioritize projects that require local compliance with federal immigration law "to the maximum extent permitted by law[.]" DOT Order at 2. Nothing in this language imposes grant conditions that would violate any applicable constitutional or statutory limitation. *See Allbaugh*, 295 F.3d at 33 (rejecting separation of powers challenge to Executive Order where the President is merely exercising his "supervisory authority over the Executive Branch" when he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'" (alteration in original) (citation omitted)).

<div align="center">7.    <strong>Plaintiffs fail to articulate a due process violation.</strong></div>

Plaintiffs claim that the directives violate the Fifth Amendment because they are too vague and that certain terms lack definitions, thus depriving Plaintiffs of notice of how the Executive directives may be enforced. This claim lacks merit for multiple reasons.

To begin, Plaintiffs have not established a protectable property interest. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to

an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure[.]" 844 F.2d 962, 966 (2d Cir. 1988). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns[.]" *Id.* at 966. "[C]ourts have resisted application of due-process principles to government contracts because [w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *New Vision*, 54 F. Supp. 3d at 29 (citation omitted). This Court should refrain from such an unprecedented expansion of the doctrine.

And as already stated, such considerations have not imposed any consequence on Plaintiffs to date. Moreover, Plaintiffs do not articulate a policy or procedure causing any alleged deprivation because there is no final agency action, as explained herein. The Executive directives call for an *evaluation* of federal funding. These directives indicate more information and implementation guidance will be forthcoming. Even Plaintiffs themselves concede that they base their preliminary injunction on financial uncertainty, not on the basis that funds have actually been diminished.

Nor, in any event, can Plaintiffs establish such a due process vagueness claim. In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Supreme Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit . . . , taking into consideration general

standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). The Court recognized that these standards were "undeniably opaque," such that they would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme[.]" *Finley*, 524 U.S. at 588. But in the context of competitive grants, however, the Court explained that this imprecision raised no such concerns. That is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589. The challenged statute "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights." *Id.* at 590. A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589 (citation omitted).

Here, the challenged directives do contain various explanations for sanctuary terms. *See, e.g.*, E.O. 14,159 § 17 (explaining "sanctuary jurisdictions"); E.O. 14,218 (explaining "sanctuary policies"); Bondi memo (same for sanctuary jurisdictions"). Plaintiffs' assertion that the terminology in the agency directives is unconstitutionally vague replicates the analysis that the Supreme Court rejected in *Finley*. Any decision to terminate grants for a "sanctuary jurisdiction" *id.*, creates no greater constitutional problem than a decision to terminate grants that are not "excellent." *Finley*, 524 U.S. at 589.

### 8.    Plaintiffs fail to articulate a Tenth Amendment violation.

Plaintiffs fail to show a likelihood of success on the merits with respect to their claim that the Executive directives violate the Tenth Amendment. The Tenth Amendment embodies the principle that the "pre-existing sovereign States" (and their subdivisions) retain their sovereignty under the Constitution and that the Federal Government may not encroach upon that sovereignty. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995); *New York*, 505 U.S. at 156. Plaintiffs claim that "the Executive Orders and Agency Directives violate the Tenth Amendment by attempting to improperly

wield federal funds to force Plaintiffs, whose priorities differ from those of the Federal Government, to carry out federal immigration laws and policies." Pls.' Br. at 22.

Because Plaintiffs may decline to apply for the specific grants to which any offensive conditions are attached, there is no commandeering of their sovereignty. *See FERC v. Mississippi*, 456 U.S. 742, 766 (1982) ("[I]t cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way[.]"); *see also Env't Def. Ctr.*, 344 F.3d at 847 ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." (citation omitted)). Further, the Executive directives speak to the agencies exercising *existing* statutory and constitutional authority. *Cf. United States v. Pickard*, 100 F. Supp. 3d 981, 1011 (E.D. Cal. 2015) (rejecting a Tenth Amendment challenge to a statement of agency policy on the grounds that a policy statement "is a very different creature from a statute" in that it does not bind States as would a statute).

