## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| City of Chelsea, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Donald J. Trump, *et al.*,<br><br>        Defendants. | Case No. 1:25-cv-10442-NMG<br>Judge Nathaniel M. Gorton<br><br>Leave to file granted on June 23, 2025 |

### IMMIGRATION REFORM LAW INSTITUTE'S AMICUS BRIEF IN SUPPORT OF DEFENDANTS

Rohan J. Samaraweera (BBO #439900)
SAMARAWEERA LAW OFFICES
382 Hammond Street, Suite 200
Boston, MA 02467-1229
Telephone: (617) 731-1985
Fax: (617) 731-1986
Samaraweera-Law@comcast.net

Jonathon P. Hauenschild*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
jhauenschild@irli.org

* appearing *pro hac vice*

Attorneys for *Amicus Curiae*
Immigration Reform Law Institute

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Immigration Reform Law Institute ("IRLI") is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. IRLI has no parent corporation. It does not issue stock.

## INTEREST OF *AMICUS CURIAE*

Amicus curiae Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and to assisting courts in understanding and accurately applying federal immigration law.[1] IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including: *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## SUMMARY OF THE ARGUMENT

Plaintiffs City of Chelsea and City of Somerville (collectively "the Cities") ask this Court to protect certain of their policies with an injunction. But because these policies, in a variety of ways, are unlawful, the Cities lack standing to seek such an injunction, and they also cannot meet the standards for injunctive relief.

Plaintiffs aver that they have standing because the President's Executive Orders defunding sanctuary cities and the related actions from executive agencies interfere with their independence and will harm smaller cities "whose residents are grievously harmed by any termination of federal funding." Amended Complaint for Declaratory and Injunctive Relief (the "Complaint"), ECF 10 at ¶¶ 4-5, 9. Plaintiffs further allege that they rely on federal funding "to fill critical budgetary needs in the management of their respective cities," though admit that the Federal government's anti-sanctuary city policies only "signals the imminent pulling of federal

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

funds and bringing enforcement actions," rather than the *actual* cessation of funds. *Id*. at ¶¶ 9, 11. *see also* Motion for Preliminary Injunction, ECF 12, pp. 2, 12-14. By Plaintiffs' own admission, though, the only "interests" of theirs being threatened by Defendants' actions are those in maintaining sanctuary policies that prevent them from meeting federal funding requirements. Complaint, at ¶ 119.

The Cities' sanctuary policies are unlawful. By standing as obstacles to congressional purposes behind several federal laws, by interfering with federal officers in the performance of their duties under federal law, and by compelling local officials to violate federal anti-harboring provisions, they violate the Supremacy Clause of the United States Constitution.

Because Plaintiffs' claimed harm would consist either in the discontinuation of these illegal policies or the loss of funding due to their continuation, they cannot show injury, necessary for standing, to a legally protected interest. There is no cognizable interest in the continuation of unlawful government policies; nor is an injury, such as a loss of funding, caused by the continuation of such policies cognizable. For the same reason, Plaintiffs cannot show the irreparable harm necessary to support injunctive relief.

## ARGUMENT

### I.    RELEVANT FEDERAL ACTIONS AND THE CITIES' SANCTUARY POLICIES

#### A.  *Relevant Federal Orders and Memoranda*

Starting on Inauguration Day, President Trump issued several Executive Orders the aim of each was to enhance public safety by expressing his administration's intent to follow the law, specifically the Immigration and Naturalization Act (INA), Pub. L. No. 82-414 (1952), codified, as amended, at 8 U.S.C. §§ 1101, *et seq*. Various Federal departments and agencies followed up with letters, interpretations, and orders requiring State and local jurisdictions receiving federal funds to comply with federal immigration law.

Relevant to this case, the President signed three Executive Orders, including Executive Order 14159, entitled "Protecting the American People Against Invasion," 90 Fed. Reg. 8443 (Jan. 2025); Executive Order 14218, entitled "Ending Taxpayer Subsidization of Open Borders," 90 Fed. Reg. 10581 (Feb. 2025); and Executive Order 14287, entitled "Protecting American Communities from Criminal Aliens, 90 Fed. Reg. 18759 (March 2025).

