# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and
CITY OF SOMERVILLE,

     *Plaintiffs*,

         v.

DONALD J. TRUMP, President of the United
States, PAMELA J. BONDI, Attorney General
of the United States, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI L.
NOEM, Secretary of the United States
Department of Homeland Security, UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY, SEAN P. DUFFY, Secretary of
the United States Department of
Transportation, UNITED STATES
DEPARTMENT OF TRANSPORTATION,
SCOTT TURNER, Secretary of the United
States Department of Housing and Urban
Development, UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, and UNITED
STATES OF AMERICA,

     *Defendants*.

Case No. 1:25-cv-10442

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

ORAL ARGUMENT REQUESTED

LEAVE TO FILE REPLY
MEMORANDUM WITH EXCESS
PAGES GRANTED ON JUNE 18, 2025

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

A.    Plaintiffs Have Standing to Seek a Preliminary Injunction, and Their Claims Are Ripe... 2

    1.    Defendants' Challenge Misunderstands the Purpose of a Preliminary
        Injunction. ......................................................................................................... 2

    2.    The Executive Orders and Agency Directives Reflect Concrete Action,
        Not Mere Planning, and There Is a Credible Threat of Enforcement. .................... 6

B.    The Tucker Act Does Not Apply, and This Court Has Subject Matter Jurisdiction. ......... 7

C.    Defendants Fail to Effectively Address Plaintiffs' Constitutional Claims, and Plaintiffs
    Have Demonstrated That They Are Likely to Succeed on the Merits. ............................... 9

    1.    Separation of Powers ......................................................................................... 9

    2.    Spending Clause................................................................................................ 11

    3.    Tenth Amendment ............................................................................................ 13

    4.    Fifth Amendment ............................................................................................. 14

D.    Defendants Also Fail to Effectively Address Plaintiffs' APA Claims, and Plaintiffs Have
    Demonstrated That They Are Likely to Succeed on the Merits. ..................................... 15

E.    Plaintiffs Have Adequately Demonstrated Irreparable Harm. ........................................ 18

F.    Defendants' Arguments Only Further Highlight That the Balance of the Equities and the
    Public Interest Weigh in Plaintiffs' Favor. ...................................................................... 19

G.    This Court Should Not Stay the Injunction Pending Appeal. ........................................... 20

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aoude v. Mobil Oil Corp.*,
862 F.2d 890 (1st Cir. 1988) ................................................................................20

*Babbitt v. United Farm Works Nat'l Union*,
442 U.S. 289 (1979) .............................................................................................3

*Benisek v. Lamone*,
585 U.S. 155 (2018) ..........................................................................................3, 6

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................16

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..........................................................................................8, 9

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ...............................................................................8, 9

*California v. U.S. Dep't of Transp.*,
2025 WL 1711531 (D.R.I. June 19, 2025) ....................................................2, 6, 15

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .............................................................................2

*City & Cnty. of San Francisco v. Trump*,
2025 WL 1282637 (N.D. Cal. May 3, 2025) ....................................................2, 15

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .......................................................................2, 6, 10

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ..............................................................................9, 11

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................................................14

*D.H.L. Assoc., Inc. v. O'Gorman*,
199 F.3d 50 (1st Cir. 1999) .................................................................................3

*Diamond Alt. Energy, LLC v. EPA*,
2025 WL 1716141 (U.S. June 20, 2025) ................................................................7

*Doe v. Trump*,
766 F. Supp. 3d 266 (D. Mass. 2025) ..........................................................................2

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ...................................................................................................14

*Francisco Sanchez v. Esso Standard Oil Co.*,
572 F.3d 1 (1st Cir. 2009) ...........................................................................................3

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .....................................................................................................2

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .........................................................................................................5

*Maine v. U.S. Dep't of Agric.*,
2025 WL 1088946 (D. Me. Apr. 11, 2025) ..................................................................9

*Martin Luther King, Jr. Cnty. v. Turner*,
2025 WL 1582368 (W.D. Wash. June 3, 2025)..............................2, 9, 11, 17, 18

*Massachusetts v. Kennedy*,
2025 WL 1414135 (D. Mass. May 12, 2025) ...........................................................8, 9

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) ..........................................................................7

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) ..........................................................................................3

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007*)* ...................................................................................................4

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021)..................................................................................1, 3, 4

*N.H. Right to Life Pol. Action Comm. v. Gardner*,
99 F.3d 8 (1st Cir. 1996) ..............................................................................................3

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
2025 WL 1188160 (D.N.H. Apr. 24, 2025).................................................................15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)...............................................................................................12, 13

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025).......................................................................................3, 5

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025)................................................................................6

*New York v. Trump*,
   2025 WL 1098966 (D.R.I. Apr. 14, 2025)..........................................................9

*New York v. Trump*,
   769 F. Supp. 3d 119 (D.R.I. 2025).....................................................................9

*New York v. United States*,
   505 U.S. 144 (1992).........................................................................................13

*Pennsylvania v. West Virginia*,
   262 U.S. 553 (1923)...................................................................................3, 18

*Perkins Coie LLP v. U.S. Dep't of Justice*,
   2025 WL 1276857 (D.D.C. May 2, 2025)..........................................................2

*Pineda v. Skinner Servs.*,
   22 F.4th 47 (1st Cir. 2021).............................................................................20

*Pub. Interest Rsch. Grp. v. FCC*,
   522 F.2d 1060 (1st Cir. 1975)...........................................................................2

*Rhode Island v. Trump*,
   2025 WL 1303868 (D.R.I. May 6, 2025) ...........................................................9

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
   699 F.3d 1 (1st Cir. 2012)................................................................................3

*Somerville Pub. Sch. v. McMahon*,
   139 F.4th 63 (1st Cir. 2025)............................................................................19

