UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF CHELSEA and<br>CITY OF SOMERVILLE,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, PAMELA J. BONDI, Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI L. NOEM, Secretary of the United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, SEAN P. DUFFY, Secretary of the United States Department of Transportation, UNITED STATES DEPARTMENT OF TRANSPORTATION, SCOTT TURNER, Secretary of the United States Department of Housing and Urban Development, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 1:25-cv-10442<br><br>**DECLARATION OF SOMERVILLE DIRECTOR OF FINANCE AND COMMUNITY DEVELOPMENT ALAN INACIO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, ALAN INACIO, declare under the penalty of perjury under the laws of the State of Massachusetts that the following is true and correct:

**Background**

1. I have personal knowledge of the facts set out in this declaration and, if called as a witness, could testify competently to the matters set out below.

2. I am the Director of Finance and Community Development for the City of Somerville, namely for the Mayor's Office of Strategic Planning and Community Development. I have served in this capacity since 2014. I previously served as a senior accountant for the same office from 2012 to 2014. Prior to this experience, I worked at Fidelity Investments for 13 years. As part of my current job duties, I prepare and submit grant applications to the United States Department of Housing and Urban Development ("HUD") each year.

3. I submit this supplemental declaration to apprise the Court of an impending issue regarding Somerville's receipt of HUD funds.

### Somerville's HUD Funding

4. Somerville relies on funding from several types of HUD grants to support community development initiatives. The Community Development Block Grant ("CDBG") program is a long-running federal program administered by HUD, which provides block grants to local and state jurisdictions. CDBG funds are targeted to assist low- and moderate-income individuals and generally fund community development activities, such as infrastructure projects, economic development projects, and public facilities installation. HOME Investment Partnerships Program ("HOME") grants support affordable housing projects. Emergency Solutions Grants ("ESGs") assist with shelters, homelessness prevention, and rapid re-housing.

5. CDBG, HOME, and ESG grants all operate on a formula basis, meaning that funding goes to local and state jurisdictions based on quantifiable factors such as overall population or proportion of the population at or below federal poverty guidelines. To my knowledge, none of the criteria for these grants include immigration enforcement or even law enforcement. These grants operate on the same funding schedule, with an application due to HUD

2

on August 15 of each year. Prior to that (generally in the February-May time period), HUD informs us of the dollar amounts we have been allocated under the funding formula.

6. Applying for and preparing to receive HUD grants is a long process, requiring the periodic development of a 5 year Consolidated Plan, and an Annual Action Plan ("Annual Plan"), the contents of which are dictated by 24 CFR 91.200(c). Drafting the Annual Plan is a collaborative process that includes review by various community stakeholders. Somerville presented our 2025-2026 Annual Plan at two public hearings, once during the drafting stage and once before submission, where it received public comment and feedback. This process is designed to ensure that the Plan addresses the most critical needs of Somerville's low-and-moderate income residents.

7. As part of the application process, HUD typically asks the jurisdiction to make various certifications or attestations in order to receive the award. For example, we must certify compliance with fair housing statutes. Such certifications are required to be made under penalty of perjury.

8. Somerville submitted its application today, in order to meet the August 15 deadline. Our submission this year requests the amounts that HUD has told us have been allocated to Somerville under the funding formula: $2,477,824 for CDBG; $517,544 for HOME; and $218,817 for ESG. This will fund a range of services from affordable housing to public infrastructure to homelessness prevention. As outlined in our application to HUD, in 2025 and 2026, Somerville plans to use CDBG and HOME funds for the construction of ten units of affordable housing, the rehabilitation of fifteen units of affordable housing, the rehabilitation of six homeowner homes, and direct financial assistance to five homebuyers. CDBG funds will also support critical infrastructure projects that will positively impact 15,000 Somerville residents, provide assistance

to twenty local businesses assisting with community development, add four beds to overnight shelters, and assist two households with rapid re-housing. Lastly, ESG funds will support homeless prevention services and increase access to overnight shelters.

