United States District Court
District of Massachusetts

```
                            )
City of Chelsea et al.,     )
                            )
          Plaintiff,        )
                            )
          v.                )      Civil Action No.
                            )      25-10442-NMG
Trump et al.,               )
                            )
          Defendant.        )
                            )
                            )
```

MEMORANDUM & ORDER

GORTON, J.

This case arises out of a series of executive orders ("EOs") issued by President Donald Trump and implementing directives published by the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), the Department of Transportation ("DOT") and the Department of Housing and Urban Development ("HUD"), all of which address jurisdictions that have adopted so-called "sanctuary" policies.

The EOs and directives appear to have two general objectives: (1) to limit or eliminate federal funding for localities implementing sanctuary policies ("sanctuary cities" or "sanctuary jurisdictions") and (2) to prepare for litigation, including criminal investigations and prosecutions, against

sanctuary cities and individual city officials for "failing to comply with lawful immigration-related commands and requests."

The City of Chelsea, Massachusetts ("Chelsea") and the City of Somerville, Massachusetts ("Somerville") (collectively, "plaintiffs" or "the Cities") bring suit, alleging that the EOs and directives are unconstitutional and violate the Administrative Procedure Act.  The Cities seek a preliminary injunction to

> immediately enjoin Defendants from
> implementing or enforcing the Executive
> Orders, the Agency Directives, or any other
> materially similar directive to withhold,
> condition, or freeze federal funds to
> "sanctuary jurisdictions."[1]

I.    **Background**

**A. Sanctuary Jurisdictions Executive Actions**

After his Inauguration on January 20, 2025, President Donald Trump issued, in quick succession, a series of EOs directed toward jurisdictions deemed to be "sanctuary jurisdictions": EO 14,159 ("the Day One EO"), EO 14,218 ("the Subsidization EO") and EO 14,287 ("the Designation EO").

The Day One EO reinstated a prior EO, numbered 13,768 issued during President Trump's first term, entitled "Enhancing Public Safety in the Interior of the United States".  That EO

---

[1] The Court is aware that, at the time of the entry of this Memorandum & Order, plaintiffs have filed a supplemental notice regarding conditions of funding by a federal agency (Docket No. 40) that will be duly considered on its own after receipt of responsive pleadings from defendants.

states that "sanctuary jurisdictions" will, to the extent the law allows, be deprived of federal funding as long as those jurisdictions interfere with the exercise of federal law enforcement operations.

The particular EO defines sanctuary jurisdictions as those that "willfully refuse to comply with 8 U.S.C. § 1373." That statute, in turn, provides that a federal, state or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual. The EO further threatens civil and criminal action against sanctuary jurisdictions to ensure that they do not receive federal funding.

In February, 2025, President Trump issued the Subsidization EO, which orders all agency heads

> to identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination.

Not long thereafter, President Trump issued the Designation EO, outlining "consequences" for sanctuary jurisdictions and declaring that the heads of executive agencies "shall identify appropriate federal funds to sanctuary jurisdictions . . . for suspension and termination."

-3-

Pursuant to the several EOs, multiple federal agencies, including those named as defendants in this litigation, swiftly issued memoranda and updated funding requirements to that effect.

On January 21, 2025, EO 14,159 was supplemented by a memorandum of then Acting Attorney General Emil Bove ("the Bove Memo"). The Bove Memo stated that the Supremacy Clause requires state and local authorities to comply with Executive Branch immigration enforcement initiatives. The Bove Memo also stated that jurisdictions that do not comply with immigration-related commands and requests are in violation of the Day One EO and federal law. The Bove Memo explicitly stated that the DOJ would investigate incidents of obstruction and non-compliance with EO 14,159 under three statutes: 18 U.S.C. § 371 Conspiracy to Commit Offense or Defraud the United States, 8 U.S.C. § 1324 Bringing in and Harboring Certain Aliens and 8 U.S.C. § 1373 Communication Between Government Agencies and the Immigration and Naturalization Service.

On February 5, 2025, Attorney General Pamela Bondi ("the Attorney General") issued a memo entitled "SANCTUARY JURISIDICTION DIRECTIVES". That memo ordered all DOJ funds planned for distribution to be suspended until a review had been completed. The memo further stated that sanctuary jurisdictions, as defined in EO 13,768, would not receive access

to DOJ funds.  The following day, the DOJ filed civil complaints against the State of Illinois and the City of Chicago, asserting the Supremacy Clause. <u>United States</u> v. <u>Illinois</u>, <u>et al</u>., No. 1:25-cv-1285 (N.D. Ill. Feb 6, 2025). On February 12, 2025, the DOJ filed a complaint against the State of New York also asserting the Supremacy Clause. <u>United States</u> <u>v. New York</u>, <u>et al</u>., No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025).

