## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF CHELSEA and<br>CITY OF SOMERVILLE,<br><br>     *Plaintiffs,*<br><br>       v.<br><br>DONALD J. TRUMP, President of the United States, PAMELA J. BONDI, Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI L. NOEM, Secretary of the United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, SEAN P. DUFFY, Secretary of the United States Department of Transportation, UNITED STATES DEPARTMENT OF TRANSPORTATION, SCOTT TURNER, Secretary of the United States Department of Housing and Urban Development, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and UNITED STATES OF AMERICA,<br><br>     *Defendants*. | Case No. 1:25-cv-10442-NMG<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.      "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the State and the Federal Government will reduce the risk of tyranny and abuse from either front." *Printz v. United States*, 521 U.S. 898, 921 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).  The Massachusetts cities of Chelsea and Somerville bring

this action to prevent the Executive Branch from depriving them of vital federal funding, including funding that supports transportation, healthcare, education, and public safety, as part of the Trump Administration's (the "Administration's") politicized attack on "sanctuary jurisdictions." The Administration's threatened defunding of sanctuary jurisdictions violates the U.S. Constitution and undermines Plaintiffs' efforts to preserve and enhance the safety of their communities through well-considered law enforcement efforts and policy judgments.

2.      Like many local governments across the country, Chelsea and Somerville have adopted policies that limit the circumstances under which they and their law enforcement agencies expend their already-constrained resources to assist with federal immigration enforcement efforts. These local jurisdictions, often referred to as "sanctuary cities," enact such policies based on their well-reasoned judgment on how best to serve their communities. By avoiding unnecessary entanglement with federal immigration efforts, sanctuary policies help ensure that all residents, regardless of their immigration status, feel safe interacting with local law enforcement and officials. This has a number of public safety benefits, including that victims of crime can report incidents to the police without fear that doing so will expose themselves or their loved ones to immigration enforcement. Witnesses are more likely to cooperate with police for the same reason. Local law enforcement can efficiently allocate often scarce resources to high-priority policing issues in their communities. For all of these reasons, Plaintiffs have determined that their sanctuary policies enhance the well-being and public safety of their residents.

3.      However, Defendants—President Donald J. Trump ("Defendant Trump") and other Administration officials—have mounted an aggressive campaign to undermine the authority of local governments to make these local determinations. Through a series of actions that began within hours of Defendant Trump's second inauguration and have only escalated since, Defendants

have attempted to commandeer local governments to play an active role in Defendants' "mass deportation" plan—trampling on the rights of Plaintiffs and other localities like them in the process.

4.      Plaintiffs challenge three unconstitutional and unlawful executive orders that Defendant Trump has issued to defund sanctuary cities: (1) Executive Order 14,159, titled "Protecting the American People Against Invasion" (the "Day One Executive Order," attached as Exhibit A); (2) Executive Order 14,218, titled "Ending Taxpayer Subsidization of Open Borders" (the "Subsidization Executive Order," attached as Exhibit B); and (3) Executive Order 14,287, titled "Protecting American Communities from Criminal Aliens" (the "Designation Executive Order," attached as Exhibit C and together with the Day One Executive Order and the Subsidization Executive Order, the "Executive Orders").

5.      Plaintiffs also challenge corresponding actions from executive agencies: (1) a memorandum from U.S. Attorney General Pamela Bondi (the "Bondi Memo," attached as Exhibit D); (2) an order from the Department of Transportation ("DOT") Secretary Sean Duffy (the "DOT Order," attached as Exhibit E); (3) a letter to all recipients of DOT funding from Secretary Duffy (the "DOT Letter," attached as Exhibit F); (4) DOT's General Terms and Conditions for its Safe Streets and Roads for All ("SS4A") grants for fiscal year ("FY") 2023 (the "SS4A Conditions," attached as Exhibit G); (5) a memorandum from the Department of Homeland Security ("DHS") Secretary Kristi Noem, titled "Restricting Grant Funding for Sanctuary Jurisdictions" (the "Noem Memo," attached as Exhibit H); (6) DHS's updated Standard Terms and Conditions for its FY2025 grants (the "DHS Conditions," attached as Exhibit I); (7) a letter from the Department of Housing and Urban Development ("HUD") Secretary Scott Turner (the "HUD Letter," attached as Exhibit J); and (8) grant conditions imposed by HUD that implement the Executive Orders (the "HUD

Immigration Conditions"), attached as Exhibit O (Addendum 1). These directives are cumulatively referred to in this Complaint as the "Agency Directives."

6. Defendants' illegal attack on sanctuary cities relies on threats and intimidation: 1) threatening and taking actions to withhold federal funds from cities that refuse to bend to Defendants' will, even if those funds have nothing to do with Defendants' stated aims and even if Congress has given no directive toward that end; and 2) threatening and pursuing criminal and civil prosecution of those who are deemed insufficiently compliant. In this manner, Defendants' attack on sanctuary cities improperly seeks to not only undermine, but fully control, what is fundamentally *local* decision-making; usurps the role of Congress and its Spending Power; injects significant uncertainty into local governance due to its vagueness; and thereby violates Plaintiffs' constitutional rights.

7. The City of San Francisco and fifteen other cities and counties initiated a similar action in the U.S. District Court for the Northern District of California, challenging the Administration's attack on sanctuary cities. On April 24, 2025, Judge William H. Orrick granted a preliminary injunction to prevent the defendants "from directly or indirectly taking any action to withhold, freeze, or condition federal funds" from the plaintiffs, based on the first sentence of Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and portions of the Bondi Memo. Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Apr. 24, 2025), ECF No. 111. Judge Orrick issued a more detailed order on May 3, 2025 to the same effect. *See* Further Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 3, 2025), ECF No. 126 at 65.

8.    On May 9, 2025, in response to the plaintiffs' concerns that the subsequently-issued Designation Executive Order would be "used as an end run around" the injunction, Judge Orrick made clear that the injunction applies "to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened" by the challenged sections of the Day One Executive Order and the Subsidization Executive Order. *See* Order Clarifying Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 9, 2025), ECF No. 136 at 8.  These orders apply only to the named plaintiffs in that action.  On June 20, 2025, the preliminary injunction orders were appealed to the Ninth Circuit, which appeal remains pending.  *See* Defendants' Notice of Appeal, *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. June 20, 2025), ECF No. 145 at 2.  Judge Orrick subsequently extended the preliminary injunction order to cover DHS, DOT, and HUD conditions imposed on respective grants.

9.    Two other litigations, initiated on the same day in the U.S. District Court for the District of Rhode Island, similarly challenge some of the Executive Branch actions at issue in the present case.  On May 13, 2025, California and nineteen other states, including Massachusetts, filed suit against DOT and Secretary Duffy in response to the imposition of a federal immigration enforcement condition on transportation grants.  *See* Complaint, *California, et al. v. U.S. Dep't of Transp., et al.*, No. 1:25-cv-00208 (D.R.I. May 13, 2025), ECF No. 1.  Chief Judge McConnell, Jr. granted the plaintiff states' motion for preliminary injunction on June 19, 2025.  *See* Order on Preliminary Injunction, *California, et al. v. U.S. Dep't of Transp., et al.*, No. 1:25-cv-00208 (D.R.I. June 19, 2025), ECF No. 57.  On November 4, 2025, the court granted the plaintiff states' motion for summary judgment.  *See* Memorandum and Order, *California, et al. v. U.S. Dep't of Transp.,*

*et al.*, No. 1:25-cv-00208 (D.R.I. Nov. 4, 2025), ECF No. 74. Subsequently, on November 18, 2025, the court granted the plaintiffs' motion to clarify the scope of the order and judgment; the court confirmed that the permanent injunction "extends to all 22 Plaintiff States and all instrumentalities and local subdivisions within those States." *See* Order, *California, et al. v. U.S. Dep't of Transp., et al.*, No. 1:25-cv-00208 (D.R.I. Nov. 18, 2025).

10.    Also on May 13, 2025, the same states filed suit against FEMA, DHS, and others in response to the imposition of civil immigration enforcement conditions on the respective agencies' funding. *See* Complaint, *Illinois, et al. v. FEMA, et al.*, 1:25-cv-00206 (D.R.I. May 13, 2025), ECF No. 1. Judge Smith granted the plaintiff states' motion for summary judgment on September 24, 2025. *See* Memorandum and Order, *Illinois, et al. v. FEMA, et al.*, 1:25-cv-00206 (D.R.I. Sept. 24, 2025), ECF No. 71. The defendants subsequently appealed to the First Circuit; that appeal remains pending. *See* Notice of Appeal, *Illinois, et al. v. FEMA, et al.*, 1:25-cv-00206 (D.R.I. Nov. 21, 2025), ECF No. 78.

11.    Defendants' illegal campaign against sanctuary cities aims to force local jurisdictions to sacrifice public safety resources and to supplant their well-founded determinations about what is best for their residents. This unlawful and unconstitutional assault is particularly harmful for smaller cities like Plaintiffs, whose residents are grievously harmed by any termination of federal funding. Plaintiffs rely on federal funding—in the range of tens of millions of dollars annually—to fill critical budgetary needs in the management of their respective cities. These funds have been approved by Congress, and the Executive Branch may not condition their award as they seek to do here. In addition, smaller jurisdictions are limited in their ability to defend against criminal and civil prosecutions.

12.    There is no question that Plaintiffs Chelsea and Somerville have been directly targeted by this Administration's unlawful campaign. On May 29, 2025, pursuant to the Designation Executive Order, a list of "Sanctuary Jurisdictions" was released by DHS. This list, titled "Sanctuary Jurisdictions Defying Federal Immigration Law" named both Chelsea and Somerville among hundreds of other jurisdictions (the "Designation List," attached as Exhibit K). Their inclusion on this list signals the Administration's erroneous belief that Plaintiffs violate federal immigration law. However, on August 5, 2025, DOJ issued "U.S. Sanctuary Jurisdiction List Following Executive Order 14,287: Protecting American Communities from Criminal Aliens." The agency indicated that it "designated the below initial list as Sanctuary Jurisdictions, based on actions and policies that materially impede enforcement of federal immigration statutes and regulations" and that the list "will be reviewed regularly, to include additional jurisdictions and remove jurisdictions that have remediated their policies, practices, and laws." Chelsea and Somerville were not included on this list. DOJ subsequently updated its list on September 26, 2025, removing Nevada, and on October 31, 2025, removing Baltimore County, Maryland, with each removal occurring after a memorandum of understanding to collaborate on immigration enforcement was announced.

13.    The challenged Executive Branch actions have caused and will continue to cause harm to Plaintiffs, in violation of the U.S. Constitution. Specifically, Defendants' conduct intrudes on the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment guarantees of due process and its void-for-vagueness doctrine. Further, the Agency Directives violate the Administrative Procedure Act ("APA") because they are arbitrary and capricious, contrary to the Constitution, and in excess of statutory authority.

14.     Plaintiffs accordingly seek declaratory relief, as well as preliminary and permanent injunctions barring Defendants from implementing or enforcing the Executive Orders and Agency Directives.  Plaintiffs further reserve the right to amend their claims should the Administration take further action supplementing or revising its unlawful attack on "sanctuary jurisdictions."

## JURISDICTION AND VENUE

15.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 e*t seq*.  Pursuant to 5 U.S.C. § 702, sovereign immunity is waived for the United States.

16.     Pursuant to 28 U.S.C. § 1391(e), venue properly lies within the District of Massachusetts because, *inter alia*, Plaintiffs each reside in this judicial district (and no real property is involved in the action).

## PARTIES

17.     Plaintiff City of Chelsea is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and self-identifies as a "sanctuary city."

18.     Plaintiff City of Somerville is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts and self-identifies as a "welcoming community."

19.     Defendant Donald J. Trump is the President of the United States.  He issued and signed the Executive Orders that restarted the Administration's attacks against sanctuary jurisdictions.  This action sues President Trump in his official capacity.

20.     Defendant Pamela J. Bondi is the Attorney General of the United States.  The Attorney General is a cabinet-level position of the U.S. federal government overseeing DOJ.  Attorney General Bondi is responsible for executing relevant provisions of the Executive Orders, and she issued and administers the implementation of the Bondi Memo.  This action sues Attorney General Bondi in her official capacity.

21.    Defendant United States Department of Justice is an executive agency of the United States federal government.  DOJ initiated some of the key Executive Branch actions at issue in this lawsuit, namely the implementation of the Day One Executive Order through two DOJ memos.

22.    Defendant Kristi L. Noem is the Secretary of the U.S. Department of Homeland Security ("DHS").  Secretary Noem is responsible for executing relevant provisions of the Executive Orders, and she issued and administers the Noem Memo and the DHS Conditions.  This action sues Secretary Noem in her official capacity.

23.    Defendant United States Department of Homeland Security is an executive agency of the United States federal government.  DHS is responsible for executing relevant provisions of the Day One Executive Order, the Noem Memo, the DHS Conditions, and the Designation Executive Order.

24.    Defendant Sean P. Duffy is the Secretary of the United States Department of Transportation.  Secretary Duffy is responsible for administering the implementation of the DOT Order, DOT Letter, and SS4A Conditions.  This action sues Secretary Duffy in his official capacity.

25.    Defendant United States Department of Transportation is an executive agency of the United States federal government.  DOT is responsible for initiating several of the Executive Branch actions at issue in this lawsuit: the DOT Order, DOT Letter, and SS4A Conditions.

26.    Defendant Scott Turner is the Secretary of the United States Department of Housing and Urban Development.  Secretary Turner is responsible for administering the implementation of the HUD Letter and HUD Immigration Conditions.  This action sues Secretary Turner in his official capacity.

27.    Defendant United States Department of Housing and Urban Development is an executive agency of the United States federal government.  HUD initiated two of the challenged

Executive Branch actions at issue in this lawsuit: the HUD Letter and HUD Immigration Conditions.

28.    Defendant United States of America is sued under 28 U.S.C. §§ 1331 and 1346, and its sovereign immunity is waived under 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### A.    The City of Chelsea

29.    The City of Chelsea, Massachusetts is located across the Mystic River from Boston, Massachusetts.   Chelsea was first settled in 1624, established as a town in 1739, and incorporated as a city in 1857.  The City of Chelsea presently employs approximately 1,600 individuals.

30.    Chelsea occupies a land area of just 2.5 square miles, making it the smallest city in Massachusetts.  According to July 2023 figures from the U.S. Census, Chelsea's population numbers 38,319 residents, approximately 45% of which are foreign-born persons, the highest percentage for any city in Massachusetts.  Chelsea is one of the most densely populated cities in Massachusetts, second only to Somerville.

31.    Chelsea is a diverse, working-class community that has twice been awarded the All-America City Award by the National Civic League in recognition of its residents' ability to work together to identify and tackle community-wide challenges.  According to the U.S. Census, approximately 65% of Chelsea's residents identify as Hispanic or Latino, and roughly 73% of the city's population comprises residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other diverse groups.  Approximately 21% of Chelsea's residents live below the poverty line.

32.    Chelsea has received, receives, and/or anticipates receiving federal funds from a broad range of federal agencies, including DOT, DOJ, DHS, and HUD.  Chelsea's fiscal year runs from July 1 to June 30.  For FY2024 (*i.e.*, the year running from July 1, 2023 to June 30, 2024),

Chelsea's overall budget was $231 million, including approximately $132 million for Chelsea's School Department. For FY2025, Chelsea's overall budget was approximately $245 million, including approximately $140 million for its School Department. Chelsea finalized its budget for FY2026 in the amount of roughly $262 million, and is looking ahead to FY2027.

33.    Chelsea received approximately $14.5 million in federal funding for FY2024. Of that funding, approximately $11.3 million was passed through the state. Virtually all such grants were reimbursement-based, meaning Chelsea must spend its own funds and later submit requests for reimbursement from the grant.

34.    Chelsea anticipates receiving approximately $8.5 million in federal funding for FY2025, of which approximately $8.47 million will be passed through the state and virtually all of which will be reimbursement-based.

35.    Chelsea receives significant Title I federal grant funding, totaling approximately $4.1 million for 2025, under the federal Elementary and Secondary Education Act. The purpose of those funds is to provide financial assistance to districts and schools that provide services to greater concentrations of children from low-income families to help ensure that they are able satisfy the Commonwealth's exacting academic standards. Without such federal grant funding, glaring educational inequities would be exacerbated.

36.    Since 2017, Chelsea has received at least $1 million in various DHS grants, including the AFG Regional Training Grant, the FEMA Emergency Aid Grant, and the Urban Area Security Initiative ("UASI") grant. Chelsea's current UASI grant is earmarked for between $300,000 and $400,000 to fund Chelsea's network infrastructure, police training, METRO SWAT equipment, and more.

37.    Chelsea has been awarded a $280,000 Safe Streets and Roads for All, or SS4A, grant from DOT for FY2023 (for which, as described below, DOT has imposed new conditions). These funds are being used to design and implement a traffic safety plan which aims to bring traffic fatalities in the city down to zero.  Chelsea has not been reimbursed yet for any amount of this $280,000 grant.  The city also applied for an SS4A grant for the upcoming fiscal year; it hopes to use those funds to address particularly unsafe intersections in the city.  That application is currently pending DOT's review.

38.    Chelsea regularly receives funds from DOJ's Byrne JAG program, which, among other things, funds local law enforcement agencies.  The program website explains that its funding supports "prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, crime victim and witness initiatives, mental health programs and related law enforcement and corrections programs."  Chelsea has also consistently received funds from the Bulletproof Vest Partnership ("BVP") program, which is administered through DOJ's Office of Justice Programs ("OJP").  All of these funds support Chelsea's goal of maintaining a safe community by supporting its police department.

39.    Chelsea also receives significant funds in Community Development Block Grant ("CDBG") funds to support its most vulnerable residents.  This program is administered by HUD, and Chelsea receives its funds as a subrecipient to the Commonwealth of Massachusetts.  These funds support a variety of critical programs and services, including housing rehabilitation, economic development, public facilities and infrastructure, and social services such as retention of youth in schools and food delivery to elderly residents. For FY2024, Chelsea received approximately $925,000 in CDBG funds.

40.    Chelsea began its budgeting process for FY2026 in late 2024 and finalized its budget mid-2025.  Chelsea is now in the early stages of planning for FY2027.  Given the uncertainty the Administration has caused with regard to federal funding, Chelsea could not and still cannot make informed decisions about how to structure its budget.  Chelsea has also partially expended certain reimbursement-based federal grants, but now faces the possibility that it will not be reimbursed for these significant expenditures given the Administration's unlawful and unconstitutional conduct.

41.    Chelsea has self-identified as a "sanctuary city" since its June 4, 2007 resolution, which resolved that the "City of Chelsea go on record as a Sanctuary City."  The resolution traced Chelsea's long history as a city "with a rich and diverse ethnic and cultural identity," noting that "[f]or decades Italian, Irish, Hispanic, Polish, African-American, Russian, Jewish, Asian, African and French people have made Chelsea their home."  It stated that "[t]he City of Chelsea respects all persons regardless of race, class, ethnicity or legal status," and that "[e]very Chelsea resident has the right to live, work and play without fear."  The resolution went on to recognize that a number of jurisdictions around the country had declared themselves to be sanctuary cities, which "promote a community as a safe haven for refugees and immigrants who are currently residing in that community from other countries; and . . . do not initiate or welcome raids that are not related to public safety and other heinous crimes."  The resolution declared Chelsea a sanctuary city, called upon workplaces to treat immigrant workers fairly, and urged "just and fair immigration reform."

42.    In 2017, the Chelsea Police Department ("Chelsea Police" or "CPD") promulgated General Order 2017-03, titled "The Specific Role and Impact of the CPD in the Enforcement of Federal Civil Immigration Law By the Department of Homeland Security (DHS-ICE-ERO)."  CPD amended the policy in August 2024 and revised it again in both February and May of 2025 (as

revised, the "Chelsea Police Policy").  Thoughtfully drawing from the dynamics of the local community, the current Chelsea Police Policy states:

> We fully realize that federal civil immigration enforcement or perceived enforcement by the Chelsea Police Department could have a "*chilling effect*" in our local immigrant community and could limit cooperation with police by members of the community at large. As stated, we depend on the cooperation of all of our residents and stakeholders including immigrants, legal and undocumented, in solving all sorts of crimes and in the maintenance of public order. Without assurances that they will not be subjected to an immigration investigation and possible deportation, many immigrants with critical information would not come forward, even when heinous crimes are committed against them and/or their families. . . .
>
> The specific immigration status of an individual or group of individuals in and of itself, is not and shall not be a matter of local police concern or subsequent enforcement action by the CPD unless there exists through reliable and credible information a potential threat to public safety and/or national security.

43.     Likewise, the Chelsea Police Policy later states, "Accordingly, the Chelsea Police Department shall not undertake immigration-related investigations and shall not routinely inquire into the specific immigration status of any person(s) encountered during normal police operations," except for in circumstances of arrests for violent felonies, already convicted felons, terrorism-related offenses, human trafficking, and criminal gang activities.  Moreover, the Chelsea Police Policy states that officers "shall not directly participate in any such ICE tactical operation(s) solely for the *civil enforcement* of federal immigration laws as part of any Detention or Arrest Team," except for in direct response to a request for immediate assistance on a temporary basis for officer safety purposes (*e.g.*, directing traffic around officers) or for assistance in the apprehension of an individual with an outstanding Massachusetts arrest warrant.

44.     In addition, CPD complies with the decision of the Massachusetts Supreme Judicial Court ("SJC") in *Lunn v. Commonwealth* regarding civil immigration detainers.  In *Lunn*, the SJC

held: "There is no Federal statute that confers on State officers the power to make this kind of an arrest" in regard to ICE detainers, which request that custodians hold individuals for up to 48 hours after they would otherwise be entitled to release. 78 N.E.3d 1143, 1146 (Mass. 2017). Moreover, "nothing in the statutes or common law of Massachusetts authorizes court officers to make a civil arrest in these circumstances." *Id.*

45. Nothing in Chelsea's resolution or in the Chelsea Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations," or "refuse[s] to comply with 8 U.S.C. § 1373," which are the hooks as outlined in the Day One Executive Order and Bondi Memo, respectively. Nor do Chelsea's policies "seek to shield illegal aliens from deportation" or "obstruct the enforcement of Federal immigration laws," which are the definitions provided in the Subsidization Executive Order and the Designation Executive Order, respectively. In fact, Chelsea's resolution and the Chelsea Police Policy make clear that they allow the efforts of federal immigration enforcement officers to occur unimpeded. Further, they reflect no attempt to conceal, harbor, or shield any individual from detection.

46. Chelsea therefore should not be considered a "sanctuary jurisdiction" under the definitions of the Executive Orders or Agency Directives. But such facts have not stopped the Administration from labeling jurisdictions with policies like Chelsea's as "sanctuary jurisdictions," publicly castigating and threatening them with loss of federal funds and targeting them with lawsuits. On May 29, 2025, DHS targeted Chelsea on the Designation List, condemning it as a "jurisdiction[] that obstruct[s] the enforcement of Federal immigration laws," although Chelsea was not on a later list issued by DOJ.

47. The Administration has initiated numerous Immigration and Customs Enforcement ("ICE") raids in Chelsea. These widely published raids have caused Chelsea's residents to live in

a state of fear and chaos while their neighbors are rounded up with little to no notice or process. These have included "collateral" arrests for which there is no suggestion or indication that the arrested individuals, who might be a roommate or might just happen to be in the wrong place at the wrong time, pose any threat to "national security" or "public safety," the primary purported rationales of the executive actions at issue.

48.    On Wednesday, January 22, 2025, a Fox News correspondent joined in a "ride-along" with ICE agents during one such raid.  In the resulting news segment, the ICE agents were shown gathered outside of the popular Market Basket supermarket in Chelsea and subsequently made a number of arrests in the vicinity.  Chelsea Police are not alleged to have interfered in any such ICE conduct.  Such arrests included a "collateral" arrest of a roommate of a "main target," confirming the broadened focus of federal immigration enforcement efforts despite the false rhetoric of targeting only threats to national security or public safety.

49.    On March 18, 2025, there was another ICE raid in Chelsea.  According to a news report, federal agents were "seen at staging areas outside the Market Basket, Chelsea City Hall, and a third location" and at least ten individuals were detained.  A local immigrant support organization closed its offices in response to the raid to prevent its visitors from being targeted by ICE agents.  Again, neither Chelsea nor its police interfered with such raids.

50.    Federal agents have continued to target Chelsea residents, similarly without interference from Chelsea or its police.  On Sunday, May 11, 2025 (Mother's Day), federal agents broke a car's window and dragged a man outside after he had gone to church with his family. Several minors have also been detained by ICE.  These efforts have caused school enrollments to drop steeply, as reported by the Boston Globe in late September 2025.  And beyond the raids, a

severe chill and climate of fear has been cast over Chelsea, preventing certain individuals from going to work, school, church, the supermarket, or other places where they regularly must go.

**B.    The City of Somerville**

51.    The City of Somerville, Massachusetts is located directly south of the Mystic River and is nestled among the cities and towns of Boston, Cambridge, Arlington, Medford, and Everett. Somerville was first settled as part of Boston's Charlestown in 1630. Somerville later separated from Charlestown and became its own town in 1842. It incorporated as a city in 1872. The City of Somerville presently employs approximately 2,200 individuals.

