**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CITY OF CHELSEA and CITY OF SOMERVILLE,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-10442-NMG |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' Second Amended Complaint. In support of this Motion, Defendants refer the Court to the attached Memorandum. Pursuant to Local Rule 7.1, Defendants certify that their counsel has conferred in good faith with counsel for Plaintiffs and determined that a motion to dismiss is the most effective way to resolve this dispute.

Dated: June 10, 2026

BRETT A. SHUMATE
Assistant Attorney General

ANDREW I. WARDEN
JOSEPH E. BORSON
Assistant Branch Directors

*/s/ Alexander J. Yun*
ALEXANDER J. YUN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.: (202) 674-0255
Email: alex.yun@usdoj.gov
*Counsel for Defendants*

i

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CITY OF CHELSEA and CITY OF
SOMERVILLE,

              *Plaintiffs*,

*v.*

DONALD TRUMP, *et al.*,

              *Defendants*.

Civil Action No. 1:25-cv-10442-NMG

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

       A.     Executive Orders.................................................................................... 2

       B.     Department of Justice ........................................................................... 3

       C.     Department of Transportation................................................................ 3

       D.     Department of Homeland Security ........................................................ 5

       E.     Department of Housing and Urban Development ................................... 5

PROCEDURAL HISTORY................................................................................................ 6

LEGAL STANDARD........................................................................................................ 6

ARGUMENT .................................................................................................................... 7

I.      Plaintiffs' Assert Facial Challenges to the Executive Orders and Agency Directives, Not As-Applied Challenges................................................................ 7

II.     Many of Plaintiffs' Claims Are Not Ripe. ............................................................ 8

III.    Plaintiffs Lack Standing...................................................................................... 11

IV.    Plaintiffs' Claims Fail on the Merits.................................................................... 13

       A.     Count I: Plaintiffs Fail to Allege a Violation of the Separation of Powers. ......... 13

       B.     Count II: Plaintiffs Fail to Allege a Violation of the Spending Clause. ............... 15

       C.     Count III: Plaintiffs Fail to Allege a Violation of the Tenth Amendment............ 19

       D.     Counts IV& V: Plaintiffs Fail to Allege Violations of the Fifth Amendment................................................................................................ 20

       E.     Counts VI–XI: Plaintiffs Fail to Allege Claims for Declaratory Relief. .............. 23

       F.     Counts XII–XV: Plaintiffs Fail to Allege Violations of the Administrative Procedure Act.......................................................................................... 24

             a.     The Agency Memoranda Are Not Final Agency Action. ......................... 24

             b.     Allocation of Discretionary Grant Funding is Committed to Agency Discretion By Law.................................................................. 26

iii

c.    The Agencies' Actions Are Not Contrary to the Constitution.................. 28

d.    The Agencies' Actions Are Not in Excess of Statute. ............................ 28

V.    The Court Should Dismiss the President as a Defendant. ................................................ 30

CONCLUSION.................................................................................................................... 30

iv

**TABLE OF AUTHORITIES**

**CASES**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967)................................................................................. 8, 11, 24

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,
300 U.S. 227 (1937)....................................................................................... 23

*Alan Guttmacher Inst. v. McPherson,*
597 F. Supp. 1530 (S.D.N.Y. 1984)................................................................. 28

*Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*,
705 F.3d 44 (1st Cir. 2013) ............................................................................. 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................... 7

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972)....................................................................................... 20

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985)................................................................................... 16, 21

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................................................................... 24

*Biden v. Missouri*,
595 U.S. 87 (2022)......................................................................................... 16

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......................................................................... 14

*California v. United States Dep't of Transportation*,
808 F. Supp. 3d 291 (D.R.I. Nov. 4, 2025).................................................. 4, 5, 12

*Charles C. Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937)................................................................................... 17, 19

*City of Fall River v. Fed. Energy Regul. Comm'n*,
507 F.3d 1 (1st Cir. 2007)............................................................................ 8, 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)................................................................................... 12, 13

*Cmty. Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) ........................................................................ 28

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................. 13

*Coast Fed. Bank, FSB v. United States*,
  323 F.3d 1035 (Fed. Cir. 2003)........................................................................... 22

*Dalton v. Specter*,
  511 U.S. 462 (1994)............................................................................................. 15

*Env't Def. Ctr., Inc. v. U.S. EPA*,
  344 F.3d 832 (9th Cir. 2003) ............................................................................... 19

*Fed. Energy Regul. Comm'n v. Mississippi*,
  456 U.S. 742 (1982)............................................................................................. 19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)....................................................................................... 24, 30

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980)....................................................................................... 24, 25

*Gizzo v. Ben-Habib*,
  44 F. Supp. 3d 374 (S.D.N.Y. 2014)................................................................... 20

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025), *denying reh'g en banc*,
  2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) .................................................... 15

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)............................................................................................. 20

*Gordo-González v. United States*,
  873 F.3d 32 (1st Cir. 2017) ................................................................................... 6

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir.), *vacated & remanded*, 583 U.S. 941 (2017) ................... 30

*Heckler v. Chaney,*
  470 U.S. 821 (1985)....................................................................................... 27, 28

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010)................................................................................................. 21

*Hol–Gar Mfg. Corp. v. United States*,
  351 F.2d 972 (Ct. Cl. 1965) ................................................................................. 22

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 554 (4th Cir.), *vacated and remanded on other grounds*, 583 U.S. 912 (2017)........ 30

vi

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,*
  746 F.2d 855 (D.C. Cir. 1984) .......................................................................................... 27

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) .......................................................................................................... 7

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) .................................................................................................... 27, 28

*Lujan v. National Wildlife Federation,*
  497 U.S. 871 (1990) ........................................................................................................ 26

*Martins v. Vt. Mut. Ins. Co.,*
  662 F. Supp. 3d. 55 (D. Mass. 2023), *aff'd*, 92 F.4th 325 (1st Cir. 2024) ................................ 23

*McAbee Constr., Inc. v. United States,*
  97 F.3d 1431 (Fed. Cir. 1996) ......................................................................................... 22

*Melton v. City of Okla. City,*
  879 F.2d 706 (10th Cir. 1989) ......................................................................................... 18

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,*
  169 F.3d 747 (Fed. Cir. 1999) ......................................................................................... 22

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) .................................................................................... 27, 28

*Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866) ........................................................................................... 30

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) .......................................................................................................... 8

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
  167 F.4th 86 (4th Cir. 2026) ............................................................................................ 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ........................................................................................... 16, 17, 19

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
  538 U.S. 803 (2003) .......................................................................................................... 8

*Nat'l Urb. League v. Trump,*
  783 F. Supp. 3d 61 (D.D.C. 2025) ............................................................................. 21, 22