This Court has no jurisdiction to review yet-to-be-filed enforcement actions arising from the Executive directives against Plaintiffs. Nor could Plaintiffs allege that the mere possibility of enforcement action has inflicted any cognizable injury. Indeed, there is always a possibility that the Federal Government may sue a State or local government alleging that the defendant's laws or policies are constitutionally preempted. *See Arizona*, 567 U.S. 387. This authority exists entirely independent of the Executive Orders and agency directives. *Id.* Further, if such action were to occur, the affected jurisdiction would have an opportunity at that time to challenge its propriety and merits.

## B. Plaintiffs have not proven irreparable harm.

Plaintiffs' motion should be denied solely on the basis that they have failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds*

34

*To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–8 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))).

Plaintiffs cannot establish irreparable harm because they have failed to identity a concrete and particularized injury. Plaintiffs have not established the threat of "immediate" and "concrete" irreparable harm necessary to secure a preliminary injunction because they premise their injury on speculative future loss of funds. Indeed, Plaintiffs have failed to identify the loss of *any* funds—or the future loss—traceable to any action that the Executive has taken. Although Plaintiffs articulate—at length—the potential consequences that they fear will flow from any alleged action from the Executive, funding has not yet been withheld, and thus, neither the Court nor Defendants can evaluate the parameters of any so-called injury. Thus, any alleged injury is not "irreparable," for the purpose of a preliminary injunction. And Plaintiffs' assertion that these executive funding decisions would eliminate "all" of their federal funding, is purely speculative. Thus, Plaintiffs overstate their alleged injury because no funding, at least no funding administered by DOJ, DHS, or HUD, has been impacted yet. *See generally* Richardson Decl.; Fernandez Decl. Neither the Court, nor Defendants for that matter, can evaluate the parameters of any alleged injury. *See Sampson v. Murray*, 415 U.S. 61, 74 (1974) ("Until administrative action has become final, no court is in a position to say that such action did or did not conform to applicable regulations."). And, for similar reasons, Plaintiffs have not established that they are *likely* to suffer irreparable harm without issuance of a preliminary injunction as *Winter* mandates. 555 U.S. at 20.

Plaintiffs' speculation about what funding may be impacted, in what amount, and in what jurisdiction, confirms that the uncertainty of future harm does not justify preliminary injunctive relief now. *See id.* at 22; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (An injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future."). Indeed, Plaintiffs' contention that the terms of the directive are ambiguous conflict with their certainty

that they will in fact be "injured" "irreparably" once the federal Government implements their terms. This, too, undermines Plaintiffs' claim that granting their request for a preliminary injunction is appropriate at this juncture.

Even if Plaintiffs' harm were imminent, it would not be irreparable. Plaintiffs ultimately seek an order from this Court to force the Federal Government to pay them money despite their lack of agreement to the terms. Thus, their claims are essentially economic. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass. 2020) ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction" (citation omitted)), *aff'd*, 976 F.3d 86 (1st Cir. 2020); *Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss"); *see also e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."); *Danielson v. Local 275, Laborers Int'l Union*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

Plaintiffs' purported inability to continue certain programs results solely from the loss of funding. Even for Plaintiffs' challenge to the conditions on DOT's SS4A program, DOT is not taking any actions—other than withholding money—that impede Plaintiffs' ability to carry on with these programs. The only thing that DOT might do is stop footing the bill. That is an economic loss. Otherwise, one could always convert the relevant harm for purposes of a preliminary injunction from (i) an economic loss to (ii) the inability to do things that cost money—thus swallowing the general rule that "[e]conomic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230 (citation omitted).

Finally, even if the Court were to find a failure to comply with the APA, the appropriate remedy would be to remand to the agency for further consideration or explanation. If that is the relief Plaintiffs would theoretically be entitled to, it is not appropriate to grant the broader relief of

reinstating any grants or excising certain conditions from them in this preliminary stage. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("[B]edrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation" (citation modified)).

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits challenging particular funding denials for specific grants in the appropriate forum. Plaintiffs' declarations do not establish the need for the exceedingly broad relief they claim.

### C. The balance of equities and the public interest weigh in the Federal Government's favor.

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). Plaintiffs must demonstrate that their claimed injury outweighs any harm that granting the injunctive relief would inflict upon Defendants. *Lancor v. Lebanon Hous. Auth.*, 760 F. 2d 361, 362 (1st Cir. 1985). Next, courts consider whether "[t]he public interest weighs in favor of granting" the preliminary injunction. *Grewal*, 60 F. Supp. 3d at 285. But where, as here, the government is the defendant, these factors simply "merge." *Nken*, 556 U.S. at 435.