The Cities challenged all three orders along with several directives and letters issued by the Attorney General, Secretary of the Department of Homeland Security, and other Cabinet Secretaries and Departments. Defendants adequately summarize each of these challenged actions. *See* Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF 19, pp. 2-6.

### B. The Cities' Policies

The Cities want to have their cake and eat it, too. One the one hand, they both claim that they are Sanctuary Cities, defining the term as those not complying with "civil enforcement of federal immigration laws"[2] or otherwise not assisting with the enforcement of such laws[3] while, on the other hand, demanding that the Court declare neither jurisdiction a Sanctuary Jurisdiction. Complaint at ¶¶ 44 and 70. In the relevant Resolutions and Ordinances, both Cities obstruct and interfere with federal immigration actions in violation of federal law. It is the Cities' own unlawful policies, therefore, that preclude them from meeting the requirements announced in the President's Executive Orders or in the various policies released by the relevant departments and agencies.

The City of Chelsea adopted a resolution declaring itself a sanctuary city on June 4, 2007. The resolution is mostly hortatory and expresses the City's intent to "go on record as a Sanctuary

---

[2] Complaint at ¶ 41
[3] Complaint at ¶ 62

City." Resolution of the City of Chelsea, Massachusetts June 4, 2007.[4] To implement the City's Sanctuary policy, the Chief of Police for Chelsea issued General Order 2017-03, which significantly limited the City Police Department's ability to cooperate with Federal immigration officials. Specifically, the Order forbids local officers from voluntarily maintaining "custody of an individual [subject to an Immigration or ICE Detainer] once that individual is released from local custody" or "*notify[ing] a federal agency before the pending release* of an individual." General Order 2017-03, p. 3.[5] (emphasis added).

The City of Somerville has adopted many sanctuary resolutions and ordinances. The City adopted nearly every resolution or ordinance in response the policy or practice of a Republican President. Each successive resolution or ordinance curtails local law enforcement's ability to communicate, or cooperate, with federal immigration officials.

Somerville adopted its first sanctuary policy in 1987. *Somerville Sanctuary City Resolution*, April 29, 1987.[6] The City revised its policy in 1989 with a Resolution nearly identical to that passed in 1987 and renewed that Resolution in 1993. *See Somerville Sanctuary City Resolution*, May 11, 1989,[7] and Resolution of April 22, 1993.[8]

On May 22, 2014, the Mayor of Somerville issued an Executive Order forbidding the police department from honoring ICE detainer requests, with limited exceptions. *Executive Order: Executive Policy for Responding to ICE detainers*, May 22, 2014.[9] Later the same year, the Somerville adopted Ordinance No. 2014-07, which forbade city law enforcement from

---

[4] Available at https://cms5.revize.com/revize/chelseama/_news/News%20Articles/MA-Chelsea-2007%20Sanctuary%20City%20Resolution.pdf.
[5] Available at https://public.powerdms.com/ChelseaPolice/documents/1710158.
[6] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/1987-sanctuary-city-resolution.pdf.
[7] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/1989-sanctuary-city-resolution.pdf.
[8] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/1993-equal-opportunity-resolution.pdf.
[9] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/2014-ice-executive-order.pdf.

detaining individuals based on federal immigration detainers. *City of Somerville Ordinance No. 2014-07*, adopted October 23, 2014.[10]

After President Trump's election in 2016, Somerville adopted a resolution committing taxpayer resources to benefit illegal aliens. *City of Somerville Docket No. 202583, Reaffirming Somerville as a Sanctuary/Trust Act City*, December 8, 2016 (emphasis added).[11] It also required the Mayor to send a letter to "all Somerville organizations working with immigrant populations" reminding them "what resources are available to anyone experiencing physical or emotional abuse or discrimination." *Id*.