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)...................................................................................3, 5

*Steffel v. Thompson*,
   415 U.S. 452 (1974)..........................................................................................3

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*,
   214 F.3d 4 (1st Cir. 2000)............................................................................3, 7

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)....................................................................................2, 7

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016)........................................................................................15

*U.S. Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025)................................................................................9

*United States v. Bormes,*
    568 U.S. 6 (2012)................................................................................7

*United States v. Tohono O'Odham Nation,*
    563 U.S. 307 (2011)................................................................................8

*United States v. Williams,*
    553 U.S. 285 (2008)................................................................................14

STATUTES

8 U.S.C. § 1373................................................................................19

8 U.S.C. § 1644................................................................................10

23 U.S.C. § 315................................................................................11

23 U.S.C. § 402(d)(3)................................................................................11

34 U.S.C. § 10102(a)(6)................................................................................11

34 U.S.C. § 10153(a)(5)................................................................................11

RULES

Fed. R. App. P. 8(a)(1)................................................................................20

Fed. R. Civ. P. 65(c)................................................................................20

## PRELIMINARY STATEMENT

Defendants' opposition (the "Opposition" or "Opp.") contends that Plaintiffs' harms are "speculative" and "hypothetical"—and therefore not worthy of a preliminary injunction—because Defendants have not yet withheld any federal funds from them.  But the whole point of injunctive relief is to freeze the status quo and stop harm before it happens.  The correct standard asks whether there is "a substantial risk" that injury will occur, and here, the risk to Plaintiffs is both grave and obvious: Defendants have issued Executive Orders and Agency Directives phrased in mandatory terms, outlining their plan to withhold federal funding from sanctuary jurisdictions that decline to devote their resources to advancing Defendant Trump's immigration priorities.  DHS[1] has moreover issued a Designation List that *expressly identifies Plaintiffs as targets* of this campaign— a fact that the Opposition fails to address at all.  Though Defendants attempt to convince this Court that their plans remain uncertain, their conduct demonstrates otherwise.  They cannot forestall the requested relief through "prolonged coyness."  *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021).  Defendants' argument under the Tucker Act similarly fails.  As numerous courts have held in recent months, lawsuits such as this that seek to vindicate Constitutional and statutory rights through injunctive and declaratory relief are not contract disputes over money.

Relying heavily on these unconvincing procedural gambits, Defendants fail to effectively grapple with the merits of the detailed Constitutional and statutory arguments advanced by Plaintiffs' opening brief.  And as to irreparable harm, the Opposition not only mischaracterizes that harm as purely economic but also fails to recognize that Defendants' actions have already intensely escalated and dramatically impacted Plaintiffs.  *See* Br. at 12-14, 29-34.

Since this case began, numerous courts have enjoined aspects of Defendant Trump's

---

[1] Capitalized terms have the meaning prescribed in Plaintiffs' opening brief, ECF No. 12-1 ("Br."). Unless otherwise noted, internal quotations and citations are omitted.

campaign against sanctuary cities.  But the relief awarded has been limited to the jurisdictions that

brought suit or to specific grant programs. [2]  Unless enjoined by this Court, Defendants' assault on

Plaintiffs—two small cities with limited budgets that make them uniquely vulnerable to

Defendants' coercive tactics—will continue and escalate, causing further irreparable harm.

## ARGUMENT

**A.    Plaintiffs Have Standing to Seek a Preliminary Injunction, and Their Claims Are Ripe.**

1.    *Defendants' Challenge Misunderstands the Purpose of a Preliminary Injunction.*

Defendants' broad claim that "Plaintiffs cannot seek relief against the Executive Orders,"

Opp. at 9, is plainly incorrect.  Courts have often declared executive orders illegal and enjoined

the agencies and agency heads charged with their implementation.[3]  "Review of the legality of

Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt

to enforce the President's directive."  *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992).[4]

---

[2] *See City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637 (N.D. Cal. May 3, 2025) (preliminarily enjoining Day One Executive Order, Subsidization Executive Order, and Bondi Memo but limiting relief to named plaintiffs); *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 1582368, at *12 (W.D. Wash. June 3, 2025) (preliminarily enjoining, *inter alia*, conditions on certain HUD and DOT grants but limiting relief to named plaintiffs); *California v. U.S. Dep't of Transp.*, 2025 WL 1711531, at *3-4 (D.R.I. June 19, 2025) (preliminarily granting relief to, *inter alia*, cities and towns in Massachusetts but limiting injunction to DOT Letter).  The first two injunctions have been appealed, with no action yet on the most recent injunction.

[3] *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235, 1243 (9th Cir. 2018) (declaring first Trump Administration sanctuary cities executive order unconstitutional and enjoining enforcement); *Doe v. Trump*, 766 F. Supp. 3d 266, 289 (D. Mass. 2025) (holding executive order on birthright citizenship unconstitutional and enjoining enforcement); *Perkins Coie LLP v. U.S. Dep't of Justice*, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025) (declaring executive order targeting law firm unconstitutional and enjoining enforcement); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (holding executive order preempted).

[4] Contrary to Defendants' claim, Plaintiffs have never contended that the President is an "agency" under the APA.  As Defendants' cited case makes clear, however, this does not immunize executive orders from Constitutional scrutiny.  *Franklin*, 505 U.S. at 801 ("[T]he President's actions may still be reviewed for constitutionality."); *see also Pub. Interest Rsch. Grp. v. FCC*, 522 F.2d 1060, 1064 (1st Cir. 1975) (executive conduct constrained by "twin external standards of statutory law and constitutional right").