9. Some of the funds requested in the Annual Plan will be supporting multi-year projects. For example, Somerville is preparing to support Phase II of its Clarendon Hill redevelopment project with CDBG funding. The project will replace 216 state-aided public housing units and add eighty new income-restricted rental units in a mixed income development with additional market rate units. Phase I of the project is nearly completed and Phase II relies on the support of CDBG funds. Additionally, CDBG and HOME funds will be used to continue offering programming such as Tenant Based Rental Assistance and ongoing infrastructure and housing rehabilitation projects that are actively underway and have existing contractual obligations with contractors and individual homeowners for payment utilizing these funds.

### New HUD Attestation

10. I am regularly in contact with my counterparts from other jurisdictions in Massachusetts. Some such jurisdictions submitted their CDBG/HOME/ESG applications to HUD ahead of the August 15 deadline. These counterparts have informed me that, this year, as soon as the application is submitted, HUD is sending an additional "attestation" for jurisdictions to sign before the application can continue. There is no reference to this additional attestation in the original certification forms.

11. This attestation references Executive Order 14,218 (the "Subsidization Executive Order"), among other Executive Orders, and requires jurisdictions to certify that the grant will be administered in accordance with Executive Orders and immigration laws. We have not been

4

required to make any such certification with respect to immigration law in the many years that I have been managing our grants program.

12. In response to a public records request, one of my counterparts in a nearby Massachusetts city produced to Somerville a copy of the email they recently received from HUD in this regard. Attached as Exhibit 1 is a true and correct copy of that email. The email cites the Subsidization Executive Order on p.1, as one of the Executive Orders for which compliance is mandated and requires, at p.3, an attestation that includes that "[t]he city will not use funding under this grant in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." The email also identifies language in the Plan that HUD believes run afoul of other Executive Orders regarding Diversity, Equity, and Inclusion (DEI), which are not challenged in this lawsuit.

13. I understand that HUD is imposing a very tight turnaround on this attestation: in some cases requiring jurisdictions to certify their compliance within a matter of days. For example, Exhibit 1 was sent by HUD on Wednesday, July 30, 2025 with a response deadline of Tuesday, August 5, 2025.

**Impending Harm to Somerville**

14. I am aware that others in this action have explained Somerville's Welcoming Community policy, which has been in place for many years. Although this policy does not "seek to shield illegal aliens from deportation," I am aware that the Trump Administration has adopted an expansive view of this language and has affirmatively sued jurisdictions that have policies very similar to Somerville's, claiming that these policies violate the law by protecting undocumented individuals from deportation.

5

15. Since we are submitting our CDBG/HOME/ESG application this week, I anticipate that HUD will imminently require Somerville to attest to the language set forth in Exhibit 1. While we do not believe that we are out of compliance with federal law in any way, we are also concerned that signing the attestation could leave us open to civil and even criminal penalties given the Trump Administration's stated views about sanctuary cities.

16. If Somerville were to lose the CDBG/HOME/ESG grants, that would be a substantial blow to the City. As noted above, according to the funding formula, this year we expect to receive over $3 million. Without that money, we would be unable to fund the wide range of activities that we have outlined in our application: from affordable housing to economic development to homelessness prevention projects.

17. Even if a court later ruled that we should have received the money, and ordered it paid, the damage would already have been done. Without funding this year, some projects would just have to stop.

18. In addition, the CDBG/HOME/ESG grants from HUD support the full salary for four full-time Somerville employees and partially fund 12 additional employees. If we faced an unanticipated loss of a budgeted revenue source for the current year, these four staff members, whose responsibilities include monitoring and tracking CDBG funds to ensure compliance with grant requirements, will be at immediate and imminent risk of being terminated. Even if a court ordered the money to be paid at some later date, the harm to the City would have already occurred.