Contemporaneously, Department of Transportation ("DOT") Secretary Sean Duffy issued an order that stated all DOT grants, loans, contracts and DOT-supported or assisted state contacts would be de-prioritized if they were going to sanctuary jurisdictions.  The order stated that, conversely, the DOT would be prioritizing projects and goals that require local compliance or cooperation with federal immigration enforcement and with other goals and objectives specified by the President or the DOT Secretary.  In March, 2025, DOT published updated grant conditions for the Safe Streets and Roads for All ("SS4A") program, including the following language for FY2023 grants:

> Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

One month later, DOT sent a letter to plaintiffs and other recipients of SS4A funding confirming the new policy.

In February, 2025, DHS published a similar memorandum ("the Noem Memo") and updated grant conditions which outline steps to restrict funding to sanctuary jurisdictions.  Thereafter, DHS released a set of conditions with updated terms and conditions for all of the agency's FY2025 grants.  One of the new conditions obligates grant recipients to agree to "compl[iance] with the requirements of 8 U.S.C. §§ 1373 and 1644" as well as

> honor[ing] requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer[,] . . . providing access to detainees, . . . [and] not leak[ing] or otherwise publiciz[ing] the existence of an immigration enforcement operation.

In May, 2025, DHS released a so-called "Designation List," identifying jurisdictions which "deliberately and shamefully obstructed the enforcement of immigration laws."  The list instructed those jurisdictions immediately to review and revise their policies in conformance with Federal immigration laws.

Finally, in April, 2025, HUD released a letter stating that it would ensure all programs comply with the Subsidization EO and

> take steps to ensure that Federal Resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.

The letter did not identify any offending jurisdictions by name.

### B. The Cities' Policies and Federal Funding

Chelsea and Somerville have two characteristics in common relevant to this suit: they have both implemented a number of "sanctuary" policies over the past several years and they both receive millions of dollars in federal funding each year.

Chelsea and Somerville have high percentages of foreign-born residents (45% and 25%, respectively). As such, city officials have chosen to implement several policies which qualify as "sanctuary policies" in the eyes of the Trump administration. First, they do not routinely inquire into the immigration status of their residents. Second, they generally prohibit local officials from participating in federal immigration enforcement for civil immigration violations. They do not, however, prevent law enforcement from cooperating or assisting with immigration-related criminal investigations, nor from cooperating in cases in which there is a serious threat to public safety or national security.

Both cities have received, and continue to receive, significant federal funding. For instance, Chelsea received approximately $14.5 million in federal funding for fiscal year 2024, of which $11.3 million came via the Commonwealth of Massachusetts ("the Commonwealth"). Chelsea expects to receive approximately $8.5 million for the 2025 fiscal year, almost all of which will be via the Commonwealth. All funds for both

-7-

fiscal years are, or will be, "reimbursement-based," meaning that the Cities must spend their own money and complete the eligible projects before being reimbursed by the relevant federal agencies.

The City of Somerville had a total budget of $356 million in fiscal year 2024. It received approximately $19.4 million in federal funds, of which $11.5 million passed through the Commonwealth. In fiscal year 2025, Somerville had a total budget of $383 million and, to date, it has received approximately $7.9 million in federal funds, of which $6.8 million has come via the Commonwealth. Somerville is currently eligible to receive approximately $15.5 million in reimbursements through federal grants.

Chelsea and Somerville regularly receive funds from the federal agencies named as defendants.[2] Some, but not all, of the federal grants to the Cities are "formula-based," meaning they are awarded based on a set formula as opposed to being subject to a competitive grant application process. As plaintiffs explain in their declarations, "[u]ually, this means that receipt of these funds is something [they] can count on."

---

[2] The complaint also describes millions of dollars in Title I federal grants that the City of Chelsea receives from Department of Education which is not a defendant in this suit.

From DOJ, the Cities regularly receives funds through the "Byrne JAG program," which supports

> prosecution, indigent defense, courts, crime prevention and education . . . and related law enforcement and corrections programs.

According to the municipal records, from that JAG program, Chelsea received $27,225 in direct allocations and Somerville received $16,801.[3]  The Cities have also regularly received funds from the federal "Bulletproof Vest Partnership" ("BVP") program, which reimburses them for up to 50% of the cost of body armor vests purchased for their law enforcement officers.[4]  As "qualifying units of local government with fewer than 100,000 residents," the Cities constitute "small jurisdictions" for which funding is prioritized.[5]  Finally, the Cities receive funding through the Community Oriented Policing Services ("COPS") program.  Chelsea is in the first year of a three-year COPS grant to fund the salaries of additional police officers.

From DHS, the Cities have previously received grants from programs for: AFG Regional Training, FEMA Emergency Aid and the Urban Area Security Initiative ("UASI").  Chelsea's current UASI

---

[3] BJA, https://bja.ojp.gov/funding/jag-local-allocations-ma.pdf.