52.    Somerville occupies a land area of just 4.1 square miles. According to the U.S. Census, Somerville's population, as estimated in July 2023, numbers 80,407 residents. Somerville is the most densely populated city in Massachusetts. Approximately 25% of Somerville's residents are foreign-born persons and approximately 10% live below the poverty line.

53.    Somerville was named the "best-run city in Massachusetts" by the Boston Globe in 2006. Somerville has been awarded the All-America City Award by the National Civic League three times, including most recently in 2015. In 2020, Somerville's police officers were awarded the Medal of Valor by the Massachusetts Police Association for acts of heroism during an August 6, 2020 situation in which Somerville Police Officers saved the life of a woman who was being held hostage at gunpoint in Somerville.

54.    Somerville has a diverse population, with U.S. Census data showing that roughly 30% of its population comprises residents who are Black, Hispanic or Latino, Asian, or Two or More Races, among other diverse groups. English is not the first language of more than 50% of students in the Somerville Public School system, and almost 25% of students in the Somerville Public School system are still learning English. A healthy number of Somerville's main street businesses that both serve the community and support the local economy are immigrant-owned.

17

55.    Somerville has received, receives, and/or anticipates receiving federal funds from a broad range of federal agencies, including DOT, DOJ, DHS, and HUD.  In FY2024, Somerville had a total budget of approximately $337 million and received approximately $19.4 million in federal funds.  Approximately $11.5 million of that federal funding was passed through the state.  Virtually all of this funding was reimbursement-based.

56.    In FY2025, Somerville has an annual total budget of $365 million.  As of now, Somerville has received approximately $14 million in federal funds for FY2025, of which approximately $10.8 million was passed through the state.  Additionally, Somerville is eligible to receive approximately $21 million in reimbursements on active and open federal grants across multiple fiscal years.

57.    Somerville also participates in congressionally directed spending projects.  From FY2022 to FY2024, the city applied and/or contracted for approximately $14.7 million in federal funding.  For several applications, amounting to approximately $5 million, the contracts have been executed and the funds are to be reimbursed.  For another application for $2.5 million, the contract is in development.

58.    Like Chelsea, Somerville has historically received funds from the Bulletproof Vest Partnership program administered by DOJ's Office of Justice Programs, which it depends upon for officer safety and the safety of their communities.

59.    As another example of a recent, significant grant that is now threatened by the Executive Orders and the Administration's actions, Somerville was awarded $3,984,000 for FY2023 from DOT's SS4A program, in addition to the approximately $117,000 it received for FY2022, in order to improve roadway safety for pedestrians and bicyclists.  Planned actions under

both of these grants had effectively stalled as a result of the actions of the new Administration until an injunction was issued against DOT by the U.S. District Court for the District of Rhode Island.

60.     Finally, Somerville has been awarded $48,000 from FEMA's FY2022 Assistance to Firefighters Grant (AFG) program and $618,182 from FEMA's FY2024 AFG Program.  The city received a total of approximately $1 million in UASI awards in 2023 and 2024.

61.     The federal funds Somerville receives support a variety of community and public safety services.  For example, Somerville's homelessness prevention agencies depend on Emergency Solutions Grant ("ESG") funding and other CDBG public service awards for their shelter operations, food pantry operations, and other core programs.  These programs provide critical support for residents who may otherwise have no way to escape life-threatening, cold-weather conditions, sometimes forcing them to battle single-digit temperatures, to receive emergency medical care, or to feed themselves.

62.     Somerville passed a $380 million FY2026 budget in June 2025 amid the complete uncertainty that the Administration has created around federal funding, and is now in the early stages of planning for FY2027.  With daily upheavals and reversals coming from the Administration, Somerville was unable to make informed decisions and is still unable to do so for the upcoming fiscal year.

63.     Somerville first identified as a sanctuary city in a 1987 resolution, which it revised in 1989.  In 2014, pre-dating the first Trump Administration, Somerville passed a Trust Act Ordinance to "ensure that all immigrants are able to fully participate in the civic and economic life of their neighborhoods and nurture and grow the spirit of unity in [its] City."  Two years later, in 2016, Somerville issued a "Reaffirmation of Sanctuary City Resolution."  It provides that "the Somerville Board of Aldermen goes on record reaffirming our commitment as a Sanctuary/Trust

Act City." And in 2019, Somerville passed a "Welcoming Community Ordinance" that "further codifies existing policy and serves to reinforce the city's ongoing commitment to the immigrant community and Sanctuary City status." The ordinance provides, "The Somerville Police Department shall not take part in or assist with federal immigration enforcement operations," but makes clear, "Nothing in this ordinance shall be construed to violate any valid federal law."

64. In 2022, the Somerville Police Department ("Somerville Police" or "SPD") promulgated General Order 143 entitled "Enforcement of Federal Immigration Law" (the "Somerville Police Policy"), which was further revised in 2024 and most recently on March 19, 2025. Similar to the Chelsea Police Policy, the Somerville Police Policy's purpose is: to encourage "all community members and stakeholders … to seek and obtain police assistance and police protection regardless of their specific immigration status without fear of status checks." The Somerville Police Policy notes that the police department "relies upon the cooperation of all persons located in the City of Somerville to achieve important goals such as protecting life and property, investigating and preventing crime, and resolving community problems." Particularly in instances of domestic violence and sexual assault, "[i]t is essential that these victims do not feel apprehensive about coming forward with knowledge to aid investigators…." The policy goes on to state that "[t]he specific immigration status of an individual or group of individuals shall not be a matter of concern" for the Somerville Police "unless reliable and credible information about a potential threat to public safety and/or national security exists."

65. Accordingly, the policy states that SPD "shall not undertake immigration-related investigations and shall not inquire into the specific immigration status of any person(s) encountered during normal police operations." Moreover, the Somerville Police Policy states, "No officer or employee of the Somerville Police Department may participate in an operation led by a

federal agency to detain persons for deportation purposes, except in response to a request to assist with support services deemed necessary to ensure officer safety or to prevent a breach of the peace during a federal operation." It goes on, "Somerville Police Officers WILL NOT have a direct role in an operation initiated by federal authorities to arrest or detain an individual sought for an immigration violation."

66.    The Somerville Police Policy also references the SJC's *Lunn* decision and notes that "consistent with Massachusetts law, no officer or employee of the Somerville Police Department may arrest or detain an individual solely based on an ICE detainer or ICE administrative warrant."

67.    More recently, in late November 2024, Somerville approved a resolution, titled "Reaffirming Somerville's Commitment as a Welcoming Community for Justice, Equity, and Inclusion," which resolved, *inter alia*, that "regardless of external pressures or challenges faced by sanctuary cities, the Somerville City Council remains committed to its values of inclusion, equity, and justice, and will not waver in supporting our immigrant neighbors, who are integral to the strength and diversity of our community."

68.    The City of Somerville is dedicated to maintaining its vibrant and diverse community, a goal that cannot be accomplished without supporting all of its residents. Somerville's policies strive to increase trust within the community such that residents feel safer reporting crimes, coming forward as victims of crimes, and sharing information as witnesses of crimes. The city's policies also enable residents to feel safe when they access city and school services.

69.    Somerville's diligent efforts to create a safe and inclusive community have benefited its residents. In Somerville's "Public Safety for All Survey," launched in September

21

2022, the city asked residents "about their perceptions of public safety, how it could be improved, and where it must be improved." The survey provided clear evidence that residents feel both safe in their communities and respected by local police officers.

70.     Somerville has stated that it will continue to support its community and *all* of its residents. As Mayor Katjana Ballantyne stated in her State of the City Address, "We are resilient, creative, and determined. Somerville welcomes all."

71.     Nothing in Somerville's resolutions/ordinances or in the Somerville Police Policy "seek[s] to interfere with the lawful exercise of Federal law enforcement operations" or "refuse[s] to comply with 8 U.S.C. § 1373." Nor do Somerville's resolutions and policies "obstruct the enforcement of Federal immigration laws" or "seek to shield illegal aliens from deportation." In fact, the resolutions and policies make clear that Somerville allows the efforts of federal immigration enforcement officers to occur unimpeded, and they reflect no attempt to conceal, harbor, or shield from detection any individual. Somerville should therefore not be considered a "sanctuary jurisdiction" under the definitions of the Executive Orders or Agency Directives. But again, such facts have not stopped the Administration from labeling jurisdictions with policies like Somerville's as "sanctuary jurisdictions," publicly castigating and threatening them with loss of federal funds, and targeting them with lawsuits. On May 29, 2025, DHS targeted Somerville on its Designation List for federal defunding and enforcement measures, although Somerville was not named on a subsequent list issued by DOJ.

72.     ICE raids have notably occurred in Somerville as well, without interference from Somerville or its police. As highly publicized by various news media, including internationally, a Tufts University graduate student, Rümeysa Öztürk, was taken into custody in Somerville on March 25, 2025, when plainclothes immigration enforcement officers suddenly surrounded her on

a public street, as captured on video. The widely shared video placed Somerville at the epicenter of the Administration's aggressive efforts to enforce its immigration initiatives, including against a graduate student whose only "transgression" appears to be that she was co-author of an editorial, the politics of which the Administration disagreed with, in her student newspaper. Like Chelsea, beyond the raids experienced, a severe chill and climate of fear has been cast over Somerville (particularly in light of that highly publicized arrest), discouraging individuals and families from going to work, school, church, the supermarket, or other places where they regularly must go.

C.    **Round One: The First Trump Administration's Unconstitutional and Unlawful Assault on Sanctuary Cities**

73.    At the start of his first term in January 2017, Defendant Trump issued Executive Order ("EO") 13,768, titled "Enhancing Public Safety in the Interior of the United States." This executive order targeted what it called "sanctuary jurisdictions," *i.e.*, jurisdictions that "willfully refuse" to comply with 8 U.S.C. § 1373, a statute concerning the sharing of the immigration statuses of individuals with the Immigration and Naturalization Service (now ICE). EO 13,768 threatened to revoke federal grant funding from those sanctuary jurisdictions and separately to take enforcement action against those jurisdictions. DOJ subsequently conditioned the receipt of certain federal funds on compliance with 8 U.S.C. § 1373.

74.    Shortly thereafter, in light of the many Constitutional deficiencies—including violations of the Separation of Powers, the Spending Clause, the Fifth Amendment, and the Tenth Amendment—that were evident on the face of EO 13,768 and the DOJ conditions, numerous district courts preliminarily enjoined the actions. These rulings were later affirmed by the vast majority of the Circuit courts to address the EO and DOJ conditions, including the First, Third, Seventh, and Ninth Circuits. While certain petitions for writs of certiorari were pending before the U.S. Supreme Court, President Biden began his term, having defeated Defendant Trump in the

2020 Presidential election. On his first day in office, January 20, 2021, President Biden issued Executive Order 13,993, titled "Revision of Civil Immigration Enforcement Policies and Priorities," revoking Defendant Trump's EO 13,768 concerning sanctuary jurisdictions. Given the executive action, the parties to the pending *certiorari* petitions, which included DOJ, thereafter filed joint stipulations to dismiss those cases in March 2021.

**D.    Round Two: New Unconstitutional Executive Orders and Agency Directives Are Issued by the Second Trump Administration and Plaintiffs Suffer Immediate Harm**

**1.    The First New Executive Order Targets Sanctuary Jurisdictions**

75.    Defendant Trump wasted no time in launching a renewed attack on sanctuary cities after his reelection in 2024 and subsequent inauguration in 2025. On the first day of his second term, January 20, 2025, just hours after his inauguration, Defendant Trump unleashed a slew of executive orders. Among them was EO 14,148, titled "Initial Recissions of Harmful Executive Orders and Actions," which rescinded a number of Biden-era executive orders, including Biden's EO 13,993 that had itself rescinded Defendant Trump's original EO regarding sanctuary jurisdictions (EO 13,768).

76.    That same day, Defendant Trump issued Executive Order 14,159, titled "Protecting the American People Against Invasion" (the "Day One Executive Order"). Starting from the demonstrably false premise that "[m]any" undocumented individuals are "committing vile and heinous acts against innocent Americans," and spewing other vitriol about "illegal aliens," the Day One Executive Order states its aim of achieving "the total and efficient enforcement" of immigration laws. Among the methods the Day One Executive Order states it will use to achieve this goal is to bring sanctuary cities to heel and to force them to assist in Defendants' efforts. Section 17 of the Day One Executive Order, titled "Sanctuary Jurisdictions," provides, in full:

> The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake

> any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

77.     The intent and force of the Day One Executive Order is clear: to deprive local jurisdictions of their constitutionally protected decision-making authority and to unlawfully compel them to carry out federal immigration enforcement.  It does so by "ensur[ing]" that sanctuary jurisdictions "do not receive access to Federal funds" and by threatening criminal and civil actions against them.  The Day One Executive Order delegates executive authority to the Attorney General and the Secretary of Homeland Security to carry out its provisions.

### 2.     DOJ Implements the Day One Executive Order: Conditioning Grants and Threatening Prosecution—and DOT Joins In

78.     The Administration acted swiftly to implement the Day One Executive Order.  The very next day, on January 21, 2025, Acting Deputy Attorney General Emil Bove published a memorandum to all DOJ employees, making clear how broadly—and illegally—the Day One Executive Order is intended to extend (the "Bove Memo," attached as Exhibit L).  Starting from the same faulty legal premise that resulted in court orders against the first Trump Administration, the Bove Memo takes direct aim at sanctuary cities: "The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives."  In fact, the Supremacy Clause requires no such thing.

79.     The Bove Memo goes on to state, in terms both excessively broad and unconstitutionally vague, that "Federal law prohibits states and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests."  The overbreadth of this statement is stunning.  While federal law may prohibit local

actors from *obstructing* the enforcement of federal immigration law—which Plaintiffs do not do and have never done—the Bove Memo claims that local actors also violate federal law if they fail to comply with "immigration-related commands and requests." No such law exists.

80.   The Bove Memo provides that DOJ "shall investigate incidents involving any such misconduct for potential prosecution," and expressly lists three statutes: 18 U.S.C. § 371 ("Conspiracy to Commit Offense or to Defraud United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service"). The memo notes that "the Department of Justice will take all steps necessary to protect the public." The Bove Memo also indicates that DOJ's Civil Division will work with the "newly established Sanctuary Cities Enforcement Working Group" "to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws." Later news reports indicated that the members of that working group all departed the group by the end of August 2025, leaving it with no members.

81.   On January 23, 2025, then-acting DHS Secretary Benjamine Huffman, issued an order titled "Finding of Mass Influx of Aliens." In that order, Huffman "request[ed] the assistance of State and local governments in all 50 states" in administering federal immigration law. Although this order is framed as a "request," the Bove Memo mandates compliance with requests from the Executive Branch.

82.   The Bove Memo was quickly followed by Defendant Trump's highly publicized "funding freeze" on all federal grants and loans, accomplished via a memo issued by the White House's Office of Management and Budget ("OMB") on January 27, 2025. As the very first example of executive actions that "safeguard valuable taxpayer resources," the OMB memo lists

the Day One Executive Order concerning sanctuary jurisdictions, highlighting the Administration's crystal-clear intention to prevent sanctuary jurisdictions from accessing federal funds.

83.     While a federal court swiftly stopped the funding freeze, and OMB rescinded its call for a funding freeze only two days later, the Administration has since stated that only the original memo calling for the blanket freeze had been rescinded, not its overall effort to use the termination of federal funding as means to force local governments to assist with the Executive Branch's policy goals.

84.     The Administration again repeated its threats to withdraw federal funds in a January 29, 2025 order issued by Defendant Trump's new DOT secretary, Sean Duffy, who stated that for "all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts," it would now be DOT policy to de-"prioritize" such funding for sanctuary jurisdictions by prioritizing "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." In a world of limited resources, as is the case with local governments trying to secure DOT funding, de-prioritization is tantamount to withholding funding.  Further, the DOT Order would oddly "give preference to communities with marriage and birth rates higher than the national average."  Neither provision on its face bears any relationship whatsoever to the responsibilities of DOT.

85.     The relentless assault on sanctuary cities, using federal funding as a weapon to compel compliance, continued apace.  On February 5, 2025, the new U.S. Attorney General, Defendant Pamela Bondi, was confirmed by the U.S. Senate.  On her first day in office, Defendant Bondi signed a memo that took direct aim at sanctuary cities.  Titled "SANCTUARY JURISDICTION DIRECTIVES," the memo unequivocally stated that "[s]anctuary jurisdictions

should not receive access to federal grants administered by the Department of Justice." It further defined "sanctuary jurisdiction" to include "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws," without specifying which "other" laws it was contemplating. Section 1373(a) provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Under these sanctuary jurisdiction directives, the Bondi Memo provided that "the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures."

86.    The Bondi Memo's language is consistent with the directive in the Day One Executive Order to withhold federal funds from "so called 'sanctuary' jurisdictions" and reveals DOJ's intention to broadly condition all DOJ funding on compliance with "applicable federal immigration laws." It additionally stated that future grants would be "tailor[ed]" to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration."

87.    The Bondi Memo also reiterated DOJ's earlier threat to prosecute sanctuary cities. It called for prosecuting violations of the same three statutes referenced in the Bove Memo—18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373—and notably expanded the scope of investigations to include any incident in which there is an "effort to obstruct" an "immigration-related directive from the Executive Branch." In that same vein, and on the same day, Defendant Bondi issued another memo to all DOJ employees that called for the prosecution of "state and local actors" if

they resist, obstruct, or "otherwise fail[] to comply with lawful immigration-related commands and requests."

3.     **DOJ Follows Through on Its Threats of Enforcement: Illinois, Chicago, New York, Rochester, Colorado, Newark, Jersey City, Paterson, and Hoboken Become the First Targets**

88.     To substantiate its threats and attempt to stifle dissent, DOJ moved quickly to initiate enforcement.  On February 6, 2025, DOJ filed a civil complaint against the State of Illinois and the City of Chicago, among other defendants, in *United States v. Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1.  The Illinois complaint demonstrates just how broadly and unlawfully Defendants are asserting their power under the Supremacy Clause, claiming that local jurisdictions violate the Constitution if they prohibit: detaining an individual on the basis of a detainer or civil immigration warrant, *see id.* ¶ 8; providing information such as custodial status and release date about noncitizens in their custody, *see id.* ¶ 9; assisting with immigration enforcement activities, *see id.* ¶ 43; or inquiring about an individual's citizenship or immigration status, *see id.* ¶ 44.  This lawsuit was subsequently dismissed in July 2025, which dismissal DOJ has appealed to the Seventh Circuit.

89.     Less than a week after filing the above suit, DOJ filed a second lawsuit, this time challenging one of New York's laws.  On February 12, 2025, DOJ filed a civil complaint against the State of New York and various local representatives, in *United States v. New York, et al.*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025), ECF No. 1.  Similar to the Illinois complaint, the New York complaint broadly asserts power under the Supremacy Clause, claiming that New York's "Green Light Law" violates the Constitution by: prohibiting the New York DMV from sharing DMV "records or information" with immigration officials in the absence of a court order or warrant, *see id.* ¶ 30; informing individuals whose information has been requested by immigration

officials of the request, *see id.* ¶ 32; and imposing limitations on those who have access to or receive such "records or information," *see id.* ¶ 33.

90.    The New York lawsuit was not the last of DOJ's enforcement actions.  When Defendant Bondi announced the lawsuit, she proclaimed: "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one.  Strike two is New York.  And if you are a state not complying with federal law, you're next.  Get ready."

91.    Following through on these threats, DOJ filed at least three more lawsuits: *United States v. Rochester, et al.*, No. 6:25-cv-06226 (W.D.N.Y. Apr. 24, 2025), *United States v. Colorado, et al.*, No. 1:25-cv-01391-KAS (D. Colo. May 2, 2025), and *United States v. Newark, et al.*, No. 2:25-cv-05081 (D.N.J. May 22, 2025).  Similar to DOJ's earlier lawsuits, the federal government is taking direct aim at cities' and states' sanctuary city laws and policies.

**4.    The Attack Continues: A Second Executive Order Is Signed and Other Agencies Join In**

92.    Defendant Trump issued another executive order on February 19, 2025, titled "Ending Taxpayer Subsidization of Open Borders," in which he ordered, under Section 2(a)(ii), that "the head of each executive department or agency (agency) shall . . . ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

93.    On the same day the Subsidization Executive Order was issued, DHS Secretary Kristi Noem issued a memo titled "Restricting Grant Funding for Sanctuary Jurisdictions."  The Noem Memo directs "[a]ll [DHS] components . . . to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions," and directs that "[t]o the extent consistent with relevant legal authorities and the applicable terms and

conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions." Further, the Noem Memo calls for "criminal referrals" to DOJ. Each agency component was directed to provide a report of "actions taken to comply" with the memo "[w]ithin 30 days."

94. On March 20, 2025, in response to the Noem Memo, the Federal Emergency Management Agency ("FEMA") released its own Memo, titled "Approval of FEMA-Administered Grant Disbursements." The FEMA Memo states as its purpose: "To seek approval on the review process and parameters of grant programs administered by [FEMA] to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions." To further that purpose, the FEMA Memo "recommends applying conditions or restrictions on FEMA administered non-disaster preparedness grant programs that go to a sanctuary jurisdiction . . . (a) where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or, (b) where [the] statute does not limit how FEMA implements the program." The FEMA Memo indicates that such "conditions or restrictions" should be "placed on all <u>open</u> and <u>future</u> awards" for applicable programs. The FEMA Memo specifically recommends that conditions be placed on Urban Area Security Initiative ("UASI") grants, among other grants.

95. On March 17, 2025, DOT revised the Terms and Conditions of its FY2023 SS4A Grant Program. The revised SS4A Conditions now include the following language: "Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." Notably, these conditions go beyond a simple mandate not to interfere, instead requiring

affirmative cooperation with federal immigration enforcement (with no limitation with respect to civil matters), in order to receive critical funds.

96.    On April 4, 2025, HUD Secretary, Scott Turner, joined in on the attack, issuing the HUD Letter.  The HUD Letter indicates that Defendant Turner "directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's [Subsidization] Executive Order."  Later that same month, HUD issued a document entitled "General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs."  The document stated that "No state or unit of general local government that receives HUD funding under [sic] may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation."  It cited EO 14,218 as the source of authority for this new requirement.  Id.

97.    On April 18, 2025, DHS issued version three of its general terms and conditions for the agency's FY2025 grants.  At least two conditions outlined in the DHS Conditions are pertinent to the present action.  Under Section C.IX, titled, "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," grant recipients must agree to: "comply with the requirements of 8 U.S.C. §§ 1373 and 1644"; "comply with other relevant laws related to immigration"; "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer"; "provide access to detainees"; and "not [to] leak or otherwise publicize the existence of an immigration enforcement operation."  Recipients must certify compliance with the aforementioned terms and agree "that [they] will require any subrecipients or contractors to certify in the same manner that they will comply" with the terms before receiving any funding under the grant.  Under

C.XXXI, titled, "Presidential Executive Orders," grant recipients "must comply with the requirements of Presidential Executive Orders related to grants."

98.     On April 24, 2025, Defendant Duffy sent the DOT Letter to all recipients of DOT funding, including Plaintiffs.  The DOT Letter furthers the agency's efforts to deny federal funds to sanctuary jurisdictions.  In that letter, Defendant Duffy wrote, "It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations."  Those legal obligations purportedly "require cooperation generally with Federal authorities . . . including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  The letter cites to "reported instances" in which recipients of DOT funds have "declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement."  The DOT Letter cements the agency's policy that continued receipt of DOT funds is tied to cooperation with federal immigration authorities: "Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

99.     On the same day, in a case similar to the present litigation, the U.S. District Court for the Northern District of California granted a preliminary injunction to prevent the federal government "from directly or indirectly taking any action to withhold, freeze, or condition federal funds" from various plaintiffs, based on the first sentence of Section 17 of the Day One Executive Order, Section 2(a)(ii) of the Subsidization Executive Order, and portions of the Bondi Memo,

Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Apr. 24, 2025), ECF No. 111, following up with a more detailed order a few days later, *see* Further Order Granting Prelim. Inj., *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO (N.D. Cal. May 3, 2025), ECF No. 126 at 65.

100.    On May 13, 2025, DOT notified Somerville of the revised SS4A Conditions in connection with its nearly $4 million FY2023 SS4A grant.  This notice, provided in conjunction with a finalized contract ready for execution, informed the city that the new conditions must be agreed to or the project could not move forward.  *See* Notice to Somerville Regarding Revised SS4A Conditions (attached as Exhibit M).  Nothing in the notice to Somerville explained how the SS4A grant was tied in any way to immigration.  The DOT conditions were subsequently enjoined by the District Court of Rhode Island.

### 5.    The Administration Continues Its Crusade Against Sanctuary Cities: A Third Executive Order

101.    Despite the ruling against the Administration in the Northern District of California, Defendant Trump continued the attack unabated, issuing yet another executive order targeting sanctuary cities on April 28, 2025.

102.    In the Designation Executive Order, Defendant Trump orders the Attorney General, along with the Secretary of DHS, in Section 2(a), to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" within 30 days.  Section 2(b) of the Designation Executive Order declares that the Attorney General and Secretary of DHS "shall notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement."  Section 3 goes on to explain the "Consequences for Sanctuary Jurisdiction Status."  All jurisdictions identified in Section 2(a) shall face "suspension or termination" of federal funds identified by the OMB director.  Additionally, any jurisdictions that

"remain sanctuary jurisdictions" after being provided notice under Section 2(b) shall face "necessary legal remedies and enforcement measures" from the Attorney General and Secretary of DHS.  The Administration made the goal of the Designation Executive Order crystal clear when it released a related fact sheet on the White House website that included a social media post from Defendant Trump's Truth Social account: "No more Sanctuary Cities!  They protect the Criminals, not the Victims.  They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"  The fact sheet further indicated that "Trump [was] following through on his promise to rid the United States of sanctuary cities" (the "Designation Fact Sheet," attached as Exhibit N).