*National Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998) ........................................................................................................ 22

vii

*New Vision Photography Program, Inc. v. District of Columbia*,
  54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................... 20, 21

*New York v. U.S. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020) ................................................................................. 29

*New York v. United States*,
  505 U.S. 144 (1992) ...................................................................................... 16, 19

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ........................................................................................ 25, 26

*Or. Nat. Desert Ass'n. v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ............................................................................. 24

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ........................................................................................... 20

*Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
  313 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................... 28

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
  421 F.3d 1 (1st Cir. 2005) .................................................................................. 20

*Renne v. Geary*,
  501 U.S. 312 (1991) ............................................................................................. 6

*S & D Maintenance Co. v. Goldin,*
  844 F.2d 962 (2d Cir. 1988) .............................................................................. 21

*Skelly Oil Co. v. Phillips Petroleum Co.*,
  339 U.S. 667 (1950) ........................................................................................... 23

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ...................................................................................... 13, 16

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................................... 11, 12

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ........................................................................... 30

*Texas v. United States*,
  523 U.S. 296 (1998) ........................................................................................ 8, 11

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ............................................................................................. 8

viii

*Town of Castle Rock v. Gonzalez*,
    545 U.S. 748 (2005) ............................................................................................ 20

*Trump v. Am. Fed'n of Gov't Emps.*,
    606 U.S.---, 145 S. Ct. 2635 (2025) (mem.) ...................................................... 14

*Trump v. New York*,
    592 U.S. 125 (2020) ............................................................................................ 10

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ............................................................................................ 19

*United States v. Pickard*,
    100 F. Supp. 3d 981 (E.D. Cal. 2015) ............................................................. 19, 20

*United States v. Rahimi*,
    602 U.S. 680 (2024) ........................................................................................... 7, 8

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................................................. 7

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8, cl. 1 ....................................................................................... 13

## STATUTES

5 U.S.C. § 701 ...................................................................................................... 26, 28

5 U.S.C. § 704 .......................................................................................................... 24

5 U.S.C. § 706 .......................................................................................................... 28

6 U.S.C. § 112 .......................................................................................................... 26

8 U.S.C. § 1324 ...................................................................................................... 5, 17

8 U.S.C. § 1373 ................................................................................................... *passim*

8 U.S.C. § 1601 ........................................................................................................ 18

8 U.S.C. § 1644 ...................................................................................................... 5, 17

20 U.S.C. § 954 ........................................................................................................ 22

34 U.S.C. § 10102 ................................................................................................. 14, 29

34 U.S.C. § 10153 ................................................................................................. 14, 29

ix

42 U.S.C. § 11386 .................................................................................................... 26

Housing and Community Development Act of 1980,
    Pub. L. No. 96-399, 94 Stat. 1614 ................................................................... 17, 29

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
    Pub. L. No. 104-193, 110 Stat. 2105 ............................................................... 17, 29

**REGULATIONS**

Exec. Order No. 14,159,
    90 Fed. Reg. 8443 (Jan. 20, 2025) ................................................................. 2, 19, 23

Exec. Order No. 14,218,
    90 Fed. Reg. 10,581 (Feb. 19, 2025) ............................................................. 2, 19, 23

Exec. Order No. 14,287,
    90 Fed. Reg. 18,761 (Apr. 28, 2025) .................................................................... 2

**OTHER AUTHORITIES**

Homeland Security, *DHS Standard Terms and Conditions* (Last Updated 04/22/2026),
    https://www.dhs.gov/publication/dhs-standard-terms-and-conditions .................................... 17

**INTRODUCTION**

Plaintiffs challenge various Executive Orders and agency directives which purport to limit funding for so-called sanctuary jurisdictions. They urge the Court to declare such actions unlawful and provide them with quick relief lest they lose funding or are unable to plan for the upcoming fiscal year. Yet, only one Defendant has imposed conditions on Plaintiffs' funding, and even then, Plaintiffs have not alleged any loss of funding since this case's inception. As such, any claims of imminent harm have proven false during the case's near eighteen-month pendency. Plaintiffs speculative fear about losing funds by being designated "sanctuary jurisdictions" also has not materialized, as Plaintiffs do not appear on the current list of sanctuary jurisdictions published by the Department of Justice or Department of Homeland Security. In fact, the only factual development alleged between the first and second amended complaints is a new set of standard conditions from the Department of Housing and Urban Development. Because much of this dispute has not crystalized into a ripe dispute—and it may never so crystalize—this Court should dismiss Plaintiff Somerville's claims against DOT, DOJ, and DHS, and Plaintiff Chelsea's claims against all Defendants, for lack of Article III jurisdiction.

Even if the Court determines the case is ripe, it should still dismiss the case for failure to state a claim upon which relief may be granted. Plaintiffs bring fifteen counts against Defendants, all of which fail. As this Court already found, "Plaintiffs have not shown a strong likelihood of success in proving that the conditions imposed by the subject orders and directives would violate a constitutional limitation." Mem. & Order at 17, ECF No. 41.  Indeed, Plaintiffs cannot succeed at all in making such a showing. Similarly, Plaintiffs have not shown any final agency action that goes beyond an agency's discretionary authority. As such, the Court should dismiss the case for failure to state any viable claim.

1

**BACKGROUND**

Plaintiffs are two self-described "sanctuary cities" asserting facial challenges to three Executive Orders ("EOs"), 14,159, 14,218, and 14,287, and eight implementing actions by the Department of Justice ("DOJ"), Department of Homeland Security ("DHS"), Department of Transportation ("DOT"), and Department of Housing and Urban Development ("HUD") applying those EOs. Second Am. Compl.¶¶ 4-5, ECF No. 48 ("Compl.").

A.    **Executive Orders**

EO 14,159 instructed the Attorney General and Secretary of Homeland Security to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." Exec. Order No. 14,159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025), ECF No. 10-1 ("E.O. 14,159").

EO 14,218 instructed the head of each agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," Exec. Order No. 14,218, § 2(a)(ii), 90 Fed. Reg. 10,581, 10,581 (Feb. 19, 2025), ECF No. 10-2 ("E.O. 14,218").

EO 14,287 instructed the Attorney General and the Secretary of Homeland Security to publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws. Exec. Order No. 14,287, 90 Fed. Reg. 18,761 (Apr. 28, 2025), ECF No. 10-3.

As explained below, Plaintiffs' Second Amended Complaint challenges eight purported "Agency Directives" issued in response to these Executive Orders.  Compl. ¶ 5.