Because the vast majority of Plaintiffs' claims are not ripe, they are currently experiencing no hardship at all. For example, with respect to the DHS grant programs, as explained above, no NOFOs have yet issued for FY 2025. Without a NOFO, there is no funding to even apply for, on whatever terms, for any of the programs. Should DHS decide to apply terms that Plaintiffs would contest for the same reasons as set forth in their Complaint and preliminary-injunction motion, they may challenge the Agency's decisionmaking before this Court if and when that contingency actually occurs.

*See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."). If, instead, the Agency decides not to apply the challenged terms, as it did with its final decision not to apply any of the challenged conditions to the Disaster and Mitigation grant programs, Plaintiffs' claims will be moot and there will be nothing for the Court to decide.

Putting that aside, if the Court grants a preliminary injunction and Plaintiffs are provided with federal funds, they will draw down the funds throughout the litigation. Defendants will be harmed because they will be unable to "recover the grant funds once they are disbursed" while, conversely, Plaintiffs can "can recover any wrongfully withheld funds through suit in an appropriate forum." *California*, 145 S. Ct. at 969. Accordingly, the agencies will bear all the risk if the Court enters a preliminary injunction. The Supreme Court recognized precisely that dynamic in *Department of Education* when it stayed a TRO enjoining the Government from terminating various education-related grants. *See id.*

Finally, the most pertinent and concretely expressed public interest in relation to this case is contained in 8 U.S.C. § 1373, which expresses the public interest in supporting the enforcement of federal immigration law. *See Arizona*, 567 U.S. at 411-412 ("Consultation between federal and state officials is an important feature of the immigration system. Congress has made clear that no formal agreement or special training needs to be in place for state officers to 'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" (alteration in original) (citing 8 U.S.C. §§ 1357(g)(10)(A), 1373(c))). These directives are meant simply to ensure compliance with the federal statutes and codify long-settled constitutional principles holding that States cannot impede the enforcement of federal law. Therefore, the public interest lies in allowing the Executive Branch to pursue the necessary steps to implement the Executive directives. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 45 (D.D.C. 2020) ("The public does have an interest in the executive branch's 'effectuating statutes enacted' by Congress." (citation omitted)). Additionally, the

38

public interest prohibits judicial "advisory opinions," which Plaintiffs' motion would require this Court to render in relation to Executive directives that have not yet been implemented.

###### D.    The Court should limit any injunctive relief to grants Plaintiffs specifically identify and only to any requirements that go beyond existing obligations to comply with federal law.

Relief under the APA is limited; courts may either "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action." 5 U.S.C. § 706(1); *see also Norton*, 542 U.S. at 66-67 (explaining how the APA's limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide relief" to injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, to the extent the Court is inclined to grant the Plaintiffs' request for a preliminary injunction, any such relief should be narrowly tailored to apply only to the grants identified in Plaintiffs' Complaint and declarations. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Also, any relief should at most enjoin only those portions of the immigration conditions which can be read to require actions beyond complying with federal law. There can be no irreparable harm from a condition that requires an agreement to comply with federal law – since the Plaintiffs are already required by federal law to do so.

###### E.    Any injunctive relief should be stayed pending a determination of whether to appeal and be accompanied by a bond.

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal that may be authorized, because Defendants are likely to succeed on appeal

and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). On the whole, as argued above, a stay is warranted. At a minimum, the court should administratively stay any injunctive relief it intends to order for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the agencies at issue spend money that may not be recouped once distributed.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' preliminary injunction motion.

Dated: June 18, 2025

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General, Civil Division*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ANDREW I. WARDEN
JOSEPH E. BORSON
*Assistant Branch Directors*

/s/  *Elisabeth J. Neylan*
Elisabeth J. Neylan
N.Y. Bar Reg. No.: 6125736
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

Telephone: (202) 616-3519
Email: elisabeth.j.neylan@usdoj.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 18, 2025, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

<div align="center" style="text-align:right">

*/s/ Elisabeth J. Neylan*
Elisabeth J. Neylan
Trial Attorney
United States Department of Justice

</div>