In 2019, Somerville adopted an ordinance restricting local law enforcement's ability to communicate with federal immigration authorities. The so-called *Welcoming Community Ordinance* barred both law enforcement officials and other employees from providing federal authorities with any information regarding those "in the custody of the Somerville Police Department" including their incarceration status, length of detention, hearing information, or pending release. *City of Somerville Ordinance No. 2019-14, Somerville Welcoming Community Ordinance*, June 13, 2019.[12] The Ordinance further prohibits federal immigration authorities from accessing any individual in custody "either in person or via telephone or video conference," and requires local law enforcement to notify individuals subject to detainers of the request, including a copy of the detainer request or other documentation received from federal officials. *Id*.

Finally, Somerville adopted a Sanctuary Ordinance in 2024 committing taxpayer funds to create an Office of Immigrant Affairs, to maintain the "Immigrant Legal Services Stabilization

---

[10] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/2014-trust-act-ordinance.pdf.
[11] Available at https://s3.amazonaws.com/somervillema-live/s3fs-public/2016-sanctuary-city-resolution.pdf.
[12] Available at https://mcclibraryfunctions.azurewebsites.us/api/ordinanceDownload/11580/966221/pdf.

Fund to provide legal representation to residents facing deportation or removal" and barring any city department from applying for, or accepting federal funds "that require gathering or sharing information regarding national origin, immigration, or citizenship status of employees, students, or residents for the purpose of targeting deportation." *Resolution Reaffirming Somerville's Commitment as a Welcoming Community for Justice, Equity, and Inclusion*, 2024.[13] The ordinance additionally attempts actively to interfere with federal immigration officials in the conduct of their responsibilities under the INA by declaring hospitals, places of worship, and courthouses as "'sensitive locations,' safe from federal immigration enforcement actions." *Id.*

## II.  THE CITIES' POLICIES ARE UNLAWFUL

The Cities' policies violate the Supremacy Clause of the U.S. Constitution by 1) standing as obstacles to the accomplishment of congressional purposes behind the INA; 2) commanding that local officials impede federal officers in the pursuance of their official business, namely, the enforcement of federal immigration law; and 3) commanding local officials to violate the anti-harboring provisions of 8 U.S.C. § 1324.

### A.  *The Cities' policies stand as an obstacle to the purposes of Congress*

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress has the power to preempt state laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)); *see also Hines v. Davidowitz*, 312 U.S. 52 (1941), *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), and *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 50 (1st Cir. 1991) ("The Supremacy Clause of the United

---

[13]  Available at https://somervillema.legistar.com/View.ashx?M=F&ID=13577623&GUID=56DE3806-7818-4DCB-9546-D693DF79C8F0.

6

States Constitution operates to preempt state laws which unduly interfere with federal law or policy.").

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024), *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), *National Foreign Trade Council*, 181 F.3d at 73-74, *Pedraza*, 942 F.2d at 50-51. Conflict preemption occurs where "state law imposes a duty that is inconsistent—i.e., in conflict—with federal law." *Consumer Data Industry Association v. Frey*, 26 F.4th 1, 5 (1st Cir. 2022) (internal quotation marks and citations omitted). Conflict preemption also takes place when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Me. Forest Products Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (citing *Arizona*, 567 U.S. at 399) (internal quotation marks and citations omitted). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), quoted in *Hines*, 312 U.S. at 67 n.20. The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. And preemption "will be more easily found where states legislate in areas traditionally reserved to the federal government." *National Foreign Trade Council*, 181 F.3d at 73.

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, the Cities' policies frustrate the INA in one of its central purposes—the federal-state cooperation Congress intended to foster in immigration enforcement. As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.[14] For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),[15] which includes 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), *quoted in City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and federal law enforcement to enforce immigration law.

---

[14] *See also Hines*, 312 U.S. at 66.
[15] Division C of Pub. L. No. 104-208 (2012).

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[16] Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of PRWORA, codified at 8 U.S.C. § 1644, is nearly identical to § 1373 and forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, the Conference Report accompanying PRWORA made clear Congress's intent in passing Section 434: to bar any restriction on local police in their communications with ICE. The scope includes the whereabouts of illegal aliens, which obviously includes notice of their release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS. The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS.