Defendants' ripeness and standing arguments—two doctrines that tend to "merge into a challenge to the irreparable injury component of the preliminary injunction analysis"—fare no better. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 8 (1st Cir. 2012); *see also N.H. Lottery Comm'n*, 986 F.3d at 52 (same). To show standing, a plaintiff must demonstrate an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Ripeness, in turn, depends on whether an issue is "fit for judicial review" and requires an evaluation of whether "withholding judgment will impose hardship." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir. 2000). Defendants' overlapping arguments as to standing and ripeness are unavailing.

As to both, the Opposition impermissibly heightens the requirements for a preliminary injunction. Defendants repeatedly argue that "no funding has yet been impacted," *e.g.*, Opp at 17, ignoring that a preliminary injunction aims to *maintain* the status quo and *stop* harm before it occurs. *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (a preliminary injunction "preserve[s] the relative positions of the parties until a trial on the merits can be held"); *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 15 (1st Cir. 2009) (same). It is thus black-letter law that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).[5] As the First Circuit recently reiterated, "although qualifying for less federal funding' is 'primarily [a] future injur[y], it can still be an Article III injury when the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *New Jersey v. Trump*, 131 F.4th 27, 37 (1st Cir. 2025) (denying stay of preliminary

---

[5] *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Babbitt v. United Farm Works Nat'l Union*, 442 U.S. 289, 298 (1979); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-164 (2014); *D.H.L. Assoc., Inc. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999); *McGuire v. Reilly*, 386 F.3d 45, 59 (1st Cir. 2004); *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996).

injunction pending government appeal).[6]  Plaintiffs need not wait for their impending injuries to be fully consummated before seeking relief.

Under this correct standard, Plaintiffs have more than met their burden.  In fact, the harm is already occurring.  Following the mandates in the challenged Executive Orders, each of the Defendant agency heads is rolling out new immigration cooperation requirements and insisting that Plaintiffs submit to their terms to receive federal funding.[7]  Plaintiffs must grapple with these threats as they attempt to keep running their cities, never knowing when the proverbial Sword of Damocles will fall.  *See* Br. at 12-14, 29-34; *N.H. Lottery Comm'n*, 986 F.3d at 53 (claim ripe in pre-enforcement proceeding; "we cannot see why the plaintiffs should be forced to sit like Damocles while the government draws out its reconsideration").  And more injury is certainly impending, as Defendants have now expressly targeted Plaintiffs in their crusade to fulfill Defendant Trump's campaign promise to bring "the full weight of the federal government on any jurisdiction that refuses to cooperate with ICE."  Am. Compl. ¶ 102(a).

Tellingly, Defendants fail to even mention the express targeting of Plaintiffs.  Chelsea and Somerville were both *specifically named* in DHS's Designation List of sanctuary jurisdictions that supposedly act "in defiance of Federal immigration law enforcement," and "deliberately and shamefully obstruct[] the enforcement of federal immigration laws."  *See id.*, Exs. C, K.  The Designation Executive Order mandates that for these listed jurisdictions, the "head of each

---

[6] *See also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007*)* ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.").

[7] *See* Am. Compl., Ex. G (DOT grant conditions whereby recipients must certify they "will cooperate with . . . and not imped[e] [ICE]"); *id.*, Ex. D (DOJ directive whereby "[s]anctuary jurisdictions should not receive access to federal grants administered by [DOJ]"); *id.*, Ex. I (DHS directive whereby grant recipients must "honor requests for cooperation, such as participation in joint operations" with federal immigration officials); *id.*, Ex. J (HUD directive to "ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.").

executive department or agency . . . *shall* identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for *suspension* or *termination*." *Id.*, Ex. C (emphases added). Defendants demanded that Plaintiffs and others on the Designation List "immediately review and revise their policies to align with Federal immigration laws." *Id.* The Designation List —which Defendants have never disavowed—patently demonstrates "a substantial risk that the harm will occur," and the Opposition ignores it altogether. *New Jersey*, 131 F.4th at 37.[8]

Defendants similarly have nothing to say about the Administration's numerous affirmative lawsuits against sanctuary cities, which make clear its view that State and local governments violate the Constitution if they prohibit: detaining an individual on the basis of a detainer or civil litigation warrant; providing information (*e.g.,* custodial status, release date) about noncitizens in their custody; assisting with immigration enforcement activities; or inquiring about an individual's citizenship or immigration status. *See* Am. Compl. ¶¶ 87-90. The Opposition ignores this active litigation, instead insisting that judicial review is inappropriate because the Administration's views on what is "consistent with law" are unknown. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (pre-enforcement challenge justiciable; government has charged others in prosecutions that "involve[] the enforcement of the statutory terms at issue here . . . [and] [t]he Government has not argued . . . plaintiffs will not be prosecuted if they do what they say they wish to do").

Despite these unmistakable threats to Plaintiffs, Defendants cling to "savings clauses" in the challenged Executive Orders and Agency Directives, arguing that Defendants are insulated from any challenge because the Orders and Directives only direct "lawful actions" and those

---

[8] As to standing, it also demonstrates the threat to Plaintiffs is far beyond "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. And Defendants do not meaningfully contest the standing elements of causation (Plaintiffs' injuries are clearly traceable to Defendants' issuance of the various Executive Orders and Agency Directives), or redressability (injunction would prevent Defendants from implementing their schemes to withhold, freeze, or condition federal funds). *See* Opp. at 25 (briefly mentioning redressability yet returning to a lack of injury).