19. Finally, 15% of the Public Services and ESG allocation of these funds go toward local nonprofits and public service providers. Because these are formula grants where the amount of money we receive is known each year, we typically notify local nonprofits ahead of time of what funds they can expect to receive from us, so that they can plan accordingly and services can

continue uninterrupted. In this case, we have already conducted our annual Request for Proposals and have communicated out award letters to numerous nonprofits and providers, and they are relying on receiving the funds we have told them to expect. The typical program year for our non-profit services runs from July 1st through June 30th of the current fiscal year. The expectation of these funds is now baked into the budgets and annual plans of these organizations. Pulling that back now would disrupt the services they provide and cause immediate harm to Somerville residents who rely on these services, which could not be remedied even if the funds eventually came at some later time. For example, part of the ESG monies we receive from HUD each year goes to fund a local homeless shelter. If we do not receive the money as expected from HUD, we would not be able to fund this shelter with that money, and the result would be fewer services to those who are most in need.

I declare under penalty of perjury under the laws of the State of Massachusetts that the foregoing is true and correct.

Executed this 15th day of August, 2025, at Somerville, Massachusetts.

*[signature]*
ALAN INACIO
Director of Finance and Community Development
City of Somerville

# EXHIBIT 1

**Thursday, August 14, 2025 at 14:03:13 Eastern Daylight Time**

**Subject:** NOTIFICATION: ▮▮▮▮ MA (and consortium members) FY25 Consolidated Plan/Action Plan
**Date:** Wednesday, July 30, 2025 at 8:22:44 PM Eastern Daylight Time
**From:** CPD DAS for Field Operations <CPDDASforfieldoperations@hud.gov>
**To:** ▮▮▮@town.▮▮▮.ma.us <▮▮▮@town.▮▮▮.ma.us>, ▮▮▮@▮▮▮.org <▮▮▮@▮▮▮.org>, ▮▮▮@ci.▮▮▮.ma.us <▮▮▮@ci.▮▮▮.ma.us>, ▮▮▮ <▮▮▮@▮▮▮-ma.gov>, ▮▮▮@▮▮▮.org <▮▮▮@▮▮▮.org>
**CC:** Sorbo, Mark F <Mark.F.Sorbo@hud.gov>, Legette, Ronnie J <Ronnie.J.Legette@hud.gov>, BostonCPD <BostonCPD@hud.gov>

Dear Grantees,

This message serves as notification that the Department is questioning the accuracy of the ▮▮▮ MA's (and the Consortium members') certification that the Community Development Block Grant (CDBG) funds described in its Fiscal Year 2025 Consolidated Pan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders. HUD is providing this opportunity for your jurisdictions to comment (i.e., provide specific evidence demonstrating compliance with the certification) by responding to this notification. The grantees' demonstration of the accuracy of its certification should include taking the actions described below no later than **5:00 pm EDT on Tuesday, August 5, 2025**. Failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan.

During HUD's review of the Fiscal Year 2025 Consolidated Plan/Action Plan submitted by your jurisdiction, the Department identified language in the Plan that is not consistent with Executive Order 14148 *Additional Rescissions of Harmful Executive Orders and Actions,* Executive Order 14218 *Ending Taxpayer Subsidization of Open Borders, and* Executive Order *14151 Ending Radical and Wasteful Government DEI Programs and Preferencing,* Executive Order 14173 *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. Specifically, the jurisdiction's Plan states the following:

[▮▮▮ MA's plan section]
- Page 2: Provide economic opportunities to LMI residents through job readiness, skill training, small business support, and other strategies in pursuit of **economic justice** for oppressed communities. (emphasis added)
- Page 57: The State CoC's Coordinated Entry guiding principles are participant choice, nondiscrimination, racial **equity**, collaboration, accurate data, performance-driven, housing first, and prioritization. (emphasis added)
- Page 59: Another complexity is the recent influx of **migrant/undocumented** individuals and families from the Southwestern Border (emphasis added)
- Page 114: Explore and advance tax reform to address **systemic inequity**. (emphasis added)