[4] See U.S. Department of Justice Office of Justice Programs, Overview: Patrick Leahy Bulletproof Vest Partnership, last modified June 11, 2024, https://www.ojp.gov/program/bulletproof-vest-partnership/overview.

[5] Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, Fact Sheet: Patrick Leahy Bulletproof Vest Partnership Program, Apr. 2023, available at https://bja.ojp.gov/doc/bvp-fact-sheet.pdf.

grant is earmarked for between $300,000 and $400,000 to fund network infrastructure, police training, METRO SWAT equipment and more. Chelsea also has a pending FEMA Building Resilient Infrastructure and Communities ("BRIC") grant with a contract signing planned for late December, 2025, with construction set to begin in the summer of 2026.

From HUD, Chelsea received a $2 million grant for a Downtown Broadway Infrastructure Improvement Project which began in 2024 and is anticipated to be completed in 2027. It receives "significant funds – in some years close to $1 million annually" in Community Development Block Grant ("CDBG") funds which support, among other services, housing rehabilitation, construction of public facilities and infrastructure and food delivery to elderly residents. In FY2024, Chelsea received $924,000 for such causes.

Finally, from DOT, Chelsea was awarded, in FY2023, a grant in the amount of $280,000 from the "Safe Streets and Roads for All" ("SS4A") program and was named as the lead recipient of a $2.5 million Reconnecting Communities Grant from DOT to be administered through the Massachusetts Department of Transportation. While the SS4A project is underway, the federal department has yet to authorize any reimbursements. Somerville was similarly awarded a $4 million grant from the program.

### C. Procedural History

In February, 2025, the Cities of Chelsea and Somerville ("plaintiffs" or "the Cities") brought suit, alleging that the EOs and directives violate the Constitution and the Administrative Procedure Act. Although the complaint indicates that plaintiffs will seek injunctive relief, they did not file a separate motion to do so for several months thereafter.

In May, 2025, after publication of the DHS Designation List, plaintiffs filed their motion for a preliminary injunction.

## II. Legal Standard

In determining whether to enter a preliminary injunction, it is well settled that district courts must weigh four factors: 1) the plaintiff's likelihood of success on the merits, 2) the potential for irreparable harm to the plaintiff if the injunction is denied, 3) the hardship to the nonmovant if enjoined" compared to the hardship to the movant in the alternative, and 4) the public interest. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); see also Winter v. Nat. Res. Def. Council, Inc., 55 U.S. 7, 20 (2008).

The party seeking the preliminary injunction bears the burden of establishing that all four factors weigh in his favor, Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d

-11-

13, 18 (1st Cir. 2006), but the first two factors, likelihood of success on the merits and irreparable harm, carry the most weight, Together Emps. v. Mass. Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022). As in other circuits, the First Circuit Court of Appeals ("the First Circuit") measures irreparable harm on a sliding scale in tandem with likelihood of success, i.e., "the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 662 F.3d 36, 42-43 (1st Cir. 2010); see, e.g., Nantucket Wine & Food Festival, LLC v. Gordon Cos., 759 F. Supp. 3d 259, 280-81 (D. Mass. 2024); Worthley v. Sch. Comm. of Gloucester, 652 F. Supp. 3d 204, 208 (D. Mass. 2023). The failure to satisfy any one of the four criteria for a preliminary injunction precludes entitlement to the relief sought. Mass. Coal. of Citizens v. Civ. Def. Agency, 649 F.2d 71, 74 (1st Cir. 1981).

The Court may accept as true all well-pled allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for a preliminary injunction. See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).

Ultimately, the issuance of preliminary injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

## III. **Application**

On the question of irreparable harm, the Cities aver that, as they face the imminent loss of all federal funding, it has become

> impossible . . . to forecast revenues and
> expenditures [and thereby] provid[e] key
> services to their constituents.

Yet it is far from clear, based on plaintiffs' pleadings, that the risk of lost funding is "of such imminence that there is a clear and present need for relief to prevent irreparable harm." Sierra Club, 769 F. Supp. at 422 (quoting Wisconsin Gas Co. v. Fed. Energy Reg. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)) (internal quotation marks omitted).

The only agency that has expressly identified plaintiffs as sanctuary jurisdictions for the purpose of the EOs is DHS.  In fact, other agencies have issued similar "designation lists" that do not identify the plaintiff cities as targeted jurisdictions.  On August 5, 2025, DOJ published its own list of offending "sanctuary jurisdictions," which included 13 states,

four counties and 18 cities, including Massachusetts and the
City of Boston but not the plaintiffs in this case.