### 6.    The Message Is Clear: The Administration Seeks to Crush Sanctuary Jurisdictions

103.    Defendant Trump, as well as executive officers and individuals in his orbit, have made various public statements that align with the Administration's intent to destroy sanctuary jurisdictions and their policy choices, both before and after Defendant Trump began his second term:

  a.  On September 21, 2024, Defendant Trump promised in a speech in North Carolina, "As soon as I take office, we will immediately surge federal law enforcement to every city that is failing . . . I will ask Congress to pass a law outlawing sanctuary cities nationwide, and we demand the full weight of the federal government on any jurisdiction that refuses to cooperate with ICE."

  b.  After Defendant Trump's reelection, on November 20, 2024, Tom Homan, Defendant Trump's "border czar," expressly threatened sanctuary cities during an appearance on television, stating that "they need to get the hell out of the way cuz we're comin', we're gonna do it."

  c.  On January 22, 2025, Defendant Trump was interviewed by Sean Hannity of Fox News, who asked about "sanctuary cities" and referenced the "federal funds" they receive.  Defendant Trump, in response, stated, "Yes, we're trying to get rid of them, and we're trying to end them," referring either to the federal funds or to the sanctuary cities themselves (or both).  When specifically asked by Hannity, "But

would you cut off their money?" Defendant Trump confirmed that he might well "have to do that" because "sometimes that's the only thing you can do."

    d.   On January 31, 2025, Defendant Noem, the newly confirmed Secretary of DHS, appeared on Fox News and said in response to a question about whether the Administration would impose consequences on sanctuary cities, "Of course we will." Continuing, she stated, "The reality is, these sanctuary cities, their laws have caused us problems. They are limiting some of our tools that we want in our toolbox, but we're going to continue to go in and use our operations."

    e.   On February 3, 2025, Tom Homan reiterated his threats against sanctuary cities and seemingly claimed to control the courts, stating: "We're going to sue 'em . . . Look, we've got the Supreme Court; that's what President Trump wanted to do. He will end sanctuary cities."

104.    And since this lawsuit was originally filed in late February, the Administration has continued to broadcast its intention, to attack, and in some cases, eliminate, sanctuary cities:

    a.   On March 5, 2025, Defendant Trump reprised his blatant attack on sanctuary cities, stating: "We are going to end sanctuary cities for some of these jurisdictions that aren't cooperating with law enforcement . . . They are guarding criminals, they are taking the rights away from the citizens of this state and this city and we are going to be ending sanctuary cities if we find it necessary to do in certain major areas and we may just end the entire thing all together because it is just a way of protecting criminals."

    b.   On April 10, 2025, Defendant Trump posted the following to his Truth Social account: "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"

**7.    DHS Names Plaintiffs Chelsea and Somerville as Targets and Orders Them to Change Their Policies; Neither Plaintiff Appears on a Subsequent List Issued by DOJ**

105.    On May 29, 2025, pursuant to the Designation Executive Order, DHS released the Designation List. The Designation List began by parroting the definition of "sanctuary jurisdictions" provided by the Designation Executive Order, as "states and local jurisdictions that obstruct the enforcement of federal immigration laws." It further explained that the list was "created to identify sanctuary jurisdictions, which are determined by factors like compliance with

federal law enforcement, information restrictions, and legal protections for illegal aliens." Beyond the identification of jurisdictions, the Designation List included the following command: "DHS demands that these jurisdictions immediately review and revise their policies to align with Federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens."

106.    Included on the Designation List were Plaintiffs Chelsea and Somerville, as well as hundreds of other jurisdictions, including those jurisdictions currently being sued by DOJ for their purported sanctuary policies.[1]

107.    A subsequent list of "sanctuary jurisdictions" issued by DOJ did not include Plaintiffs.

108.    Individually and cumulatively, these actions by Defendants amount to a concerted effort to intimidate and attack Plaintiffs (and others like them) to override their locally determined policies and priorities, to force them to bend to the will of the federal government, and to assist with Defendants' mass deportation plans—all in derogation of Plaintiffs' rights.

**8.    The Administration's Attack Shows No Sign of Stopping**

109.    Since the filing of the first amended complaint in this litigation, DOJ has continued to file lawsuits against similarly situated jurisdictions: *United States v. City of Los Angeles, et al.*, No. 2:25-cv-05917 (C.D. Cal. June 30, 2025), *United States v. City of New York, et al.*, No. 1:25-cv-04084 (E.D.N.Y. July 24, 2025), *United States v. City of Boston, et al.*, No. 1:25-cv-12456 (D. Mass. Sep. 4, 2025), and *United States v. Minnesota, et al.*, No. 0:25-cv-03798 (D. Minn. Sep. 29, 2025).

---

[1] Although the Designation List has since been removed from the DHS website, a few days after its removal, Defendant Noem confirmed that the list "is absolutely continuing to be used." Despite opportunities to do so, Defendants have not repudiated the Designation List.

110.    On September 23, 2025, HUD notified Somerville that in order to receive its allocation of CDBG, HOME, and ESG funds (formula grants administered through HUD), it must sign grant agreements—one for each program—that state in addenda the following key HUD Immigration Conditions: "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations."  Based on the formulas by which these programs are funded, Somerville is due to receive in excess of $3.2 million for the three HUD programs combined this fiscal year. Somerville plans to use that significant allocation to fund a range of services and activities to benefit its low- and moderate-income residents, including affordable housing, public infrastructure, and homelessness prevention services.

### 9.    Plaintiffs Are Harmed by the Executive Branch's Unlawful and Unconstitutional Assault

111.    As a direct result of these unlawful Executive Branch actions, Plaintiffs have been harmed and will continue to be harmed absent relief from the Court.

112.    Plaintiffs rely on various sources of federal funding—in the range of tens of millions of dollars—to fill critical budgetary needs in the management of their respective cities. Plaintiffs face the very real and imminent termination of federal funding, which will immediately result in a slew of harms to Plaintiffs:

    a.    Many of the federal grant funds that Plaintiffs receive are reimbursement-based, which means that Plaintiffs are immediately in the red if no federal grant monies are forthcoming, and face a "fiscal cliff";

    b.    Plaintiffs are grossly impeded in their abilities to spend funds for their communities in light of both the actual and imminent termination of access to federal funding;

    c.      Plaintiffs face breaches of a number of existing contracts that they entered into in reliance on approved federal grant monies, such as construction-related contracts;

    d.      Plaintiffs face the termination of critical services they provide to their respective communities in connection with those federal grant monies; and

    e.      Plaintiffs further face the termination of significant numbers of staff on their respective payrolls.

113.    For example, Plaintiffs receive and rely on certain critical DOT grants to improve infrastructure and safety in their communities.  These DOT grants are in turn tied to express contracts with general contractors and subcontractors.  If Plaintiffs have the rug of federal funding pulled out from underneath them—as the Administration has promised it will do—Plaintiffs will be forced to breach those existing contracts and subject themselves to suits for breach of contract and related claims.

114.    Somerville was awarded nearly $4 million from DOT's Safe Streets and Roads for All, or SS4A, program for FY2023 in order to improve roadway safety for bicyclists and pedestrians, in addition to a roughly $117,000 grant they received for FY2022.  Chelsea was similarly awarded a significant grant from that same SS4A program for the purpose of bringing traffic fatalities to zero in their Vision Zero plan, in the amount of $280,000 for FY2023.  The SS4A Conditions have been imposed for FY2023 funds by DOT, threatening these funds and endangering the lives of motorists, bicyclists, and pedestrians.

115.    Plaintiffs Chelsea and Somerville have similarly received millions in various DHS grants over the past five years; each city still actively draws down from these grants.  When these grants are withdrawn by DHS, Plaintiffs will lose access to important public safety equipment, including anti-terrorism measures and tactical vans.

116.    Plaintiffs additionally receive and rely on DOJ grants to help fund their police departments and promote public safety in their communities.  Chelsea regularly receives funds

from DOJ's Byrne JAG program as well as its BVP program administered through DOJ's OJP. Somerville has also historically received funding through the Byrne JAG and BVP programs. All of these funds support Plaintiffs' goal of maintaining safe communities by supporting their police departments.

117.    Plaintiffs also receive and rely on HUD grants to help fund housing and community development activities. Chelsea receives significant funds in CDBG grants, which support critical programs and services, including housing rehabilitation, economic development, public facilities and infrastructure, and social services such as retention of youth in schools and food delivery to elderly residents. Somerville receives funds through the CDBG, HOME, and ESG grant programs. These funds help support critical programs, such as new housing construction for low-income households, homelessness prevention, revitalizing struggling business districts, family stabilization and job readiness for Somerville's neediest residents, and temporary shelter for homeless individuals and families. The HUD Immigration Conditions now directly threaten these funds.

118.    An illustration of the critical services that Plaintiffs would be forced to terminate— for lack of federal grant funding—are initiatives combating homelessness in their communities through, *inter alia*, prevention, rapid re-housing, and emergency shelters. This is especially critical for Plaintiffs in light of the brutally cold winters in the greater Boston area. If Plaintiffs are forced to terminate those critical services, people living in their communities will suffer as a result, with life-threatening consequences. Like with the ramifications surrounding the DOT funds, Plaintiffs can envision no example of greater concretized harm than this.

119.    If all federal funds are cut off, as the challenged executive actions provide for, Plaintiffs would also need to terminate significant portions of staff on their payrolls (a consistently

accruing expense), and the lack of personnel would immediately damage Plaintiffs' ability to effectively govern and manage their respective cities.

120.    As a result of the extreme uncertainty and the Administration's threats of funding freezes, Plaintiffs have been deprived of their long-standing expectations that federal funding sources will honor their commitments and not impose unconstitutional conditions, which are critical for responsible decision-making and local resource allocation.  Plaintiffs make significant expenditures relating to federal, reimbursement-based grant funding (the bulk of Plaintiffs' federal funding), but there is no longer any guarantee of reimbursement under the slew of unlawful executive actions, which all purport to deprive Plaintiffs and similarly situated jurisdictions of any and all federal funding.

121.    Plaintiffs face a severe squeeze due to the time-limited nature of many of the funds committed to them.  If they spend and are not reimbursed by the federal government, they are harmed.  And, if they refrain from spending out of fear of non-reimbursement and cannot complete certain projects in time, they will forfeit those funds and are still harmed.  No matter what Plaintiffs do, they are injured by the Administration's actions.

122.    The necessary effects of the imminent termination of federal funding fly in the very face of the Administration's stated rationale of "enhancing public safety" and would in fact fundamentally impair Plaintiffs' abilities to protect the public safety.  What the Administration is doing is punishing sanctuary cities because of those cities' well-founded local decisions, by vindictively withdrawing and threatening to withdraw funding, even if those funds have nothing to do with the Administration's stated aims and even if Congress has given no directive toward that end.  The Administration cannot legislate, as that is the domain of Congress, and the Executive

Orders and the implementing Agency Directives are blatantly unconstitutional efforts to harm Plaintiffs and their communities.

123.    Plaintiffs seek declaratory and injunctive relief so that their local decision-making will not be stymied by the federal government and so that they may continue their crucial work to support residents' health and safety without the fear of a fiscal cliff or crisis, and without fear of significant layoffs to city personnel who provide critical services.  They seek relief so that they can continue to provide essential services to their communities, including the most vulnerable populations—such as shelter for homeless families, or redesigned roadways so that schoolchildren can safely get to school—instead of having to cut such services and projects.  They seek relief so that they can continue their important multi-year projects for which they have secured promises of federal funding.  And above all, they seek relief so that they can continue to ensure the public safety of all individuals and families in their communities, regardless of their immigration status. This Court must not allow the challenged Executive Orders and Agency Directives to stand.

## CAUSES OF ACTION

### COUNT ONE
(Separation of Powers)

124.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

125.    The Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives" and grants Congress alone the power to spend for the general welfare of the United States.  U.S. Const. art. I, secs. 1, 8.  These clauses vest Congress with legislative powers and establishes that it is Congress, not the President or any Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds.

126.     When Congress does delegate its spending powers, it must do so clearly and unmistakably, while providing specific guidance as to the conditions the Executive Branch may attach to receipt of federal funds.  A federal agency "has no power to act . . . unless and until Congress confers power upon it."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When the [Executive] takes measures incompatible with the express or implied will of Congress, [its] power is at its lowest ebb."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

127.     As such, the Executive Branch cannot place conditions on funds already allocated by Congress, without Congress's express authorization.  The challenged Executive Orders and Agency Directives violate the Separation of Powers by imposing conditions on funding—which Congress did not authorize—namely that Plaintiffs do not interfere with federal immigration enforcement and that they comply with 8 U.S.C. § 1373 and other unspecified federal immigration laws.

128.     Moreover, the Day One Executive Order authorizes the Attorney General and the Secretary of DHS to impose penalties on states and localities, again without any regard to whether Congress authorized either entity to impose them.  Similarly, the Designation Executive Order instructs the Attorney General and Secretary of DHS to pursue legal remedies and enforcement measures against "sanctuary jurisdictions" that do not bend to the Executive's will.

129.     The Executive Orders and Agency Directives authorize conditions and penalties that Congress did not envision.  They are a blatant attempt by the Executive Branch to usurp the powers of Congress.  As applied to Plaintiffs, this sweeping overreach by the Executive Branch creates uncertainty and deeply disrupts Plaintiffs' ability to budget daily governance needs and implement their law enforcement priorities.

## COUNT TWO
(Spending Clause)

130.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

131.    The Spending Clause provides, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."  U.S. Const. art. I, sec. 8, cl. 1.  This clause vests the spending power in Congress alone, authorizing it to raise and spend money for the "general Welfare" of the United States.

132.    There are four significant limitations on the Spending Power.  First, any conditions imposed must be identified unambiguously.  *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Second, the conditions must not be coercive.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012).  Third, the conditions must be related to the federal interest in the program.  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Fourth, the conditions must not induce unconstitutional actions on the part of the recipient.  *Id.* at 210-11.

133.    Even if Congressional authority for the challenged conditions existed, the Executive Orders and Agency Directives violate the Spending Clause because they do not comply with the limitations placed on the Spending Power:

a.    The conditions imposed by the Executive Orders and Agency Directives are ambiguous, as they fail to specify with clarity which laws Plaintiffs will be required to comply with.  Further, several of the challenged actions do not specify which grants will be conditioned.  The conditions placed on federal grants are also constitutionally infirm because they were not established unambiguously prior to the funds being awarded; as such, Plaintiffs were unable to make knowing, cognizant decisions about whether to apply for and accept the federal grants.  *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 24-25.

b.    The amount of federal funds being threatened—tens of millions of dollars—is unconstitutionally coercive.  The Administration's conduct is particularly harmful

for smaller cities like Plaintiffs, whose residents would be grievously harmed by any termination of federal funding. Plaintiffs rely on various key sources of federal funding to fill critical budgetary needs in the management of their respective cities. In addition, as smaller jurisdictions, their abilities to defend against criminal and civil prosecutions are relatively limited.

c.    There is no connection between the conditions imposed mandating non-interference with federal immigration enforcement (including compliance with 8 U.S.C. § 1373) and the federal funds being threatened (*e.g.*, the DOT funds), as is constitutionally required. *See Dole*, 483 U.S. at 211.

d.    The conditions imposed would also require Plaintiffs to act unconstitutionally by detaining individuals based on civil detainers without a finding of probable cause and in contravention of Massachusetts law.

134.    As applied to Plaintiffs, the conditions placed on federal grants in the Executive Orders and Agency Directives, the threatened loss of federal funds, the lack of nexus between the Executive Branch directives and the federal funds being threatened, and the unconstitutional actions that the conditions induce represent unconstitutional coercion in violation of the Spending Clause.

## COUNT THREE
(Tenth Amendment – Anti-Commandeering)

135.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

136.    The Tenth Amendment of the U.S. Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Accordingly, "[t]he Constitution simply does not give Congress the authority to require the States to regulate," much less give the Executive Branch such authority. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)).  Therefore, the federal government cannot compel state or local governments to enact or enforce a federal regulatory program.  On their face, the Executive

Orders and related Agency Directives violate the Tenth Amendment by attempting to use the spending power to force Plaintiffs into carrying out federal immigration laws and policies.

137.    The Executive Orders and Agency Directives purport to grant executive officers the authority to penalize state and local governments that are deemed to interfere with the enforcement of federal law.  In so doing, they enable the federal government to force state and local governments to adopt policies and practices that support federal policies, to the subordination of their own interests.  For example, the SS4A Conditions require Plaintiffs to cooperate with federal immigration enforcement in order to get DOT funding for safe streets and roads: there is no logical nexus between the two, and this coercive effort by the federal government plainly constitutes commandeering of local governments.

138.    By withholding federal funds and directing enforcement against Plaintiffs unless they comply with federal immigration laws and policies and cooperate with federal immigration enforcement, Defendants are compelling Plaintiffs to enact a federal regulatory program in violation of the anti-commandeering principle of the Tenth Amendment.

### **COUNT FOUR**
(Fifth Amendment – Due Process)

139.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

140.    Under the Fifth Amendment, the federal government may not deprive Plaintiffs of property without "due process of law."

141.    Plaintiffs have a protectable property interest in the federal funding for which they have applied and been approved.  A large portion of the sources of federal funding, including the DOT grants secured by Plaintiffs, are reimbursement-based, which means that Plaintiffs are

spending money in reliance on the promise of federal reimbursement. The retraction of those promises results in direct harm to Plaintiffs.

142.    The Day One Executive Order deprives Plaintiffs of their procedural due process rights because it grants the Attorney General and the Secretary of Homeland Security unbounded discretion to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Further, those executive officials are empowered to "undertake any other lawful actions, criminal or civil, that they deem warranted."

143.    Similarly, the Subsidization Executive Order empowers "the head of each executive department or agency" to "ensure . . . that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." And the Designation Executive Order grants the Attorney General and Secretary of DHS authority to list cities as explicit targets of the Administration, declaring by edict that the Cities are not in compliance with federal law, all without providing a procedure to challenge this designation.

144.    The Agency Directives also have the effect of depriving Plaintiffs of their procedural due process rights as each purports to unilaterally deny Plaintiffs funds from the respective agency. The Bondi Memo declared that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." The Noem Memo similarly writes, "each [DHS] component must cease providing federal funding to sanctuary jurisdictions" and is backed by the DHS Conditions which deny federal awards to any recipient that does not agree to cooperate with federal immigration enforcement. The DOT Order de-prioritizes funding for sanctuary jurisdictions, while the DOT Letter clarifies the Agency's intention to withhold funds from all recipients that do not cooperate with "the enforcement of Federal immigration law." The

SS4A Conditions require affirmative cooperation with federal immigration enforcement to receive funds. The HUD Letter stated the agency's intention to condition grants on compliance with the Subsidization Executive Order and "to ensure that Federal resources are not used to support 'sanctuary' policies . . . that actively prevent federal authorities from deporting illegal aliens." The HUD Immigration Conditions follow through on the letter's promise, requiring such compliance to receive allocated funding.

145.    The Executive Orders and Agency Directives do not provide Plaintiffs or other similarity situated jurisdictions with any path to seek review or to challenge actions taken under their authority. This pre- and post-deprivation opportunity to be heard violates the Fifth Amendment's guarantee of due process.

146.    The Executive Orders and Agency Directives deprive Plaintiffs of their interests through the express conditions these directives place on federal funds. Plaintiffs have been deeply disrupted for months now as a result of their inability to spend further funds for the credible fear of the Administration's imminent pulling of federal funding. Moreover, there was no notice as to this deprivation, and no way to review or challenge the government's decision to withhold this property.

## COUNT FIVE
### (Fifth Amendment – Void for Vagueness)

147.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

148.    Also falling under the Fifth Amendment is the void-for-vagueness doctrine. A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

149.     The Executive Orders and Agency Directives are unconstitutionally vague.   It is impossible for cities to determine if they fit into what the Day One Executive Order terms "so-called 'sanctuary' jurisdictions," whether they are subject to its penalties, or what penalties might be imposed if they are determined to be sanctuary jurisdictions.  The Day One Executive Order purports to define sanctuary jurisdictions as those jurisdictions "which seek to interfere with the lawful exercise of Federal law enforcement operations," but this is no clearer (and is also *not* what Plaintiffs' policies seek to do).  The Day One Executive Order also gives the Attorney General and the Secretary of DHS virtually unfettered discretion to determine whether jurisdictions comply or do not comply with the Day One Executive Order.

150.     Like the Day One Executive Order, the Subsidization Executive Order vaguely references "so-called 'sanctuary' policies" without defining them, except to modify such policies by adding, "that seek to shield illegal aliens from deportation," which is not only vague but also *not* what Plaintiffs' sanctuary policies seek to do.  Similarly, the reference to "by design or effect" is vague because it fails to describe how that effect may come about.  As a result of these sources of vagueness, there is a high risk of arbitrary enforcement against Plaintiffs and other localities.

151.     The Designation Executive Order suffers from similar defects.   It defines "sanctuary jurisdictions" as those jurisdictions that "obstruct the enforcement of Federal immigration laws."  Plaintiffs and similarly situated jurisdictions are provided with no guidance as to what will be considered "obstruct[ion]" of federal immigration enforcement.  Further, the Designation Executive Order grants the Attorney General and the Secretary of DHS complete discretion to decide which jurisdictions belong on the "list" of sanctuary jurisdictions and empowers those agents to "pursue all necessary legal remedies and enforcement measures" against the jurisdictions which "remain in defiance of Federal law."

152.     The Bondi Memo fares no better.  While it identifies 8 U.S.C. § 1373 as a basis for "sanctuary jurisdiction" status, the memo vaguely references "other" federal immigration laws as a basis, without spelling out which laws these are.  As a result, there is a high risk of arbitrary enforcement, as DOJ can self-servingly conjure some violation of federal immigration law (whether true or not), with no notice to Plaintiffs or similarly situated jurisdictions, as a basis for withholding significant funds to which those jurisdictions are already entitled.  Also, while Plaintiffs' position is that they fully comply with 8 U.S.C. § 1373, there is a significant risk of arbitrary enforcement in whether "refus[ing] to comply" accords with DOJ's interpretation of compliance, rather than Plaintiffs' correct interpretation.

153.     The DOT Order similarly states that it will prioritize "projects and goals that . . . require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary."  This sets forth DOT's aim of de-prioritizing sanctuary jurisdictions, but it is vague in referencing compliance/cooperation with immigration enforcement and with "other goals and objectives," to the point that it fails to provide notice to Plaintiffs and others regarding what specific conduct would cause DOT to de-prioritize (*i.e.*, defund) their projects.  The DOT Letter does not provide any clarification, instead noting that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law."  This open-ended mandate does nothing to clarify Plaintiffs' obligations.  While it provides a singular example of non-compliance—"issu[ing] driver's licenses to individuals present in the United States in violation of Federal immigration law"—it makes no attempt to define compliance with the new policy.  The SS4A Conditions suffers from similar defects, requiring recipients to "cooperate" with immigration enforcement without further explanation.

154.     The Noem Memo provides a somewhat more expansive definition of "sanctuary jurisdictions," suggesting various additional ways that a jurisdiction may fall into the category. Similar to the Bondi Memo, the Noem Memo points to 8 U.S.C. § 1373, but DHS, like DOJ, puts forth a clearly erroneous interpretation of what the statute requires, giving rise to a significant risk of arbitrary enforcement.  Further, similar to other Agency Directives challenged by this action, the Noem Memo points to "other relevant laws" without clarifying exactly which laws DHS will look to for identifying "sanctuary jurisdictions."

155.     The DHS Conditions are also unconstitutionally vague because they state that grant recipients must agree to "comply with other relevant laws related to immigration."  Although the DHS Conditions identify subsections of 8 U.S.C. § 1324 as one such "relevant law[]," Plaintiffs have no notice of what "other" laws DHS requires compliance with.  Further, by requiring "compl[iance] with the requirements of Presidential Executive Orders related to grants," the DHS Conditions also compound the vagueness inherent in the Executive Orders.  DHS asserts that it expects grant recipients to comply with the Executive Orders, which are themselves vague and unlawful.

156.     The HUD Letter is also unconstitutionally vague because it states that "going forward, grant agreements will include language that will require compliance with [the Subsidization Executive Order], and [HUD] will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens."  The HUD Letter suffers from the same flaw as the DHS Conditions; by expecting grant recipients to comply with executive directives that are themselves vague and unlawful, the HUD Letter only furthers the confusion.  Further, the HUD Letter makes no attempt at defining what constitute "'sanctuary' policies."

157.    The HUD Immigration Conditions are likewise unconstitutionally vague because they are based, in large part, on vague language from the Subsidization Executive Order, including reference to "facilitat[ing] the subsidization or promotion of illegal immigration or shield[ing] illegal aliens from deportation."  Further, there is no explanation for what would constitute "policies or practices that materially impede enforcement of federal immigration statutes and regulations."