2

## B.      Department of Justice

Former Attorney General Bondi issued a memorandum stating that that DOJ "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." Memorandum from Pamela Bondi, Att'y Gen. to All Department Employees, re *Sanctuary Jurisdiction Directives* at 1 (Feb. 5, 2025), ECF No. 48-4 ("Bondi Memo"); *see also* Compl. ¶¶ 85–87. The memo states that it must be implemented "consistent with law" and "[c]onsistent with applicable statutes, regulations, court orders, and terms"; and requires a "report" to determine "the grants to which [the sanctuary jurisdiction] requirement applies." Bondi Memo at 1-2. The memo further stated that DOJ would "exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations," and would "[c]onsistent with statutory authority and past practice . . . require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)."[1] *Id*. The memo also suggests that "to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, . . ." and reiterated that DOJ will "seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions." *Id.* at 2. The memo further emphasized that it must be implemented "consistent with law" and "[c]onsistent with applicable statutes, regulations, court orders, and terms." *Id.* at 1.

## C.      Department of Transportation

Similarly, Secretary of Transportation Duffy issued an order that "[t]o the maximum extent permitted by law, DOT-supported or -assisted programs and activities . . . shall prioritize projects

---

[1] "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).

3

and goals that: . . . require local compliance or cooperation with Federal immigration enforcement . . . ." Off. of Sec'y of Transp., U.S. Dep't of Transp., DOT Order 2100.7, Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities at 2–3 (last updated Feb. 7, 2025), ECF No. 48-5 ("DOT Order"); *see also* Compl. ¶ 84. DOT later sent a letter to all recipients of DOT funding reminding them of their responsibility to comply with federal law, including U.S. Immigration and Customs Enforcement. Letter from Sean Duffy, Sec'y, U.S. Dep't of Transp., to All Recipients of U.S. Department of Transportation Funding at 2 (Apr. 24, 2025), ECF No. 48-6 ("DOT Letter"); *see also* Compl. ¶ 98. Finally, DOT updated its terms and conditions for the Safe Streets and Roads For All ("SS4A") program to require recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." U.S. Dep't of Transp., General Terms & Conditions Under the Fiscal Year 2023 Safe Streets & Roads for All Grant Program: FHWA Projects 24.2(a) (last revised Mar. 17, 2025), ECF No. 48-7 ("DOT Conditions"); *see also* Compl. ¶ 95. DOT notified Plaintiff Somerville of these revised conditions on May 13, 2025. Compl. ¶ 100.

Since then, DOT has been permanently enjoined from imposing or enforcing grant conditions related to cooperation with federal civil immigration enforcement. *See California v. United States Dep't of Transportation,* 808 F. Supp. 3d 291 (D.R.I. Nov. 4, 2025). The court declared the terms[2] "unlawful and ordered vacated from all grant agreements administered by

---

[2] The grant term is the same one alleged here:  "…the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.") *Id.* at 314.

4

[DOT]." *Id.* Accordingly, DOT has not included any grant conditions requiring cooperation with federal civil immigration enforcement in any grant agreements presented to any recipients for signature on or after November 4, 2025. To the extent any such conditions were included in any grant agreement that was executed or presented for signature prior to November 4, 2025, DOT notified those recipients that it will not enforce those conditions, the conditions have no legal effect, and the conditions should be considered stricken from the agreements.

### D.    Department of Homeland Security

DHS for its part has issued two notices. Former Secretary Noem issued a memorandum stating that "[t]o the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each [DHS] component must cease providing federal funding to sanctuary jurisdictions." Memorandum from Kristi Noem, Sec'y, U.S. Dep't of Homeland at 2 (Feb. 19, 2025), ECF No. 48-4 ("Noem Memo"); *see also* Compl. ¶ 93. DHS also updated its terms and conditions for financial assistance recipients to require recipients to comply with 8 U.S.C. §§ 1373 and 1644; comply with other relevant immigration laws, including 8 U.S.C. § 1324; honor requests for cooperation; provide access to detainees; and not leak the existence of an immigration enforcement operation. U.S. Dep't of Homeland Sec., FY 2025 DHS Standard Terms and Conditions *Version 3* (Apr. 18, 2025), ECF No. 48-9 ("DHS Conditions"); *see also* Compl. ¶ 97.

### E.    Department of Housing and Urban Development

Finally, HUD updated its guidance on funding recipients. HUD Secretary Turner issued a letter stating that grant agreements will include language requiring compliance with Executive Order 14,218 and that HUD will take steps to ensure federal resources are not used to support sanctuary policies which actively prevent federal authorities from deporting illegal aliens. Letter from Scott Turner, Sec'y, U.S. Dep't of Hous. & Urb. Dev., to HUD Grantees & Stakeholders

5

(Apr. 4, 2025), ("HUD Letter"), ECF No. 48-10; *see also* Compl. ¶ 96. HUD also updated its terms and conditions for financial assistance to prohibit recipients from using "funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations." U.S. Dep't of Hous. & Urb. Dev., Fed. Award Agreement, (Sept. 23, 2025), ECF No. 45-15 ("HUD Conditions"); *see also* Compl. ¶ 110. HUD notified Plaintiff Somerville of these conditions on September 23, 2025. *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed this suit on February 23, 2025, ECF No. 1, and subsequently amended their complaint on May 31, 2025, ECF No. 10. On June 3, 2025, Plaintiffs moved for a preliminary injunction, seeking to enjoin Defendants from withholding or conditioning of federal funds based on the challenged Executive Orders and agency directives. ECF No. 12. The Court denied the motion after a hearing. ECF No. 41. Plaintiffs filed the operative, second amended complaint with leave of court on December 18, 2025, ECF No. 48. In amending their complaint a second time, Plaintiffs bring fifteen constitutional and statutory claims challenging the above-mentioned executive orders and agency directives.

## LEGAL STANDARD

On a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a district court must "accept the well-pleaded factual averments contained" in the complaint, but the "party seeking to invoke the jurisdiction of a federal court must bear the burden of demonstrating the existence of such jurisdiction." *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017) (citation modified). Courts must "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citation omitted).

6

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## ARGUMENT

**I.    Plaintiffs' Assert Facial Challenges to the Executive Orders and Agency Directives, Not As-Applied Challenges.**

As a threshold matter, it is important to define the type of challenges Plaintiffs have asserted in this case. Specifically, Plaintiffs challenge three Executive Orders, five agency memoranda, and the DHS conditions *on their face* rather than in connection with any particular set of facts as applied to Plaintiffs. In determining whether a plaintiff has brought a facial or as-applied challenge, "[t]he label" the plaintiff chooses "is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). "The important point" of distinction is whether the plaintiff's "claim and the relief that would follow . . . reach beyond" the plaintiff's "particular circumstances." *Id.* If so, the plaintiff must "satisfy [the] standards for a facial challenge." *Id.* To succeed on such facial challenge, Plaintiffs must "establish that no set of circumstances exists under which" the challenged Executive Orders and agency memoranda "would be valid," *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Applying these principles here, the majority of Plaintiffs' claims are plainly facial attacks against the challenged Executive Orders and agency directives. Plaintiff Somerville alleges specific conditions from DOT and HUD, but otherwise, Plaintiffs have not identified specific grants or federal funding streams that have been terminated, modified, or conditioned because of the challenged Executive Orders and directives. And regarding the Executive Orders and agency memoranda, Plaintiffs request categorical relief in the form of declaratory and injunctive relief prohibiting enforcement in every conceivable application. *See* Compl., Prayer for Relief.