> The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) at 383 (1996) (emphases added), *quoted in City of New York*, 179 F.3d at 32.

---

[16] Pub. L. No. 104-193 (1996), as amended through Pub. L. No. 118-42.

Another federal statute fosters cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

The Tenth Amendment reserves the authorities not delegated by the Constitution to States and the people. The Cities, by the plain text of the Amendment, have no rights or protections under it.[17] Even if a Court were to apply the Tenth Amendment to cities, the Amendment would avail them naught as a jurisdiction may not use it to "make an otherwise unconstitutional state law constitutional." *National Foreign Trade Council*, 181 F.3d at 61.

The seminal cases delimiting such rights are *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). In *New York*, the Court took up a statute that required states to enact legislation to take possession and dispose of nuclear waste produced in their state. In *Printz*, the Court considered the Brady Act, which required state employees to do background checks of firearm purchasers. The Court ruled that both of these two kinds of federal imperatives constituted commandeering in violation of the Tenth Amendment. *New York*, 505 U.S. at 158; *Printz*, 521 U.S. at 935.

---

[17] *See, e.g.*, *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978) (cities and counties as municipalities are creations of the State) and *Printz v. United States*, 521 U.S. 898, 930-932 (1997) (Tenth Amendment reserves power to individuals or States and concern is whether a federal law interferes with *State* sovereignty, not local authority).

Relevantly here, however, the Supreme Court has carved out a safe harbor for federal law controlling state or even local activity when such laws or ordinances regulate information flow in or affecting a domain of federal authority. In this realm, the Court has ruled in favor of federal law's both mandating state actions and prohibiting state actions. *See also*, *City of New York*, 179 F.3d at 33-35 (distinguishing *New York* and *Printz* and rejecting a Tenth Amendment challenge to § 1373).

In *Reno v. Condon*, 528 U.S. 141 (2000), the Court considered a suit by the State of South Carolina enjoining enforcement of the Driver's Privacy Protection Act of 1994 ("the DPPA"), 18 U.S.C. §§ 2721-25. The DPPA forbade state department of motor vehicles personnel from disclosing the personal information of drivers for most purposes, though in some circumstances it mandated such disclosure. 18 U.S.C. § 2721. In a unanimous decision, the Court held that the DPPA was consistent with the federalism required by the Tenth Amendment, despite the heavy resource expenditures States needed to expend to comply with the Act, including the States' need to pass laws to comply with it. *Condon*, 528 U.S. at 150-51.

The Court distinguished the federal legislation in *Condon* from that in *Printz* and *New York* by first noting that the statute in *Condon* regulated state activities, with the legislation required and man hours employed being byproducts. *Condon*, 528 U.S. at 150-51. By contrast, the statute in *Printz* directly required state employers to fulfill a federal law enforcement function, and the statute in *New York* directly commanded state legislative initiatives and expenditures to dispose of property (waste). As the Court held:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of databases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals. We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in New York and Printz.

11

*Id*. at 151. In affirming the validity of the DPPA, the Court noted that the statute *requires* the disclosure of certain information:

> The DPPA's prohibition of nonconsensual disclosures is also subject to a number of statutory exceptions. For example, the DPPA requires disclosure of personal information for use in connection with matters of motor vehicle or driver safety and theft, to carry out the purposes of [federal statutes].

*Id*. at 145 (internal quotation marks and ellipses omitted). The Court explained: "'That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.'" *Id*. at 150-51 (*quoting South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)). *Cf. Arizona*, 567 U.S. at 412-13 (holding that an Arizona law making verification of immigration status by local officials mandatory was not preempted by federal immigration law because 8 U.S.C. § 1644 (a provision with wording almost identical to that of § 1373), the constitutionality of which the Court did not question, encouraged the sharing of such information).