"consistent with applicable law." *See* Opp. at 10 (citing Day One and Subsidization Executive Orders). But courts regularly reject such facile arguments. *See New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (denying government's stay request in funding freeze case; "the 'consistent with the law' caveat" did not rescue an unconstitutional directive). As the Ninth Circuit explained in a case striking down a similar executive order during the first Trump Administration, the notion that phrases such as "consistent with law" can shield an executive order from court scrutiny leads down "an intellectual cul-de-sac" that would render judicial review "a meaningless exercise, precluding resolution of the critical legal issues." *San Francisco*, 897 F.3d at 1240; *see also California v. U.S. Dep't of Transp.*, 2025 WL 1711531 at *3 n.4 (Defendants' argument would require the court to "interpret the [DOT] Directive in a way that both ignores its plain meaning and its obviously broad intention to coerce [Plaintiffs] into cooperating with federal immigration enforcement.").[9]

While Defendants attack Plaintiffs' request for a preliminary injunction as seeking an "extraordinary remedy," Opp. at 14, Defendants' conduct is itself extraordinary and warrants that remedy. In the face of Defendants' stunning assault on Plaintiffs and similar localities, Plaintiffs merely seek to preserve the status quo pending this case's resolution, maintaining the funding that they rely upon for vital services for their residents. *See Benisek*, 585 U.S. at 161.

2.    *The Executive Orders and Agency Directives Reflect Concrete Action, Not Mere Planning, and There Is a Credible Threat of Enforcement.*

Defendants argue there is no "concrete act beyond the announcement of a policy or plan," and the "Executive directives call for an *evaluation* of federal funding." Opp. at 16, 32. Not so. The Executive Orders and Agency Directives go far beyond planning or evaluation, *see* Br. at 8-11, and stake concrete markers that both reflect and implement "the President's priorities," Opp.

---

[9] *See also San Francisco*, 897 F.3d at 1236 (finding standing despite savings clauses where it is enough that, if Plaintiffs' "interpretation of the [challenged actions] is correct," they will be "forced to either change their policies or face serious consequences").

at 1. And the Designation List—as an implementation of the Designation Executive Order, which directs agency heads to identify federal funds for suspension or termination from Chelsea, Somerville, and other specifically named cities and counties—puts further emphasis on the point.

Moreover, injury is also established where a plaintiff "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (finding standing for advocacy organization that had already been targeted by administrative complaint). Various constitutional interests are implicated by Plaintiffs' sanctuary policies, *see* Br. at 15-27, policies which Defendants in turn aver are proscribed by the Executive Orders, Agency Directives, and the federal immigration laws cited therein. Plaintiffs more than establish an injury here and amply answer standing's "basic question—'What's it to you?'" *Diamond Alt. Energy, LLC v. EPA*, 2025 WL 1716141, at *6 (U.S. June 20, 2025).[10]

**B.    The Tucker Act Does Not Apply, and This Court Has Subject Matter Jurisdiction.**

Defendants further argue that this Court lacks subject matter jurisdiction over the present dispute, focusing on the DOT SS4A claims (and mentioning others, *see* Opp. at 22 n.2), because the dispute is "contractual in nature" and therefore "belongs in the Court of Federal Claims under the Tucker Act." Opp. at 1-2; *see also id.* at 20-22. Defendants are wrong.

The Tucker Act was enacted "to open a judicial avenue for certain monetary claims against the United States." *United States v. Bormes*, 568 U.S. 6, 11 (2012). "In suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the federal district courts." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 291 (D. Mass. 2025). But

---

[10] This threat of enforcement also answers the ripeness inquiry. *See Stern*, 214 F.3d at 11 (credible threat of injury sufficient to show standing; "that self-same credible threat serves to render the case fit for judicial review and to demonstrate the hardship that will result should no review ensue.").

the Supreme Court has made clear that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). And the First Circuit recently explained that "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025) ("*California I*"). The analysis of "[w]hether a claim is contractual in nature under the Tucker Act is based upon a determination of the essence of the action," *i.e.*, the "rights and remedies" test. *Massachusetts v. Kennedy*, 2025 WL 1414135, at *4 (D. Mass. May 12, 2025) (noting that while the First Circuit has not formally adopted that test, numerous courts in the Circuit have done so). The "essence" of the action involves both "the source of the rights upon which the plaintiff bases its claim and the type of relief sought." *Id*.

Here, even a cursory review of the Amended Complaint makes clear that the "essence" of this lawsuit does not sound in contract. Plaintiffs seek to enforce their rights under the Constitution and the APA to self-govern and to limit their participation in federal immigration enforcement— free of unconstitutionally coercive overreach from the Executive Branch. They do not seek to enforce rights under any specific contract or grant, but instead challenge broad policy directives that impinge on their Constitutional and statutory rights. And the remedies sought are declaratory and injunctive in nature; those remedies are not even available in the Court of Federal Claims. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011) ("Unlike the district courts . . . the [Court of Federal Claims] has no general power to provide equitable relief against the Government or its officers."). The Amended Complaint makes no claim for damages at all. *See* Am. Compl. at 62-65.

Defendants rely on the Supreme Court's recent emergency stay of a district court order

enjoining the termination of certain Department of Education grants.  *See* Opp. at 21 (citing *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) ("*California II*")).  But that decision does not sweep nearly as broadly as Defendants assert and does not require a court to cede jurisdiction "simply because both cases involve federal grant funding and bear a superficial resemblance to one another."  *Ass'n of Am. Univs. v. U.S. Dep't of Energy*, 2025 WL 1414135, at *6 (D. Mass. May 15, 2025) (rejecting reliance on *California II* and asserting jurisdiction over DOE rate cap).  Numerous courts have rejected Defendants' argument in similar litigation.[11]

In sum, Plaintiffs' "claims are, at their core, assertions that [Defendants] acted in violation of federal law—not its contracts."  *California I*, 132 F.4th at 97.  Even though some of the relief sought could "require the payment of money by the federal government," at its essence the requested relief "is not a claim for money damages."  *Bowen*, 487 U.S. at 894.  As such, this Court has subject matter jurisdiction over Plaintiffs' claims.