- Page 12: Most of the census block groups in ▮▮▮▮ have an **Environmental Justice** population, including minority, low-income, and English isolation populations. (emphasis added, and note, this statement is about ▮▮▮▮ MA, a consortium member)
- Page 124: Provide economic opportunities to LMI residents through job readiness, skill training, small business support, and other strategies in pursuit of **economic justice** for oppressed communities. (emphasis added)
- Page 129: ▮▮▮▮ has enjoyed recent economic success and historically low unemployment rates, as well as increased investment in its downtown. However, according to 2017–2021 CHAS estimates, 56 percent of ▮▮▮▮ residents are LMI. Additionally, **oppressed groups face wealth and earnings inequities**, as well as higher rates of underemployment. Supporting small businesses, especially in their early years, can provide economic and social benefits in neighborhoods and communities that have seen as much benefit from recent economic expansion. (emphasis added)
- Page 131: The City of ▮▮▮▮ is focused on addressing the needs of LMI residents, particularly **immigrants**, children, seniors, domestic violence survivors, people with disabilities, and other LMI populations. The City will prioritize needs related to removing language barriers and other barriers to access, improving public health and healthcare access, promoting climate adaptation and **environmental justice**, and supporting upward mobility and economic opportunity, **especially within oppressed groups**. (emphasis added)
- Page 132: Increasing concern regarding **environmental justice** and climate change. (emphasis added)
- Page 145: LMI residents' needs continue to change, and the Consortium and the City of ▮▮▮▮ programs will need to change with them. Responding to the housing crisis, combating climate change, and addressing growing wealth disparities are urgent challenges that will require local, state, and federal programs and policymakers to be united behind a strategy of affordable housing development, housing production, climate resiliency, **environmental justice, and economic justice**. (emphasis added)
- Page 151: Provide economic opportunities to LMI residents through job readiness, skill training, small business support, and other strategies in pursuit of **economic justice for oppressed communities**. (emphasis added)
- Page 166: LMI residents' needs continue to change, and the Consortium and the City of ▮▮▮▮ programs will need to change with them. Responding to the housing crisis, combating climate change, and addressing growing wealth disparities are urgent challenges that will require local, state, and federal programs and policymakers to be united behind a strategy of affordable housing development, housing production, climate resiliency, **environmental justice, and economic justice**. (emphasis added)

[▮▮▮▮ MA's plan section]
- Page 386: ▮▮▮▮ Office of **Diversity, Equity and Inclusion** (emphasis added)
- Page 416: Explore and advance tax reform to address **systemic inequity** (emphasis added)

[▮▮▮▮ MA's plan section]
- Page 630: Explore and advance tax reform to address **systemic inequity**.

This language includes provisions that appear to be inconsistent with the implementation of federal programs pursuant to the referenced executive orders. To address this issue, your jurisdiction should provide assurance to the Department by taking the following actions

1. Remove or replace *all* "equity" references *throughout the document* and replace with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" ;

2. Remove or replace *all* "environmental justice" references *throughout the document* and replace with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" ;

3. Replacing *all* "immigrant" references with "legal/documented immigrant"; and

4. Provide the following assurance statements within the Plan:

"▮▮▮▮ MA or (insert name of each jurisdiction in consortium) shall administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and certification requirement that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S. C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218 or other Executive Orders or immigration laws. The city will not use funding under this grant in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation. Unless excepted by PRWORA, the city must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

"▮▮▮▮ MA or (insert name of each jurisdiction in consortium) agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code."

"▮▮▮▮ MA or (insert name of each jurisdiction in consortium) will not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964."

The grantee should re-submit the action plan to HUD by the deadline noted above.  Please work to revise and resubmit your Plan in HUD's Integrated Disbursement and Information System (IDIS) *and reply to this message indicating that you have re-submitted the plan in IDIS*.  You are welcome to provide in your email response the section or page that contains the assurance statements.  If HUD disapproves the Plan, the grantee must resubmit its Plan within 45 days after first notification of Plan disapproval (see 24 CFR 91.500(d)).

If you should have any questions, please reach out to the Office of Community Planning and Development Office of Field Operations at cpddasforfieldoperations@hud.gov .