In any event, it is speculative to assume that inclusion on
an agency designation list is indicative of an "imminent"
funding freeze. A comparison of the actions taken by DOT and
DHS is illustrative. Although DOT has not published any such
similar designation list, it has already issued updated
conditions for the SS4A Program grants for FY 2023 to provide
that "[r]ecipients will cooperat[e] with Federal officials in
. . . [DHS] in the enforcement of Federal immigration law." DOT
then alerted all recipients of DOT funding of the updated
language, not just the Cities or recipients considered sanctuary
jurisdictions. DHS, on the other hand, has published a
designation list without updating the requirements for any
specific grants historically awarded to plaintiffs.

The theory of harm espoused by the Cities has not evolved
during the past four months since publication of the Designation
List. DHS has not frozen any particular funding, denied any
grant application or withheld any reimbursement from plaintiffs.
The Cities' anticipation of "imminent" loss of funding after
publication of the designation list has proven to be precisely
the kind of "conjecture, surmise, or . . . unsubstantiated fears
of what the future might have in store," which cannot justify
the issuance of a preliminary injunction. Charlesbank Equity

-14-

Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

Other aspects of plaintiffs' pleadings fail to demonstrate how "there is a clear and present need for relief to prevent irreparable harm." Sierra Club, 769 F. Supp. at 422. They aver that if they do not receive the expected federal funding, they will have to cut necessary city staff and programs but the timeline is obscure. Is the federal government already delinquent on what it owes the city? If not, when is reimbursement expected and must the Cities decide whether to make program cuts before that reimbursement deadline? If funds are, in fact, withheld, the alleged harm can easily be remedied with a prompt injunction ordering the offending agency to "unfreeze" the authorized funding. In that case, the Cities would suffer no harm beyond the loss of interest, which, of course, could also be awarded.

The nature of many of the grants at issue also renders plaintiffs' claim of irreparable harm implausible. Only a portion of the grants at issue are "formula-based," i.e., awarded based on established criteria as to which the Cities can reasonably predict success.[6] For those grants awarded pursuant to a competitive bidding process, however, the Cities already

---

[6] The Cities do not, however, specify which of the prospective grants are formula-based versus competitive.

face uncertainty. They cannot reasonably argue that the EOs and directives adversely affect their budget planning already fraught with unpredictability due to the competitive nature of the grant application process.

Nor can the Cities claim harm when threatened with the withholding of funds to which they were not guaranteed in the first place. See Power v. Connectweb Tech., Inc., 740 F. Supp. 3d 39, 58 (D. Mass. 2024) ("Without ever having been promised these benefits or having been entitled to them in the first place, [plaintiff] cannot claim to have suffered a loss when he inevitably did not receive them.").

The competitive nature of the grants is also relevant to the third requirement for a preliminary injunction: the balance of the equities, i.e. a comparison of the harms to the parties. Plaintiffs necessarily face, with or without an injunction, budgetary uncertainty when bidding for competitive grants. The net loss to the Cities absent a preliminary injunction is, arguably, zero. A preliminary injunction would not eliminate the status quo uncertainty for the Cities.

Even if plaintiffs were to establish a strong likelihood of success on the merits, the Cities' uncertainty would persist because such a finding is simply a "statement[] of probable outcomes only," Akebia Therapeautics, Inc. v. Azar, 976 F.3d 86, 93 (1st Cir. 2020), not a guarantee of future reimbursement. No

-16-

matter how this Court rules at this preliminary stage, the
Cities are prudently required to plan for a contingency in which
the federal agencies ultimately prevail on the merits in this
Court, at the First Circuit, and even in the United States
Supreme Court.

Furthermore, it is far from certain that plaintiffs will
succeed on the merits of their claims.  Congress is free to
attach conditions upon the receipt of federal funds to further
federal policy objectives.  S. Dakota v. Dole, 483 U.S. 203, 206
(1987).  Congress may also, within the bounds of the
Constitution, delegate authority to the Executive branch to
decide how to spend appropriated funds. See Cnty. of Santa Clara
v. Trump, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017); Tennessee
v. United States Dep't of Health & Hum. Servs., 720 F. Supp. 3d
564, 579 (E.D. Tenn. 2024).  Plaintiffs have not shown a strong
likelihood of success in proving that the conditions imposed by
the subject orders and directives would violate a constitutional
limitation.

This Court acknowledges the nuances and complex
relationships that characterize the administration of
municipalities and how they prioritize constituent services.
Those complexities notwithstanding, the Cities still bear the
burden of demonstrating to this Court how it is not just
possible, but likely, that without injunctive relief, they will

-17-

suffer imminent and irreparable harm. <u>Winter</u> v. <u>Natural Res.</u>
<u>Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). Plaintiffs have not
done so.

### ORDER

For the foregoing reasons, plaintiffs' motion for
preliminary injunction against defendants is **DENIED**.


**So ordered.**




_____
Nathaniel M. Gorton
Senior United States District Judge

Dated: September *October* 2 , 2025