158.    The Executive Orders and Agency Directives are unconstitutionally vague within the meaning of the Due Process Clause of the Fifth Amendment because they fail to clarify what is required of Plaintiffs and what consequences may occur, and thus encourage arbitrary enforcement by failing to describe their applicability and effects with sufficient particularity.  This confused patchwork of vague definitions and provisions appears intentional so that the Administration can target whomever they want on whatever grounds they can scrounge up.

## COUNT SIX
(Declaratory Relief – The Executive Orders and Agency Directives Are Unconstitutional)

159.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

160.    Plaintiffs seek declaratory relief that the Executive Orders and Agency Directives are unconstitutional because they violate the Separation of Powers, the Spending Clause, the Tenth Amendment and its anti-commandeering doctrine, and the Fifth Amendment and its Due Process Clause (and related void-for-vagueness doctrine).

161.    An actual controversy presently exists between Plaintiffs and Defendants as to whether the Executive Orders and Agency Directives are constitutional.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT SEVEN
(Declaratory Relief – Plaintiffs Are Not "Sanctuary Jurisdictions" Under the Day One
Executive Order)

162.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

163.     Plaintiffs further seek a declaration that their policies, on their face, do not "seek to interfere with the lawful exercise of Federal law enforcement operations," per the language of the Day One Executive Order.

164.     Nothing in Plaintiffs' respective resolutions or ordinances or implementing policies states any intention to interfere with the lawful exercise of federal immigration enforcement, but Defendants ignore that reality.

165.     An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs are a "sanctuary jurisdiction" as defined by the Day One Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT EIGHT
(Declaratory Relief – Plaintiffs' Policies Are Not "Sanctuary Policies" Under the
Subsidization Executive Order)

166.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

167.     Plaintiffs further seek a declaration that their resolutions, ordinances, and implementing policies, on their face, do not "seek to shield illegal aliens from deportation" as defined by the Subsidization Executive Order.

168.     None of Plaintiffs' respective resolutions or ordinances or implementing policies states any intention to "shield illegal aliens from deportation."

169.    An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' policies are "'sanctuary' policies" as defined by the Subsidization Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT NINE
(Declaratory Relief – Plaintiffs Are Not "Sanctuary Jurisdictions" Under the Designation Executive Order or the Designation List)

170.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

171.    Plaintiffs further seek a declaration that their policies, on their face, do not "obstruct the enforcement of Federal immigration laws," as outlined in the Designation Executive Order and Designation List.

172.    None of Plaintiffs' policies states any intention to obstruct federal immigration enforcement; rather Plaintiffs' policies leave that *federal* responsibility to the *federal* government so that they may prioritize their *local* responsibilities.

173.    An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' policies "obstruct the enforcement of Federal immigration laws," as defined by the Designation Executive Order.  A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TEN
(Declaratory Relief – Plaintiffs Comply with 8 U.S.C. § 1373)

174.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

175.      Plaintiffs similarly seek a declaration that their resolutions or ordinances or implementing policies comply with 8 U.S.C. § 1373, and they should therefore not be considered a "sanctuary jurisdiction" as defined in the Bondi Memo and Noem Memo.

176.      Plaintiffs comply with 8 U.S.C. § 1373.  Neither Plaintiffs' sanctuary city resolutions/ordinances nor their police policies "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual," as Section 1373 requires.  That Plaintiffs' police departments do not routinely inquire about immigration status in ordinary matters or affirmatively assist in federal immigration enforcement operations like ICE raids (beyond ensuring officer safety) does not violate that federal statute.

177.      An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs' resolutions/ordinances or implementing policies comply with 8 U.S.C. § 1373.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT ELEVEN
(Declaratory Relief – Plaintiffs Are Not Criminally Liable Under the Bondi Memo)

178.      Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as if fully set forth herein.

179.      Plaintiffs also seek a declaration that they cannot be held criminally liable under the Bondi Memo, at least in terms of the limited statutes DOJ cites, merely by virtue of Plaintiffs' sanctuary policies and adherence thereto.

180.      The Bondi Memo cites 18 U.S.C. § 371 ("Conspiracy to Commit Offense or to Defraud United States"), 8 U.S.C. § 1324 ("Bringing in and Harboring Certain Aliens"), and 8 U.S.C. § 1373 ("Communication Between Government Agencies and the Immigration and Naturalization Service").

181.      8 U.S.C. § 1373, is not a criminal statute.   18 U.S.C. § 371, is a conspiracy statute that requires the predicate commission of a crime that is the object of the conspiracy. Plaintiffs have not committed, nor have they been accused of committing, a crime (nor have they entered into, or been accused of entering into, a criminal conspiracy).

182.      That leaves 8 U.S.C. § 1324, which also fails: Plaintiffs cannot be liable under that criminal statute as Plaintiffs neither bring, transport, nor induce aliens to enter into the United States.  Moreover, Plaintiffs do not, with knowledge or reckless disregard, "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection" aliens.  Nor do Plaintiffs aid and abet such crimes or conspire to commit such crimes.  This is all plain from Plaintiffs' resolutions/ordinances and police policies, which make clear that they will not affirmatively inquire about immigration status on a routine basis and will not affirmatively provide assistance unless legally required, but that do not obstruct or interfere with any lawful immigration commands.

183.      An actual controversy presently exists between Plaintiffs and Defendants as to whether Plaintiffs can be held criminally liable under the Bondi Memo.  A judicial determination resolving this controversy is necessary and appropriate at this time.

## COUNT TWELVE
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)
(Against Defendants Bondi and DOJ)

184.      Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

185.      Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is an agency action subject to review under the APA.

186.      Final agency actions (1) "mark the 'consummation' of the agency's decision-

making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

187.    The Bondi Memo is a final agency action because it announces a final decision to pause DOJ funding on a blanket basis at a certain time and thus marks the consummation of DOJ's decision-making process.  Further, the Bondi Memo is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DOJ to stop funding directed by Congress that would be provided but for the Bondi Memo.

188.    Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

189.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In addition, an agency action will normally be determined to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. When an agency rescinds a prior policy, it "must consider the alternatives that are within the ambit of the existing policy'" and must consider "potential reliance interests."  *Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (cleaned up).

190.    The Bondi Memo fails to provide any reasonable explanation for the decision to withhold all DOJ funds from Plaintiffs, a disproportionately broad action with immediate consequences to Plaintiffs.  It also fails to justify the decision to condition and withhold funds that Congress had already appropriated for disbursement, and fails to adequately consider alternatives and reliance interests.

191.    The APA further provides that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

192.    As described above, the Bondi Memo violates bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

193.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

194.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress.  The freeze of DOJ funds and the conditions placed on all DOJ grants are blatantly illegal.

195.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the Bondi Memo violates the APA because it is arbitrary and capricious, because it is contrary to constitutional rights, powers, privileges, or immunities; to vacate the Bondi Memo under 5 U.S.C. § 706; to provide preliminary relief under 5 U.S.C. § 705; and to preliminarily and

permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

## COUNT THIRTEEN
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)
(Against Defendants Duffy and DOT)

196.      Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

197.      Defendant DOT is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the DOT Order is an agency action subject to review under the APA.

198.      Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

199.      The DOT Order, DOT Letter, and SS4A Conditions are final agency actions because each announces a final decision: to de-prioritize DOT funding to sanctuary jurisdictions, to withhold funds from all recipients who do not cooperate with "the enforcement of Federal immigration law," and to require cooperation with immigration enforcement to receive funds. Thus, each marks the consummation of DOT's decision-making process.  Further, the DOT Order, DOT Letter, and SS4A Conditions are actions determining rights or obligations or from which legal consequences will flow because each exercises a purported authority held by DOT to stop or condition funding directed by Congress that would be provided but for the DOT directives.

200.      Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

201.      "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S.

at 423).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

202.    The DOT Order, DOT Letter, and SS4A Conditions fail to provide any reasonable explanation for the decision to deprioritize DOT funds for sanctuary jurisdictions or to deny funds to recipients who do not cooperate with federal immigration enforcement.  There is a qualitative disconnect between the threatened DOT funding and immigration-related policies: sanctuary policies have nothing to do with transportation or traffic safety and the DOT Order, DOT Letter, and SS4A Conditions fail to explain any link between them.  As a further illustration of this disconnect, the DOT Order nonsensically prioritizes other projects such as those for "communities with marriage and birth rates higher than the national average."  The DOT Order, DOT Letter, and SS4A Conditions also fail to adequately consider alternatives or reliance interests.

203.    The APA further provides that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

204.    As described above, the DOT Order, DOT Letter, and SS4A Conditions violate bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

205.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

206.    Defendants may exercise only authority granted to them by statute.  No law or

provision of the Constitution authorizes DOT to withdraw properly obligated federal funds to impose extra-statutory conditions not authorized by Congress. DOT's de-prioritization of DOT funds for sanctuary jurisdictions (the effect of which is defunding) and its efforts to deny funds to jurisdictions that do not cooperate with federal immigration policy are blatantly illegal.

207.     Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the DOT Order, DOT Letter, and SS4A Conditions violate the APA because each is arbitrary and capricious and because each is contrary to constitutional rights, powers, privileges, or immunities; to vacate portions of the DOT Order, DOT Letter, and SS4A Conditions under 5 U.S.C. § 706; to provide preliminary relief under 5 U.S.C. § 705; and to preliminarily and permanently enjoin Defendants from implementing or enforcing the DOT Order, DOT Letter, and the SS4A Conditions.

## COUNT FOURTEEN

(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)
(Against Defendants Noem and DHS)

208.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

209.     Defendant DHS is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Noem Memo and DHS Conditions are agency actions subject to review under the APA.

210.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

211.     The Noem Memo and DHS Conditions are final agency actions because both announce a final decision to cease all funding of sanctuary jurisdictions and require cooperation

with federal civil immigration enforcement.  Further, the Noem Memo and DHS Conditions are actions determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DHS to stop funding directed by Congress that would be provided but for the Noem Memo or DHS Conditions.

212.    Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

213.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

214.    The Noem Memo and DHS Conditions fail to provide any reasonable explanation for the decision to cease DHS funds for sanctuary jurisdictions.  There is a qualitative disconnect between the threatened DHS funding and immigration-related policies: for example, the sanctuary policies have nothing to do with emergency relief grants and the Noem Memo and DHS Conditions fail to explain any link between them.  The Noem Memo and DHS Conditions also fail to adequately consider alternatives and reliance interests.

215.    Also under the APA, a "court shall . . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

216.    As described above, the Noem Memo and Section C of the DHS Conditions violate bedrock constitutional provisions and principles, including the Separation of Powers, the

Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

217.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

218.    Defendants may exercise only authority granted to them by statute. No law or provision of the Constitution authorizes DHS to withdraw properly obligated federal funds on the basis of cooperation and compliance with federal civil immigration enforcement. DHS's ceasing of certain DHS funds for sanctuary jurisdictions is blatantly illegal.

219.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that both the Noem Memo and Section C.IX of the DHS Conditions violate the APA because they are arbitrary and capricious and because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the Noem Memo and Section C.IX of the DHS Conditions under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Noem Memo and DHS Conditions.

### **COUNT FIFTEEN**
(Violation of the Administrative Procedure Act – Arbitrary and Capricious; Contrary to the Constitution; In Excess of Statutory Authority)
(Against Defendants Turner and HUD)

220.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs, as fully set forth herein.

221.    Defendant HUD is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the HUD Letter and HUD Immigration Conditions are agency actions subject to review under the APA.

222.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178.

223.    The HUD Letter and HUD Immigration Conditions are final agency actions because they announce a final decision to withhold funds from all recipients who do not cooperate with the Subsidization Executive Order or who have certain "policies." Thus, both mark the consummation of HUD's decision-making process. Further, the HUD Letter and HUD Immigration Conditions are actions determining rights or obligations or from which legal consequences will flow because they exercise a purported authority held by HUD to condition funding directed by Congress that would be provided but for the HUD Letter or HUD Immigration Conditions. Under the APA, a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

224.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 603 U.S. at 292 (quoting *Prometheus Radio Project*, 592 U.S. at 423). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

225.    The HUD Letter and HUD Immigration Conditions fail to provide any reasonable explanation for the decision to condition funding on compliance with the Subsidization Executive Order. There is a qualitative disconnect between the threatened HUD funding and the immigration-related policies of the Subsidization Executive Order: sanctuary policies have nothing to do with housing and community development activities, and the HUD Letter and HUD

Immigration Conditions fail to explain any link between them.  They also fail to adequately consider alternatives and reliance interests.

226.    Also under the APA, a "court shall . . . hold unlawful and set aside agency action[s], findings, and conclusions found to be. . . contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).

227.    As described above, the HUD Letter and HUD Immigration Conditions violate bedrock constitutional provisions and principles, including the Separation of Powers, the Spending Clause, the anti-commandeering principle enshrined in the Tenth Amendment, and the Fifth Amendment's procedural due process and vagueness doctrines.

228.    The APA also requires that a "court shall. . . hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

229.    Defendants may exercise only authority granted to them by statute.  No law or provision of the Constitution authorizes HUD to impose extra-statutory conditions not authorized by Congress.  HUD's efforts to deny funds to jurisdictions that do not cooperate with the Subsidization Executive Order are blatantly unlawful.

230.    Plaintiffs therefore ask the Court to declare, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the HUD Letter and HUD Immigration Conditions violate the APA because they are arbitrary and capricious and because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the HUD Letter and HUD Immigration Conditions under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing HUD Letter and HUD Immigration Conditions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein.  Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

1.    Declare the following are unlawful and unconstitutional on their face and as applied:

      a.  Section 17 of the Day One Executive Order;

      b.  Section 2(a)(ii) of the Subsidization Executive Order;

      c.  Section 3 of the Designation Executive Order;

      d.  The Bondi Memo;

      e.  Section 5(f)(v) of the DOT Order;

      f.  The DOT Letter;

      g.  Article 24.2(a) of the SS4A Conditions;

      h.  The Noem Memo;

      i.  Sections C.IX and C.XXXI of the DHS Conditions;

      j.  The HUD Letter; and

      k.  The HUD Immigration Conditions.

2.    Declare that Plaintiffs do not "seek to interfere with the lawful exercise of Federal law enforcement operations" merely by virtue of their sanctuary policies and adherence thereto;

3.    Declare that Plaintiffs' policies do not "seek to shield illegal aliens from deportation";

4.    Declare that Plaintiffs do not "obstruct the enforcement of Federal immigration laws" merely by virtue of their sanctuary policies and adherence thereto;

5.    Declare that Plaintiffs do not violate 8 U.S.C. § 1373 merely by virtue of their sanctuary policies and adherence thereto;

6.      Declare that Plaintiffs cannot be held criminally liable under the Bondi Memo merely by virtue of Plaintiffs' sanctuary policies and adherence thereto;

7.      Declare that the following violate the APA:

    a.   The Bondi Memo;

    b.   Section 5(f)(v) of the DOT Order;

    c.   The DOT Letter;

    d.   Article 24.2(a) of the SS4A Conditions;

    e.   The Noem Memo;

    f.   Sections C.IX and C.XXXI of the DHS Conditions;

    g.   The HUD Letter; and

    h.   The HUD Immigration Conditions.

8.      Preliminarily and permanently enjoin Defendants from implementing or enforcing, or taking any other action in furtherance of any withholding or conditioning of federal funds based on, the following orders and directives:

    a.   Section 17 of the Day One Executive Order;

    b.   Section 2(a)(ii) of the Subsidization Executive Order;

    c.   Section 3 of the Designation Executive Order;

    d.   The Bondi Memo;

    e.   Section 5(f)(v) of the DOT Order;

    f.   The DOT Letter;

    g.   Article 24.2(a) of the SS4A Conditions;

    h.   The Noem Memo;

    i.   Sections C.IX and C.XXXI of the DHS Conditions;

          j.   The HUD Letter; and

          k.   The HUD Immigration Conditions.

9.     Preliminarily and permanently enjoin Defendants from taking enforcement action against Plaintiffs based on the policies, orders, and directives identified in this Complaint.

10.    Issue preliminary relief under 5 U.S.C. § 705 and vacate the following agency orders and directives pertaining to sanctuary jurisdictions under 5 U.S.C. § 706:

          a.   The Bondi Memo;

          b.   Section 5(f)(v) of the DOT Order;

          c.   The DOT Letter;

          d.   Article 24.2(a) of the SS4A Conditions;

          e.   The Noem Memo;

          f.   Sections C.IX and C.XXXI of the DHS Conditions;

          g.   The HUD Letter; and

          h.   The HUD Immigration Conditions.

11.    Award to Plaintiffs reasonable attorney's fees and costs incurred in pursuing this action, and pre-judgment and post-judgment interest at the highest lawful rates; and

12.    Grant such other and further relief as this Court deems just and appropriate.

Dated: December 17, 2025                Respectfully submitted,

*/s/ Oren Sellstrom*
Iván Espinoza-Madrigal (BBO# 708080)
Oren Sellstrom (BBO# 569045)
Mirian Albert (BBO# 710093)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 482-1145
iespinoza@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org

malbert@lawyersforcivilrights.org

*Attorneys for Plaintiffs City of Chelsea and City of Somerville*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of Court using CM/ECF, which generates and transmits Notices of Electronic Filings to all counsel of record.

*/s/ Oren Sellstrom*
Oren Sellstrom

# Exhibit A

Day One Executive Order

(EO 14,159)

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit B

Subsidization Executive Order
(EO 14,218)

**Federal Register**/Vol. 90, No. 36/Tuesday, February 25, 2025/Presidential Documents    **10581**

# Presidential Documents

Executive Order 14218 of February 19, 2025

## Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose*. The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2**. *Preserving Federal Public Benefits*. (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called "sanctuary" policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit C

Designation Executive Order
(EO 14,287)

# Presidential Documents

Executive Order 14287 of April 28, 2025

## Protecting American Communities From Criminal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy*. Federal supremacy with respect to immigration, national security, and foreign policy is axiomatic. The Constitution provides the Federal Government with plenary authority regarding immigration to protect the sovereignty of our Nation and to conduct relations with other nations, who must be able to deal with one national Government on such matters. This power is sometimes contained in specific constitutional provisions: Article II of the Constitution vests the power to protect national security and conduct foreign policy in the President of the United States, and Article IV, Section 4, requires the Federal Government to "protect each of [the States] against Invasion." This Federal power over immigration is also an inherent element of national sovereignty.

The prior administration allowed unchecked millions of aliens to illegally enter the United States. The resulting public safety and national security risks are exacerbated by the presence of, and control of territory by, international cartels and other transnational criminal organizations along the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. This invasion at the southern border requires the Federal Government to take measures to fulfill its obligation to the States.

Yet some State and local officials nevertheless continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws. This is a lawless insurrection against the supremacy of Federal law and the Federal Government's obligation to defend the territorial sovereignty of the United States. Beyond the intolerable national security risks, such nullification efforts often violate Federal criminal laws, including those prohibiting obstruction of justice (18 U.S.C. 1501 *et seq.*), unlawfully harboring or hiring illegal aliens (8 U.S.C. 1324), conspiracy against the United States (18 U.S.C. 371), and conspiracy to impede Federal law enforcement (18 U.S.C. 372). Assisting aliens in violating Federal immigration law could also violate the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. 1961 *et seq.*). Some measures to assist illegal aliens also necessarily violate Federal laws prohibiting discrimination against Americans in favor of illegal aliens and protecting Americans' civil rights.

It is imperative that the Federal Government restore the enforcement of United States law.

**Sec. 2**. *Designation of "Sanctuary" Jurisdictions*. (a) Within 30 days of the date of this order, the Attorney General, in coordination with the Secretary of Homeland Security, shall publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions). After this initial publication, the Attorney General and the Secretary of Homeland Security shall update this list as necessary.

(b) Immediately following each publication under subsection (a) of this section, the Attorney General and the Secretary of Homeland Security shall notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law.

**Sec. 3**. *Consequences for Sanctuary Jurisdiction Status*. (a) With respect to sanctuary jurisdictions that are designated under section 2(a) of this

order, the head of each executive department or agency (agency), in coordination with the Director of the Office of Management and Budget and as permitted by law, shall identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate.

(b) With respect to jurisdictions that remain sanctuary jurisdictions after State or local officials are provided notice of such status under section 2(b) of this order and yet remain in defiance of Federal law, the Attorney General and the Secretary of Homeland Security shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States.

**Sec. 4**. *Preventing Federal Benefits for Aliens in Sanctuary Jurisdictions.* The Secretary of Homeland Security, in coordination with the Attorney General, shall develop guidance, rules, or other appropriate mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits within the meaning of 8 U.S.C. 1611(c) from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf.

**Sec. 5**. *Equal Treatment of Americans.* The Attorney General, in consultation with the Secretary of Homeland Security and appropriate agency heads, shall identify and take appropriate action to stop the enforcement of State and local laws, regulations, policies, and practices favoring aliens over any groups of American citizens that are unlawful, preempted by Federal law, or otherwise unenforceable, including State laws that provide in-State higher education tuition to aliens but not to out-of-State American citizens that may violate 8 U.S.C. 1623 or that favor aliens in criminal charges or sentencing.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Federal Register** / Vol. 90, No. 84 / Friday, May 2, 2025 / Presidential Documents    **18763**

(d) The Department of Justice shall provide funding for this order's publication in the *Federal Register*.

THE WHITE HOUSE,
*April 28, 2025.*

[FR Doc. 2025–07789
Filed 5–1–25; 8:45 am]
Billing code 4410–CW–P

# Exhibit D

Bondi Memo



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:   THE ATTORNEY GENERAL

SUBJECT:  SANCTUARY JURISDICTION DIRECTIVES[1]

 Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

## I. End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations

 Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

 Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a). So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws. Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a). Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration. The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.   Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens. For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided. The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws. The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III.     Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws. State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373. All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations. Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices. Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.

# Exhibit E

DOT Order



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation



DOT Order

SUBJECT: ENSURING
RELIANCE UPON SOUND
ECONOMIC ANALYSIS IN
DEPARTMENT OF
TRANSPORTATION POLICIES,
PROGRAMS, AND ACTIVITIES

1. PURPOSE

This Order updates and resets the principles and standards underpinning U.S. Department of Transportation (Department or DOT) policies, programs, and activities to mandate reliance on rigorous economic analysis and positive cost-benefit calculations and ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy and benefit the American people.

2. CANCELLATION

None

3. APPLICABILITY AND SCOPE.

This Order applies to all the Department's Operating Administrations (OA) and the Departmental Offices in the Office of the Secretary of Transportation (OST).[1]

4. EFFECTIVE DATE

This Order is effective upon its date of execution.

5. POLICIES.

The following principles govern the implementation and administration of all DOT policies, programs, and activities:

    a. The Department's grantmaking, lending, policymaking, and rulemaking activities shall be based on sound economic principles and analysis supported by rigorous cost-benefit requirements and data-driven decisions. This requirement shall apply

---

[1] The terms "Operating Administration" and "OA" hereinafter refer to both the Department's operating administrations and the OST Departmental Offices.

regardless of whether the activities in question fall below the economic threshold required for review by the Office of Information and Regulatory Affairs.

b. To engage in grantmaking, lending, policymaking, or rulemaking, the benefits must be estimated to outweigh the costs. The calculation of the "social cost of carbon" is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation. Consequently, the Administrator of the Environmental Protection Agency has been ordered by the President to issue guidance to address these harmful and detrimental inadequacies. Prior to issuance of that guidance, DOT shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis).

c. Statutes governing DOT policies, programs, and activities shall be administered to identify and avoid, to the extent practicable, relevant, appropriate, and consistent with law, adverse impacts on families and communities. Adverse impacts may include, but are not limited to, noise; water pollution; soil contamination; a denial of or a reduction in transportation services; increased difficulty in raising children in a safe and stable environment; and destruction or disruption of community cohesion, safety, or economic vitality.

d. Statutes governing DOT policies, programs, and activities shall also be administered to maximize, to the extent practicable, relevant, appropriate, and consistent with law, benefits for families and communities. The benefits may include, but are not limited to, economic opportunities, such as increased access to jobs, healthcare facilities, recreational activities, commercial activity, or any actions or project components that will help alleviate poverty, enhance safety, and primarily benefit families and communities by improving the quality of their lives, raising their standard of living, or enabling them to participate more fully in our economy.

e. DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall not be used to further local political objectives or for projects and goals that are purely local in nature and unrelated to a proper Federal interest. DOT programs and activities should instead prioritize support and assistance for projects and goals that are consistent with the proper role of the Federal government in our system of federalism, have strong co-funding requirements, adhere faithfully to all Federal statutory Buy America requirements, and not depend on continuous or future DOT support or assistance for improvements or ongoing maintenance.

f. To the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall prioritize projects and goals that:

    i.    utilize user-pay models;

    ii.    direct funding to local opportunity zones where permitted;

    iii.    to the extent practicable, relevant, appropriate, and consistent with law, mitigate the unique impacts of DOT programs, policies, and activities on families and family-specific difficulties, such as the accessibility of transportation to families with young children, and give preference to communities with marriage and birth rates higher than the national average (including in administering the Federal Transit Administration's Capital Investment Grant program);

    iv.    prohibit recipients of DOT support or assistance from imposing vaccine and mask mandates; and

    v.    require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

6. <u>RESPONSIBILITIES</u>.

  a.  The General Counsel is the chief legal officer of the Department with final authority on all questions of law for all components of DOT. The Office of the General Counsel (OGC) shall provide the legal advice, support, and guidance necessary to implement and effectuate this Order, including via the issuance of additional orders as warranted.

  b.  OAs engaged in grantmaking, lending, policymaking, or rulemaking activities shall, in coordination and consultation with OGC, implement this Order and determine the most effective and efficient way of integrating the principles outlined in this Order with their existing regulations and guidance.

  c.  In undertaking the integration with existing operations, and in coordination and consultation with OGC, OAs shall:

    1.  Develop and issue guidance necessary to implement and effectuate this Order, or review and update any previously issued guidance to ensure consistency with this Order. OAs shall also engage in the notice-and-comment process, as appropriate and in accordance with DOT Order 2100.6B (Policies and Procedures for Rulemakings) and any corresponding regulations, to implement the requirements of this Order.