7

Plaintiffs' claims should be resolved on the grounds on which they chose to litigate them. Plaintiffs' decision to pursue facial challenges for the majority of their claims "comes at a cost," as the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Plaintiffs cannot overcome that "difficult challenge." *Rahimi*, 602 U.S. at 693.

## II.   Many of Plaintiffs' Claims Are Not Ripe.

"Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (first quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003), then quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967)). To determine whether administrative action is ripe for judicial review, courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)).

Here, Plaintiff Somerville's claims against DOJ and DHS, and Plaintiff Chelsea's claims against all Defendants, rest on such "contingent future events." *Id.* Simply put, Plaintiff Somerville has not alleged that either DOJ or DHS have taken any particular actions against it, and the same is true of all Defendants for Plaintiff Chelsea. They have not imposed any new conditions on Plaintiffs, nor have they issued any funding decisions. Rather, Plaintiffs filed this action anticipating the possibility of such denials that have not come to pass.

8

Regarding DOJ, Plaintiffs only challenge the Bondi Memo. Compl. ¶ 5. But that Memo merely directs the Associate Attorney General to create a report identifying grants that may be conditioned upon compliance with immigration laws and then to take additional steps "to tailor future grants to promote a lawful system of immigration." Bondi Memo at 2. In other words, it directs no specific action against Plaintiffs but merely calls for an evaluation of potential future action. And even so, DOJ specifically removed Plaintiffs from its designation list. Compl. ¶ 106.

For DHS, Plaintiffs challenge both the Noem Memo and DHS's updated FY2025 conditions. *Id.* ¶ 5. As with the Bondi Memo, the Noem Memo merely directs DHS to evaluate potential funding cuts: DHS is to "review all federal financial assistance awards" to determine if they are going to sanctuary jurisdictions. *Id.* ¶ 93. As to the DHS conditions, Plaintiffs never allege that such conditions apply to them. Rather, they merely note that DHS updated its conditions to generally require cooperation with immigration enforcement. *Id.* ¶ 97. The fact that DHS does not have a designation list with Plaintiffs on it only underscores this fact. *Id.* ¶ 106 n.1.

Regarding DOT and HUD, Plaintiff Somerville alleges that these Defendants imposed new conditions on it, but Plaintiff Chelsea nowhere alleges the same. Chelsea, then, only challenges the HUD Letter, DOT Order, and DOT Letter, all of which, like the DOJ and DHS memoranda, are not specifically directed at Chelsea. The HUD Letter directed a "review [of] our programs," *id.* ¶ 96, and the DOT memoranda announced broad review of agency policies, *id.* ¶¶ 84, 98.

Indeed, regarding Defendants DOJ and DHS for Somerville and all Defendants for Chelsea, Plaintiffs have not alleged any particular action to deny them federal funding. Nor have they identified any contemplated or imminent agency action imposing an allegedly unlawful condition on their grant funding. Instead, the central premise of the claims against these Defendants is that federal agencies carrying out the instructions in the President's executive orders

9

will do so in an unlawful manner, and thereby impermissibly deny funding to Plaintiffs. But the Executive Orders are not self-executing and do not identify any specific funding that could or should be terminated, conditioned, or otherwise affected. Before any action could occur, the agency administering each grant would have to determine in each case that terminating the grant or imposing certain conditions on its acceptance are consistent with the applicable statutes, regulations, and grant terms. Plaintiffs' subjective fear that a Defendant agency will make such a determination is no substitute for a concrete action, only the latter of which would create a live controversy. Any such live controversy would not resemble this unwieldly lawsuit: if an agency made such a determination for any individual grant directly impacting Plaintiffs, any legal challenge would center on whether the agency's specific decision in that regard was correct.

As these points show, Plaintiffs' claims of lost funding are entirely contingent on future events. And as the Supreme Court has recognized, the mere fact that the President has expressed a desire to take certain action does not give rise to a justiciable controversy on its own. *See Trump v. New York*, 592 U.S. 125, 131, 141 (2020) ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time." (citation omitted)). The very possibility of such future litigation underscores why the present suit is not justiciable now. Federal funds are distributed under a host of distinct statutory schemes and appropriations, and any termination, condition, or other action would have to be assessed under the standards applicable to the particular statutory scheme.  Yet Plaintiffs' suit calls on the Court to make a blunderbuss determination about every affected agency's authority to take any action pursuant to the Executive Orders, without even the most basic information about what statutory authorities would be implicated, the nature of the actions the agencies propose to take (whether termination, imposition of conditions, or something else entirely), and the specific funding source.

10

Article III does not permit such speculative lawsuits because such denials "may not occur at all." *Texas*, 523 U.S. at 300 (citation omitted). As this Court acknowledged in its denial of the Motion for Preliminary Injunction, "it is speculative to assume that inclusion on an agency designation list is indicative of an 'imminent' funding freeze." Mem. & Order at 14.

To that point, the Second Amended Complaint is rife with hypothetical language. Plaintiffs claim "extreme uncertainty." Compl. ¶ 120. "*If* Plaintiffs have the rug of federal funding pulled out from underneath them . . . Plaintiffs *will* be forced to breach . . . contract[s]." *Id* ¶ 113 (emphasis added). "*When* these grants are withdrawn by DHS, Plaintiffs *will* lose access to important public safety equipment . . . ." *Id*. ¶ 115 (emphasis added). And Plaintiffs forecast "imminent termination of federal funding," despite that never coming to fruition. *Id*. ¶ 122. This sort of speculative language only underscores that much of Plaintiffs' suit is not ripe for judicial resolution.

Allowing Plaintiff Somerville to proceed against DOJ and DHS, and Plaintiff Chelsea to proceed at all, is precisely the sort of "entangling . . . in abstract disagreements over administrative policies" that the ripeness doctrine is meant to prevent. *City of Fall River*, 507 F.3d at 6 (quoting *Abbott Lab'ys*, 387 U.S. at 148-49). That is the case here, where Plaintiffs seek to preclude *any* implementation of the EOs, *see* Compl., Prayer for Relief, even though Defendants have taken no concrete actions to deprive them of funds.