Indeed, finding the Cities' ordinances or policies protected under the Tenth Amendment would mark something of a revolution in Tenth Amendment jurisprudence. For example, the Crime Control Act of 1990 compels states to report missing children and prohibits them from allowing their state law enforcement agencies to delay or delete missing child reports:

**State requirements**

Each State reporting under the provisions of this title shall—

(1) ensure that no law enforcement agency within the State establishes or maintains any policy that requires the observance of any waiting period before accepting a missing child or unidentified person report;

(2) ensure that no law enforcement agency within the State establishes or maintains any policy that requires the removal of a missing person entry from its State law enforcement system or the National Crime Information Center computer database based solely on the age of the person;

(3) provide that each such report and all necessary and available information, which, with respect to each missing child report, shall include—(A) the name, date of birth, sex, race, height, weight, and eye and hair color of the child; (B) a recent photograph of the child, if available; (C) the date and location of the last known contact with the child; and (D) the category under which the child is reported missing; is entered within 2 hours of receipt into the State law enforcement system and the National Crime Information Center computer networks and made available to the Missing Children Information Clearinghouse within the State or other agency designated within the State to receive such reports ….

42 U.S.C. § 5780.

If the Cities' sanctuary policies are protected by the Tenth Amendment, so too would be local ordinances mandating the withholding of federally-required information about missing children, or any other state or local refusal to adhere to federal information-sharing requirements.

In short, by requiring non-cooperation in immigration enforcement, the Cities' sanctuary policies stand as an obstacle to the congressional purpose of fostering such cooperation, and thus violate the Supremacy Clause.

B. *The City's policies impede federal officers in the performance of their duties*

Under the Cities' sanctuary policies, if a federal immigration officer asks when an alien in custody will be released, city officials may not tell him. If a federal immigration officer seeks other information about potential illegal immigrants, city officials may not provide it. If an immigration officer seeks to place a detention notice on an illegal immigrant, neither Chelsea nor Somerville will honor it. By thus shutting off its city law enforcement personnel from communicating with immigration officials and by refusing to provide information very germane to the federal enforcement mission, the laws patently interfere with federal immigration enforcement, and were designed to do just that.

Such interference violates the Supremacy Clause at a very basic level; the supremacy of federal law would be meaningless if states or localities could block its enforcement within their

territories. Especially egregious is the denial of information about an individual's release dates from local custody, as if the federal government were a hostile foreign power. One wonders if Chelsea or Somerville officials would attempt to prevent federal entry into its jails by force, or to arrest federal officers who attempted entry. *See*, for example, *City of Somerville Resolution Reaffirming Somerville's Commitment as a Welcoming Community for Justice, Equity, and Inclusion* (declaring courthouses, among other locations, as "sensitive areas" to be "free from federal enforcement immigration actions"). Such a shocking course would, of course, violate the Supremacy Clause, as the Supreme Court decided well over a century ago in a case in which state marshals arrested a federal officer in the performance of his federal duties:

> "If, when thus acting, and within the scope of their authority, [federal] officers can be arrested and brought to trial in a state court, for an alleged offence against the law of the State, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection—if their protection must be left to the action of the state court—the operations of the general government may at any time be arrested at the will of one of its members. *The legislation of a State may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the State, but equally federal law, in such a manner as to paralyze the operations of the government.* And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, *and the exercise of acknowledged federal power arrested*. We do not think such an element of weakness is to be found in the Constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States. While it is limited in the number of its powers, so far as its sovereignty extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the Constitution; *obstruct its authorized officers against its will; or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it.*"

*In re Neagle*, 135 U.S. 1, 61-62 (1890) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)) (emphases added). *See generally* Seth P. Waxman and Trevor W. Morrison, *What Kind of*

14

*Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J. 2195, 2236-37 (2003) (discussing *Neagle*).

But if, under the Supremacy Clause, the Cities may not use force or legal process to block federal officers performing their federal law enforcement duties from their jails, they have no legitimate authority, under that clause, to "deny" them access to their jails by law. In this very basic way, the Cities' policies violate the Supremacy Clause.

C. *The Cities' policies make obeying both federal and local law an impossibility*

What are generally referred to as the "anti-harboring" provisions of the INA—located at Title II, Chapter 8, § 274 and codified at 8 U.S.C. § 1324—read in pertinent part:

**Bringing in and Harboring Certain Aliens**

**(a) Criminal penalties.—**

(1) (A) Any person who—
(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .

(v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
(ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal

corporations and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

By preventing state and local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, the Cities' policies compel local law enforcement to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE requests the release date of an alien from a local jail, and local authorities refuse to give that information to it, as mandated by the Cities' policies, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection" either in the jail (a "building") or outside the jail (a "place"), depending on the alien's location at any given moment. Or, if ICE agents arrive at a local jail to assume custody of an alien, and local authorities, as mandated by the Cities' policies, both refuse them entry and do not transfer custody outside of the jail, the local officials are "harbor[ing]" the alien "in . . . a[] building" while the alien remains in the jail, "harbor[ing]" the alien "in . . . a[] place" if they bring the alien outside the jail and there refuse to transfer custody, or concealing the alien "in a[] place" if they deliberately slip the alien out of the jail in a way that evades the agents' notice. Even if local law enforcement claims that receiving a Form I-247A from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence.

Accordingly, the Cities' policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and local law an

impossibility, and are therefore conflict preempted. *E.g., Lozano*, 724 F.3d at 303 (citing *Arizona*, 567 U.S. at 399).

### III.  BECAUSE OF ITS POLICIES, THE CITY IS INCAPABLE OF MEETING THE REQUIREMENTS FOR EITHER STANDING OR INJUNCTIVE RELIEF.

Plaintiff Cities claim several "harms" for which they seek relief, including their respective sovereignty, risking public safety, and—the admitted crux of the suit and motion for preliminary injunction—the alleged *potential* loss of various types of grants. The Cities cite little authority supporting their claims of harm, instead stating in largely conclusory fashion that the Government's policy threatens "irreparable harm" no matter which decision they make. They aver that they must either "abandon critical projects and services… or abandon the policies they have determined make their residents and communities safer." Motion for Preliminary Injunction at p. 14.

The elements for standing in the federal courts are first, injury in fact, second, a causal connection between the injury and the conduct complained of, and third, a likelihood that the conduct complained of be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is "an invasion of a legally protected interest." *Id*. at 560. The Cities have no legally protected interest here. It is well established that litigants lack standing to seek prospective relief if they will only be injured if they engage in illegal conduct. *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (finding that a victim of an illegal police chokehold lacked standing where his likelihood of further injury was premised on a repetition of his unlawful traffic violation); *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (finding that plaintiffs lacked standing because they planned to induce future injury by unlawful civil disobedience); *Spencer v. Kemna*, 523 U.S. 1, 13 (1998) (finding that plaintiff lacked standing where his injury would only arise if he were punished for future unlawful conduct).

For the same reason the Cities cannot show injury requisite for standing, they cannot show irreparable harm requisite for injunctive relief: its harm will only occur because of their own unlawful sanctuary policies. *See Lyons*, 461 U.S. at 111 (holding that irreparable harm was not shown for the same reasons injury for standing purposes was not shown). Indeed, it is a maxim of equity, especially important in cases, such as this one, involving the public interest, that "he who comes into equity must come with clean hands." *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945), *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60F.3d 867, 880 (1st Cir. 1995). Here, the Cities' hands are decidedly unclean, for they maintain, and seek an injunction by this Court to protect, sanctuary policies that are unlawful and unconstitutional.

## CONCLUSION

For the foregoing reasons, the Cities' motion for preliminary injunction should be denied.

<div align="right">

/s/ Rohan J. Samaraweera
Rohan J. Samaraweera (BBO #439900)
SAMARAWEERA LAW OFFICES
382 Hammond Street, Suite 200
Boston, MA 02467-1229
Telephone: (617) 731-1985
Fax: (617) 731-1986
Samaraweera-Law@comcast.net

Jonathon Hauenschild*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
jhauenschild@irli.org

• appearing *pro hac vice*

Attorneys for *Amicus Curiae*
Immigration Reform Law Institute

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2025, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

<div style="margin-left: 50%;">

<u>/s/ Rohan J. Samaraweera</u>
Rohan J. Samaraweera

Attorney for *Amicus Curiae*
Immigration Reform Law Institute

</div>