**C.    Defendants Fail to Effectively Address Plaintiffs' Constitutional Claims, and Plaintiffs Have Demonstrated That They Are Likely to Succeed on the Merits.**

1.    *Separation of Powers*

"It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'"  *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir.

---

[11] *See Massachusetts*, 2025 WL 1371785, at *9 (canvassing post-*California II* rulings and holding, in case challenging agency directives implementing anti-DEI executive orders, that "the 'essence' of this action is not one of contract"); *Rhode Island v. Trump*, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025) (rejecting reliance on *California II* in case seeking to restrain federal defendants from implementing executive order to dismantle congressionally sanctioned agencies); *New York v. Trump*, 2025 WL 1098966, at *2-3 (D.R.I. Apr. 14, 2025) (rejecting reliance on *California II* in case involving FEMA grants); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025) (rejecting Tucker Act claim in case challenging federal defendants' failure to follow proper procedures before freezing federal funds).  Courts outside of the First Circuit have also ruled similarly.  *See, e.g.*, *MLK Jr. Cnty.*, 2025 WL 1582368, at *12 (rejecting argument by federal defendants that APA claims by plaintiff cities and counties challenging federal funding conditions are "disguised" breach-of-contract claims that belong in the Court of Federal Claims).

2020).  Federal agencies "can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power."  *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025).  Nowhere does the Constitution contemplate that funds must be expended, as Defendants argue, "to ensure consistency with the President's priorities."  Opp. at 1; *San Francisco*, 897 F.3d at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."). Defendants ignore vital Constitutional guardrails that keep the Executive Branch in check.

Defendants' broad claim that Congress "[i]ntended" state and local governments to work with the federal government in carrying out immigration enforcement and "envisioned" that cities would cooperate with the Administration's mass deportation efforts, *see* Opp. at 7-8, is wildly overstated.  They cite only 8 U.S.C. § 1373 and § 1644: two narrow provisions of federal law concerning information-sharing.  These laws provide, in nearly identical terms, that a local government cannot prohibit or restrict any government entity or official from sending or receiving information about an individual's citizenship or immigration status to or from federal immigration officials.  They are not even relevant where, as here, information about residents' citizenship or immigration status is simply not collected by Plaintiffs in the ordinary course.  *See* Houghton Decl. ¶ 12; Benford Decl. ¶ 11.  Defendants (and the amicus) fail to point to any statutory authority supporting the Executive's ability to override any local law that diverges from the Administration's view of immigration enforcement.  And elsewhere, Defendants show how malleable they believe the Separation of Powers to be, simply conflating Congress and the Executive Branch as the "Federal Government" and asserting without limitation that state and local governments must affirmatively assist with federal immigration enforcement.  *See* Opp. at 7.

Similarly, Defendants assert that Congress provided statutory authority for DHS, HUD, DOJ, and DOT to impose immigration-related conditions on grant programs, *see id.* at 30-31, but

the First Circuit foreclosed this argument in *City of Providence*.  Defendants point to two statutes that purportedly authorize DOJ to withhold funds as an example across all agencies.  The First Circuit ruled these same statutes—34 U.S.C. § 10102(a)(6) and § 10153(a)(5)(D)—did *not* give DOJ authority to impose immigration-related conditions on the Byrne JAG grant program.  *See City of Providence,* 954 F.3d at 38, 45.  Similarly, Defendants argue that DOT derives authority from 23 U.S.C. § 315 and § 402(d)(3) to impose immigration-related conditions.  But § 402(d)(3) does not exist and § 315 is as generic as those analyzed in *City of Providence*.  Opp. at 23; *see also MLK Jr. Cnty.*, 2025 WL 1582368 at *16 (generic language granting Secretary of Transportation authority to include grant terms the Secretary "considers necessary to carry out this chapter" cannot support grant conditions imposing President's policy agenda).  The Opposition disregards the First Circuit's careful statutory analysis that requires conditions to be related to the purpose of the program and that interprets authorization statutes through the lens of *Congressional* intent, rather than through the lens of the policy priorities of the *Executive Branch*.  Opp. at 38 (giving due consideration to the word "applicable" in the phrase "all other applicable laws" in § 10153(a)(5)(D) and refusing to "permit the DOJ to create qualification requirements unrelated to the grant program simply to advance its own policy priorities").  *City of Providence* compels the same result here: that the Executive Orders and Agency Directives violate core Separation of Powers principles.

2.    *Spending Clause*

In arguing against Plaintiffs' Spending Clause claim, Defendants immediately start off on the wrong foot, asserting that "[t]he Federal Government is empowered to decide when it will fund certain activities by the States and under what conditions."  Opp. at 27.  But this again improperly conflates the distinct roles of Congress and the Executive Branch into one entity: the "Federal Government."  In fact, it is *Congress* that has the power of the purse; the Executive's role is simply to carry out Congress' will as duly enacted into law.  *See* Section C.1 *supra*.