    2.  Update and revise all Notices of Funding Opportunity, grant agreements, loan agreements, and other program documents as necessary to ensure compliance with Federal law and consistency with this Order.

    3.  Review their existing grant agreements, loan agreements, and contracts, and, to the extent permitted by law, unilaterally amend the general terms and conditions as necessary to ensure compliance with Federal law and consistency with this Order, and provide corresponding notice of such to recipients.

d. OAs shall prepare a report describing their efforts to comply with this Order and the impact of those efforts on their grantmaking, lending, policymaking, and rulemaking activities. The first of these reports shall be submitted to OGC no later than six months after the effective date of this Order, and each subsequent report shall be due no later than six months thereafter.

e. OAs shall also observe the following principles:

1. This Order should be implemented in a simple, transparent manner that avoids adding unnecessary procedural or regulatory steps or causing undue delay. The Order should not be interpreted to impose procedural or regulatory requirements that provide no benefit in the decision-making process. The Order should be carried out in a manner that considers the impact that delays in project delivery or rule-making may have on the economic vitality, safety, and well-being of the American people, their families, and communities.

2. OAs shall strive to promote the economic opportunities of DOT programs, policies, and activities for families and communities. Procedures shall be established or modified, as necessary, to provide meaningful opportunities for public involvement by families and communities during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures).

3. DOT shall ensure comprehensive public engagement, including with families and community stakeholders, and provide meaningful access to public information concerning both the costs and the benefits of DOT programs, policies, or activities.

4. Compliance with the terms of this Order is an ongoing responsibility. OAs shall continuously monitor their programs, policies, and activities to ensure they are administered in a manner consistent with this Order. This Order does not alter existing assignments or delegations of authority to the Operating Administrations or other DOT components.

7. <u>DISCLAIMER</u>.

This Order is intended to improve the internal management of DOT and is not intended to, nor does it, create any rights, benefits, or trust responsibility, substantive or procedural, enforceable at law or equity, by a party against the Department, its OAs, its officers, or any person. Nor should this Order be construed to create any right to judicial review involving the compliance or noncompliance with this Order by the Department, its Operating Administrations, its officers or any other person.

_____
Secretary of Transportation

# Exhibit F

DOT Letter



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq.*) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq.*), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq.*).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

# Exhibit G

SS4A Conditions

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2023 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT**
**PROGRAM:**
**FHWA PROJECTS**

**Date: January 4, 2024**
**Revised:  October 1, 2024**
**Revised:    March 17, 2025**

## Table of Contents

Article 7 Purpose...................................................................................................................... 6
   7.1   Purpose. ............................................................................................................................ 6
Article 8 USDOT Role ............................................................................................................ 6
   8.1   Division of USDOT Responsibilities. .............................................................................. 6
   8.2   USDOT Program Contact. ................................................................................................ 7
Article 9 Recipient Role. ......................................................................................................... 7
   9.1   Statements on the Project. ................................................................................................ 7
   9.2   Statements on Authority and Capacity. ........................................................................... 7
   9.3   USDOT Reliance. ............................................................................................................ 8
   9.4   Project Delivery. .............................................................................................................. 8
   9.5   Rights and Powers Affecting the Project. ........................................................................ 8
   9.6   Notification of Changes to Key Personnel. ..................................................................... 8
Article 10 Award Amount, Obligation, and Time Periods ...................................................... 9
   10.1   Federal Award Amount ................................................................................................. 9
   10.2   Federal Obligations. ..................................................................................................... 9
   10.3   Budget Period ............................................................................................................. 10
   10.4   Period of Performance. ............................................................................................... 10
Article 11 Statement of Work, Schedule, and Budget Changes ............................................ 11
   11.1   Notification Requirement. ........................................................................................... 11
   11.2   Statement of Work Changes. ...................................................................................... 11
   11.3   Schedule Changes. ...................................................................................................... 11
   11.4   Budget Changes. ......................................................................................................... 11
   11.5   USDOT Acceptance of Changes. ............................................................................... 12
Article 12 General Reporting Terms. .................................................................................... 13
   12.1   Report Submission. ..................................................................................................... 13
   12.2   Alternative Reporting Methods. .................................................................................. 13
   12.3   Paperwork Reduction Act Notice. .............................................................................. 13
Article 13 Progress and Financial Reporting ....................................................................... 13
   13.1   Quarterly Performance Progress Reports. ................................................................... 13
   13.2   Quarterly Financial Status. ......................................................................................... 13
Article 14 Performance Reporting ........................................................................................ 13
   14.1   Baseline Performance Measurement. .......................................................................... 13
   14.2   SS4A Final Report ...................................................................................................... 14
   14.3   Performance Measurement Information……………………………………………14
   14.4   Performance Reporting Survival……………………………………………………14
   14.5   Program Evaluation……………………………………………………………………15
Article 15 Noncompliance and Remedies ............................................................................. 15
   15.1   Noncompliance Determinations. ................................................................................. 15
   15.2   Remedies. .................................................................................................................... 16
   15.3   Other Oversight Entities. ............................................................................................ 16
Article 16 Agreement Termination ....................................................................................... 16
   16.1   USDOT Termination. .................................................................................................. 16
   16.2   Closeout Termination. ................................................................................................. 17
   16.3   Post-Termination Adjustments. .................................................................................. 17
   16.4   Non-Terminating Events. ............................................................................................ 17
   16.5   Other Remedies. ......................................................................................................... 18

Article 17 Monitoring, Financial Management, Controls, and Records ................................ 18
   17.1   Recipient Monitoring and Record Retention. ............................................................. 18

17.2    Financial Records and Audits. ..................................................................................18
17.3    Internal Controls. ....................................................................................................19
17.4    USDOT Record Access. ............................................................................................19
Article 18 Contracting and Subawards ...............................................................................19
18.1    Build America, Buy America .....................................................................................19
18.2    Small and Disadvantaged Business Requirements. ....................................................21
18.3    Engineering and Design Services. .............................................................................21
18.4    Foreign Market Restrictions. ....................................................................................22
18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment. ..22
18.6    Recipient Responsibilities for Subawards. ..................................................................22
18.7    Subaward and Contract Authorization. .......................................................................22
Article 19 Costs, Payments, and Unexpended Funds ...........................................................23
19.1    Limitation of Federal Award Amount. ........................................................................22
19.2    Projects Costs. ........................................................................................................22
19.3    Timing of Project Costs. ...........................................................................................23
19.4    Recipient Recovery of Federal Funds. ........................................................................23
19.5    Unexpended Federal Funds. .....................................................................................23
19.6    Timing of Payments to the Recipient. ........................................................................23
19.7    Payment Method. .....................................................................................................23
19.8    Information Supporting Expenditures .........................................................................23
19.9    Reimbursement Frequency. ......................................................................................23
19.10   Match. ....................................................................................................................23
Article 20 Liquidation, Adjustments, and Funds Availability .................................................24
20.1    Liquidation of Recipient Obligations. .........................................................................24
Article 21 Agreement Modifications ..................................................................................24
21.1    Bilateral Amendments. .............................................................................................24
21.2    Unilateral Contact Modifications. ..............................................................................24
21.3    USDOT Unilateral Modifications. ..............................................................................24
21.4    Other Modifications. ................................................................................................24
Article 22 [RESERVED] ...................................................................................................26
22.1    [RESERVED]. ..........................................................................................................26
Article 23 [RESERVED] ...................................................................................................26
23.1    [RESERVED]. ..........................................................................................................26
Article 24 Federal Financial Assistance, Administrative, and National Policy Requirements ....25
24.1    Uniform Administrative Requirements for Federal Awards. ...........................................25
24.2    Federal Law and Public Policy Requirements. .............................................................25
24.3    Federal Freedom of Information Act. ..........................................................................25
24.4    History of Performance. ...........................................................................................26
24.5    Whistleblower Protection. .........................................................................................26
24.6    External Award Terms and Obligations. .....................................................................26
24.7    Incorporated Certifications. ......................................................................................26
Article 25 Assignment .....................................................................................................27
25.1    Assignment Prohibited. ............................................................................................27
Article 26 Waiver ............................................................................................................27
26.1    Waivers. .................................................................................................................27
Article 27 Additional Terms and Conditions ......................................................................27
27.1    Effect of Planning and Demonstration or Implementation Award. ..................................27
27.2    Disclaimer of Federal Liability. ..................................................................................27
27.3    Environmental Review .............................................................................................27
27.4    Railroad Coordination. .............................................................................................30
27.5    Relocation and Real Property Acquisition. ..................................................................30
27.6    Equipment Disposition. ............................................................................................30

Article 28 Mandatory Award Information ..................................................................................... 30
    28.1   Information Contained in a Federal Award. ........................................................................ 30
Article 29 Construction and Definitions ..................................................................................... 31
    29.1   Attachments. ...................................................................................................................... 31
    29.2   Exhibits. ............................................................................................................................ 31
    29.3   Construction. ..................................................................................................................... 31
    29.4   Integration. ........................................................................................................................ 30
    29.5   Definitions. ........................................................................................................................ 30
Article 30 Agreement Execution and Effective Date ................................................................. 31
    30.1   Counterparts. ..................................................................................................................... 31
    30.2   Effective Date. ................................................................................................................... 31

## Index of Definitions

Administering Operating Administration ................................................................ 7
Environmental Review Entity……………………………………………………………...28
Federal Share ...................................................................................................... 12
FHWA ................................................................................................................... 7
NOFO ................................................................................................................... 6
OMB ..................................................................................................................... 13
Program Statute ................................................................................................... 31
Project………………………………………………………………………………………22
Project Closeout .................................................................................................. 18
SS4A Grant ........................................................................................................... 31
USDOT .................................................................................................................. 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act (IIJA; Pub. L. 117–58, November 15, 2021) established the Safe Streets and Roads for All (the "SS4A") Discretionary Grant Program (IIJA Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2023 for the SS4A Discretionary Grant Program (88 Fed. Reg. 22090, April 12, 2023).

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2023 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F are project-specific attachments.

### ARTICLE 7
### PURPOSE

7.1     **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)     timely completing the Project; and

(2)     ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

### ARTICLE 8
### USDOT ROLE

8.1     **Division of USDOT Responsibilities.**

(a)  The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b)  The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2    USDOT Program Contact.**

Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2822


# ARTICLE 9
# RECIPIENT ROLE

**9.1    Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)    Attachment B documents all material changes in the information contained in that application.

**9.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)    it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 24.7 on behalf of the Recipient.

**9.3**    **USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4**    **Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c) The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d) The Recipient shall provide access to records as provided at 2 C.F.R. 200.337.

**9.5**    **Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6**    **Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.3 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.2.

**ARTICLE 10**
**AWARD AMOUNT, OBLIGATION, AND TIME PERIODS**

**10.1    Federal Award Amount** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in section 2.2 as the SS4A Grant Amount.

**10.2    Federal Obligations.**

This agreement obligates funds for the period of performance listed on Page 1, Block 6 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," (for phased agreements) then an amount up to the Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.2(c)–10.2(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant funds among separate phases of the Project for the purpose of the Federal obligation of funds. The scope of each phase of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.4 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

(1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

(2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

(1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

(2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

## 10.3    Budget Period

The budget period for this award begins on the effective date of this agreement and ends on the budget period end date that is listed in section 2.4, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

## 10.4    Period of Performance.

(a) The period of performance for this award begins on the effective date of award listed in page 1 item 2 and ends on the period of performance end date that is listed in Page 1, Block 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

## ARTICLE 11
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**11.1**  **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

**11.2**  **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

**11.3**  **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant dates:

    (1)    a substantial completion date for the Project or a component of the Project that is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

    (2)    a schedule change would require the period of performance to continue after the period of performance end date listed on Page 1, Block 6.  (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements).

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

**11.4**  **Budget Changes.**

  (a) The Recipient acknowledges that if the cost of completing the Project increases:

    (1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

    (2)    the USDOT will not increase the amount of this award to address any funding shortfall.

  (b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

    (1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c) For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

(1)    in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2)    if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3(a).

(f) The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5  USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

**ARTICLE 12**
**GENERAL REPORTING TERMS**

**12.1**  **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.4.  Reports will be added to a central repository maintained by FHWA.

**12.2**  **Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

**12.3**  **Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

**ARTICLE 13**
**PROGRESS AND FINANCIAL REPORTING**

**13.1**  **Quarterly Performance Progress Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Performance Progress Report in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Performance Progress Report in the second calendar year quarter that begins after the date of this agreement.

**13.2**  **Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit a Federal Financial Report using SF-425.

**ARTICLE 14**
**PERFORMANCE REPORTING**

**14.1**  **Baseline Performance Measurement.** Recipients of Implementation Grants or Planning and Demonstration Grants with demonstration activities shall:

(1)      collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)     on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2**    **SS4A Final Report:** The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report in the format specified by FHWA and with the content described in Attachment A that describes, consistent with sections 24112(g)-(h) of IIJA:

(1)     the costs of each eligible project and strategy carried out using the grant;

(2)     the roadway safety outcomes and any additional benefits (e.g., increased walking, biking, or transit use without a commensurate increase in serious and fatal crashes, etc.) that each such project and strategy has generated, as—

- identified in the grant application; and

- measured by data to the maximum extent practicable; and

(3)     [RESERVED]

(4)     the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3**    **Performance Measurement Information.**

For each performance measure identified to be submitted annually in the Performance Measure Table in Attachment A, not later than January 31 of each year, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4**    **Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5**    **Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant

recipients, before/after photographs of the sites, qualitative activities such as videos describing the project and its impact on the community, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

## ARTICLE 15
## NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

    (1)    accept the remedy;

    (2)    acknowledge the noncompliance, but propose an alternative remedy; or

    (3)    dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

    (1)    after considering the Recipient's response under section 15.1(b); or

    (2)    if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the basis for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

    (1)      additional conditions on the award;

    (2)      any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

    (3)      any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**15.3    Other Oversight Entities.**

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

**ARTICLE 16
AGREEMENT TERMINATION**

**16.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all its obligations under this agreement if any of the following occurs:

(1) the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.3(a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

(2) a construction start date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(3) a substantial completion date for the project or strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4) the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(5) the USDOT determines that termination of this agreement is in the public interest.

(6) the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5**    **Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

### ARTICLE 17
### MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**17.1**    **Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

   (1)    that those activities comply with this agreement; and

   (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2**    **Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the project, and the amount or nature of that portion of the cost of the project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2023 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

   (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2023" in the program name; and

(2)  list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2023" in column c ("Additional Award Identification").

**17.3  Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4  USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

## ARTICLE 18
## CONTRACTING AND SUBAWARDS

**18.1  Build America, Buy America.** This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184, and Office of Management and Budget (OMB) Memorandum M-24-02, "Initial Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1)  all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2)  all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3)  all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure

project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1)    applying the domestic content procurement preference would be inconsistent with the public interest;

(2)    the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3)    the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"Construction materials" means articles, materials, or supplies —that consist of only one of the items listed below in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material:

(1) The listed Items are:
- non-ferrous metals;
- plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
- glass (including optic glass);
- fiber optic cable (including drop cable)
- optical fiber;

- lumber;
- engineered wood; and
- drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"Domestic content procurement preference" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"Iron or steel products" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"Manufactured products" means:

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

> "Predominantly of iron or steel or a combination of both" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.
>
> **"Project"** means temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.
>
> "Section 70917(c) materials" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

**18.2**   **Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

**18.3**   **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering,

surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under 2 C.F.R. 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

18.4    **Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

18.5    **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

18.6    **Recipient Responsibilities for Subawards.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

18.7    **Subaward and Contract Authorization.**  If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f)(6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

### ARTICLE 19
### COSTS, PAYMENTS, AND UNEXPENDED FUNDS

19.1    **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

19.2    **Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3    Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b)  The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement, unless there has been an approval of pre-award costs under 2 C.F.R. 200.458.

**19.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6   Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall    not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7   Payment Method.** The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8   Information Supporting Expenditures**

(a)  If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b)  If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9   Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then the Recipient shall not request reimbursement more frequently than monthly.

**19.10   Match.** The recipient should show on each request for reimbursement that at least 20 percent of the incurred costs will count towards match. If the recipient intends to vary the match percentage over the life of the project, it must communicate its plan to

USDOT. The recipient is responsible for tracking match according to the plan.  At the completion of the grant award, the cost share requirement must be met, and Federal funds must not exceed the project's Federal share.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Amendments.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**

(a)  The USDOT may update the contacts who are listed in sections 4.4 by written notice to all of the Recipient contacts who are listed in section 4.3.

**21.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 21.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, or 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**
**[RESERVED]**


**ARTICLE 23**
**[RESERVED]**


**ARTICLE 24**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

**24.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**24.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**24.3    Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**24.4    History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**24.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**24.6    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 29, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

(3)    2 C.F.R part 175: Award Term for Trafficking in Persons; and

(4)    Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 C.F.R. part 20: New Restrictions on Lobbying;

(2)    49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)    49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**24.7    Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)    Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).

## ARTICLE 25
## ASSIGNMENT

25.1 **Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 26
## WAIVER

26.1 **Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

## ARTICLE 27
## ADDITIONAL TERMS AND CONDITIONS

27.1 **Effect of Planning and Demonstration or Implementation Award.** Based on information that the Recipient provided to the USDOT, including the Grant Application, as indicated in section 2.5, this agreement designates this award as a Planning and Demonstration award or an Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation as listed in the FY 2023 Notice of Funding Opportunity for Safe Streets and Roads for All.

27.2 **Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

27.3 **Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 27.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

  (1)    the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

  (2)    if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

  (1) the Environmental Review Entity's actions under section 27.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

  (2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

  (1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

  (2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**27.4**  **Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**27.5**  **Relocation and Real Property Acquisition.**

(a)  The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b)  The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c)  The Recipient shall make available to displaced persons, comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**27.6**  **Equipment Disposition.**

(a)  In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b)  In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.310–200.316 and 2 C.F.R. 1201.313.

(c)  The Recipient shall ensure compliance with this section (27.6) for all tiers of subawards under this award.

## ARTICLE 28
## MANDATORY AWARD INFORMATION

**28.1**  **Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)  the "Federal Award Date" is the date of this agreement, as defined under section 30.2;

(2)  the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)  this award is not for research and development.

**ARTICLE 29**
**CONSTRUCTION AND DEFINITIONS**

29.1  **Attachments.** This agreement includes the following attachments as integral parts unless Attachment D is not required for certain Grants:

| | |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | [RESERVED] |
| Attachment D | [RESERVED] |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |

29.2  **Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2023 SS4A Grant Program", dated March 17, 2025 and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Performance Progress Reports: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

29.3  **Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–2830, then the provision in articles 1–2830 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

29.4  **Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

29.5  **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the IIJA section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement.

"**SS4A Grant**" means an award of funds that were made available under the SS4A NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 30
## AGREEMENT EXECUTION AND EFFECTIVE DATE

30.1   **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

30.2   **Effective Date.** The agreement will become effective when all parties have signed it. The effective date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

# Exhibit H

Noem Memo



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

February 19, 2025

MEMORANDUM FOR ALL AGENCIES AND OFFICES

FROM:  Kristi Noem
       Secretary

SUBJECT:  **Restricting Grant Funding for Sanctuary Jurisdictions**

---

Following the horrific attacks on this country on September 11, 2001, the American people trusted their leaders to make sure it would never happen again. Among the circumstances that led to those attacks was the failure to treat immigration as a national security issue. The 9/11 Commission Report, for example, recognized that "the institutions charged with protecting our borders . . . did not understand how grave th[e] threat could be." 9/11 Commission Report at xvi. The Commission also specifically noted that there were, at that time, "9 million people . . . in the United States outside the legal immigration system." *Id.* at 390. A second factor recognized by the Commission was the failure of different law enforcement entities to share information. The Report recognized "pervasive problems of managing and sharing information across a large and unwieldy government." *Id.* at xvi.

The year after those terrible attacks, President George W. Bush signed into the law the Homeland Security Act of 2002. The Act created the Department of Homeland Security (DHS), and it transferred into that new agency a number of important national security components, including those responsible for immigration enforcement. Congress expressly found that "State and local personnel have capabilities and opportunities to gather information on suspicious activities and terrorist threats not possessed by Federal agencies." 6 U.S.C. § 481(b)(8). Congress also found that "[t]he Federal Government relies on State and local personnel to protect against terrorist attack." *Id.* § 481(b)(2).

The bottom line is that partnership is an essential element of our national security and public safety mission. And that mission undoubtedly includes immigration enforcement. State and local governments that refuse to cooperate with, refuse to share information with, or even actively obstruct federal immigration enforcement reject these ideals and the history we share in common as Americans. If any government entity chooses to thumb its nose at the Department of Homeland Security's national security and public safety mission, it should not receive a single dollar of the Department's money unless Congress has specifically required it.

For purposes of this memorandum, "sanctuary jurisdictions" include the following:

- Jurisdictions that fail to comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644.

Prohibiting Grant Funding for Sanctuary Jurisdictions
Page 2

- Jurisdictions that violate other relevant laws, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, *id.* § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

- Jurisdictions that fail to honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer. A jurisdiction, however, is not a sanctuary jurisdiction merely because it lacks the necessary resources to assist in a particular instance.

- Any jurisdiction that fails to provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.

- Any jurisdiction that leaks the existence of an enforcement operation.

All components are to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions. To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions. Components should also make appropriate criminal referrals to the Department of Justice where illegal conduct is discovered.

For questions regarding applicable legal authorities, components must consult with the General Counsel or his designee. For questions regarding whether a particular jurisdiction is a sanctuary jurisdiction, components must consult with the Director of Immigration and Customs Enforcement and the Commissioner of Customs and Border Protection or their designees.

Within 30 days, each component shall provide a report to the Undersecretary for Management with a summary of actions taken to comply with this memorandum.

# Exhibit I

DHS Conditions

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

A. **Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications**

    I.    Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

B. **General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.**

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

    I.    Recipients must cooperate with any DHS compliance reviews or compliance investigations.

    II.    Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

    III.    Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

    IV.    Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

    V.    Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rightsresources-recipients-dhs-financial-assistance.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

**C.** <u>**Standard Terms & Conditions**</u>

I. <u>Acknowledgement of Federal Funding from DHS</u>

Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal award funds.

II. <u>Activities Conducted Abroad</u>

Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

III. <u>*Age Discrimination Act of 1975*</u>

Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

IV. <u>*Americans with Disabilities Act of 1990*</u>

Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

V. <u>Best Practices for Collection and Use of Personally Identifiable Information</u>

(1) Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

(2) Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

VI. <u>*CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS</u>

(1) Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

(2) Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

(a) Award number,

(b) Name of PI or Co-PI being reported,

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

    (c) Awardee name,

    (d) Awardee address,

    (e) AOR name, title, phone, and email address,

    (f) Indication of the report type:
      (i) Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

      (ii) Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

      (iii) The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act.*

(3) Definitions.

    (a) An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

    (b) "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

    (c) A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

    (d) "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

    (e) "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII.   *Civil Rights Act of 1964 – Title VI*

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII.    _Civil Rights Act of 1968_

Recipients must comply with Title VIII of the _Civil Rights Act of 1968_, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 _et seq._)  which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX.    Communication and Cooperation with the Department of Homeland Security and Immigration Officials

(1) All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b) They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c) That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d) That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e) That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(2) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

X.    Copyright

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI.    Debarment and Suspension

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000. These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII.    Drug-Free Workplace Regulations

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII.    Duplicative Costs

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV.    Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XV.     *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI.     Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

XVII.     Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1)  Definitions. As used in this clause –

   (a)  DEI means "diversity, equity, and inclusion."

   (b)  DEIA means "diversity, equity, inclusion, and accessibility."

   (c)  Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

   (d)  Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.

   (e)  Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

   (f)  Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.

(2)  Grant award certification.

   (a)  By accepting the grant award, recipients are certifying that:

      (i)  They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

      (ii)  They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

      (iii) They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration.

(3)  DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)..

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

XVIII.  *False Claims Act* and Program Fraud Civil Remedies

Recipients must comply with the requirements of the *False Claims Act*, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.  Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.  Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.  *Fly America Act of 1974*

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-aircarriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the *International Air Transportation Fair Competitive Practices Act of 1974*, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.  *Hotel and Motel Fire Safety Act of 1990*

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the *Hotel and Motel Fire Safety Act of 1990*, 15 U.S.C. § 2225a.

XXIII.  *John S. McCain National Defense Authorization Act of Fiscal Year 2019*

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the *John S. McCain National Defense Authorization Act for Fiscal Year 2019*, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.  Limited English Proficiency (*Civil Rights Act of 1964, Title VI*)

Recipients must comply with Title VI of the *Civil Rights Act of 1964* (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizationsprovide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV.     <u>Lobbying Prohibitions</u>

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

*XXVI.*     *<u>National Environmental Policy Act</u>*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969,* Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII.     <u>National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and Science Act of 2022, Pub. L. 117-167, Section 10254</u>

(1)  Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

    (a)  cybersecurity;

    (b)  foreign travel security;

    (c)  research security training; and

    (d)  export control training, as appropriate.