## III.    Plaintiffs Lack Standing.

For many of the same reasons that this suit is not ripe, Plaintiffs also lack standing. Specifically, Plaintiff Chelsea lacks standing for all of its claims, and Plaintiff Somerville lacks standing to assert claims against DOT, DOJ, and DHS.

For a case to have Article III standing, Plaintiffs must establish an injury that is concrete, particularized, and imminent rather than "conjectural or hypothetical," *Spokeo, Inc. v. Robins*, 578

11

U.S. 330, 339 (2016) (citation omitted). Imminence is "a somewhat elastic concept," but "it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). To that end, the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Id*. (citation modified and emphasis omitted).

As with the ripeness discussion, only Plaintiff Somerville alleges an Article III injury. Neither Plaintiff alleges deprivation of funding, and Plaintiff Chelsea nowhere alleges that Defendants imposed any new conditions on it.[3] Plaintiff Somerville only alleges that DOT and HUD imposed new conditions for the SS4A grant and the CDBG, HOME, and ESG funds, respectively. Compl. ¶¶ 100, 110. And any allegations made by Plaintiff Somerville regarding DOT imposing new conditions in SS4A grants is no longer factually accurate. *See California,* 808 F. Supp. 3d 291 (declaring unlawful and vacating DOT immigration enforcement condition from all DOT grant agreements). Plaintiff Somerville has not alleged any harm from Defendants DOJ, DOT, or DHS that is "certainly impending," and neither has Plaintiff Chelsea for any Defendant.[4]

With the exception of Somerville's claims against HUD, Plaintiffs' allegations of harm boil down to "uncertainty." Plaintiffs create a hypothetical scenario—that the federal Government may withhold funding or otherwise penalize them for being sanctuary locales, *id.* ¶¶ 120-23—and then claim injury from not knowing if that scenario will come true. The opposite is true. Plaintiffs' uncertainty underscores the reality that no injury has occurred. Plaintiffs cannot "manufacture

---

[3] Notably, for FY25 and '26, Plaintiff Chelsea was not awarded any grant by HUD. *See* Compl. ¶ 39 ("Chelsea receives its funds [from HUD] as a subrecipient of the Commonwealth of Massachusetts.")

[4] For the same reasons, Plaintiffs' claims against the immigration enforcement conditions in DOT grant agreements are moot. Because the challenged conditions have been permanently vacated by another court, there is no longer a live issue before the Court, and the Court cannot grant any meaningful relief. *Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013).

12

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Indeed, Plaintiffs' situation is part and parcel with applying for competitive grants. As this Court acknowledged, "the Cities already face uncertainty" due to the nature of competitive funding, and as such, are "not guaranteed [funds] in the first place." Mem. & Order at 15–16. Plaintiffs discuss past receipts from Defendants, as though they are perpetual obligations. Nothing could be further from the truth. Federal funding requires yearly applications, and with that comes a degree of ambiguity. Challenging future events that have not imposed any cognizable injury means no standing exists. As such, the Court should dismiss Plaintiff Somerville's claims against DOJ, DOT, and DHS, and Plaintiff Chelsea's claims against all Defendants, for lack of standing.

## IV.    Plaintiffs' Claims Fail on the Merits.

### A.    Count I: Plaintiffs Fail to Allege a Violation of the Separation of Powers.

Plaintiffs fail to establish a claim that the EOs and agency directives violate the separation of powers. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress therefore may, "[i]ncident to" its spending power, "attach conditions on the receipt of federal funds," *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 530 (N.D. Cal. 2017) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)), and "Congress can delegate some discretion to the President to decide how to spend appropriated funds" so long as "any delegation and discretion is cabined by [relevant] constitutional boundaries." *Id*. at 531.

That is precisely what has happened here. Congress authorized agencies administering certain grant programs—including those at issue here—to impose discretionary conditions on their

13

receipt. Those statutory authorizations have taken a variety of forms, including authorizing an agency to ensure grant recipients comply "with all provisions of . . . applicable Federal laws," *see* 34 U.S.C. § 10153(A)(5)(D) (governing DOJ grant program), or allowing an agency to "plac[e] special conditions" on certain grants under appropriate circumstances. *See id*. § 10102(a)(6).

Contrary to Plaintiffs' allegations, the Executive Orders and agency directives do not attempt to withhold funds or unilaterally impose conditions on federal funds without Congressional authorization. As explained *supra*, Section 17 of E.O. 14,159 simply calls for an evaluation and undertaking of any lawful actions to ensure that "sanctuary" jurisdictions do not receive access to Federal funds. Section 2(b) of EO 14,218 asks certain federal agencies to identify sources of funding for illegal aliens and recommend additional agency action to align federal spending with the Order "consistent with applicable law." Where, as here, the challenged Executive Orders are "not self executing," and instruct subordinate officers to take action only to the extent permitted by law, "[t]he mere possibility that some agency might make a legally suspect decision . . . to deny funding for a project does not justify an injunction." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *see Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S.---, 145 S. Ct. 2635 (2025) (mem.) (Sotomayor, J., concurring in grant of stay) (noting that challenged Executive Order directs agency action "consistent with applicable law").

Relatedly, the Bondi Memo makes clear that all action will be done "consistent with law" and "appliable statutes, regulations, court orders, and terms[.]" Bondi Memo at 1. Regarding any grants, the Memo confirms that DOJ will require compliance with 8 U.S.C. § 1373(a) as a condition of grant eligibility only where "consistent with statutory authority and past practice[.]" *Id*. at 2. Further, DOJ may seek to tailor future grants to promote a lawful system of immigration. *Id*. The same is true of the Noem memo, which directs components to cease funding sanctuary

14

jurisdictions "[t]o the extent consistent with relevant legal authorities and the applicable terms and conditions of each award[.]" Noem Memo at 2. And the DOT Order likewise provides that DOT shall prioritize projects that require local compliance with federal immigration law "[t]o the maximum extent permitted by law[.]" DOT Order at 2. Nothing in this language imposes grant conditions that would violate any applicable constitutional or statutory limitation.