11

Defendants attempt to paint the Executive Orders and Agency Directives as merely encouraging states and municipalities to adopt certain immigration policies by conditioning a fraction of funds so tiny that it could not be coercive. First, this is once again a mischaracterization of the Executive Orders and Agency Directives, as it ignores the mandatory language that runs throughout each challenged action. *See* Br. at 8-11. Second, in arguing that the percentage of Plaintiffs' city funds at issue is too small to be coercive, Defendants misread the Supreme Court's decision in *South Dakota v. Dole*. *See* Opp. at 29. In *Dole*, the Supreme Court found that conditions placed on what amounted to *less than one half of one percent* of South Dakota's state budget were not coercive. *See* 483 U.S. 203, 212 (1987); *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 581 (2012) (discussing *Dole*). Defendants attempt to draw a parallel between the amount of funds at issue here to the amount in *Dole*, but federal funds here make up over 5% or 6% of Plaintiffs' budgets, more than *ten times* the percentage at issue in *Dole*. *See* Hartke Decl. ¶¶ 8-9; Maltz Decl. ¶¶ 14-16. Further, the *Dole* funds represented only a small portion of monies that could be obtained through highway grant programs, *see* 483 U.S. at 211, whereas Plaintiffs here have critical programs, services, and staff positions that rely almost entirely on certain federal funds, *see* Hartke Decl. ¶ 21; Maltz Decl. ¶¶ 13, 28.[12]

Moreover, Defendants fail to address the key requirement that any conditions imposed on grants must be *related to the federal interest in the program*. *See* Br. at 20; *Dole*, 483 U.S. at 207-08. Defendants cursorily point to the DOT Letter, which states that actions impeding immigration

---

[12] Defendants' argument that *NFIB* applies only to the "unexpected imposition" of a "dramatically broadened, independent grant program," Opp. at 28, is also unsupported. The key is whether, in light of all the circumstances, the threat is unduly coercive. *NFIB*, 567 U.S. at 585 (declining to "fix the outermost line where persuasion gives way to coercion"). Here, Plaintiffs are small cities, and federal funding constitutes a sizeable percentage of their already-stretched municipal budgets, entirely funding certain programs and personnel. "[W]herever the line may be," Defendants' concerted anti-sanctuary city campaign "is surely beyond it." *Id.*

enforcement "compromise the safety and security of the transportation systems." Opp. at 24; Am. Compl., Ex. F at 2.[13] But this connection is nonsensical—or appears premised on a fundamentally mistaken premise that immigrants are somehow a greater threat to public safety than any other resident—and defies explanation, particularly as a basis for Defendants to withhold critical funding from Chelsea and Somerville that is *expressly for the purposes of reducing traffic fatalities to zero or improving roadway safety for various users*, respectively. Defendants fail to elaborate on this critical requirement, as there is no colorable argument to be made on their end.

Finally, in another conspicuous omission, Defendants fail to respond at all to the critical point that in Massachusetts, local officials are *forbidden* under state law from cooperating with federal immigration enforcement by detaining individuals for ICE under civil immigration detainers, when they would otherwise be eligible for release. *See* Br. at 20-21 (citing *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017)). Spending conditions may not induce unlawful conduct, *see Dole*, 483 U.S. at 210, a point for which Defendants have no response at all.

3. *Tenth Amendment*

The federal government cannot compel states to enact or administer a regulatory program. *See New York v. United States*, 505 U.S. 144, 188 (1992). It does not matter if the federal government "directly commands" a state to regulate or "indirectly coerces" a state to adopt a regulatory program; neither is permissible. *NFIB*, 567 U.S. at 578.

Defendants argue that because Plaintiffs can opt not to apply for funds to which conditions are attached, there can be no commandeering of their governments. *See* Opp. at 34. First, Plaintiffs rely on federal funds to support core services; they cannot decline to apply for conditioned funds without forgoing vital infrastructure projects, critical community programs, and other public

---

[13] Plaintiffs do not "impede" immigration officials; rather their policies limit the local resources Plaintiffs expend in support of federal civil immigration enforcement. *See* Br. at 6.

services.  *See* Br. at 13-14, 31-32.  And these Plaintiffs *already* applied for, and in some cases have

*already* been awarded (*e.g.*, Somerville FY2023 SS4A grant), funds to which Defendants attached

conditions.  Defendants also argue that Plaintiffs cannot be coerced because they cannot identify

the funding that would be impacted.  This argument also falls short, as Plaintiffs' opening brief

plainly explains that *all* federal funding is threatened.  *See* Br. at 22; *see also* Section A.1 *supra*.

    4.    *Fifth Amendment*

The Fifth Amendment protects against the deprivation of property without due process of

law and requires that laws and regulations provide fair notice of prohibited conduct.  *Cnty. of Santa*

*Clara v. Trump*, 250 F. Supp. 3d 497, 536 (N.D. Cal. 2017); *FCC v. Fox Television Stations, Inc.*,

567 U.S. 239, 253 (2012).  Plaintiffs have a property interest in federal funds granted to them on

a reimbursement basis and upon which they rely for crucial budgetary needs.  *See* Br. at 24.

Plaintiffs are literally entitled to those funds authorized by Congress, and Defendants now violate

this interest by attacking these funds by pure executive fiat.  *See id.*

Similarly, Defendants fail to engage with the long line of cases, cited by Plaintiffs in their

opening brief, that hold that laws that are impermissibly vague violate the Fifth Amendment.  *See*

*id.* at 24-25.  Instead of grappling with the enormous threats posed by Defendants' campaign to

defund sanctuary cities, Defendants try to analogize the targeting of Plaintiffs to a performance

artist vying for a federal arts grant, where "the consequences of imprecision are not constitutionally

severe."  Opp. at 32-33 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998)).

Yet here, the vague terms like "sanctuary jurisdictions" that are bandied about in the Executive

Orders and Agency Directives are being used to threaten millions of dollars of federal funding that

support vital services such as homelessness prevention and transportation safety.  The vague terms

used represent "subjective judgments without statutory definitions, narrowing context, or settled

legal meanings," *United States v. Williams*, 553 U.S. 285, 306 (2008), whose whole purpose

appears designed to pressure jurisdictions to give up their principles for fear of crossing an unknown line into "sanctuary jurisdiction" territory. *See Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *3, *11 (D.N.H. Apr. 24, 2025) (enjoining enforcement of agency letter prohibiting vague terms such as "DEI initiatives" and noting that "schools will eliminate all vestiges of DEI to avoid even the possibility of funding termination"). Defendants' imprecision has grave consequences for Plaintiffs and violates Fifth Amendment guarantees.