(2)  Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII.     <u>Non-Supplanting Requirement</u>

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX.     <u>Notice of Funding Opportunity Requirements</u>

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX.    Patents and Intellectual Property Rights

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq.* and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI.    Presidential Executive Orders

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII.    Procurement of Recovered Materials

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

*XXXIII.*    *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV.    Reporting Recipient Integrity and Performance Matters

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV.    Reporting Subawards and Executive Compensation

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI.    Required Use of American Iron, Steel, Manufactured Products, and Construction Materials

(1)    Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

(c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

(i) applying the domestic content procurement preference would be inconsistent with the public interest;

(ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) *Definitions*. The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII.     SAFECOM

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII.     Subrecipient Monitoring and Management

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX.     System for Award Management and Unique Entity Identifier Requirements

Recipients are required to comply with the requirements set forth in the governmentwide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL.     Termination of a Federal Award

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

    (a) If the recipient fails to comply with the terms and conditions of the federal award;

    (b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

    (c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344200.345 after an award is terminated.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XLI.    Terrorist Financing

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.    Trafficking Victims Protection Act of 2000(TVPA)

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.    *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001*, Pub. L. 107-56

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.    Use of DHS Seal, Logo and Flags

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.    *Whistleblower Protection Act*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.

# Exhibit J

HUD Letter



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
THE SECRETARY
WASHINGTON, DC 20410-0001

April 4, 2025

Dear HUD Grantees and Stakeholders,

President Trump issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," on February 19, 2025, to promote the rule of law and prevent American taxpayer dollars from being spent on federal assistance for illegal aliens. As Secretary of the Department of Housing and Urban Development (HUD), it is my responsibility to effectively implement the President's executive order at the agency.

HUD's contributions to housing and community development across the country serve some of America's most vulnerable citizens on a path towards self-sufficiency. To that end, the President's Executive Order emphasizes that the federal resources distributed by HUD shall be primarily focused on benefiting American citizens and other qualified recipients, not illegal aliens.

President Trump's Executive Order reinforces the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA, P.L. 104-193), which unequivocally prohibits illegal aliens from receiving certain federal public benefits, including many forms of assistance provided under HUD programs. Further, Section 214 of the Housing and Community Development Act of 1980 (P.L. 96-399) prohibits HUD from making financial assistance available to persons other than United States citizens or certain categories of eligible noncitizens in the Section 8 Housing Assistance programs, Public Housing programs, Housing Development Grant programs, Section 202 direct loan program, Section 235 program, Section 236 Program, and Rent Supplement Program. This letter serves as a reminder to all HUD grantees of their legal obligations to comply with these laws and the President's Executive Order.

Recently, I directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's Executive Order. For example, going forward, grant agreements will include language that will require compliance with Executive Order 14218, and the Department will take steps to ensure that Federal resources are not used to support "sanctuary" policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.

I am excited to work with our grantees and other stakeholders to implement this Executive Order and enforce the law so that HUD programs are used for the benefit of the American people. Thank you for your cooperation, and I encourage you to contact our team at HUD with any ideas that may be able to help improve our implementation of President Trump's Executive Order.

Sincerely,

Scott Turner
Secretary

# Exhibit K

Designation List



U.S. Department of Homeland Security

# Sanctuary Jurisdictions Defying Federal Immigration Law

Sanctuary jurisdictions undermine the rule of law and endanger the lives of Americans and Law Enforcement

Executive Order 14287: *Protecting American Communities from Criminal Aliens* requires that a list of states and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions) be published. Sanctuary jurisdictions including cities, counties, and states that are deliberately and shamefully obstructing the enforcement of federal immigration laws endangering American communities. Sanctuary cities protect dangerous criminal aliens from facing consequences and put law enforcement in peril.

The list below was created to identify sanctuary jurisdictions, which are determined by factors like compliance with federal law enforcement, information restrictions, and legal protections for illegal aliens.

Each jurisdiction listed will receive formal notification of its non-compliance with Federal statutes. DHS demands that these jurisdictions immediately review and revise their policies to align with Federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens.

Note that the list can be reviewed and changed at any time and will be updated regularly. No one should act on this information without conducting their own evaluation of the information.



↗ Close all        ↗ Open all

## Sanctuary Jurisdiction List

### Alaska

### Cities

- City of Anchorage

### California

### State

- Self-Identification as a State Sanctuary Jurisdiction

### County

- Alameda County
- Amador County
- Butte County
- Calaveras County
- Colusa County
- Del Norte County
- El Dorado County
- Glenn County

- Humboldt County
- Imperial County
- Lake County
- Lassen County
- Los Angeles County
- Madera County
- Mariposa County
- Mendocino County
- Merced County
- Modoc County
- Mono County
- Monterey County
- Nevada County
- Plumas County
- Riverside County
- Sacramento County
- San Benito County
- San Bernardino County
- San Francisco County
- San Joaquin County
- San Luis Obispo County
- San Mateo County
- Santa Barbara County
- Santa Clara County
- Santa Cruz County
- San Diego County
- Shasta County
- Sierra County
- Siskiyou County
- Solano County
- Sonoma County
- Stanislaus County
- Sutter County
- Tehama County
- Tuolumne County
- Trinity County
- Tulare County
- Ventura County
- Yolo County
- Yuba County

## Cities

- Alameda
- Albany
- Arcata
- Baldwin Park
- Belmont
- Benicia
- Berkeley
- Calipatria
- Cathedral City
- Chula Vista
- City of San Rafael
- Coachella
- Concord

- Culver City
- Davis
- El Cerrito
- Emeryville
- Eureka
- Fort Bragg
- Fremont
- Fresno
- Hayward
- Healdsburg
- Huntington Beach
- Huron
- Imperial
- La Puente
- Long Beach
- Los Angeles
- Madera
- Malibu
- Martinez
- Maywood
- Menlo Park
- Mountain View
- Newark
- Oakland
- Pacifica
- Palm Springs
- Pasadena
- Petaluma
- Pleasanton
- Represa
- Richmond
- Sacramento
- Salinas
- San Diego
- San Francisco
- San Jose
- San Leandro
- San Luis Obispo
- San Pablo
- Santa Cruz
- Santa Rosa
- Santee
- Soledad
- Stockton
- Union City
- Ventura
- Vista
- Watsonville
- West Hollywood
- Williams

## Colorado

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Adams County
- Arapahoe County
- Baca County
- Bent County
- Boulder County
- Broomfield County
- Chaffee County
- Cheyenne County
- Clear Creek County
- Conejos County
- Costilla County
- Custer County
- Denver County
- Eagle County
- Garfield County
- Gilpin County
- Gunnison County
- Huerfano County
- Jefferson County
- Kiowa County
- Kit Carson County
- La Plata County
- Lake County
- Larimer County
- Las Animas County
- Lincoln County
- Logan County
- Morgan County
- Otero County
- Park County
- Pitkin County
- Prowers County
- Pueblo County
- Rio Grande County
- Saguache County
- San Miguel County
- Summit County
- Washington County
- Yuma County

## Cities

- Boulder
- City of Durango
- City of Fort Collins
- Denver
- Lafayette
- Lakewood
- Longmont
- Northglenn
- Town of Avon
- Town of Basalt

- Town of Carbondale
- Town of Dillon
- Town of Eagle
- Town of Vail

## Connecticut

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Cities

- East Haven
- Hamden
- Hartford
- New Haven
- New London
- Windham

## Delaware

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- New Castle County

### Cities

- Camden
- Newark

## District of Columbia

### Cities

- Self-Identification as Local Sanctuary Jurisdiction

## Georgia

### Counties

- Athens-Clarke County
- DeKalb County
- Douglas County
- Fulton County

## Cities

- Athens
- Atlanta

### Hawaii

## Cities

- City of Honolulu

### Idaho

## Cities

- City of Boise

### Illinois

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Adams County
- Alexander County
- Bond County
- Boone County
- Bureau County
- Calhoun County
- Carroll County
- Cass County
- Champaign County
- Christian County
- Clark County
- Clay County
- Clinton County
- Coles County
- Cook County
- Crawford County
- Cumberland County
- DeKalb County
- De Witt County
- Douglas County
- DuPage County
- Edgar County
- Effingham County
- Fayette County
- Ford County
- Franklin County

- Fulton County
- Gallatin County
- Greene County
- Grundy County
- Hancock County
- Hardin County
- Henderson County
- Henry County
- Iroquois County
- Jackson County
- Jersey County
- Jo Daviess County
- Johnson County
- Kane County
- Kankakee County
- Kendall County
- Knox County
- Lake County
- LaSalle County
- Lawrence County
- Lee County
- Livingston County
- Logan County
- Macon County
- Macoupin County
- Madison County
- Marion County
- Marshall County
- Mason County
- Massac County
- McDonough County
- McLean County
- Mercer County
- Menard County
- Monroe County
- Montgomery County
- Morgan County
- Moultrie County
- Ogle County
- Peoria County
- Perry County
- Piatt County
- Pike County
- Pope County
- Pulaski County
- Putnam County
- Randolph County
- Richland County
- Rock Island County
- St. Clair County
- Saline County
- Sangamon County
- Schuyler County
- Scott County
- Shelby County
- Stark County

- Stephenson County
- Tazewell County
- Union County
- Vermilion County
- Wabash County
- Warren County
- Washington County
- Wayne County
- White County
- Whiteside County
- Will County
- Williamson County
- Winnebago County
- Woodford County

## Cities

- Berwyn
- Chicago
- Evanston
- Oak Park Village
- Skokie
- St. Joseph
- Urbana

## Indiana

### Counties

- Monroe County

## Kansas

### County

- Lawrence

### Cities

- Douglas County

## Kentucky

### Counties

- Campbell County
- Franklin County
- Jefferson County
- Scott County

### Cities

- Louisville

## Louisiana

### Cities

- New Orleans/Orleans (Parish)

## Maine

### Counties

- Cumberland County
- Hancock County

### Cities

- Portland

## Maryland

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Anne Arundel County
- Baltimore County
- Charles County
- Howard County
- Montgomery County
- Prince George's County
- Queen Anne's County
- Talbot County

### Cities

- Annapolis
- Baltimore City
- Cheverly
- College Park
- Edmonston
- Greenbelt
- Hyattsville
- Mount Rainier
- Rockville
- Takoma Park

## Massachusetts

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Barnstable County
- Berkshire County
- Bristol County
- Dukes County
- Essex County
- Franklin County
- Hampshire County
- Middlesex County
- Nantucket County
- Norfolk County
- Plymouth County
- Suffolk County
- Worcester County

### Cities

- Amherst
- Boston
- Cambridge
- Chelsea
- Concord
- Holyoke
- Lawrence
- Newton
- Northampton
- Orleans
- Somerville
- Springfield

## Michigan

### Counties

- Kalamazoo County
- Kent County
- Oakland County
- Washtenaw County
- Wayne County
- Wexford County

### Cities

- Ann Arbor

- East Lansing

## Minnesota

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Anoka County
- Carver County
- Cottonwood County
- Goodhue County
- Hennepin County
- Le Sueur County
- Lincoln County
- Lyon County
- Martin County
- Nicollet County
- Nobles County
- Otter Tail County
- Pipestone County
- Ramsey County
- Scott County
- Stearns County
- Steele County
- Todd County
- Watonwan County
- Wright County

### Cities

- Minneapolis
- St. Paul

## Nebraska

### Counties

- Arthur County
- Blaine County
- Grant County
- Greeley County
- Hooker County
- Howard County
- Logan County
- Loup County
- McPherson County
- Thomas County

## Nevada

### Cities

- Las Vegas City

## New Hampshire

### Cities

- Hanover
- Lebanon

## New Jersey

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Burlington County
- Cumberland County
- Warren County

### Cities

- Asbury Park
- Bloomfield
- Camden
- East Orange
- Hoboken
- Jersey City
- Leonia
- Linden
- Maplewood
- Montclair Township
- Newark
- North Bergen
- Paterson
- Plainfield
- Prospect Park
- South Orange
- Trenton
- Union City

## New Mexico

## Counties

- Bernalillo County
- Chaves County
- Colfax County
- DeBaca County
- Doña Ana County
- Eddy County
- Grant County
- Hidalgo County
- Lincoln County
- Los Alamos County
- Luna County
- McKinley County
- Otero County
- Quay County
- Rio Arriba County
- Roosevelt County
- San Juan County
- San Miguel County
- Sandoval County
- Santa Fe County
- Sierra County
- Socorro County
- Taos County

## Cities

- Albuquerque
- Santa Fe

## New York

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Albany County
- Dutchess County
- Monroe County
- Orange County
- Putnam County
- Rockland County
- Saratoga County
- Suffolk County
- Sullivan County
- Tompkins County
- Ulster County
- Warren County
- Wayne County
- Westchester County

- Yates County

## Cities

- Albany
- Beacon
- East Hampton
- Hudson
- Ithaca
- Kingston
- New Paltz
- New York City
- Newburgh
- Poughkeepsie
- Rochester
- Syracuse

### North Carolina

## Counties

- Buncombe County
- Chatham County
- Durham County
- Orange County
- Watauga County

### North Dakota

## Counties

- Billings County
- Golden Valley County
- Grant County
- Morton County
- Ramsey County
- Sioux County
- Slope County

### Ohio

## Counties

- Franklin County
- Lorain County
- Warren County

## Cities

- Cincinnati

- Columbus

## Oregon

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Clatsop County
- Columbia County
- Harney County
- Klamath County
- Lake County
- Lane County
- Lincoln County
- Linn County
- Marion County
- Multnomah County
- Tillamook County
- Umatilla County
- Union County
- Washington County
- Yamhill County

### Cities

- Beaverton
- Eugene
- Hood River
- Portland

## Pennsylvania

### Counties

- Adams County
- Allegheny County
- Centre County
- Chester County
- Clarion County
- Dauphin County
- Delaware County
- Lehigh County
- Montgomery County
- Montour County
- Northampton County

### Cities

- Gettysburg

- Philadelphia
- Pittsburgh
- State College
- York

## Rhode Island

### State

- Court Order Requiring State Sanctuary Requirements

### Cities

- Central Falls
- Providence

## Tennessee

### Counties

- Shelby County

### Cities

- Nashville

## Vermont

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Cities

- Burlington
- Montpelier
- Winooski

## Virginia

### Counties

- Albemarle County
- Amherst County
- Arlington County
- Augusta County
- Brunswick County
- Charlotte County
- Chesterfield County

- Dinwiddie County
- Fairfax County
- Gloucester County
- Halifax County
- Hanover County
- Henrico County
- Martinsville County
- Middlesex County
- Prince William County
- Rappahannock County
- Richmond County
- Tazewell County
- Warren County

## Cities

- Abingdon
- Alexandria
- Charlottesville
- Duffield
- Hampton
- Lynchburg
- Manassas
- Martinsville
- Newport News
- Portsmouth
- Richmond
- Tazewell
- Virginia Beach

## Washington

### State

- Self-Identification as a State Sanctuary Jurisdiction

### Counties

- Asotin County
- Benton County
- Chelan County
- Clallam County
- Clark County
- Columbia County
- Cowlitz County
- Ferry County
- Franklin County
- Garfield County
- Grant County
- Grays Harbor County
- Island County
- Jefferson County
- King County
- Kitsap County
- Kittitas County

- Lewis County
- Lincoln County
- Mason County
- Okanogan County
- Pacific County
- Pend Oreille County
- Pierce County
- San Juan County
- Skagit County
- Skamania County
- Snohomish County
- Spokane County
- Stevens County
- Thurston County
- Wahkiakum County
- Walla Walla County
- Whatcom County
- Whitman County

## Cities

- City of Everett
- City of Olympia
- City of Tacoma
- Seattle
- Yakima

**Wisconsin**

## Counties

- Dane County
- Shawano County

## Cities

- Madison
- Milwaukee

**Keywords**

IMMIGRATION (/KEYWORDS/IMMIGRATION)    ALIEN (/KEYWORDS/ALIEN)    BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)

LAW ENFORCEMENT (/KEYWORDS/LAW-ENFORCEMENT)

# Exhibit L

Bove Memo



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC 20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                THE ACTING DEPUTY ATTORNEY GENERAL *EB*

SUBJECT:          Interim Policy Changes Regarding Charging, Sentencing, And
                          Immigration Enforcement

Following President Trump's second inauguration yesterday, I write regarding interim decisions and policy changes pending confirmation of the Attorney General.[1] These interim changes are necessary as an initial response to Executive Orders that President Trump issued yesterday, critical to the Justice Department's mission, and part of the response to three of the most serious threats facing the American people. First, Cartels and other Transnational Criminal Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge on society resulting in an unstable and unsafe border and huge flows of illegal immigration in violation of U.S. law. Second, brutal and intolerable violent crime by members of these organizations and illegal aliens is escalating rapidly across the country. Third, the fentanyl crisis and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of addiction, suffering, and death.

The Justice Department must, and will, work to eradicate these threats. Indeed, it is the responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully execute the policies that the American people elected President Trump to implement. The Justice Department's responsibility, proudly shouldered by each of its employees, includes aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the President's actions on behalf of the United States against legal challenges. The Department's personnel must come together in the offices that taxpayers have funded to do this vitally important work.

**I.    Core Principle: Pursuing The Most Serious, Readily Provable Offense**

Interim changes to the Justice Department's policy regarding charging and sentencing are necessary in order to implement policies articulated in President Trump's January 20, 2025 Executive Orders relating to the elimination of Cartels and other Transnational Criminal Organizations, and securing our borders against illegal immigration and drug trafficking. Therefore, effective today, the Justice Department's interim policy regarding charging and

---

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

# Exhibit M

Notice to Somerville Regarding Revised
SS4A Conditions

| From: | Brad Rawson |
|---|---|
| To: | Nikki Spencer; Cindy Amara; Kate Hartke |
| Cc: | Thomas Galligani; Alan Inacio |
| Subject: | FW: Updated 2023 SS4A Grant Agreement (GA) Schedules, General Terms and Conditions, and Exhibits- Somerville |
| Date: | Tuesday, May 13, 2025 9:25:45 AM |
| Attachments: | SS4A FY23 Grant Agreement Template_3172025- Somerville (2025.05.12).docx |
| | SS4A FY23 Terms and Conditions_3172025.pdf |
| | SS4A FY23 Exhibits_3172025.pdf |
| | Letter to Grant Applicants_final.pdf |

Good morning team,

We've just received some new information from USDOT/FHWA regarding our big FY2023 "Safe Streets & Roads for All" grant award.

We will stand by pending internal discussion.

Thanks,

Brad

---

**From:** Kunhardt, Maria (FHWA) <maria.kunhardt@dot.gov>
**Sent:** Tuesday, May 13, 2025 7:16 AM
**To:** Greg Hanafin <ghanafin@somervillema.gov>
**Cc:** Brad Rawson <BRawson@somervillema.gov>; Grzegorzewski, Joshua (FHWA) <Joshua.Grzegorzewski@dot.gov>; Carr, William (FHWA) <william.carr@dot.gov>; Miller, Kenneth (FHWA) <Kenneth.Miller@dot.gov>
**Subject:** Updated 2023 SS4A Grant Agreement (GA) Schedules, General Terms and Conditions, and Exhibits- Somerville

Good Morning Greg,

Thank you so much for your patience. The Program Office provided the attached **updated 2023 SS4A Grant Agreement (GA), General Terms and Conditions, and Exhibits.** The grant agreement for Somerville's Bicycle Network Vision Safety Demonstration Project must be executed under the new template. We transferred the project information from the last draft GA into the attached Microsoft Word document. Please:

- Review the **updated grant agreement** in its entirety and update the project information, as needed.
  - Make a new selection and review the narrative for Attachment E. The language in the table is has been entirely updated.
- Review the updated **Terms and Conditions.** Note that **Article 24** includes language related to the letter issued by the US. Secretary of Transportation on April 24, 2025 (attached).
- Review the updated **FHWA Exhibits**.
- Once you review all the documentation and confirm the project information, return the updated draft GA Schedules (with Track Changes) back to me and I'll coordinate with the

Program Office to provide the final version for your signature.

Feel free to call me anytime to discuss. We look forward to continuing to work with you on this important project.

Best regards,

Maria

_____

**Maria E. Kunhardt**
Competitive Grants Program Manager
Federal Highway Administration - Massachusetts
220 Binney Street, Cambridge, MA 02142
617-494-3241
Maria.kunhardt@dot.gov

---

**From:** Greg Hanafin <ghanafin@somervillema.gov>
**Sent:** Friday, January 17, 2025 9:27 AM
**To:** Carr, William (FHWA) <william.carr@dot.gov>
**Cc:** Brad Rawson <BRawson@somervillema.gov>; Kunhardt, Maria (FHWA) <maria.kunhardt@dot.gov>; Grzegorzewski, Joshua (FHWA) <Joshua.Grzegorzewski@dot.gov>
**Subject:** RE: HSA240216PR City of Somerville (MA) FY23 S4A agreement and Standard Forms

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Will,

Thank you for the update. I see that in the version of the grant agreement you sent over the line item in the Cost Clarification Table has already been changed from Miscellaneous to Administrative. Does a draft need to be resubmitted for review, or can this be considered the final version to send for signature?

Best,
Greg

-------------------
**Greg Hanafin** (he/him/his)
Transportation Planner, Mobility Division
City of Somerville, OSPCD
93 Highland Ave.

**From:** Carr, William (FHWA) <william.carr@dot.gov>
**Sent:** Friday, January 17, 2025 9:00 AM
**To:** Greg Hanafin <ghanafin@somervillema.gov>
**Cc:** Brad Rawson <BRawson@somervillema.gov>; Kunhardt, Maria (FHWA)
<maria.kunhardt@dot.gov>; Grzegorzewski, Joshua (FHWA) <Joshua.Grzegorzewski@dot.gov>
**Subject:** RE: HSA240216PR City of Somerville (MA) FY23 S4A agreement and Standard Forms

**This email is from an external source. Use caution responding to it, opening attachments or clicking links.**

Hi Greg,

Regarding the forms listed in item 2 – SF-LLL and SF-424B, Somerville did submit them as part of their application but for some reason did not make it into the program office folder. The files are now in the project folder and do not need to be completed again by you. My apologies for the confusion. All that is needed now is the change to the draft grant agreement.

V/R
Will Carr

William G. Carr
Discretionary Grants Coordinator & PMA
Federal Highway Administration – Massachusetts
220 Binney Street, 9th Floor
Cambridge, MA 02142
(617) 494–3622

**From:** Carr, William (FHWA)
**Sent:** Friday, January 17, 2025 8:57 AM
**To:** Greg Hanafin <ghanafin@somervillema.gov>
**Cc:** Brad Rawson <BRawson@somervillema.gov>; Kunhardt, Maria (FHWA)
<maria.kunhardt@dot.gov>; Grzegorzewski, Joshua (FHWA) <Joshua.Grzegorzewski@dot.gov>
**Subject:** FW: HSA240216PR City of Somerville (MA) FY23 S4A agreement and Standard Forms

Good morning, Greg,

The AO (Agreement Officer) has reviewed the Somerville FY23 SS4A draft grant agreement. There are two items to address, they are listed in Rich's email below and I will also include them in mine.

1. Their review noted the Cost Classification Table (page 8) Miscellaneous line item, should be labeled as Administrative.

2. The AO also noted that required Standard Form SF-LLL and SF-424B are not included in the application materials

Blank copies of the Standard Form SF-LLL and SF-424B are attached to this email for you to complete as requested. Please send the completed forms as well as the draft grant agreement with the noted change to the Cost Classification Table to me and I will forward the documents to the program office for approval. If you have any questions or concerns please reach out at any time.

Thank you!

V/R
Will Carr

William G. Carr
Discretionary Grants Coordinator & PMA
Federal Highway Administration – Massachusetts

220 Binney Street, 9th Floor
Cambridge, MA 02142
(617) 494–3622

---

**From:** Hull, Rich (FHWA) <richard.hull@dot.gov>
**Sent:** Thursday, January 16, 2025 4:39 PM
**To:** Carr, William (FHWA) <william.carr@dot.gov>
**Cc:** Grzegorzewski, Joshua (FHWA) <Joshua.Grzegorzewski@dot.gov>; Kunhardt, Maria (FHWA) <maria.kunhardt@dot.gov>; Parker, Stephen (FHWA) <stephen.parker@dot.gov>; Wheeler, Travis (FHWA) <travis.wheeler@dot.gov>
**Subject:** HSA240216PR City of Somerville (MA) FY23 S4A agreement and Standard Forms

William Carr,

Good afternoon.

The Agreement Officer (AO) completed their review the draft agreement and supporting documentation for the agreement with the City of Somerville.

Their review noted the Cost Classification Table (page 8) Miscellaneous line item, should be labeled as Administrative.

The AO also noted that required Standard Form SF-LLL and SF-424B are not included in the application materials.  I have attached the blank forms to this email.  I am able to send the request, to complete and return the forms, to the selected recipient, if you prefer.