In any event, Plaintiffs' separation of powers claims fails because it is a statutory claim repackaged as a constitutional claim. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  *Id.* (collecting cases). Here, Plaintiffs' separation of powers claims is predicated entirely on the argument that Defendants might take action to deny Plaintiffs funding without appropriate statutory authorization from Congress. *See* Compl. ¶¶ 127-29. Long-standing precedent prevents Plaintiffs from recasting that kind of alleged statutory violation into a constitutional claim. *See Glob. Health Council v. Trump*, 153 F.4th 1, 13-18 (D.C. Cir. 2025), *denying reh'g en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

**B.     Count II: Plaintiffs Fail to Allege a Violation of the Spending Clause.**

Plaintiffs cannot succeed on the merits of their Spending Clause claim. To the extent it is authorized to do so by Congress, the Executive Branch may to decide when it will fund certain State activities and under what conditions. The Spending Clause does not require Congress to specifically set out every precise requirement of a grant program. Rather, Supreme Court precedent (and long practice) makes clear that agencies have power to set grant criteria consistent with and subject to Congressional direction if such direction has been given. *See* Mem. & Order at 17

15

("Congress is free to attach conditions upon the receipt of federal funds to further federal policy objectives."). For example, the Supreme Court upheld agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*, 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring facilities ensuring staff are vaccinated against COVID-19 did not exceed applicable statutory authority); *see also Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements").

To the extent Plaintiffs suggest that funding conditions cannot impose policy-based requirements, Compl. ¶ 133, the Supreme Court has made clear that, even where the Federal Government may not be able to compel them to do a particular activity, it may encourage States and municipalities to implement federal regulatory programs. *See New York v. United States*, 505 U.S. 144, 149 (1992). As this Court recognized, "Congress is free to attach conditions upon the receipt of federal funds to further federal policy objectives," and it may "delegate [that] authority to the Executive branch." Mem. & Order at 17. *See also Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 537 (2012) (The federal government may "induce the States to adopt policies that the Federal Government itself could not impose."). It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. at 205-08 (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one).

Plaintiffs claim that the Executive Orders and agency directives are ambiguous because they fail to specify which laws they are required to comply with. Compl. ¶ 133(a). This is not true. Model sanctuary-jurisdiction conditions are stated unambiguously in the DHS Standard Terms and Conditions and apply unless the agency specifies otherwise, and any other conditions imposed

16

pursuant to that Executive Order would be clearly set forth in the relevant grant terms.[5] The Executive Orders merely implement the Congressional mandates imposed 30 years ago in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 ("PRWORA"), which "generally prohibits illegal aliens from obtaining most taxpayer-funded benefits." Moreover, many of the agency directives list specific federal statutes such as 8 U.S.C. §§ 1324, 1373, 1644, and the HUD Letter also lists compliance with the PROWORA, Pub. L. No. 104-193, and Section 214 of the Housing and Community Development Act of 1980, Pub. L. No. 96-399, 94 Stat. 1614.

Plaintiffs further contest that Defendants' actions are unconstitutionally coercive. Compl. ¶ 133(b). In *NFIB*, the Supreme Court found that the federal government unconstitutionally coerced the States' compliance by threatening withdrawal of all Medicaid funds that amounted to over 10 percent of a State's budget. 567 U.S. at 581. The key was the size of the financial inducement, which was such a large part of the state's budget that it amounted to a "gun to the head." *Id*. In contrast, the federal funds in *Dole* constituted less than half of one percent of South Dakota's budget, and thus the loss of those funds was not so coercive as to violate the Spending Clause. *Id*. Because the monetary value of the "coercion" in *NFIB* was such an outsized percentage of the states' total budgets, *NFIB* should be viewed as the exception rather than the general rule.

As explained in NFIB, the Court has not "'fix[ed] the outermost line' where persuasion gives way to coercion." *Id.* at 585 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 591 (1937)). That point has not been passed here. The grant programs here are nowhere near as

---

[5] The DHS Standard Terms and Conditions "apply unless otherwise specified in the terms and conditions" of particular grants. As further explained on the DHS website linked in the Standard Terms and Conditions, "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]. DHS directs individuals to review the program's NOFO [Notice of Funding Opportunity] and/or FEMA-State Agreement to determine which Terms and Conditions apply to a particular grant." *See* Homeland Security, *DHS Standard Terms and Conditions* (Last Updated 04/22/2026), https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

17

large a portion of federal grants to state budgets as Medicaid. Chelsea's FY 2024 budget was $231 million dollars, and it received, in total, approximately $14.5 million in all federal funding that year, which represents only 6.28% of its budget. Compl. ¶¶ 32–33. Similarly, Somerville's budget in FY 2024 was $337 million, and it received, in total, approximately $19.4 million in federal funds for that fiscal year, which represents only 5.76% of its overall budget. *Id.* ¶ 55. Of course, individual grants on their own will represent far smaller percentages of each city's budget. Thus, this case falls in the range of the inducements considered acceptable in *Dole*.

Plaintiffs also claim that there is not a sufficient connection between the conditions and the threatened federal funds. *Id.* ¶ 133(c). With respect to some agencies, there are no specific conditions in place. But in any event, Congress provided a rationale in the PRWORA. There, Congress recognized that restrictions on federal public benefits to unlawful aliens are part of the "national policy with respect to welfare and immigration." 8 U.S.C. § 1601. The Executive Orders and agency directives simply affirm and reinforce that existing law.

Finally, Plaintiffs contend that the Orders and directives require them to act unconstitutionally. Compl. ¶ 133(d). Not so. The Orders and directives either prevent sanctuary jurisdictions from interfering with federal immigration efforts or require cooperation as permitted by law. Plaintiffs' claim that they will break the law by working with federal law enforcement assumes that federal agents themselves are breaking the law, which is entirely unreasonable. *See e.g.*, *Melton v. City of Okla. City*, 879 F.2d 706, 731 (10th Cir. 1989) ("[O]fficials are presumed to know and abide by clearly established law."). Moreover, each Order and directive instructs the agencies to implement them only to the extent that they follow federal law.

18

C.      **Count III: Plaintiffs Fail to Allege a Violation of the Tenth Amendment.**

Plaintiffs fail to show a likelihood of success on the merits of their Tenth Amendment claim. The Tenth Amendment declares that the "pre-existing sovereign States" (and their subdivisions) retain their sovereignty under the Constitution and that the Federal Government may not encroach upon that sovereignty except as permitted by the Constitution. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995); *New York*, 505 U.S. at 156. Plaintiffs claim that "the Orders and directives violate the Tenth Amendment by attempting to use the spending power to force Plaintiffs into carrying out federal immigration laws and policies." Compl. ¶ 136.

But the challenged agency actions impose no mandatory requirements in a manner that might offend the Constitution. To do so, the conditions must be so extreme such that "pressure turns into compulsion." *NFIB*, 567 U.S. at 577 (quoting *Steward Mach. Co.*, 301 U.S. at 590). That is not the situation here. Executive Order 14,218 does not even apply to funding for States and localities. As for Executive Order 14,159, it applies only to programs specifically identified by the Departments of Justice and Homeland Security. Because Plaintiffs may decline to apply for the specific grants to which any offensive conditions are attached, there is no commandeering of their sovereignty. *See Fed. Energy Regul. Comm'n v. Mississippi*, 456 U.S. 742, 766 (1982) ("[I]t cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way[.]"); *see also Env't Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." (citation omitted)). Further, the Executive directives speak to the agencies exercising *existing* statutory and constitutional authority, and, in any event, are not independently enforceable. *Cf. United States v.*

19

*Pickard*, 100 F. Supp. 3d 981, 1011 (E.D. Cal. 2015) (rejecting a Tenth Amendment challenge to a statement of agency policy on the grounds that a policy statement "is a very different creature from a statute" in that it does not bind States as would a statute).