**D.    Defendants Also Fail to Effectively Address Plaintiffs' APA Claims, and Plaintiffs Have Demonstrated That They Are Likely to Succeed on the Merits.**

For similar reasons as to why Plaintiffs' claims are ripe, they are also justiciable under the APA. Although Defendants argue that there is no final agency action for this Court to review, *see* Opp. at 15, the Supreme Court has repeatedly emphasized "the 'pragmatic' approach . . . long taken to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). Here, the Executive Orders and Agency Directives all announce their intent in terms that are "quite clearly definitive," not "tentative," and they state "that compliance [is] expected." *Abbott*, 387 U.S. at 151. Under any pragmatic analysis, all are reviewable under the APA. *See, e.g.*, *San Francisco*, 2025 WL 1282637, at *34-35 (Bondi Memo is final agency action because it commands action and "clearly marks the consummation of the DOJ's decision-making process that so-called sanctuary jurisdictions are ineligible for federal funding") (cleaned up); *California v. U.S. Dep't of Transp.*, 2025 WL 1711531, at *3-4 (DOT Directive violates APA).

The Opposition effectively concedes the strength of Plaintiffs' DOT-related APA claims. Defendants argue that the "HUD, DOJ, and DHS" agency actions are not final agency actions, yet conspicuously omit DOT from that list. *See* Opp. at 15. Even when the Opposition eventually addresses the merits of the DOT claims, astonishingly nowhere does it rebut Plaintiffs' argument that DOT's actions were arbitrary and capricious. *Compare* Br. at 29 & n.15 *with* Opp. at 23-24.

Rather, apparently addressing Plaintiffs' separate argument that DOT's actions were taken in excess of statutory authority, Defendants focus on an attenuated argument that attempts to distinguish DOT's authorizing statute from the Byrne JAG program's authorizing statute, which was addressed in *City of Providence*. *See* Opp. at 23-24. Nowhere do Defendants address Plaintiffs' argument already rebutting that very point. *See* Br. at 17 & n.9 (citing the Bipartisan Infrastructure Law and explaining "the final, broader consideration in the statute that the project 'achieve[] such other conditions as the Secretary considers to be necessary' does not save Defendants, as the immigration-related conditions are hardly related to the purposes of the SS4A program"). Defendants weakly attempt to point to a "necessary" rationale articulated in the DOT Letter, which states that actions impeding immigration enforcement "compromise the safety and security of the transportation systems." Opp. at 24; Am. Compl., Ex. F at 2. Plaintiffs have already explained, in Section C.2 *supra*, why that purported rationale is deficient.

As to the remainder of Plaintiffs' APA claims, Defendants begin by mislabeling the actions of DOJ, DHS, and HUD as mere "evaluations." *See* Opp. at 15. In reality, the Bondi Memo, Noem Memo, DHS Conditions, and HUD letter are far more than the preliminary steps Defendants paint them out to be. *See* Br. at 27-28. Each directive includes *mandatory* language embodying policy initiatives and mark "the consummation of the agency's decision-making process" from which "legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997). The language in these directives is far stronger and more definitive than Defendants' indeterminate "reason to believe" example. Opp. at 15 (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239, 243 (1980)); *see* Br. at 8-11 (highlighting mandatory language in the Agency Directives).

Defendants also argue that the Supreme Court's decision in *Lincoln v. Virgil* bestows upon agencies the discretion to allocate funds from an appropriation. *See* Opp. at 18 (citing 508 U.S. 182, 192 (1993)). What Defendants ignore in making that general pronouncement is that this

discretion does not encompass the absolute authority to refuse to disburse funds based on conditions that are *entirely unrelated* to the purpose of funds and that are imposed in excess of the relevant authorizing statute. *See MLK Jr. Cnty.*, 2025 WL 1582368 at *12 (distinguishing *Lincoln* and holding that imposition of new conditions advancing President's policy priorities on HUD and DOT funding is not committed to agency discretion by law). Defendants even caveat in their Opposition that this discretion is only allowed "*[s]o long as the agency abides by the relevant statutes*." Opp. at 18 (emphasis added). Here, Defendants have not abided by the relevant statutes, *see* Br. at 27-29, and their actions are unlawful under the APA.

Finally, Defendants cherry-pick the DHS Conditions, stating there are "rational reasons" supporting the agency's decision to add the challenged conditions, while failing to rationalize any of the other challenged agency actions (which have even less of a sufficient nexus). *See* Opp. at 19-20. The Opposition avers that DHS's "core purpose" is to enforce federal immigration laws, so its conditioning of funding on a guarantee of cooperation with federal immigration enforcement is neither contrary-to-law nor arbitrary and capricious. *See id*. This argument too falls flat: these conditions apply to *all* DHS funds—including DHS grants entirely unrelated to immigration—and represent an agency-wide policy against distributing funds to jurisdictions like Plaintiffs on the Designation List. *MLK Jr. Cnty.*, 2025 WL 1582368 at *17 ("[R]ote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"). Defendants do not identify any DHS funding that Plaintiffs receive that has *anything* to do with immigration. *See* Maltez Decl. ¶ 22; Hartke Decl. ¶¶ 11-12. Despite Defendants' purported "rational reasons," there is "no obvious connection" from the immigration-related conditions to any DHS grants (or any other federal agency grants)

received by Plaintiffs.  *See* Br. at 29 & n.15.  These deficiencies violate the APA.  *See id.*[14]

**E.    Plaintiffs Have Adequately Demonstrated Irreparable Harm.**

As the Supreme Court has made clear, and as discussed at length in Section A.1 *supra*, a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania*, 262 U.S. at 593.  In rehashing their standing/ripeness/justiciability arguments in the harm section, *see* Opp. at 35, Defendants not only mischaracterize the relevant jurisprudence but also Plaintiffs' injuries and requested relief. These injuries are not "speculative" and are not based on "unsubstantiated fears," as Defendants contend.  *See* Br. at 12-14, 29-34.  Defendants' plethora of public statements, executive actions, agency directives, and enforcement lawsuits—not to mention the express targeting of Plaintiffs in the Designation List—make clear that "[t]he axe is falling" on Plaintiffs.  *See id.* at 31.