Respectfully,

**Rich**

Richard J. Hull
Agreement Specialist (HCFA-41)
Office of Assistance Agreements (HCFA-40)
Office of Acquisition and Grant Management (HCFA)
Federal Highway Administration (FHWA)
Department of Transportation (DOT)
Teams Chat Rich Hull
Office 202-366-0627
Text: 571-241-4090

*HCFA values your perspective on your recent acquisition experience.  Please take a moment to complete our brief customer survey available* here*. Your response is anonymous and will help us assess the quality of our support to your program.*

**City of Somerville Public Records Notice**

*Please be advised that the Massachusetts Attorney General has determined that email is a public record unless the content of the email falls within one of the stated exemptions under the Massachusetts Public Records Laws.*

# Exhibit N

Designation Fact Sheet



## Fact Sheet: President Donald J. Trump Protects American Communities from Criminal Aliens

The White House

April 28, 2025

**CRACKING DOWN ON SANCTUARY CITIES:** Today, President Donald J. Trump signed an Executive Order to enforce federal law with respect to sanctuary jurisdictions to protect their citizens from dangerous illegal aliens.

- The Order directs the Attorney General and Secretary of Homeland Security to publish a list of States and local jurisdictions obstructing federal immigration law enforcement and notify each sanctuary jurisdiction of its non-compliance, providing an opportunity to correct it.

- Sanctuary jurisdictions that do not comply with federal law may lose federal funding.

- The Order directs the Attorney General and Secretary of Homeland Security to pursue all necessary legal remedies and enforcement measures to bring non-compliant jurisdictions into compliance.

- It instructs the Attorney General and Secretary of Homeland Security to develop mechanisms for proper eligibility verification in sanctuary jurisdictions to prevent illegal aliens from receiving federal public benefits.

- The Order ensures illegal aliens are not being favored over American citizens by directing the Attorney General to address state or local laws that unlawfully prioritize aliens.
  - This includes in-state tuition benefits for aliens or criminal sentencing factors that favor aliens.

**ENFORCING FEDERAL LAW:** President Trump believes it is imperative that the federal government restore the enforcement of United States immigration law to protect national sovereignty and security.

- Millions of illegal aliens entered the United States under President Biden's watch, including human smugglers, gang members, criminals, and terrorists.

- Some state and local officials are choosing to violate, obstruct, and defy the enforcement of Federal immigration laws, a lawless insurrection against the Federal Government's constitutional authority to protect the territorial sovereignty of the United States and conduct a unified national policy on immigration.
  - The sanctuary state of Massachusetts released several illegal aliens accused of raping kids back into the community while refusing to hold them for ICE.
  - Jose Ibarra was arrested and released twice before going on to murder Laken Riley.
  - The sanctuary city of Philadelphia ignored an ICE detainer and released a previously deported illegal alien from Honduras, who then went on to rape a child.

- Beyond creating enormous national security risks, these efforts often violate federal criminal laws, including those prohibiting obstruction of justice, harboring or hiring illegal aliens, conspiring against the United States, and impeding federal law enforcement.

**SECURING OUR HOMELAND:** President Trump is following through on his promise to rid the United States of sanctuary cities.

- President Trump: "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY



VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

Subscribe to The White House newsletter

Your email                                    SIGN UP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

# Exhibit O

HUD Immigration Conditions

| | |
|---|---|
| **From:** | Jette, Alexandra B <Alexandra.B.Jette@hud.gov> |
| **Sent:** | Tuesday, September 23, 2025 4:24 PM |
| **To:** | Alan Inacio |
| **Cc:** | Thomas Galligani |
| **Subject:** | Somerville, MA FY25 Formula Grant Agreements - CDBG, HOME, ESG |
| **Attachments:** | 2025 ConAAP Grant Agreement Transmittal Letter - Boston - City of Somerville.docx.pdf; R01 B25MC250022 - CDBG - Somerville.docx.pdf; R01 M25MC250208 - HOME - Somerville.docx.pdf; R01 E25MC250022 - ESG - Somerville.docx.pdf |

| | |
|---|---|
| **Importance:** | High |

Please find your FY2025 CPD Formula Grant Agreement(s) and Transmittal Letter attached.  New for this year, grantees sign all grant agreements first, followed by HUD signature, so you are receiving a grant agreement(s) that is unsigned by HUD.  Once processed, our Office will provide you with the fully executed grant agreement for your records.  Please sign and return as soon as possible.

**Please note that there is a processing pause from September 25 until late October to accommodate year-end financial reconciliation. Any grant agreements returned after September 22 (or incomplete/insufficient) may not be contracted until late October. Funds cannot be drawn until your grant has been contracted.**

**IMPORTANT** reminders regarding grant agreement processing:

- No additions/modifications other than those described here (or in the Transmittal Letter) should be made to the grant agreement without prior written approval.
- The signature block **must** include the Name **and** Title of the Authorized Official, along with Signature and Date.
- Please do not enter any information in Boxes 1-23—our Office will complete needed inputs based on the HUD signature date.
- The Indirect Cost Rate Addendum (Addendum 3) **must** be completed for each grant agreement (even if no indirect costs will be charged under the grant).
- Return a full grant agreement package, including all addenda (we need all pages).
- Your organization's UEI status **must** be active in SAM.gov (if it becomes expired, it will need to be renewed before HUD can process your agreement(s)).
- Submit the executed, fully completed grant agreement(s) to BostonCPD@hud.gov for processing.

We ask that you adhere to these important processing reminders, otherwise, your agreement(s) will be returned for correction, which will delay the processing of your award and access to funds.



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT
Boston Field Office
10 Causeway Street, 3rd Floor
Boston, MA 02222

Alan Inacio                                                                    9/23/2025
City of Somerville
93 Highland Avenue
City Hall
Somerville, MA 02143-0000

**SUBJECT: Fiscal Year 2025 Grant Agreement Transmittal**

Dear Mr. Inacio:

The Boston Field Office would like to thank you for your continued partnership in providing quality affordable housing, a suitable living environment, and expanding economic opportunities through the Department of Housing and Urban Development (HUD) programs.

One Grant Agreement is attached for each program awarded as follows:

| | |
|---|---|
| Community Development Block Grant Program (CDBG) | $2,477,825.00 |
| HOME Investment Partnerships (HOME) | $517,544.40 |
| Emergency Solutions Grants (ESG) | $218,817.00 |
| | |
| | |
| | |
| **Total FY 2025 Award** | **$3,214,186.40** |

**<u>Federal Award Agreement</u>**

Transmittal of a grant agreement does not constitute approval of the activities described in your Consolidated Plan or Annual Action Plan. You are reminded that you, as grantee, are responsible for ensuring that all grant funds are used in accordance with all program requirements. By executing the Federal Award Agreement, you are entering into a legally binding agreement with HUD to use the awarded funds and carry out the funded activities in accordance with all Federal statutes, regulations, Federal Register notices, and award terms and conditions that apply to those funds and activities.

Please carefully note the addenda that are part of each agreement.

HUD recognizes that some U.S. District Courts have issued injunction orders which impact certain FY 2025 CPD formula funding grant agreement(s). To preserve all legal rights and defenses, the enclosed grant agreement contains the same conditions at issue in those court actions. For grantees who are plaintiffs in those court actions, HUD intends to comply with all applicable injunction orders and will not implement or enforce the challenged conditions consistent with those court orders, including disregarding any "certifications" or "compliance" statements. Please return an executed copy of the grant agreement, as discussed below, and

HUD will make grant funds at issue in your agreement available consistent with all applicable orders. Please be advised that should the injunction orders that currently prohibit HUD from enforcing the challenged conditions as to your grant be stayed, dissolved, or reversed, the grant agreement, with conditions, will automatically become effective.

**Executing the Agreement**

The authorized official **must** complete Addendum 3. Indirect Cost Rate Schedule for each agreement, even if no indirect costs will be charged under the grant. Please mark one (and only one) checkbox to reflect how indirect costs will be calculated and charged under the grant. Please note that the Office of Management and Budget (OMB) issued revised Guidance and the *de minimis* indirect cost rate increased from 10 percent to up to 15 percent of Modified Total Direct Costs.

After inputting their name and title, the authorized official must execute each agreement, with a signature, and date. No other additions other than those described here should be made to the grant agreement without prior written approval. Please ensure the Chief Elected Official or authorized official signs the agreement.

You must return the entire Federal Award Agreement, including all addenda, to this office via the Field Office General Email Inbox: BostonCPD@hud.gov. HUD will be signing the grant agreement second and will return to your office a copy of each signed agreement for you to maintain in your local program files.

HUD congratulates the City of Somerville on your grant award(s), and we look forward to assisting you in accomplishing your program goals. If you have any questions or need further information or assistance, please contact your assigned Field Office representative or email our Office at BostonCPD@hud.gov.

Sincerely,

Mark Sorbo
CPD Director (Acting)
Office of Community Planning and
    Development

Enclosure(s)

2

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT
## FEDERAL AWARD AGREEMENT

### A. General Federal Award Information

| | |
|---|---|
| 1. Recipient name (must match Unique Entity Identifier name) and address:<br>Somerville<br>93 HIGHLAND AVENUE<br>CITY HALL<br>SOMERVILLE, MA 02143-0000 | 12. Assistance listing number and title:<br>• 14.218, Community Development Block Grant Program for Entitlement Communities<br>• 14.225, Community Development Block Grant Program for Insular Areas<br>• 14.228, Community Development Block Grant Program for States and Non-Entitlement Grants in Hawaii |
| 2. Recipient's Unique Entity Identifier:<br>KV62KX4QF3N8 | 13. Amount of federal funds obligated by this action:<br>$2,477,825.00 |
| 3. Tax identification number:<br>046001414 | 14. Total amount of federal funds obligated:<br>$2,477,825.00 |
| 4. Federal Award Identification Number (FAIN):<br>B25MC250022 | 15. Total approved cost sharing (if applicable):<br>N/A |
| 5. Instrument type:<br>Grant ☒    Cooperative agreement ☐<br>Loan Guarantee ☐ | 16. Total federal award amount, including approved cost sharing:<br>$2,477,825.00 |
| 6.  Period of performance start and end date:<br>10/1/2024 - See Addendum 2 | 17. Budget approved by HUD: |
| 7. Budget period start and end date:<br>10/1/2024 - See Addendum 2 | 18. Fiscal year:<br>2025 |
| 8. Initial Agreement ☒    Amendment ☐ # | 19. Statutory authority:<br>42 U.S.C. 5301 et seq. |
| 9. Indirect cost rate (per § 200.414):<br>Recipients must complete Addendum 3: Indirect Cost Rate Schedule | 20. Applicable appropriations act(s):<br>Public Law 119-4 |
| 10. Is this award for research and development (per 2 C.F.R. § 200.1)? Yes ☐    No ☒ | 21. Notice/notice of funding opportunity this award is made under (if applicable):<br>N/A |
| 11. Awarding official name and contact information: | 22. Program regulations (if applicable):<br>24 C.F.R. Part 570 |

| |
|---|
| 23. Federal award description:<br>The CDBG program provides funding to eligible grantees for the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income.<br><br>• Addendum 1. Policy Requirements<br>• Addendum 2. Program-Specific Requirements<br>• Addendum 3. Indirect Cost Rate Schedule |

*Authority and Agreement.* This agreement between the U.S. Department of Housing and Urban Development (HUD) and the Recipient is made pursuant to the statutory authority above (box 19) and is subject to the applicable appropriations act(s) (box 20). This agreement incorporates by reference the Community Development Block Grant program statute 42 U.S.C. 5301 et seq., the program regulations at 24 C.F.R. § 570 (as now in effect and as may be

U.S. Department of Housing and Urban Development — Federal Award Agreement

amended from time to time), Recipient's consolidated plan/action plan, the relevant funding notice (box 21), any attached Specific Terms and Conditions, and the attached addenda (box 23).

**B. Terms and Conditions**

1. *General terms and requirements.* The Recipient must comply with all applicable federal laws, regulations, and requirements, unless otherwise provided through HUD's formal waiver authorities. This agreement, including any attachments and addenda, may only be amended in writing executed by parties to this agreement and any addenda.

2. *Administrative requirements.* The Recipient must comply with the following requirement(s) if checked below:

   ☐ The administrative requirements in the HUD General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs 2025, as indicated in the relevant NOFO, apply to this agreement.

   ☒ The grantee shall comply with requirements established by the Office of Management and Budget (OMB) concerning the Unique Entity Identifier (UEI); the System for Award Management (SAM.gov.); the Federal Funding Accountability and Transparency Act as provided in 2 C.F.R. part 25, Universal Identifier and General Contractor Registration; and 2 C.F.R. part 170, Reporting Subaward and Executive Compensation Information.

3. *Applicability of 2 C.F.R. part 200.*

   ☒ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200, as may be amended from time to time. If any previous or future amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

   ☐ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200. If any previous amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

4. *Future budget periods.* If the period of performance spans multiple budget periods, subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

5. *Indirect Cost Rate.* If the Recipient intends to use a negotiated or de minimis rate for indirect costs, the Recipient must submit an Indirect Cost Rate form to HUD, either with its application using HUD-426 (competitive grants) or with this agreement using "Addendum #3 "Indirect Cost Rate Schedule" (formula and congressional grants). The submitted form/addendum will be incorporated into and made part of this agreement, provided that the rate information is consistent with the applicable requirements under 2 C.F.R. § 200.414. If there is any change in the Recipient's indirect cost rate, it must immediately notify HUD and execute an amendment to this agreement to reflect the change if necessary.

6. *Recipient integrity and performance matters.* If the Federal share of this award is more than $500,000 over the period of performance (box 6), the terms and conditions in 2 C.F.R. part 200 Appendix XII apply to this agreement.

7. *Recordkeeping and Access to Records.* The Recipient hereby agrees to maintain complete and accurate books of account for this award and award activities in such a manner as to permit the preparation of statements and reports in accordance with HUD requirements, and to permit timely and effective audit. The Recipient agrees to furnish HUD such financial and project reports, records, statements, subrecipient data, and documents at such times, in such form, and accompanied by such reporting data as required by HUD. HUD and its duly authorized representative shall have full and free access to all Recipient offices and facilities, and to all books, documents, and records of the Recipient relevant to the administration, receipt, and use of this award and award activities, including the right to audit and make copies. The Recipient agrees to maintain records that identify the source and application of funds, including relevant subrecipient data, in

U.S. Department of Housing and Urban Development — Federal Award Agreement

such a manner as to allow HUD to determine that all funds are and have been expended in accordance with program requirements and in a manner consistent with applicable law.

Further, the Recipient hereby acknowledges that HUD is in the process of implementing new grants management and reporting tools, which will be made available for the Recipient's use in the future. The Recipient agrees to report on grant performance and financial activities (including vendor and cash disbursement supporting details for the Recipient and its subrecipients) using these new tools when they are released. HUD will work with the Recipient to support the Recipient's transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all of its available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include, without limitation, requiring 100% review, suspension of disbursements, and all other legally available remedies, to the furthest extent permitted by law, as amended.

8. *Noncompliance.* If the Recipient fails to comply with the provisions of this agreement, HUD may take one or more of the actions provided in program statutes, regulations or 2 C.F.R. § 200.339, as applicable. Nothing in this agreement shall limit any remedies otherwise available to HUD in the case of noncompliance by the Recipient. No delay or omissions by HUD in exercising any right or remedy available to it under this agreement shall impair any such right or remedy or constitute a waiver of or acquiescence in any Recipient noncompliance.

9. *Termination provisions.* Unless superseded by program statutes, regulations or NOFOs, the termination provisions in 2 C.F.R. § 200.340 apply.

10. *Build America, Buy America.* The Recipient must comply with the requirements of the Build America, Buy America (BABA) Act, 41 U.S.C. § 8301 note, and all applicable rules and notices, as may be amended, if applicable. Pursuant to HUD's Notice, "Public Interest Phased Implementation Waiver for FY 2022 and 2023 of Build America, Buy America Provisions as Applied to Recipients of HUD Federal Financial Assistance" (88 Fed. Reg. 17001), BABA requirements apply to any infrastructure projects HUD has obligated funds for after the effective dates, unless excepted by a waiver.

11. *Waste, Fraud, Abuse, and Whistleblower Protections.* Any person who becomes aware of the existence or apparent existence of fraud, waste, or abuse of any HUD award must report such incidents to both the HUD official responsible for the award and to HUD's Office of Inspector General (OIG). Allegations of fraud, waste, and abuse related to HUD programs can be reported to the HUD OIG hotline via phone at 1-800-347-3735 or online hotline form. The Recipient must comply with 41 U.S.C. § 4712, which includes informing employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a government contractor, subcontractor, recipient, and subrecipient—as well as a personal services contractor—who make a protected disclosure about a Federal award or contract cannot be discharged, demoted, or otherwise discriminated against if they reasonably believe the information they disclose is evidence of (1) gross mismanagement of a Federal contract or award; (2) waste of Federal funds; (3) abuse of authority relating to a Federal contract or award; (4) substantial and specific danger to public health and safety; or (5) violations of law, rule, or regulation related to a Federal contract or award.

12. *Third-Party Claims.* Nothing in this agreement shall be construed as creating or justifying any claim against the federal government or the Recipient by any third party.

13. *Rule of Construction and No Construction Against Drafter.* Notwithstanding anything contained in this agreement, the terms and conditions hereof are to be construed to have full and expansive effect in both interpretation and application, and the parties agree that the principle of interpretation that holds that ambiguities in terms or conditions are construed against the drafter shall not apply in interpreting this agreement.

## C. Federal Award Performance Goals

The Recipient must meet any applicable performance goals, indicators, targets, and baseline data as required by applicable program requirements.

U.S. Department of Housing and Urban Development — Federal Award Agreement

**D. Specific Terms and Conditions**    Not applicable ☒    Attached ☐

| For the U.S. Department of HUD<br>(name and title of authorized official) | Signature | Date |
|---|---|---|
| For the Recipient<br>(name and title of authorized official) | Signature | Date |

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 1. POLICY REQUIREMENTS**

If applicable:

1.  The Recipient shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

2.  The Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

3.  The Recipient certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

4.  The Recipient shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that,

5.  Notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

6.  The Recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

7.  No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations.

8.  The Recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

9.  Faith-based organizations may be subrecipients for funds on the same basis as any other organization.  Recipients may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

U.S. Department of Housing and Urban Development — Federal Award Agreement

## ADDENDUM 2. PROGRAM-SPECIFIC REQUIREMENTS

**Assistance Listing 14.218, Community Development Block Grant Program for Entitlement Communities**

**Assistance Listing 14.225, Community Development Block Grant Program for Insular Areas**

**Assistance Listing 14.228, Community Development Block Grant Program for States and Non-Entitlement Grants in Hawaii**

1.  *Environmental Review.* The Recipient agrees to assume all the responsibilities for environmental review, decision making, and actions, as specified and required in regulations issued by the Secretary pursuant to section 104(g) of title I of the Housing and Community Development Act of 1974 and published in 24 C.F.R. part 58; except that if the Recipient is a state, the Recipient must require the unit of general local government to assume that responsibility and must comply with the state's responsibilities under 24 C.F.R. 58.4.

2.  *Public Use.* The Recipient shall ensure that no CDBG funds are used to support any Federal, State, or local projects that seek to use the power of eminent domain, unless eminent domain is employed only for public use. For the purposes of this requirement, public use shall not be construed to include economic development that primarily benefits private entities. Any use of funds for mass transit, railroad, airport, seaport, or highway projects as well as utility projects that benefit or serve the general public (including energy-, communication-, water-, and wastewater-related infrastructure), other structures designated for use by the general public or which have other common-carrier or public-utility functions that serve the general public and are subject to regulation and oversight by the government, and projects for the removal of an immediate threat to public health and safety or brownfield as defined in the Small Business Liability Relief and Brownfields Revitalization Act (Pub. Law No. 107–118) shall be considered a public use for purposes of eminent domain.

3.  *Prohibition on Selling, Trading, and Transferring Funds.* The Recipient or unit of general local government that directly or indirectly receives CDBG funds may not sell, trade, or otherwise transfer all or any such portion of such funds to another such entity in exchange for any other funds, credits or non-Federal considerations, but must use such funds for activities eligible under title I of the Housing and Community Development Act of 1974.

4.  *Construction of Water and Sewer Facilities.* Notwithstanding any other provision of this agreement, the Recipient may not obligate or expend award funds to plan or construct water or sewer facilities, including any new or revised activities, until after 1) it completes the review procedures required under Executive Order 12372, Intergovernmental Review of Federal Programs, and 24 C.F.R. part 52 and 2) HUD provides written notice of the release of funds.

5.  *Funds for For-Profit Entities.* Under 42 U.S.C. § 5305(a)(17), CDBG funds may not be provided to a for-profit entity unless such activity or project has been evaluated and selected in accordance with Appendix A to 24 C.F.R. § 570, *Guidelines and Objectives for Evaluating Project Costs and Financial Requirements*.

6.  *Violence Against Women Act.* The Recipient will comply with the right to report crime and emergencies protections at 34 U.S.C. § 12495 of the Violence Against Women Act.

U.S. Department of Housing and Urban Development — Federal Award Agreement

7.  Funding Information and Period of Performance and Budget Period End Dates

| Source of Funds | Amount | Period of Performance End Date | Budget Period End Date |
|---|---|---|---|
| 2025 | $2,477,825.00 | 9/30/2033 | 9/30/2033 |

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 3. INDIRECT COST RATE SCHEDULE**

As the duly authorized representative of the Recipient, I certify that the Recipient:

☐   Will not use an indirect cost rate to calculate and charge indirect costs under the grant.

☐   Will calculate and charge indirect costs under the grant by applying a *de minimis* rate as provided by 2 C.F.R. § 200.414(f), as may be amended from time to time.

☐   Will calculate and charge indirect costs under the grant using the indirect cost rate(s) listed below, and each rate listed is included in an indirect cost rate proposal developed in accordance with the applicable appendix to 2 C.F.R. part 200 and, *if required*, was approved by the cognizant agency for indirect costs.

| Agency/department/major function | Indirect cost rate | Type of Direct Cost Base |
|---|---|---|
|  | % |  |
|  | % |  |
|  | % |  |

Instructions for the Recipient:
The Recipient must mark the one (and only one) checkbox above that best reflects how the Recipient's indirect costs will be calculated and charged under the grant.  Do not include indirect cost rate information for subrecipients.

The table following the third box must be completed only if that box is checked.  When listing a rate in the table, enter both the percentage amount (e.g., 10%) and the type of direct cost base to be used. For example, if the direct cost base used for calculating indirect costs is Modified Total Direct Costs, then enter "MTDC" in the "Type of Direct Cost Base" column.

If using the Simplified Allocation Method for indirect costs, enter the applicable indirect cost rate and type of direct cost base in the first row of the table.

If using the Multiple Allocation Base Method, enter each major function of the organization for which a rate was developed and will be used under the grant, the indirect cost rate applicable to that major function, and the type of direct cost base to which the rate will be applied.

If the Recipient is a government and more than one agency or department will carry out activities under the grant, enter each agency or department that will carry out activities under the grant, the indirect cost rate(s) for that agency or department, and the type of direct cost base to which each rate will be applied.

To learn more about the indirect cost requirements, see 2 C.F.R. part 200, subpart E and Appendix VII to Part 200 (for state and local governments).

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT
**FEDERAL AWARD AGREEMENT**

### A. General Federal Award Information

| | |
|---|---|
| 1. Recipient name (must match Unique Entity Identifier name) and address:<br>Somerville<br>93 HIGHLAND AVENUE<br>City Hall<br>SOMERVILLE, MA 02143 | 12. Assistance listing number and title:<br>14.239, HOME Investment Partnerships Program |
| 2. Recipient's Unique Entity Identifier:<br>KV62KX4QF3N8 | 13. Amount of federal funds obligated by this action:<br>$517,544.40 |
| 3. Tax identification number:<br>046001414 | 14. Total amount of federal funds obligated:<br>$517,544.40 |
| 4. Federal Award Identification Number (FAIN):<br>M25MC250208 | 15. Total approved cost sharing (if applicable):<br>See Addendum 2 |
| 5. Instrument type:<br>Grant ☒    Cooperative agreement ☐<br>Loan Guarantee ☐ | 16. Total federal award amount, including approved cost sharing:<br>$517,544.40 |
| 6. Period of performance start and end date:<br>- 09/30/2034 | 17. Budget approved by HUD: |
| 7. Budget period start and end date:<br>FY 2025 through FY 2033 | 18. Fiscal year:<br>See Addendum 2 |
| 8. Initial Agreement ☒    Amendment ☐ # | 19. Statutory authority:<br>42 U.S.C. 12701 et seq |
| 9. Indirect cost rate (per § 200.414):<br>Recipients must complete Addendum 3: Indirect Cost Rate Schedule | 20. Applicable appropriations act(s):<br>Public Law 118-158, Public Law 119-4 |
| 10. Is this award for research and development (per 2 C.F.R. § 200.1)? Yes ☐    No ☒ | 21. Notice/notice of funding opportunity this award is made under (if applicable):<br>N/A |
| 11. Awarding official name and contact information: | 22. Program regulations (if applicable):<br>24 C.F.R. Part 92 |
| 23. Federal award description:<br>Under the HOME Investment Partnerships Program, HUD allocates funds by formula among eligible State and local governments to strengthen public-private partnerships and to expand the supply of decent, safe, sanitary, and affordable housing, with primary attention to rental housing, for very low-income and low-income families.<br><br>• Addendum 1. Policy Requirements<br>• Addendum 2. Program-Specific Requirements<br>• Addendum 3. Indirect Cost Rate Schedule | |

*Authority and Agreement.* This agreement between the U.S. Department of Housing and Urban Development (HUD) and the Recipient is made pursuant to the statutory authority above (box 19) and is subject to the applicable appropriations act(s) (box 20). This agreement incorporates by reference the HOME Investment Partnerships program statute 42 U.S.C. 12701 et seq., the program regulations at 24 C.F.R. § 92 (as now in effect and as may be amended

U.S. Department of Housing and Urban Development — Federal Award Agreement

from time to time), Recipient's consolidated plan/action plan, the relevant funding notice (box 21), any attached Specific Terms and Conditions, and the attached addenda (box 23).