> **D.      Counts IV& V: Plaintiffs Fail to Allege Violations of the Fifth Amendment.**

Plaintiffs claim that the EOs and agency directives violate the Fifth Amendment because they (1) deprive Plaintiffs of a property interest without due process of law and (2) are too vague, thus depriving Plaintiffs of notice of how the Executive directives may be enforced. These claims lacks merit for multiple reasons.

First, Plaintiffs fail to allege a protectable property interest. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann*, 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12,

20

29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)); *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 93 (D.D.C. 2025).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure[.]" 844 F.2d 962, 966 (2d Cir. 1988) (emphasis omitted). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id*. at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns[.]" *Id*. at 966. "[C]ourts have resisted application of due-process principles to government contracts because [w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *New Vision*, 54 F. Supp. 3d at 29 (citation omitted). This Court should refrain from such an unprecedented expansion of the doctrine.

Second, Plaintiffs fail to allege that the EOs and directives are unconstitutionally vague. The purpose of the vagueness doctrine is to provide "a person of ordinary intelligence fair notice of what is prohibited," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010). "[P]erfect clarity and precise guidance have never been required," *id.* at 19 (citation omitted). This standard is easily satisfied here. [6]

---

[6] As grant funding has the attributes of contracts, upon accepting any funds, the recipient does so subject to all the terms and conditions set forth in the agreement. See *Bennett*, 470 U.S. at 669. It is axiomatic that when interpreting a

21

In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Supreme Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit . . . , taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). The Court recognized that these standards were "undeniably opaque," such that they would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme[.]" *Finley*, 524 U.S. at 588. In the context of competitive grants, however, such imprecision raised no such concerns because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589. The challenged statute "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights." *Id.* at 590. A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589 (citation omitted); *see also Nat'l Urb. League*, 783 F. Supp. 3d at 95 (the "'Constitution tolerates' even *more* ambiguity here because the [provisions] just tell agencies to stop funding certain things or contracting in certain ways." (citation omitted)); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 101-02 (4th Cir. 2026).

Plaintiffs claim that the Executive Orders and agency directives are unconstitutionally vague because they fail to adequately define the term "sanctuary jurisdiction" or what laws they

---

contract, "'the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)). Thus, the meaning of the grant conditions begins with their language. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). When the language is unambiguous it must be given its "plain and ordinary" meaning, and the court may not look to extrinsic evidence to interpret its provisions. *Id*. at 1040; *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

22

will be required to obey. But the challenged directives do contain various explanations for sanctuary terms. *See, e.g.*, E.O. 14,159 § 17 (explaining "sanctuary jurisdictions"); E.O. 14,218 § 2(a)(ii) (explaining "sanctuary policies"); Bondi memo (same for "sanctuary jurisdictions"); Noem memo (specifying that sanctuary jurisdictions refuse to comply with 8 U.S.C. § 1373). And grants conditioned on following federal law are perhaps even more specific than the vague terms in *Finley* as federal law is a limited universe as opposed to the esoteric concepts of "excellence" and "merit." Even if the Court finds such terms vague, such terms are not unconstitutional in light of the significant leeway the Court affords to competitive grants.

### E.    Counts VI–XI: Plaintiffs Fail to Allege Claims for Declaratory Relief.

Plaintiffs improperly list their requests for declaratory relief as claims rather than demands for relief. Declaratory relief is not a cause of action but instead a type of relief. *See, e.g.*, *Martins v. Vt. Mut. Ins. Co.*, 662 F. Supp. 3d. 55, 66 (D. Mass. 2023) ("declaratory relief is a form of relief, not a cause of action . . ."), *aff'd*, 92 F.4th 325 (1st Cir. 2024). The Declaratory Judgment Act does not provide an independent jurisdictional basis for suits in federal court; it only permits the district court to adopt a specific remedy when jurisdiction exists. As the Supreme Court has held, "[t]he operation of the Declaratory Judgment Act is procedural only"; specifically, it "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (citing *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937)). Regardless of whether Plaintiffs' other claims survive, the claims for declaratory relief should be dismissed.

23

F.      **Counts XII–XV: Plaintiffs Fail to Allege Violations of the Administrative Procedure Act.**

a.   **The Agency Memoranda Are Not Final Agency Action.**

The APA only contemplates judicial review of "final agency action[.]" 5 U.S.C. § 704. An agency action is final only if two conditions are met: (1) the agency action marks "the 'consummation' of the agency's decisionmaking process"—it must not be of a merely tentative or interlocutory nature, and (2) the "action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Both conditions must be satisfied for agency action to be considered "final" under the APA. *Id*. at 175.

Courts have interpreted the "finality" element with an eye toward pragmatism. *See FTC v. Standard Oil Co. of Cal*., 449 U.S. 232, 239 (1980) (citing *Abbott Lab'ys*, 387 U.S. at 149). Courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations' of the subject party, or if 'immediate compliance [with the terms] is expected.'" *Or. Nat. Desert Ass'n. v. U.S. Forest Serv*., 465 F.3d 977, 982 (9th Cir. 2006) (alteration in original) (citation omitted). In *Standard Oil*, the Supreme Court held that the Federal Trade Commission's issuance of a complaint averring there was "reason to believe" that a party was in violation of the Federal Trade Commission Act was insufficient to satisfy the finality requirement. 449 U.S. at 239, 243. The Court explained that "reason to believe" was merely a determination that adjudicatory proceedings would begin, and the actual issuance of the complaint was sufficient only to initiate the proceedings. *See id*. at 242. The complaint had no effect on the daily operations of defendant's business, nor did it legally compel a party to do something or refrain from doing something. *See id; see also Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (finding no final agency action where "the Secretary's

24

report to the President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination").

Here, the challenged memoranda are merely internal directives describing the agencies' future efforts to ensure that state and local authorities comply with federal law or put them on notice that changes are coming. The memos do not direct immediate denial of Plaintiffs' specific federal grants or impose new conditions. Plaintiffs cannot sue to prevent Defendants from taking future actions that could impact their federal funding because they are not "definitive statement[s] of position", but rather "a threshold determination that further inquiry is warranted . . . ." *See Standard Oil*, 449 U.S. at 241.