Furthermore, Plaintiffs have shown concrete harm regarding the impact these actions have on community and public safety.  *See id.* at 12-14, 29-34.  "Defendants have put Plaintiffs in the position of having to choose between accepting conditions that they believe are unconstitutional, and risking the loss of . . . millions of dollars in federal grant funding, including funding that they have already budgeted and are committed to spending."  *MLK Jr. Cnty.*, 2025 WL 1582368, at *18.  In no way are Plaintiffs merely attempting to "force the Federal Government to pay them money."  Opp. at 36.  Rather, Plaintiffs seek to enjoin Defendants' illegal and unconstitutional actions that hinder their ability to govern their localities safely, effectively, and in the way they best see fit, as is their constitutional right.  The public safety and community harms detailed are

---

[14] As the Opposition states, DHS requires recipients of its funding to "comply with, and not impede, DHS's duty to enforce federal immigration laws." Opp. at 19.  But like similar language in many of the directives, there is a material difference between "impeding" (which Plaintiffs do not do) and affirmatively "complying" (which the Trump Administration interprets much more broadly).  This conflation of terms within the conditions exemplifies the arbitrary and overreaching nature of these conditions.

imminent, irreparable, and not purely "economic." *Id.* Defendants fail to respond to such harms, including, *inter alia*, that the Executive Orders and Agency Directives have injected "extreme uncertainty and chaos," Br. at 31, "making it impossible for them to forecast revenues and expenditures, which is critical to advance their primary missions of providing key services to their constituents," *id.* at 13. Defendants also fail to respond to Plaintiffs' argument that irreparable harm exists where a city faces a "Hobson's choice" to either "diminish[] community trust and undermine[] public safety" by implementing objectionable policies or forgo certain agency funds. *See id.* at 33 (quoting *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019)).

## F.   Defendants' Arguments Only Further Highlight That the Balance of the Equities and the Public Interest Weigh in Plaintiffs' Favor.

As the First Circuit has recently reiterated, "there is generally no public interest in the perpetuation of unlawful agency action" and "[t]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (cleaned up).

Defendants inconceivably claim that "the most pertinent and concretely expressed public interest" is the enforcement of 8 U.S.C. § 1373. *See* Opp. at 38. In doing so, Defendants elevate a narrow federal statute—which does not even apply to Plaintiffs since they do not collect such information—above the Constitution. Plaintiffs have established a strong likelihood that the Executive Orders and Agency Directives violate the Constitution, and Plaintiffs do not "impede the enforcement of federal law" as Defendants claim, Opp. at 38. *See* Br. at 6, 25; Maltez Decl. ¶¶ 10-11; Houghton Decl. ¶¶ 10-16; Ballantyne Decl. ¶¶ 10-11; Benford Decl. ¶¶ 10-15.

Defendants also take the astonishing position that Plaintiffs are suffering "no hardship at all" and that if the preliminary injunction is granted, the "agencies will bear all the risk." Opp. at

37-38. Plaintiffs are small jurisdictions that must govern their communities *in the present*, a present marred by uncertainty as a result of the chaotic environment created by Defendants.

**G.      This Court Should Not Stay the Injunction Pending Appeal.**

This Court should not stay any injunction pending appeal, first because Defendants must ordinarily bring such a motion following a judgment on the present motion. *See* Fed. R. App. P. 8(a)(1). For many of the same reasons as already detailed in Plaintiffs' opening brief and this reply brief, the factors articulated in *Nken v. Holder* weigh in Plaintiffs' favor. *See* 556 U.S. 418, 434 (2009) ("There is substantial overlap between these and the factors governing preliminary injunctions."). And it would moreover be inequitable to stay the injunction pending appeal, given the relative imbalance of the equities: what Defendants, who have the coffers of the federal government behind them, stand to lose when Defendants complain about having to pay out federal grants, *see* Opp. at 38, pales in comparison to what Plaintiffs stand to lose as smaller localities that have relatively smaller budgets and provide critical services for residents that are now at stake, *see* Br. at 12-14, 29-34.[15]

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that this Court grant their Motion.

---

[15] Finally, as to Defendants' argument that Plaintiffs should be required to pay a bond, despite Defendants' framing of Federal Rule of Civil Procedure 65(c) as a mandatory provision, "posting of a bond is not a jurisdictional prerequisite to the validity of a preliminary injunction." *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 896 (1st Cir. 1988). Indeed, there is "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Pineda v. Skinner Servs.*, 22 F.4th 47, 57 (1st Cir. 2021). This Court should exercise its discretion and decline to require a bond, given the financial pressures highlighted with respect to Chelsea and Somerville in light of Defendants' unlawful assault and given the relative imbalance of the equities.

Dated: July 2, 2025

Respectfully submitted,

*/s/ Oren Sellstrom*
Iván Espinoza-Madrigal (BBO# 708080)
Oren Sellstrom (BBO# 569045)
Mirian Albert (BBO# 710093)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 482-1145
iespinoza@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
malbert@lawyersforcivilrights.org

*Attorneys for Plaintiffs City of Chelsea and City of Somerville*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2025, I electronically filed the foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Oren Sellstrom*
Oren Sellstrom