**B. Terms and Conditions**

1. *General terms and requirements.* The Recipient must comply with all applicable federal laws, regulations, and requirements unless otherwise provided through HUD's formal waiver authorities. This agreement, including any attachments and addenda, may only be amended in writing executed by parties to this agreement and any addenda.

2. *Administrative requirements.* The Recipient must comply with the following requirement(s) if checked below:

   ☐ The administrative requirements in the HUD General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs 2025, as indicated in the relevant NOFO, apply to this agreement.

   ☒ The grantee shall comply with requirements established by the Office of Management and Budget (OMB) concerning the Unique Entity Identifier (UEI); the System for Award Management (SAM.gov.); the Federal Funding Accountability and Transparency Act as provided in 2 C.F.R. part 25, Universal Identifier and General Contractor Registration; and 2 C.F.R. part 170, Reporting Subaward and Executive Compensation Information.

3. *Applicability of 2 C.F.R. part 200.*

   ☒ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200, as may be amended from time to time. If any previous or future amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

   ☐ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200. If any previous amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

4. *Future budget periods.* If the period of performance spans multiple budget periods, subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

5. *Indirect Cost Rate.* If the Recipient intends to use a negotiated or de minimis rate for indirect costs, the Recipient must submit an Indirect Cost Rate form to HUD, either with its application using HUD-426 (competitive grants) or with this agreement using "Addendum #3 "Indirect Cost Rate Schedule" (formula and congressional grants). The submitted form/addendum will be incorporated into and made part of this agreement, provided that the rate information is consistent with the applicable requirements under 2 C.F.R. § 200.414. If there is any change in the Recipient's indirect cost rate, it must immediately notify HUD and execute an amendment to this agreement to reflect the change if necessary.

6. *Recipient integrity and performance matters.* If the Federal share of this award is more than $500,000 over the period of performance (box 6), the terms and conditions in 2 C.F.R. part 200 Appendix XII apply to this agreement.

7. *Recordkeeping and Access to Records.* The Recipient hereby agrees to maintain complete and accurate books of account for this award and award activities in such a manner as to permit the preparation of statements and reports in accordance with HUD requirements, and to permit timely and effective audit. The Recipient agrees to furnish HUD such financial and project reports, records, statements, subreceipient data, and documents at such times, in such form, and accompanied by such reporting data as required by HUD. HUD and its duly authorized representative shall have full and free access to all Recipient offices and facilities, and to all books, documents, and records of the Recipient relevant to the administration, receipt, and use of this award and award activities, including the right to audit and make copies. The Recipient agrees to maintain records that identify the source and application of funds, including relevant subrecipient data, in

U.S. Department of Housing and Urban Development — Federal Award Agreement

such a manner as to allow HUD to determine that all funds are and have been expended in accordance with program requirements and in a manner consistent with applicable law.

Further, the Recipient hereby acknowledges that HUD is in the process of implementing new grants management and reporting tools, which will be made available for the Recipient's use in the future. The Recipient agrees to report on grant performance and financial activities (including vendor and cash disbursement supporting details for the Recipient and its subrecipients) using these new tools when they are released. HUD will work with the Recipient to support the Recipient's transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all of its available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include, without limitation, requiring 100% review, suspension of disbursements, and all other legally available remedies, to the furthest extent permitted by law, as amended.

8. *Noncompliance.* If the Recipient fails to comply with the provisions of this agreement, HUD may take one or more of the actions provided in program statutes, regulations or 2 C.F.R. § 200.339, as applicable. Nothing in this agreement shall limit any remedies otherwise available to HUD in the case of noncompliance by the Recipient. No delay or omissions by HUD in exercising any right or remedy available to it under this agreement shall impair any such right or remedy or constitute a waiver of or acquiescence in any Recipient noncompliance.

9. *Termination provisions.* Unless superseded by program statutes, regulations or NOFOs, the termination provisions in 2 C.F.R. § 200.340 apply.

10. *Build America, Buy America.* The Recipient must comply with the requirements of the Build America, Buy America (BABA) Act, 41 U.S.C. § 8301 note, and all applicable rules and notices, as may be amended, if applicable. Pursuant to HUD's Notice, "Public Interest Phased Implementation Waiver for FY 2022 and 2023 of Build America, Buy America Provisions as Applied to Recipients of HUD Federal Financial Assistance" (88 Fed. Reg. 17001), BABA requirements apply to any infrastructure projects HUD has obligated funds for after the effective dates, unless excepted by a waiver.

11. *Waste, Fraud, Abuse, and Whistleblower Protections.* Any person who becomes aware of the existence or apparent existence of fraud, waste, or abuse of any HUD award must report such incidents to both the HUD official responsible for the award and to HUD's Office of Inspector General (OIG). Allegations of fraud, waste, and abuse related to HUD programs can be reported to the HUD OIG hotline via phone at 1-800-347-3735 or online hotline form. The Recipient must comply with 41 U.S.C. § 4712, which includes informing employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a government contractor, subcontractor, recipient, and subrecipient—as well as a personal services contractor—who make a protected disclosure about a Federal award or contract cannot be discharged, demoted, or otherwise discriminated against if they reasonably believe the information they disclose is evidence of (1) gross mismanagement of a Federal contract or award; (2) waste of Federal funds; (3) abuse of authority relating to a Federal contract or award; (4) substantial and specific danger to public health and safety; or (5) violations of law, rule, or regulation related to a Federal contract or award.

12. *Third-Party Claims.* Nothing in this agreement shall be construed as creating or justifying any claim against the federal government or the Recipient by any third party.

13. *Rule of Construction and No Construction Against Drafter*. Notwithstanding anything contained in this agreement, the terms and conditions hereof are to be construed to have full and expansive effect in both interpretation and application, and the parties agree that the principle of interpretation that holds that ambiguities in terms or conditions are construed against the drafter shall not apply in interpreting this agreement.

## C. Federal Award Performance Goals

The Recipient must meet any applicable performance goals, indicators, targets, and baseline data as required by applicable program requirements.

U.S. Department of Housing and Urban Development — Federal Award Agreement

**D. Specific Terms and Conditions**    Not applicable ☒    Attached ☐

| For the U.S. Department of HUD (name and title of authorized official) | Signature | Date |
|---|---|---|
| For the Recipient (name and title of authorized official) | Signature | Date |

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 1. POLICY REQUIREMENTS**

If applicable:

1.  The Recipient shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

2.  The Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

3.  The Recipient certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

4.  The Recipient shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that,

5.  Notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

6.  The Recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

7.  No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations.

8.  The Recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

9.  Faith-based organizations may be subrecipients for funds on the same basis as any other organization. Recipients may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

U.S. Department of Housing and Urban Development — Federal Award Agreement

## ADDENDUM 2. PROGRAM-SPECIFIC REQUIREMENTS

**Assistance Listing 14.239, HOME Investment Partnerships Program**

1.  For the purposes of this Agreement and any applicable addenda, the term "recipient" shall have the meaning of "grantee", "participating jurisdiction" as defined in 24 C.F.R. 92.2., or "insular area" as defined in 24 C.F.R. 92.2.

2.  *Community Housing Development Organizations (CHDOs)*. When 42 U.S.C. 12771(b) is suspended by a given year's appropriations, the Secretary shall not deduct funds set aside for CHDOs from the Recipient's HOME Investment Trust Fund for failure to reserve those funds for projects owned, developed, or sponsored by CHDOs within 24 months after the last day of the month in which HUD notifies the Recipient of HUD's execution of this Agreement.

3.  *Commitment*. When 42 U.S.C. 12749(g) is suspended by a given year's appropriations, the Recipient's ability to commit funds provided through this Agreement will not expire 24 months after the last day of the month in which such funds are deposited in the jurisdiction's HOME Investment Trust Fund.

4.  *Deobligations*. To the extent authorized by HUD regulations at 24 C.F.R. Part 92, HUD may, by its execution of an amendment to this Agreement, deobligate funds previously awarded to the Recipient without the Recipient's execution of the amendment or other consent.

5.  *State Environmental Review*. If a Recipient is a State, as defined in 24 C.F.R. 92.2, and the Recipient provides HOME funds to a "State recipient", as that term is defined in 24 CFR 92.2, then the Recipient must require that the "State recipient" shall assume responsibility for the environmental review in accordance with 24 CFR 92.352 in the written agreement entered into pursuant to 24 CFR 92.504. Notwithstanding the foregoing, as per 24 CFR 92.504(c)(1)(vi), the "State recipient" shall not assume the Recipient's responsibilities for release of funds under 24 CFR 92.352.

6.  *Reallocations*. All funds for the specified Fiscal Year provided by HUD by formula reallocation are covered by this Agreement upon execution of an amendment by HUD, without the Recipient's execution of the amendment or other consent.

7.  *Repayments*. The Recipient agrees that funds invested in affordable housing under 24 C.F.R. Part 92 are repayable when the housing no longer qualifies as affordable housing. Repayment shall be made as specified in 24 C.F.R. Part 92.

8.  *Cost Sharing*. This award is subject to match provisions in 24 C.F.R. 92.64(a)(1) and 24 C.F.R. 92.218-222, as applicable. The amount of match that a recipient may be required to provide in a year is not based upon the amount of the recipient's award. Under 24 C.F.R. 92.218, the amount of match that a recipient may be required to provide is determined by the type of eligible costs incurred by the recipient and the amount of funds drawn from the HOME Investment Trust Fund Treasury Account in that year. Since these factors are fact-sensitive, the amount of match is not included in either Box 15 or Box 16 of this Agreement.

U.S. Department of Housing and Urban Development — Federal Award Agreement

9. *Funding Information*:

| Source of Funds | Appropriation Code | PAS Code | Amount |
|---|---|---|---|
| 2023 | 86 3/6 0205 | HMF (M) | $2,571.37 |
| 2024 | 86 4/7 0205 | HMF (N) | $1,929.94 |
| 2025 | 86 5/8 0205 | HMF (P) | $513,043.09 |

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 3. INDIRECT COST RATE SCHEDULE**

As the duly authorized representative of the Recipient, I certify that the Recipient:

☐    Will not use an indirect cost rate to calculate and charge indirect costs under the grant.

☐    Will calculate and charge indirect costs under the grant by applying a *de minimis* rate as provided by 2 C.F.R. § 200.414(f), as may be amended from time to time.

☐    Will calculate and charge indirect costs under the grant using the indirect cost rate(s) listed below, and each rate listed is included in an indirect cost rate proposal developed in accordance with the applicable appendix to 2 C.F.R. part 200 and, *if required*, was approved by the cognizant agency for indirect costs.

| Agency/department/major function | Indirect cost rate | Type of Direct Cost Base |
|---|---|---|
|  | % |  |
|  | % |  |
|  | % |  |

<u>Instructions for the Recipient</u>:
The Recipient must mark the one (and only one) checkbox above that best reflects how the Recipient's indirect costs will be calculated and charged under the grant.  Do not include indirect cost rate information for subrecipients.

The table following the third box must be completed only if that box is checked.  When listing a rate in the table, enter both the percentage amount (e.g., 10%) and the type of direct cost base to be used. For example, if the direct cost base used for calculating indirect costs is Modified Total Direct Costs, then enter "MTDC" in the "Type of Direct Cost Base" column.

If using the Simplified Allocation Method for indirect costs, enter the applicable indirect cost rate and type of direct cost base in the first row of the table.

If using the Multiple Allocation Base Method, enter each major function of the organization for which a rate was developed and will be used under the grant, the indirect cost rate applicable to that major function, and the type of direct cost base to which the rate will be applied.

If the Recipient is a government and more than one agency or department will carry out activities under the grant, enter each agency or department that will carry out activities under the grant, the indirect cost rate(s) for that agency or department, and the type of direct cost base to which each rate will be applied.

To learn more about the indirect cost requirements, see 2 C.F.R. part 200, subpart E and Appendix VII to Part 200 (for state and local governments).

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT
## FEDERAL AWARD AGREEMENT

### A. General Federal Award Information

| | |
|---|---|
| 1. Recipient name (must match Unique Entity Identifier name) and address:<br>Somerville<br>93 HIGHLAND AVENUE<br>CITY HALL<br>SOMERVILLE, MA 02143- | 12. Assistance listing number and title:<br>14.231, Emergency Solutions Grants Program |
| 2. Recipient's Unique Entity Identifier:<br>KV62KX4QF3N8 | 13. Amount of federal funds obligated by this action:<br>$218,817.00 |
| 3. Tax identification number:<br>046001414 | 14. Total amount of federal funds obligated:<br>$218,817.00 |
| 4. Federal Award Identification Number (FAIN):<br>E25MC250022 | 15. Total approved cost sharing (if applicable):<br>$218,817.00                    (See Addendum 2) |
| 5. Instrument type:<br>Grant ☒    Cooperative agreement ☐<br>Loan Guarantee ☐ | 16. Total federal award amount, including approved cost sharing:<br>$437,634.00 |
| 6.  Period of performance start and end date: | 17. Budget approved by HUD: |
| 7. Budget period start and end date: | 18. Fiscal year:<br>2025 |
| 8. Initial Agreement ☒    Amendment ☐ # | 19. Statutory authority:<br>42 U.S.C. 11371 et seq. |
| 9. Indirect cost rate (per § 200.414):<br>Recipients must complete Addendum 3: Indirect Cost Rate Schedule | 20. Applicable appropriations act(s):<br>Public Law 119-4 |
| 10. Is this award for research and development (per 2 C.F.R. § 200.1)? Yes ☐   No ☒ | 21. Notice/notice of funding opportunity this award is made under (if applicable):<br>N/A |
| 11. Awarding official name and contact information: | 22. Program regulations (if applicable):<br>24 C.F.R.  576 |
| 23. Federal award description:<br> The Emergency Solutions Grant Program is designed to assist people with quickly regaining stability in permanent housing after experiencing a housing crisis and/or homelessness.<br><br>    • Addendum 1. Policy Requirements<br>    • Addendum 2. Program-Specific Requirements<br>    • Addendum 3. Indirect Cost Rate Schedule | |

*Authority and Agreement.* This agreement between the U.S. Department of Housing and Urban Development (HUD) and the Recipient is made pursuant to the statutory authority above ( box 19) and is subject to the applicable appropriations act(s) ( box 20). This agreement incorporates by reference the Emergency Solutions Grants program statute 42 U.S.C. 11371 et seq., the program regulations at 24 C.F.R. § 576 (as now in effect and as may be amended

U.S. Department of Housing and Urban Development — Federal Award Agreement

from time to time), Recipient's consolidated plan/action plan, the relevant funding notice (box 21), any attached Specific Terms and Conditions, and the attached addenda (box 23).

**B. Terms and Conditions**

1. *General terms and requirements.* The Recipient must comply with all applicable federal laws, regulations, and requirements, unless otherwise provided through HUD's formal waiver authorities. This agreement, including any attachments and addenda, may only be amended in writing executed by parties to this agreement and any addenda.

2. *Administrative requirements.* The Recipient must comply with the following requirement(s) if checked below:

   ☐ The administrative requirements in the HUD General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs 2025, as indicated in the relevant NOFO, apply to this agreement.

   ☒ The grantee shall comply with requirements established by the Office of Management and Budget (OMB) concerning the Unique Entity Identifier (UEI); the System for Award Management (SAM.gov.); the Federal Funding Accountability and Transparency Act as provided in 2 C.F.R. part 25, Universal Identifier and General Contractor Registration; and 2 C.F.R. part 170, Reporting Subaward and Executive Compensation Information.

3. *Applicability of 2 C.F.R. part 200.*

   ☒ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200, as may be amended from time to time. If any previous or future amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

   ☐ The Recipient must comply with the applicable requirements at 2 C.F.R. part 200. If any previous amendments to 2 C.F.R. part 200 replace or renumber any part 200 section cited in HUD's regulations in Title 24 of the Code of Federal Regulations, the amended part 200 requirements will govern award activities carried out after the amendments' effective date.

4. *Future budget periods.* If the period of performance spans multiple budget periods, subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

5. *Indirect Cost Rate.* If the Recipient intends to use a negotiated or de minimis rate for indirect costs, the Recipient must submit an Indirect Cost Rate form to HUD, either with its application using HUD-426 (competitive grants) or with this agreement using "Addendum #3 "Indirect Cost Rate Schedule" (formula and congressional grants). The submitted form/addendum will be incorporated into and made part of this agreement, provided that the rate information is consistent with the applicable requirements under 2 C.F.R. § 200.414. If there is any change in the Recipient's indirect cost rate, it must immediately notify HUD and execute an amendment to this agreement to reflect the change if necessary.

6. *Recipient integrity and performance matters.* If the Federal share of this award is more than $500,000 over the period of performance (box 6), the terms and conditions in 2 C.F.R. part 200 Appendix XII apply to this agreement.

7. *Recordkeeping and Access to Records.* The Recipient hereby agrees to maintain complete and accurate books of account for this award and award activities in such a manner as to permit the preparation of statements and reports in accordance with HUD requirements, and to permit timely and effective audit. The Recipient agrees to furnish HUD such financial and project reports, records, statements, subrecipient data, and documents at such times, in such form, and accompanied by such reporting data as required by HUD. HUD and its duly authorized representative shall have full and free access to all Recipient offices and facilities, and to all books, documents, and records of the Recipient relevant to the administration, receipt, and use of this award and award activities, including the right to audit and make copies. The Recipient agrees to maintain records that identify the source and application of funds, including relevant subrecipient data, in

U.S. Department of Housing and Urban Development — Federal Award Agreement

such a manner as to allow HUD to determine that all funds are and have been expended in accordance with program requirements and in a manner consistent with applicable law.

Further, the Recipient hereby acknowledges that HUD is in the process of implementing new grants management and reporting tools, which will be made available for the Recipient's use in the future. The Recipient agrees to report on grant performance and financial activities (including vendor and cash disbursement supporting details for the Recipient and its subrecipients) using these new tools when they are released. HUD will work with the Recipient to support the Recipient's transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all of its available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include, without limitation, requiring 100% review, suspension of disbursements, and all other legally available remedies, to the furthest extent permitted by law, as amended.

8.  *Noncompliance.* If the Recipient fails to comply with the provisions of this agreement, HUD may take one or more of the actions provided in program statutes, regulations or 2 C.F.R. § 200.339, as applicable. Nothing in this agreement shall limit any remedies otherwise available to HUD in the case of noncompliance by the Recipient. No delay or omissions by HUD in exercising any right or remedy available to it under this agreement shall impair any such right or remedy or constitute a waiver of or acquiescence in any Recipient noncompliance.

9.  *Termination provisions.* Unless superseded by program statutes, regulations or NOFOs, the termination provisions in 2 C.F.R. § 200.340 apply.

10. *Build America, Buy America.* The Recipient must comply with the requirements of the Build America, Buy America (BABA) Act, 41 U.S.C. § 8301 note, and all applicable rules and notices, as may be amended, if applicable. Pursuant to HUD's Notice, "Public Interest Phased Implementation Waiver for FY 2022 and 2023 of Build America, Buy America Provisions as Applied to Recipients of HUD Federal Financial Assistance" (88 Fed. Reg. 17001), BABA requirements apply to any infrastructure projects HUD has obligated funds for after the effective dates, unless excepted by a waiver.

11. *Waste, Fraud, Abuse, and Whistleblower Protections.* Any person who becomes aware of the existence or apparent existence of fraud, waste, or abuse of any HUD award must report such incidents to both the HUD official responsible for the award and to HUD's Office of Inspector General (OIG). Allegations of fraud, waste, and abuse related to HUD programs can be reported to the HUD OIG hotline via phone at 1-800-347-3735 or online hotline form. The Recipient must comply with 41 U.S.C. § 4712, which includes informing employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a government contractor, subcontractor, recipient, and subrecipient—as well as a personal services contractor—who make a protected disclosure about a Federal award or contract cannot be discharged, demoted, or otherwise discriminated against if they reasonably believe the information they disclose is evidence of (1) gross mismanagement of a Federal contract or award; (2) waste of Federal funds; (3) abuse of authority relating to a Federal contract or award; (4) substantial and specific danger to public health and safety; or (5) violations of law, rule, or regulation related to a Federal contract or award.

12. *Third-Party Claims.* Nothing in this agreement shall be construed as creating or justifying any claim against the federal government or the Recipient by any third party.

13. *Rule of Construction and No Construction Against Drafter.* Notwithstanding anything contained in this agreement, the terms and conditions hereof are to be construed to have full and expansive effect in both interpretation and application, and the parties agree that the principle of interpretation that holds that ambiguities in terms or conditions are construed against the drafter shall not apply in interpreting this agreement.

## C. Federal Award Performance Goals

The Recipient must meet any applicable performance goals, indicators, targets, and baseline data as required by applicable program requirements.

U.S. Department of Housing and Urban Development — Federal Award Agreement

**D. Specific Terms and Conditions**    Not applicable ☒    Attached ☐

| For the U.S. Department of HUD<br>(name and title of authorized official) | Signature | Date/ Federal Award Date |
|---|---|---|
| For the Recipient<br>(name and title of authorized official) | Signature | Date |

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 1. POLICY REQUIREMENTS**

If applicable:

1. The Recipient shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

2. The Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

3. The Recipient certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

4. The Recipient shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that,

5. Notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

6. The Recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

7. No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations.

8. The Recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

9. Faith-based organizations may be subrecipients for funds on the same basis as any other organization.  Recipients may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 2. PROGRAM-SPECIFIC REQUIREMENTS**

**Assistance Listing Number 14.231, Emergency Solutions Grants Program**

1.  The funds may be used for costs incurred before the Budget Period under the conditions specified in HUD Notice CPD-25-02 or another prior written approval by HUD, or if the Recipient is not covered by Notice CPD-25-02, under the condition that the costs are otherwise allowable and were incurred on or after the date HUD received the Recipient's Consolidated Plan submission, the Recipient's program year start date, or 90 calendar days before the period of performance start date in Box 6 (whichever is latest).

2.  The Recipient agrees to assume responsibility for environmental review, decision making, and action under 24 C.F.R. Part 58; except that if the Recipient is a state and distributes funds to a unit of general local government, the Recipient must require the unit of general local government to assume that responsibility and must comply with the state's responsibilities under 24 C.F.R. 58.4.

3.  To the extent authorized by applicable law, HUD may, by its execution of an amendment, deobligate funds under this Agreement without the Recipient's execution of the amendment or other consent.

4.  Despite any requirements that provide otherwise, youth aged 24 and under who seek assistance (including shelter, services or rental assistance) shall not be required to provide third-party documentation that they meet the homeless definition in 24 C.F.R. 576.2 as a condition for receiving assistance, and unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under) who have an unsafe primary nighttime residence and no safe alternative to that residence shall be considered homeless for purposes of assistance provided by any private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under.

5.  Cost sharing is defined in 2 C.F.R. Part 200 to include match, which is the required level of cost share that must be provided. Box 15 reflects the total match amount the recipient is required to contribute, as determined in accordance with 24 CFR 576.201.

U.S. Department of Housing and Urban Development — Federal Award Agreement

**ADDENDUM 3. INDIRECT COST RATE SCHEDULE**

As the duly authorized representative of the Recipient, I certify that the Recipient:

☐    Will not use an indirect cost rate to calculate and charge indirect costs under the grant.

☐    Will calculate and charge indirect costs under the grant by applying a *de minimis* rate as provided by 2 C.F.R. § 200.414(f), as may be amended from time to time.

☐    Will calculate and charge indirect costs under the grant using the indirect cost rate(s) listed below, and each rate listed is included in an indirect cost rate proposal developed in accordance with the applicable appendix to 2 C.F.R. part 200 and, *if required*, was approved by the cognizant agency for indirect costs.

| Agency/department/major function | Indirect cost rate | Type of Direct Cost Base |
|---|---|---|
|  | % |  |
|  | % |  |
|  | % |  |

Instructions for the Recipient:
The Recipient must mark the one (and only one) checkbox above that best reflects how the Grantee's indirect costs will be calculated and charged under the grant.  Do not include indirect cost rate information for subrecipients.

The table following the third box must be completed only if that box is checked.  When listing a rate in the table, enter both the percentage amount (e.g., 10%) and the type of direct cost base to be used. For example, if the direct cost base used for calculating indirect costs is Modified Total Direct Costs, then enter "MTDC" in the "Type of Direct Cost Base" column.

If using the Simplified Allocation Method for indirect costs, enter the applicable indirect cost rate and type of direct cost base in the first row of the table.

If using the Multiple Allocation Base Method, enter each major function of the organization for which a rate was developed and will be used under the grant, the indirect cost rate applicable to that major function, and the type of direct cost base to which the rate will be applied.

If the Grantee is a government and more than one agency or department will carry out activities under the grant, enter each agency or department that will carry out activities under the grant, the indirect cost rate(s) for that agency or department, and the type of direct cost base to which each rate will be applied.

To learn more about the indirect cost requirements, see 2 C.F.R. part 200, subpart E and Appendix VII to Part 200 (for state and local governments).