For example, the Bondi memo merely states that "[w]ithin 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies." Bondi Memo at 2. The same is true of the Noem memo, which requires DHS components to "*provide a report* to the Undersecretary for Management with a summary of actions taken to comply with this memorandum." Noem Memo at 2 (emphasis added). These memos merely begin the process to determine which grants will have additional conditions attached to them. Indeed, memos are clearly focused on *future* conditions, not retroactive actions. *See* Bondi Memo at 2 ("the Department may seek to tailor future grants"); HUD Letter ("going forward, grant agreements will include language that will require compliance with Executive Order 14218").

Neither can Plaintiffs challenge the agencies' programs as a whole. The "agency action" requirement precludes "broad programmatic attack[s]" on an agency's administration of a program. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). In *Lujan v. National Wildlife Federation*, the Supreme Court announced a prohibition on programmatic challenges and

25

determined that the challenged "program" was "not an agency action" within the meaning of § 702, much less a "final agency action" under § 704. 497 U.S. 871, 890 (1990). The Court emphasized that § 702 only allows for review of "'identifiable' agency action," and that the APA requires challenge to agency action on a "case-by-case" basis, rather than pursuing "wholesale improvement of [an agency] program by court decree." *Id*. at 890-94 (emphasis omitted). The Court's prohibition on programmatic challenges was motivated by institutional limits on Article III courts, which constrain their review to narrow and concrete actual controversies. *See id*. at 891–94. Because Plaintiffs challenge the Agencies' implementation of the Orders as a whole rather than discrete, identifiable actions, their claims fail. *See Norton*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan*[.]").

### b. Allocation of Discretionary Grant Funding is Committed to Agency Discretion By Law.

Because the allocation of discretionary grant funding is committed to agency review, Plaintiffs' APA claims are precluded from review under 5 U.S.C. § 701(a)(2). As explained above, Plaintiffs challenge the agency directives, which call for an assessment of federal grant programs to determine where immigration conditions may lawfully be imposed. Congress has not directed specific amount of funding to Plaintiffs or set the specific terms and conditions for any such award. Instead, Congress has simply appropriated funding for various programs generally, for the agency to in turn distribute as appropriate. *See e.g.,* 6 U.S.C. § 112(b)(2) (Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law . . . ."). HUD has discretion to establish "other terms and conditions" to "carry out [the program] in an effective and efficient manner." 42 U.S.C. § 11386(b)(8).  The agencies thus have broad discretion in creating, awarding, and terminating specific grants.

26

In *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* As the Supreme Court has acknowledged, in such circumstances, it is squarely within an agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* So long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a . . . program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* (quoting *Heckler v. Chaney,* 470 U.S. 821, 831 (1985)); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,* 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman,* 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions "clearly require[] 'a complicated balancing of a number of

27

factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); *see Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.,* 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cnty., Inc. v. Bowen,* 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'" (quoting *Alan Guttmacher Inst. v. McPherson,* 597 F. Supp. 1530, 1536-37 (S.D.N.Y. 1984))).

Here, Plaintiffs seek to challenge decisions quintessentially "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). Particularly regarding HUD's conditions, an agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action where Congress has not provided any "meaningful standard against which to judge the agency's exercise of discretion." *See Lincoln*, 508 U.S. at 191, 193 (quoting *Heckler*, 470 U.S. at 830).

### c.  The Agencies' Actions Are Not Contrary to the Constitution.

The APA further provides that a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). For the reasons discussed above, Plaintiffs have not sufficiently alleged a violation of the Separation of Powers, Spending Clause, Tenth Amendment, or Fifth Amendment. Thus, Defendants' actions are not contrary to the Constitution.

### d.  The Agencies' Actions Are Not in Excess of Statute.

Finally, the APA provides that a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Plaintiffs fail to articulate which

28

statutory provisions the agency directives violate, nor could they at this stage because the degree of agency discretion in implementing grant programs varies depending on the type of grant program and the terms of the authorizing legislation. For instance, 34 U.S.C. § 10153(a)(5)(D), authorizes an agency to ensure that a grant recipient complies "with all provisions of . . . applicable Federal laws," and Section 10102(a)(6), allows an agency to "plac[e] special conditions" on certain grants under appropriate circumstances." The Attorney General also has authority to impose conditions of funding that do not violate applicable constitutional or statutory limitations. *See* Bondi Memo at 1 ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so." (quoting *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020))).

Moreover, each of the directives from the head of the agency require compliance with federal law. The Bondi Memo instructs that sanctuary jurisdictions may not receive access to federal funds "consistent with law." Bondi Memo at 1. The DOT Order instructed DOT to prioritize projects and goals that comply with federal immigration enforcement "[t]o the maximum extent permitted by law." DOT Order at 2. The Noem Memo instructed DHS to "cease providing federal funding to sanctuary jurisdictions" "[t]o the extent consistent with relevant legal authorities and the applicable terms and conditions of each award." Noem Memo at 2. Finally, the HUD Letter explains that HUD's enforcement of the Executive Orders is consistent with PRWORA, Pub. L. No. 104-193, and Section 214 of the Housing and Community Development Act of 1980, Pub. L. No. 96-399. Because Plaintiffs fail to allege which statutes Defendants violated, and because the heads of Defendant agencies specifically required the observance of federal law, Defendants' actions are not in excess of statutory authority.

29

**V.      The Court Should Dismiss the President as a Defendant.**

To the extent Plaintiffs seek declaratory and injunctive relief against the President, such relief is improper. Federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)). And many courts have held that declaratory relief against the President is equally inappropriate. *See, e.g., id.* at 827 (Scalia, J. concurring in part & concurring in the judgment) ("[W]e cannot issue a declaratory judgment against the President."); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment.").

Because Plaintiffs' alleged injuries can be redressed fully by injunctive and declaratory relief against the remaining agency Defendants, "the extraordinary remedy of enjoining the President is not appropriate here." *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated & remanded*, 583 U.S. 941 (2017); *see also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.) ("[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (citation omitted)), *vacated and remanded on other grounds*, 583 U.S. 912 (2017). With no remedy against the President available, Plaintiffs' claims against him are not redressable. Accordingly, the Court must dismiss the President as a defendant.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and dismiss Plaintiffs' action.

30

Dated: June 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ANDREW I. WARDEN
JOSEPH E. BORSON
Assistant Branch Directors

*/s/ Alexander J. Yun*
ALEXANDER J. YUN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.: (202) 674-0255
Email: alex.yun@usdoj.gov
*Counsel for Defendants*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2026, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ *Alexander J. Yun*
ALEXANDER J. YUN
Trial Attorney
United States Department of Justice

32