**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CITY OF CHELSEA and CITY OF SOMERVILLE,<br><br>    *Plaintiffs,*<br><br>       v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>    *Defendants.* | Case No. 1:25-cv-10442-NMG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Leave to file excess pages granted on June 1, 2026 |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

      A.     Factual Background ..................................................................................... 2

      B.     Procedural History ...................................................................................... 4

      C.     Parallel Litigation........................................................................................ 5

LEGAL STANDARD......................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

I.      PLAINTIFFS' CLAIMS ARE JUSTICIABLE ................................................... 6

      A.     Plaintiffs' Claims are Ripe........................................................................... 6

      B.     Plaintiffs Allege Article III Standing......................................................... 11

II.     PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS FOR RELIEF ................. 15

      A.     Plaintiffs Have Adequately Pleaded Both Facial and As-Applied
           Challenges.................................................................................................. 15

      B.     Plaintiffs Have Adequately Pleaded a Violation of the Separation of
           Powers....................................................................................................... 16

      C.     Plaintiffs Have Adequately Pleaded a Violation of the Spending Clause ............ 18

      D.     Plaintiffs Have Adequately Pleaded a Violation of the Tenth Amendment ......... 22

      E.     Plaintiffs Have Adequately Pleaded a Violation of the Fifth Amendment........... 24

      F.     Plaintiffs Have Adequately Pleaded Violations of the APA .............................. 25

      G.     Plaintiffs Have Adequately Pleaded Claims for Declaratory Relief..................... 28

      H.     The Court Should Not Dismiss the President as a Defendant ............................. 29

III.    IN THE EVENT OF DISMISSAL, PLAINTIFFS SHOULD NONETHELESS
      BE PROVIDED AN OPPORTUNITY TO AMEND........................................................ 29

CONCLUSION................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Spiegel*,
  988 F.3d 564 (1st Cir. 2021)...................................................................................5

*Am. Acad. of Pediatrics v. Kennedy*,
  814 F. Supp. 3d 150 (D. Mass. 2026) ...........................................................8, 12, 14

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)................................................................................................14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................5, 6

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................................26

*Biden v. Missouri*,
  595 U.S. 87 (2022)..................................................................................................17

*Biden v. Texas*,
  597 U.S. 785 (2022)................................................................................................26

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) .................................................................................18

*California v. Mullin*,
  2026 WL 1649160 (D. Mass. June 8, 2026) ..........................................................19

*California v. Trump*,
  2026 WL 1826490 (D. Mass. June 25, 2026) ........................................................29

*California v. U.S. Dep't of Transp.*,
  808 F. Supp. 3d 291 (D.R.I. 2025)...........................................................................9

*Carpenter v. Rivera*,
  2014 WL 4928963 (D. Mass. Sept. 30, 2014) .........................................................5

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
  332 F. Supp. 3d 393 (D. Mass. 2018) .....................................................................29

*City & Cnty. of San Francisco v. Trump*,
  783 F. Supp. 3d 1148 (N.D. Cal. 2025) ....................................................23, 24, 26

*City & Cnty. of San Francisco v. Trump*,
816 F. Supp. 3d 1017 (N.D. Cal. 2026) ...............................................................5, 9, 16, 21

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...............................................................................17, 18, 28

*City of Fresno v. Turner*,
2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) ...................................................................25

*City of Philadelphia v. Att'y Gen. of the U.S.*,
916 F.3d 276 (3d Cir. 2019)...............................................................................................17

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)................................................................................................17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).........................................................................................................15

*Clinton v. City of New York*,
524 U.S. 417 (1998).........................................................................................................29

*Dalton v. Specter*,
511 U.S. 462 (1994).........................................................................................................18

*Doe v. Bolton*,
410 U.S. 179 (1973).........................................................................................................14

*Env't Def. Ctr., Inc. v. U.S. EPA*,
344 F.3d 832 (9th Cir. 2003) ............................................................................................23

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
45 F.3d 530 (1st Cir. 1995).................................................................................................9

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).........................................................................................................25

*FERC v. Mississippi*,
456 U.S. 742 (1982).........................................................................................................23

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026).................................................................................................11, 12

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980).....................................................................................................26, 27

*Garcia-Gonzalez v. Puig-Morales*,
761 F.3d 81 (1st Cir. 2014)...............................................................................................25

*Guerra v. Teradyne Inc.*,
   2004 WL 1467065 (D. Mass. Jan. 16, 2004)........................................................................29

*Illinois v. FEMA*,
   801 F. Supp. 3d 75 (D.R.I. 2025)..................................................................................20, 21

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013)...........................................................................................28

*Jensen v. R.I. Cannabis Control Comm'n*,
   160 F.4th 18 (1st Cir. 2025)........................................................................................7, 8, 9

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)............................................................................................................16

*Libertarian Party of N.H. v. Gardner*,
   843 F.3d 20 (1st Cir. 2016)................................................................................................15

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)............................................................................................................27

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................................................11

*Lunn v. Commonwealth*,
   78 N.E.3d 1143 (Mass. 2017)............................................................................................21

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)............................................................................................................14

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)............................................................................................................15

*Murphy v. NCAA*,
   584 U.S. 453 (2018)............................................................................................................23

*N.H. Lottery Comm'n v. Rosen*,
   986 F.3d 38 (1st Cir. 2021)............................................................................................7, 8

*N.H. Right to Life Pol. Action Comm. v. Gardner*,
   99 F.3d 8 (1st Cir. 1996).....................................................................................................14

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998)............................................................................................................25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)......................................................................................................20, 24

iv

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
   538 U.S. 803 (2003)......................................................................................7

*New Jersey v. Trump*,
   131 F.4th 27 (1st Cir. 2025).............................................................9, 12, 13

*New York v. McMahon*,
   784 F. Supp. 3d 311 (D. Mass. 2025) .......................................................8

*New York v. Trump*,
   171 F.4th 1 (1st Cir. 2026).....................................................................17, 27

*New York v. Trump*,
   769 F. Supp. 3d 119 (D.R.I. 2025)..........................................................26, 27

*Noonan v. Wonderland Greyhound Park Realty LLC*,
   723 F. Supp. 2d 298 (D. Mass. 2010) ......................................................30

*Penney v. Deutsche Bank Nat'l Tr. Co.*,
   2017 WL 1015002 (D. Mass. Mar. 15, 2017)...........................................28

*Perry v. Sindermann*,
   408 U.S. 593 (1972)....................................................................................24

*Printz v. United States*,
   521 U.S. 898 (1997)....................................................................................22

*Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*,
   421 F.3d 1 (1st Cir. 2005)...........................................................................25

*South Dakota v. Dole*,
   483 U.S. 203 (1987).............................................................................19, 21

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).............................................................9, 10, 12, 13, 14

*Trump v. New York*,
   592 U.S. 125 (2020)....................................................................................10

*U.S. Dep't of Commerce v. New York*,
   588 U.S. 752 (2019).....................................................................11, 12, 13, 27

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)........................................................................................27

*United States v. City of Boston*,
   2026 WL 1493706 (D. Mass. May 28, 2026).......................................19, 21, 26, 28

v

*United States v. Colorado*,
  2026 WL 878882 (D. Colo. Mar. 31, 2026) ...............................................................22

*United States v. Illinois*,
  796 F. Supp. 3d 494 (N.D. Ill. 2025) .......................................................................22

*United States v. New York*,
  810 F. Supp. 3d 329 (N.D.N.Y. 2025) ......................................................................22

*United States v. Pickard*,
  100 F. Supp. 3d 981 (E.D. Cal. 2015).......................................................................24

*United States v. Williams*,
  553 U.S. 285 (2008)..................................................................................................15

*Voter Reference Found., LLC v. Galvin*,
  2026 WL 836855 (D. Mass. Mar. 26, 2026).............................................................28

*Widakuswara v. Lake*,
  773 F. Supp. 3d 46 (S.D.N.Y. 2025)........................................................................28

**Statutes**

5 U.S.C. § 701(a)(2).........................................................................................................27

8 U.S.C. § 1373..................................................................................................................3

8 U.S.C. § 1644..................................................................................................................3

34 U.S.C. § 10102(a)(6)...................................................................................................17

34 U.S.C. § 10153(a)(5)(D) .............................................................................................17

Plaintiffs City of Chelsea and City of Somerville ("Plaintiffs") respectfully submit this opposition to Defendants' motion to dismiss (the "Motion" or "Mot."), ECF Nos. 55, 56, Plaintiffs' Second Amended Complaint, ECF No. 48 (the "SAC" or the "Complaint").

## INTRODUCTION

Plaintiff communities filed this lawsuit to stop Defendants' attack on their constitutionally protected policy judgments. President Trump's coordinated campaign of executive actions—three unconstitutional executive orders directing the elimination of federal funding to so-called "sanctuary" jurisdictions and the cascade of agency directives implementing those orders—seeks to strong-arm Plaintiffs and other communities into abandoning their lawful local priorities and policies to further his federal anti-immigrant agenda. Plaintiffs are pressured to divert scarce local resources to federal immigration enforcement, on pain of losing key federal funds their residents need.

Plaintiffs depend on tens of millions of dollars in federal funding each year to support transportation, public safety, housing, education, and homelessness prevention, among other critical initiatives. Like many jurisdictions, they have chosen not to devote limited local resources to civil immigration enforcement, a constitutionally protected judgment made to preserve community trust and keep residents safe. Those policies do not interfere with federal enforcement. Yet, Plaintiffs have nonetheless been targeted for this constitutionally protected local decision.

Defendants' Motion asks the Court to disregard what has already happened and what has been amply alleged in the Complaint. It recasts a sixteen-month campaign of implemented and hovering threats—through designation, conditioning, and enforcement—as nothing more than "contingent future events," and urges dismissal despite the ongoing and cumulative harm. Plaintiffs have already been targeted and named on a public list of "sanctuary jurisdictions" and directed to change their constitutionally protected policies, have already had millions in federal

funds conditioned on immigration-related terms, and have already witnessed Defendants bring lawsuits against municipalities, including neighboring Boston, with materially identical policies. These are concrete, ongoing injuries—not speculation.

Measured against this Court's pleading standards, Plaintiffs' claims are justiciable and adequately pleaded:  Defendants' overreach has violated the separation of powers, usurped Congress's Spending Power, coerced and commandeered Plaintiffs in violation of the Tenth Amendment, deprived them of entitlements and fair notice under the Fifth Amendment, and implemented all of it through unlawful final agency action.  Defendants' attempt to end this case amidst their escalating campaign to seize local authority to further their federal anti-immigrant agenda must be rejected, and the Motion denied in its entirety.

## BACKGROUND

### A.     Factual Background

Plaintiff Cities Chelsea and Somerville are among the jurisdictions often referred to as "sanctuary cities" because they have exercised their constitutional right to adopt policies that limit their participation in federal immigration enforcement to ensure public safety, maintain community trust, and preserve scarce resources.  *See* SAC ¶¶ 41–46, 63–71.  Plaintiffs' policies share two material features.  First, Plaintiffs do not routinely inquire into the specific immigration status of any individual.  *See id.* ¶¶ 43, 65.  Second, Plaintiffs generally limit local officials from participating in federal immigration enforcement for civil immigration violations.  *See id.* ¶¶ 43, 65.  Neither practice interferes with federal immigration enforcement.  *See id.* ¶¶ 45, 71.

Defendant Donald J. Trump ("Trump") initiated a sweeping campaign against sanctuary cities during his first term in office.  *Id.* ¶¶ 73–74.  Shortly after his second inauguration, Trump renewed the attack, issuing a series of executive orders targeting sanctuary jurisdictions.  *Id.* ¶¶

75–76, 92, 101–02.  The three Executive Orders[1] Plaintiffs challenge seek to penalize sanctuary cities by withholding crucial federal funding.  *Id.* ¶ 4.  Federal agencies swiftly implemented the Executive Orders through a series of Agency Directives.  *Id.* ¶ 5.  The Agency Directives either directly condition or mandate future conditions on the receipt of federal funds based on Plaintiffs' entanglement with federal immigration enforcement, despite the absence of any logical connection of those funds to immigration.  *See, e.g.*, *id.* ¶¶ 95–98, 100, 110.  For example, in September 2025, the Department of Housing and Urban Development ("HUD") notified Somerville that in order to receive its allocation of specified housing and community development formula grants, it had to sign agreements that included immigration-related conditions.[2]  *See id.* ¶ 110.  The conditions and requirements go far beyond mandating non-interference, instead demanding affirmative local action in support of federal immigration enforcement.  *See, e.g.*, *id.* ¶¶ 95, 97.  Likewise, the Department of Homeland Security ("DHS") issued conditions for its FY2025 grants that state grant recipients must: "comply with the requirements of 8 U.S.C. §§ 1373 and 1644"; "comply with other relevant laws related to immigration"; "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer"; and "provide access to detainees."  *Id.* ¶ 97.  The Agency Directives also include threats of federal investigations and prosecutions for jurisdictions the government deems insufficiently compliant.  *Id.* ¶¶ 80, 87.

    Chelsea and Somerville rely on tens of millions of dollars in federal funding annually for essential services, and unlike wealthier municipalities, they depend heavily on these

---

[1] Terms not defined herein shall have the meaning ascribed to them in the SAC (ECF No. 48).

[2] Those conditions include: "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations."  SAC ¶ 110.

congressionally allocated funds for critical programs. *See id.* ¶¶ 32–39, 55–62, 112–23. That dependence makes Defendants' threatened funding cuts especially coercive. *See id.* Defendants' hovering threat has already interfered with Plaintiffs' ability to budget and govern effectively—because many of Plaintiffs' federal grants are reimbursement-based, they face immediate and devastating fiscal cliffs if Defendants withhold any awarded funds. *See id.* ¶¶ 111–24.

Plaintiffs' policies are woven into the fabric of their local governance—Plaintiffs have long exercised their constitutionally protected authority to determine how best to deploy local law-enforcement resources, adopting lawful policies that reflect the priorities, values, and public-safety needs of their communities. *See id.* ¶¶ 41–43, 63–70. Those policies have endured through both Democratic and Republican administrations because they are rooted in local governance rather than shifting federal priorities. *See id.* ¶¶ 41–44, 64–68. By threatening and effectuating retribution for this constitutionally protected choice, the Executive Orders and Agency Directives aim to usurp Plaintiffs' local authority in favor of a politicized presidential priority.

### B.    Procedural History

Plaintiffs initiated this litigation on February 23, 2025. ECF No. 1. Due to ongoing implementation of the Executive Orders and Agency Directives resulting in a developing factual landscape, Plaintiffs filed an Amended Complaint on May 31, 2025. ECF No. 10. On June 3, 2025, Plaintiffs moved for a preliminary injunction to prevent Defendants from implementing or enforcing the challenged Executive Orders and Agency Directives. ECF No. 12. Defendants opposed the motion, ECF No. 19, and oral argument was held on July 17, 2025. The Court denied the preliminary injunction on October 2, 2025, but noted that HUD's imposition of funding conditions—made known to the Court through a supplemental notice filed by Plaintiffs, ECF No. 40—could be considered separately after receipt of Defendants' responsive pleadings. ECF No. 41 at 2 n.1. The Court stayed the proceedings during the lapse in federal appropriations in October

4

2025. ECF No. 43. After resumption of appropriations, Plaintiffs filed the SAC. ECF No. 48. Defendant HUD subsequently produced to Plaintiffs the administrative record as to the HUD claims. After the Court granted the parties' case schedule stipulation, Defendants filed the Motion.[3] ECF Nos. 55, 56.

### C. Parallel Litigation

Plaintiffs are not the only communities challenging Defendants' illegal attack on lawful public safety policies. In *City & County of San Francisco v. Trump*, No. 25-cv-1350 (N.D. Cal.), over fifty cities and counties across the country have challenged the federal government's blatant violations of constitutional and statutory law. In that case, the United States moved to dismiss the operative complaint under Federal Rules of Civil Procedure 12(b)(1) and (6), and the Court denied that motion in its entirety. *City & Cnty. of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1026, 1029 (N.D. Cal. 2026) (ruling in plaintiffs' favor on standing and finding most claims were "well supported" by the complaint).

The Department of Justice ("DOJ") has also initiated affirmative lawsuits challenging policies similar to Plaintiffs' against Illinois and Chicago, Los Angeles, New York City, Boston, and Minnesota. *See* SAC ¶¶ 88, 109.

### LEGAL STANDARD

When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (citations omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that "for the purposes of a motion

---

[3] Defendants filed the Motion at 10:53pm on June 10, 2026, which means it was deemed filed the following day (June 11, 2026) and was therefore untimely under the Local Rules. *See*, *e.g.*, *Carpenter v. Rivera*, 2014 WL 4928963, at *2 (D. Mass. Sept. 30, 2014).

to dismiss we must take all of the factual allegations in the complaint as true"). A claim must not be dismissed if the plaintiff has pleaded facts sufficient "to raise a right to relief above the speculative level," even if the allegations are "doubtful in fact." *Twombly*, 550 U.S. at 555.

## ARGUMENT

Defendants argue that this Court should disregard what the federal government has already done because their campaign against Plaintiff communities is not yet complete. This creates a moving jurisdictional target and a constitutional catch-22 that would permit an unlawful executive campaign to evade review by unfolding incrementally—but Article III does not require Plaintiffs to await the final blow before seeking relief. Defendants have already identified and targeted Plaintiffs for adverse treatment, imposed immigration-related funding conditions, altered the terms on which federal funds are distributed, initiated enforcement actions against similarly situated jurisdictions, thwarted Plaintiffs' budgeting process, and disrupted Plaintiffs' ability to govern. The Constitution permits judicial intervention before unlawful executive action succeeds in accomplishing its devastating—and express—objective to destroy "sanctuary" jurisdictions and their protected policy choices. Similarly, Defendants cannot avoid judicial review by attacking the merits of Plaintiffs' claims, which are adequately pleaded under binding precedent.

## I.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A.    Plaintiffs' Claims are Ripe

Plaintiffs' claims are ripe. Defendants' coordinated campaign has specifically and overtly targeted Plaintiffs and similarly situated communities over the past sixteen months. From issuing the Day One Executive Order to "ensure" sanctuary cities "do not" receive any federal funding, to naming Chelsea and Somerville on the DHS list titled "Sanctuary Jurisdictions Defying Federal Immigration Law" (the "Designation List"), which calls for affirmative enforcement action against

6

Plaintiff Cities,[4] Defendants' attempt to subvert Plaintiffs' local policies has harmed Plaintiffs by imposing a campaign of fear and throwing their fiscal planning into disarray.  These harms flow directly from the authority and directives of the challenged actions and are compounding and escalating with Defendants' continuing implementation.  Plaintiffs should not have to wait for relief: the challenges at issue here are final, definite, and mature enough to warrant judicial intervention.  "A litigant does not have to await the consummation of threatened injury to obtain preventative relief."  *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025) (citation modified).

The doctrines of standing and ripeness originate from the same Article III limitation, and, in essence, "boil down to the same question": "whether the harm asserted has matured sufficiently to warrant judicial intervention."  *See id*. at 25 (citations omitted).  Further, to determine ripeness, courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003).  Fitness involves issues of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," while hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties."  *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021) (citation omitted).

Defendants contend that Plaintiffs' claims are not ripe because they rest upon "contingent future events."  Mot. 8.  Not so.  Concrete actions towards Plaintiffs have already occurred and concrete injury has followed.  Plaintiffs adequately allege ongoing harms of budgetary uncertainty

---

[4] Defendants note that the Designation List has been removed from the DHS website, Mot. 9, but a few days after its removal, then-DHS Secretary Kristi Noem confirmed that the list "is absolutely continuing to be used" and Defendants have yet to repudiate the Designation List.  SAC ¶ 106 n.1.

stemming from the Executive Orders and Agency Directives, including the ongoing inability to make "informed decisions" about how to structure their budgets, SAC ¶¶ 40, 62; the "possibility that it will not be reimbursed" for "significant expenditures" related to reimbursement-based federal grants, *id.* ¶ 40; palpable fear of fiscal cliffs related to funding loss from the reimbursement-based nature of the bulk of their grant funding, *id.* ¶¶ 112, 120–21; the ongoing "severe squeeze" related to the funding uncertainty, *id.* ¶ 121; and genuine concern over prosecution or enforcement stemming from the challenged policies themselves, *id.* ¶ 11.  Each of these listed injuries presently "[create] a direct and immediate dilemma for the parties" and do not depend on the occurrence of future events.  *Rosen*, 986 F.3d at 53; *see New York v. McMahon*, 784 F. Supp. 3d 311, 345 (D. Mass. 2025), *appeal dismissed*, No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025) ("[U]ncertainty and delay stemming from Defendants' actions are harming [plaintiff educational institutions] by making it extraordinarily difficult to plan, budget, and hire educators."); *see also Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 163 (D. Mass. 2026) (finding that threat of initiation of legal action against plaintiffs, even if such litigation would fail, constituted sufficient harm).  Defendants' attempts to dispute the substance or veracity of these well-pleaded allegations are inappropriate at this stage.

Indeed, the text of a statute alone may inflict harm and create conflict sufficient to establish ripeness, even when implementing regulations have not yet been promulgated.  *See Jensen*, 160 F.4th at 24–25 (holding that plaintiffs' challenges were ripe because the provisions of the challenged statute required future implementing actions to conform to the statute's restrictions). The same logic as *Jensen* applies here: Plaintiffs' claims are direct challenges to the Executive Orders and Agency Directives and the language of these orders *requires* agencies to condition

8

funding on compliance with federal immigration priorities in future implementing actions.[5]  That

all of the government agencies have not yet promulgated final conditions implementing the

Executive Orders and Agency Directives, "did not mean that the eventual promulgation was an

uncertain or contingent event, and it did not render the case not ripe."  *Jensen*, 160 F.4th at 24–25;

*see also Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995) ("[E]ven

when the direct application of a statute is to some degree remote or contingent, its collateral effects

may inflict present injuries that, though indirect, are adequate to support a finding of ripeness.").[6]

Even if the Executive Orders and Agency Directives in question are mere "evaluations" as

Defendants contend—which they are not—the fact that future events have not yet fully unfolded

is hardly "fatal to justiciability."  *Ernst & Young*, 45 F.3d at 536.  A future injury can be an Article

III injury when the threatened injury is certainly impending or there is a substantial risk that the

harm will occur.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *New Jersey v.*

*Trump*, 131 F.4th 27, 37 (1st Cir. 2025).  Here, Defendants have continually indicated that they

will—and they have—taken targeted action against Plaintiffs.  Defendants have never disavowed

the directives in the Executive Orders and Agency Directives.  Instead, Defendants: (1) specifically

placed Plaintiffs on the Designation List; (2) continue to bring affirmative enforcement actions

---

[5] Each challenged document uses affirmative, commanding language and in effect and reality, are more than the mere "evaluation" Defendants claim.  *See San Francisco*, 816 F. Supp. 3d at 1029 ("Here, plaintiffs' injuries are not 'contingent upon many layers of hypothetical and contradictory future actions' as defendants suggest.  Instead, the 'text of the challenged provisions . . . requires compliance' and 'unambiguously command[s] action.'" (citations omitted)).

[6] Notably, Defendants do not challenge the ripeness of Plaintiff Somerville's claims against HUD and the Department of Transportation (DOT), precisely because the orders have already resulted in conditioned funding.  *See* Mot. 8–9.  Defendants argue in a footnote that Plaintiffs' claim against DOT is moot, as the challenged DOT conditions have been enjoined by another court.  *See id.* at 12 n.4; *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291 (D.R.I. Nov. 4, 2025).  However, Plaintiffs challenge not only the DOT immigration conditions but also the DOT Order that effectively deprioritizes funding to sanctuary jurisdictions—that order is not covered by the current injunction.  *See* SAC ¶ 84.

against similarly situated jurisdictions, particularly against those that have brought suit against the federal administration;[7] and (3) actually promulgated conditions on numerous grants housed under three different agencies,[8] exactly as called for in Executive Orders and Agency Directives.

Through these actions over the past sixteen months, Defendants have proven their steadfast commitment to executing the mandates in the Executive Orders and Agency Directives. What's to come is not hypothetical or "mere conjecture"[9]—the Defendants' path forward is clear because they are already doing it and they have done it before. The nation saw this unfold during the first Trump Administration with the imposition of conditions on DOJ grants, *see* SAC ¶¶ 73-74, and has now seen its redux in Defendant Trump's second term, manifesting in, *inter alia*, the conditioning of DOT, HUD, and DHS grants on wholly unrelated immigration conditions. After nearly a year and a half of coordinated implementation across multiple agencies, Defendants can no longer plausibly characterize additional immigration-related funding conditions as speculative. The extension of those conditions to Plaintiffs' remaining federal funding is the predictable—and already unfolding—next step in this coordinated campaign. *See SBA List*, 573 U.S. at 158 ("[P]ast

---

[7] *See United States v. New Mexico, et al.*, No. 1:26-cv-01471 (D.N.M. May 8, 2026); *United States v. Connecticut, et al.*, No. 3:26-cv-00568 (D. Conn. Apr. 13, 2026); *United States v. Washtenaw, et al.*, No. 4:26-cv-11166 (E.D. Mich. Apr. 9, 2026); *United States v. New Jersey, et al.*, No. 3:26-cv-01170 (D.N.J. Feb. 23, 2026); *United States v. Minnesota, et al.*, No. 0:25-cv-03798 (D. Minn. Sept. 29, 2025); *United States v. City of Boston, et al.*, No. 1:25-cv-12456 (D. Mass. Sept. 4, 2025); *United States v. Los Angeles, et al.*, No. 2:25-cv-05917 (C.D. Cal. June 30, 2025); *United States v. Newark, et al.*, No. 2:25-cv-05081 (D.N.J. May 22, 2025); *United States v. Colorado, et al.*, No. 1:25-cv-01391 (D. Colo. May 2, 2025); *United States v. City of Rochester, et al.*, No. 6:25-cv-06226 (W.D.N.Y. Apr. 24, 2025); *United States v. Illinois, et al.*, No. 1:25-cv-01285 (N.D. Ill. Feb. 6, 2025). Connecticut, Minnesota, and New Mexico, each targeted here, themselves or cities within them, all brought affirmative lawsuits against the government. *See City & County of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal.).

[8] Namely, DOT, HUD, and DHS. SAC ¶¶ 95–100.

[9] Defendants argue that any action to follow the Executive Orders and Agency Directives is "mere conjecture." *See Trump v. New York*, 592 U.S. 125, 131, 141 (2020). However, the Executive Orders and Agency Directives at issue are far more than the general statement of policy in *Trump v. New York*, as the Executive Orders and Agency Directives *demand* and have resulted in affirmative action.

enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citation omitted)); *see also U.S. Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (noting predictable chain of events).  Plaintiffs have been harmed, are being harmed, and are at substantial risk of being further harmed by Defendants' actions—their claims are ripe.

### B.      Plaintiffs Allege Article III Standing

Plaintiffs' allegations are sufficient to establish Article III standing.  Their injury, as described above, is concrete and imminent, fairly traceable to the challenged conduct, and redressable by the requested relief.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Plaintiffs allege present and ongoing harms as well as imminent future harm in the form of prosecution, loss of federal funds, and related budgeting repercussions.  *See* SAC ¶¶ 109, 112–19, 120–21.  Defendants attempt to evade judicial review by recasting Plaintiffs' injuries as a run-of-the-mill uncertainty associated with competing for competitive grants.[10]  But Defendants fail to acknowledge that key grants such as the HUD grants are formula-based, *id.* ¶ 110, and further disregard Plaintiffs' credible fear of enforcement—stemming directly from the challenged actions, *see id.* ¶¶ 109, 112–19, 120–21.  The challenged actions have already infringed on Plaintiffs' constitutionally protected decision-making and governance authority through disrupting their budgeting processes and imposing fear and instability through new immigration-related conditions, the Designation List, and lawsuits against neighboring communities with similar policies.  *See id.* ¶¶ 112–23.  Even in the unlikely event that Defendants take no further action against Plaintiffs, these harms are sufficient to confer standing.  *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1129 (2026) ("A government that takes three limbs but spares the last imposes an injury all the same.").

---

[10] Defendants again exclude Plaintiff Somerville's claims against HUD from their standing challenge, therefore conceding that there is standing for such claims.

Similarly, Article III does not require Plaintiffs to wait until the federal government figuratively cuts off "limbs"—police, housing, transportation, or homelessness-prevention funds—before seeking review of conditions already imposed and threats already carried out. *Id*. Nevertheless, Defendants attempt to defeat Plaintiffs' claims by examining each agency action in isolation. *See* Mot. 8–10. Defendants repeatedly dissect the challenged conduct into isolated administrative acts, then argue that each individual piece is either too tentative or too incomplete to review. *See id.* However, Plaintiffs challenge Defendants' integrated federal campaign implemented through mutually reinforcing Executive Orders, Agency Directives, funding conditions, designation lists, and enforcement threats, all designed to pressure jurisdictions into abandoning lawful local policies. *See* SAC ¶¶ 73–110. Standing and ripeness are evaluated based on the concrete injuries inflicted by this coordinated campaign, not by artificially fragmenting and compartmentalizing its component parts. *See Dep't of Commerce*, 588 U.S. at 767–68 (rejecting federal government's attempt to undermine plaintiffs' standing by separating its action from its "predictable effect").

Defendants also fail to contend with standing conferred by certain future injuries, including through pre-enforcement standing. *See SBA List*, 573 U.S. at 158; *New Jersey*, 131 F.4th at 37. It is well-established that a plaintiff need not "wait for the government to take coercive action" to have standing if there is a "credible threat of enforcement." *First Choice*, 146 S. Ct. at 1122 (citation modified); *Am. Acad. of Pediatrics*, 814 F. Supp. 3d at 163 (finding that credible threat of mere initiation of legal action was sufficient injury to confer standing). Specifically, threatened enforcement confers standing where plaintiffs allege: "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 158. Plaintiffs' allegations also meet this standard.

12

First, Plaintiffs allege a continuing practice of maintaining policies that limit use of local resources for federal immigration enforcement, *see* SAC ¶¶ 41–43, 63–70, and the assertion of this local decision-making authority implicates multiple constitutional interests. *See id.* ¶¶ 108, 124–38. Second, Plaintiffs allege this conduct is arguably proscribed by the authorities they challenge: it has already landed them on the Designation List and Defendants have filed lawsuits against jurisdictions with substantially similar policies. *See id.* ¶¶ 88–91, 106, 108–09, 111–23. Third, Plaintiffs have alleged a credible threat of enforcement that would result in the loss of federal funds, some of which are reimbursement funds that have already been allocated and spent, that Plaintiffs would otherwise have received and recovered. *See id.* ¶¶ 113–17; *see also id.* ¶¶ 40, 112–18, 120–21; *Dep't of Commerce*, 588 U.S. at 767 (finding that future loss of federal funds is a concrete injury); *New Jersey*, 131 F.4th at 37–38 (same).

The credible threat analysis considers the context the alleged threat exists within, including the history and frequency of enforcement and lack of disavowal of future enforcement. *See SBA List*, 573 U.S. at 164–65. All of those considerations bolster the credibility of the alleged threat against Plaintiffs. Defendants have already laid out the blueprint for how the challenged policies will predictably threaten Plaintiffs' funding. For example, the Subsidization Executive Order called on agency heads to "ensure" that federal funds do not "abet so-called 'sanctuary' policies." *See* SAC ¶ 92. Less than a month later, the HUD Secretary issued a letter directing a review of HUD grant programs which led to conditions placed on HUD grants that, if enforced, would deprive Somerville of $3.2 million in funding. *See id.* ¶¶ 96, 110. When the path between the threat and its actualization is predictable, the need for intervening action for implementation does not undermine the risk of future harm. *See Dep't of Commerce*, 588 U.S. at 767–68 (future injuries predicated on an expectation that a series of events with multiple contingencies would occur were sufficiently concrete and traceable). And far from disavowing future enforcement, Defendants

13

continue to make affirmative statements about attacking sanctuary cities, SAC ¶ 104, and bring affirmative litigation against jurisdictions with similar policies, *id.* ¶ 109. Finally, the "additional threat" of litigation resulting from Defendants' challenged policies further reinforces Plaintiffs' alleged injury under this standard. *See SBA List*, 573 U.S. at 166.[11]

Defendants emphasize that many months have passed since the initiation of these actions (setting aside the lapse in federal appropriations) but fail to address their ongoing implementation during this time. Instead, Defendants attempt to write off their actions, such as conditions to HUD grants, as outliers, with any future implementation being purely "hypothetical." Mot. 12. To the contrary, these actions reveal Defendants' intent to proceed against Plaintiffs, even if implementation has lagged behind that intent. Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is misplaced. *See* Mot. 12–13. Unlike the Plaintiffs in *Clapper*, Plaintiffs' fears are not based on purely hypothetical future harm; Plaintiffs have been expressly targeted. *See* SAC ¶¶ 105–06.

Defendants' attempt to recharacterize Plaintiffs' alleged harm as part of routine local government uncertainty, *see* Mot. 12, rather than grapple with the targeted ongoing harms that Plaintiffs are experiencing, *see* SAC ¶¶ 111–23, is telling. Defendants cannot challenge the

---

[11] *See also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (finding that when a plaintiff intends to engage in an action that implicates his constitutional rights and there exists "a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" (citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973))); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."); *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("A credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement."); *Am. Acad. of Pediatrics*, 814 F. Supp. 3d at 163 ("It does not matter that, according to Defendants, any litigation . . . would fail. Instead, it is the very clear threat that such an action would be brought in the first place that creates harm.").

veracity of Plaintiffs' claims at this stage in the litigation. Plaintiffs' allegations of both ongoing harm and the credible threat of future harm are each sufficient to confer standing.

## II.  PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS FOR RELIEF

### A.  Plaintiffs Have Adequately Pleaded Both Facial and As-Applied Challenges

Defendants' threshold premise is wrong: Plaintiffs bring both facial challenges to directives that categorically target "sanctuary" jurisdictions for funding restrictions and enforcement measures, *id.* ¶¶ 4–5, 102–08, and as-applied challenges based on Defendants' concrete actions toward Chelsea and Somerville, *see, e.g.*, *id.* ¶¶ 100, 106, 110. Both theories should survive, as Plaintiffs plausibly allege that the challenged directives lack a "plainly legitimate sweep" and operate through unconstitutional applications. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723–25 (2024); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24–25 (1st Cir. 2016).

Plaintiffs have stated sufficient facial challenges by alleging that Defendants impose immigration-related conditions on funding to punish jurisdictions whose local policy choices do not align with the Administration's priorities, even where the federal programs they invoke bear no nexus to those policies or to immigration. *See* SAC ¶¶ 103, 122. Moreover, they have alleged that Defendants threaten funding loss and enforcement through undefined terms such as "sanctuary jurisdictions," "sanctuary policies," "obstruct," "cooperat[e]," and "materially impede." *Id.* ¶¶ 151–58. That is the kind of "expansive, standardless language" that creates a serious risk of arbitrary enforcement regardless of which city is targeted. *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs also sufficiently allege as-applied claims. Plaintiffs allege that DHS placed both Chelsea and Somerville on the Designation List and demanded policy revisions, SAC ¶¶ 105–06; that DOT required Somerville to accept revised SS4A Conditions for its nearly $4 million grant, *id.* ¶ 100; and that HUD required Somerville to accept immigration-related conditions to receive

15

more than $3.2 million in CDBG, HOME, and ESG formula-based funds, *id.* ¶ 110. Plaintiffs also allege present budgetary harm, reimbursement risk, and disruption to city planning. *Id.* ¶¶ 40, 111–17. Finally, Plaintiffs face enforcement and litigation risk because their policies resemble those DOJ has used to justify prosecutions against other cities, including neighboring Boston.[12]

The Complaint thus pleads both facial invalidity and unconstitutional application. *See, e.g.*, *San Francisco*, 816 F. Supp. 3d at 1031–33 (finding both facial and as-applied challenges for similar claims and rejecting the federal government's motion to dismiss for both).

### B.    Plaintiffs Have Adequately Pleaded a Violation of the Separation of Powers

Defendants inaptly try to cast Count I (Separation of Powers) as either premature or "a statutory claim repackaged as a constitutional claim," Mot. 13–15, but Plaintiffs allege that Defendants have used the Executive Orders and Agency Directives to impose funding conditions that Congress did not authorize and, in so doing, threatened penalties, termination of federal funds, and enforcement measures against jurisdictions that do not bend to the President's will and preferred immigration policies, SAC ¶¶ 124–29. Those allegations state a classic separation-of-powers claim: the Executive Branch may not seize Congress's Spending Power by attaching new conditions to appropriated funds without Congressional authorization. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that a federal agency "has no power to act . . . unless and until Congress confers power upon it").

Defendants miscast the challenged actions as calling only for future "evaluation[s]," Mot. 14, but the plain language of the challenged actions confirms that Defendants are ordering the withholding or conditioning of funds, not merely requesting evaluations. For example, Section 17 of the Day One Executive Order directs that the Attorney General and DHS Secretary "shall" take

---

[12] *See supra* note 7.

action to "ensure" that so-called sanctuary jurisdictions "do not receive access to Federal funds," SAC ¶ 142; further, the Designation Executive Order provides that identified jurisdictions face "suspension or termination" of federal funds, *id.* ¶ 102.

These operative commands pose serious separation-of-powers issues—as even Defendants concede, the Constitution vests the Spending Power in Congress.  Mot. 13.  Only Congress may attach conditions to federal funds, and "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  Defendants acknowledge that Congress holds the Article I Spending Power, but instead contend that Congress delegated enough authority in 34 U.S.C. § 10153(a)(5)(D) and § 10102(a)(6) for the agencies to impose the challenged immigration conditions.  But the First Circuit in *City of Providence v. Barr* foreclosed this theory, rejecting the premise that either of these statutes provides a sufficient hook to authorize immigration-enforcement conditions.  954 F.3d 23, 32–45 (1st Cir. 2020); *see also City of Philadelphia v. Att'y Gen. of the U.S.*, 916 F.3d 276, 287–88, 291 (3d Cir. 2019) (same).  Moreover, Defendants cannot salvage their argument by relying on *Biden v. Missouri*, *see* Mot. 16, which involved vaccination conditions directly related to HHS's congressionally delegated authority to take actions necessary in the interest of "health and safety"—they have pointed to no statute that confers comparable authority to impose immigration-related conditions on all the federal funding at issue here.  *See* 595 U.S. 87, 92–93 (2022) (permitting agency rulemaking because "[t]he rule [] fits neatly within the language of the statute").

Nor can Defendants avoid review by invoking "consistent with law," "to the extent permitted by law," or similar savings language.  Caveats such as this constitute "nothing more than window dressing," *New York v. Trump*, 171 F.4th 1, 22–24 (1st Cir. 2026), and do not immunize executive actions from constitutional challenges, especially where the actual implementation

contradicts the caveat, *San Francisco*, 897 F.3d at 1239 (distinguishing Defendants' cited case, *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), and rejecting reliance on "consistent with law" language as a means of avoiding review).

Finally, Defendants mistakenly rely on *Dalton v. Specter*, 511 U.S. 462 (1994), to argue that Count I should have been pleaded as a statutory rather than constitutional claim, but *Dalton* does not support that logic: *Dalton* held only that not every action in excess of statutory authority is automatically a constitutional violation, particularly where the statute commits the relevant decision to the President's discretion. *Id.* at 472, 476–77. *Dalton* involved a statute which gave the President "unfettered discretion" over base-closure recommendations. *Id.* at 478. Here, Plaintiffs allege not a procedural misstep within a discretionary statutory scheme, but a lack of power entirely. Defendants are imposing funding conditions and penalties Congress did not authorize, thereby usurping the Spending Power reserved to Congress. The same distinction has been recognized in this District in *California v. Mullin*, which explained that *Dalton* does not bar review where executive action intrudes on a core Article I power and raises "weighty constitutional concerns regarding the balance of power between the executive and legislative branches." 2026 WL 1649160, at *7–8 (D. Mass. June 8, 2026).

Count I therefore states a plausible claim for relief, as Plaintiffs adequately allege that Defendants used Executive Orders and Agency Directives to do what only Congress may do: decide whether federal funds will be conditioned, suspended, terminated, or withheld based on local public safety decisions.

### C.      Plaintiffs Have Adequately Pleaded a Violation of the Spending Clause

Plaintiffs have adequately pleaded that Defendants cannot reconcile the challenged Executive Orders and Agency Directives with the constitutional constraints on conditional spending. Even if Congressional authority for these actions existed—which it does not—the

18

Executive Orders and Agency Directives violate four of the limitations placed on the Spending Power. *See South Dakota v. Dole*, 483 U.S. 203, 207–08, 210–11 (1987) (holding that conditions must be unambiguous, uncoercive, related to the federal interest, and must not induce unconstitutional action); SAC ¶¶ 132–33; *see supra* Section II.B.

First, the challenged actions are unlawfully ambiguous. *See Dole*, 483 U.S. at 207; SAC ¶ 133(a). The Executive Orders fail to adequately or meaningfully define "so-called 'sanctuary' jurisdictions," "so-called 'sanctuary' policies," and "sanctuary jurisdictions." SAC ¶¶ 76, 92, 102.[13] For example, the Designation Executive Order purports to define "sanctuary jurisdictions" as those "jurisdictions that obstruct the enforcement of Federal immigration laws." *See id.* ¶ 102. But it does not include an explanation of what constitutes "obstruct[ion]." *See id.* What conduct amounts to obstruction is particularly uncertain given the Administration's apparent expectation that local jurisdictions proactively engage in federal immigration enforcement.[14] *See e.g.*, *United States v. City of Boston*, 2026 WL 1493706, at *7 (D. Mass. May 28, 2026) (alleging injuries of "increased operational costs" and "sovereign harm" purportedly resulting from local policy preventing police from detaining individuals solely to effectuate federal civil immigration detainers); SAC ¶¶ 103–04. The challenged Agency Directives are similarly inadequate. *See* SAC ¶ 133(a). For example, the HUD Letter states that "grant agreements will include language that will require compliance with Executive Order 14218" and HUD "will take steps to ensure that Federal resources are not used to support 'sanctuary' policies . . . that actively prevent federal

---

[13] For example, Minneapolis, which has been sued by DOJ, *see* SAC ¶ 109, was named on the Designation List, *see id.*, Ex. K, but does not appear on either of the sanctuary jurisdiction lists currently published on DOJ's website, *see, e.g.*, Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

[14] Importantly, while it is apparent from the Administration's actions and public statements that Plaintiffs are being targeted by Defendants, the language of the challenged actions themselves remain unconstitutionally ambiguous.

authorities from deporting illegal aliens." *See id.*, Ex. J. In addition to compounding the ambiguity of the Subsidization Order, which indistinctly prohibits payments to states and localities that "abet so-called 'sanctuary policies,'" the HUD Letter offers no explanation as to the contours of the sorts of policies that "actively prevent federal authorities" from immigration enforcement activity. *See id.* The DHS Conditions similarly set forth undefined requirements, including "honor[ing] requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer." *See id.*, Ex. I; *see Illinois v. FEMA*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025) (finding such conditions to be unlawfully ambiguous).

Second, Defendants' conclusion that the financial inducement contemplated in the present matter is within the range found to be acceptable in *Dole* is both unsupported by authority and beyond reason. *See* Mot. 17–18. Although Defendants calculate the percentage of federal funding in each Plaintiff's budget for fiscal year 2024 (Chelsea: 6.28%; Somerville: 5.76%), they inexplicably conclude that those percentages are closer to the inducement in *Dole*, which was less than 0.5% of South Dakota's budget, than the inducement in *NFIB*, which was over 10% of a State's overall budget. *Compare Dole*, 483 U.S. at 210-11, *with Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581–82 (2012). Defendants' suggestion that the percentage represented by each grant may be smaller, Mot. 18, cannot rescue their argument, because the plain language of the Executive Orders purports to apply to *all* federal funding. *See* SAC ¶¶ 76, 92, 102. That the financial pressure is coercive is particularly apparent when considering the size and demographic profile of Plaintiff Cities and the critical nature of the programs at risk. *See* SAC ¶¶ 112–18, 133(b); *Illinois*, 801 F. Supp. 3d at 96 ("The coercion is even more pronounced because the threatened funds involve essential public safety responsibilities rather than optional or peripheral programs.").

20

Third, Defendants' reliance on the PRWORA, Mot. 18, a statute limiting the availability of public benefits for noncitizens, does not plausibly justify conditions requiring affirmative local entanglement with federal law enforcement. *See San Francisco*, 816 F. Supp. 3d at 1039 ("[N]owhere does the text [of PRWORA] suggest giving the federal Government the authority to condition the receipt of federal funds on the requirement that states and local jurisdictions actively assist in enforcing federal immigration laws"). Even if such authorization existed, the actions impermissibly apply to funding that is unrelated to federal immigration enforcement, such as DOT funding for safe streets and roads. *Illinois*, 801 F. Supp. 3d at 96 ("Sweeping immigration-related conditions imposed on every DHS-administered grant, regardless of statutory purpose, lack the necessary tailoring.").

Finally, Defendants' Motion is markedly silent on the reality that, under Massachusetts law, local officials are prohibited from detaining individuals solely on the basis of civil immigration detainers. *See Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017); *City of Boston*, 2026 WL 1493706, at *7. The challenged conditions, which purport to require active entanglement in federal immigration enforcement rather than simple non-interference, *see e.g.*, SAC, Ex. E (mandating that fund recipients prioritize projects and goals that "require local compliance or cooperation with Federal immigration enforcement"), would force Plaintiffs to act in contravention of both state law and the Constitution. *See Dole*, 483 U.S. at 210–11.[15] The Constitution does not permit Defendants to coerce Plaintiffs into violating binding Massachusetts law under *Lunn* as the price of receiving Congressionally appropriated federal funds.

---

[15] Defendants' inclusion of phrases such as "consistent with applicable law" cannot overcome the plain language of the directives. *See supra* Section II.B.

### D.        Plaintiffs Have Adequately Pleaded a Violation of the Tenth Amendment

Plaintiffs have also adequately pleaded that Defendants have attempted to control their local policies via a coordinated campaign of unconstitutional federal commandeering.  "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997).  Plaintiffs' well-reasoned decision to limit their participation in federal immigration enforcement is squarely protected under this principle.  *See United States v. Colorado*, 2026 WL 878882, at *4 (D. Colo. Mar. 31, 2026) ("[S]tate implementation and enforcement of the federal immigration scheme is necessarily voluntary."); *United States v. New York*, 810 F. Supp. 3d 329, 350 (N.D.N.Y. 2025) ("[T]he Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement."); *United States v. Illinois*, 796 F. Supp. 3d 494, 535 (N.D. Ill. 2025) ("[T]he Sanctuary Policies reflect Defendants' decision to not participate in enforcing civil immigration law—a decision protected by the Tenth Amendment.").

As a threshold matter, Defendants misrepresent the plain language of the Subsidization Executive Order and the Day One Executive Order, suggesting that the former does not apply to States and localities and that the latter only applies to specific programs.  *See* Mot. 19.  Yet, the Subsidization Executive Order directs the head of each executive agency to "ensure…that *Federal payments to States and localities* do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies."  SAC, Ex. B (emphasis added).  The Day One Executive Order commands the Attorney General and the DHS Secretary to take action "to ensure that so-called 'sanctuary' jurisdictions…*do not receive access to Federal funds*."  *Id.*, Ex. A (emphasis added).  Defendants identify no authority limiting either directive as they now contend.  *See* Mot. 19.

22

Next, Defendants boldly suggest that there can be no commandeering where Plaintiffs may decline to apply for the funding to which the challenged conditions are attached.  *See* Mot. 19. That argument fails for several reasons.  First, Plaintiffs cannot simply decline to apply for federal funding without foregoing life-saving public services.  *See* SAC ¶¶ 112–18.  Second, the Administration has made it abundantly clear that *all* federal funding, including already conditioned (and long-relied-upon) formula funding, is at risk.  *See e.g.*, *id.* ¶¶ 76–77, 92.  Third, Defendants' reliance on *FERC v. Mississippi*, Mot. 19, is misplaced because, as the Supreme Court acknowledged in *Murphy*, that case was decided before the Court's anticommandeering doctrine further developed, and that case involved a statute that only directed states to "consider" a congressional "preference."  *Murphy v. NCAA*, 584 U.S. 453, 476–77 (2018) ("*FERC* was decided well before our decisions in *New York* and *Printz*, and PASPA, unlike the law in *FERC*, does far more than require States to *consider* Congress's preference that the legalization of sports gambling be halted.").  So too here, the Executive Orders and Agency Directives do far more than require Plaintiffs to consider the Administration's expectation that local jurisdictions entangle themselves in federal immigration enforcement.[16]

Finally, Defendants' position that the challenged directives instruct agencies to exercise existing authority and are not independently enforceable entirely disregards DOJ's litigation against similarly situated jurisdictions.  *See* SAC ¶¶ 88–91, 109.  Defendants' comparison to *United States v. Pickard*, Mot. 19–20, is inapt given that *Pickard* was decided on the particulars of an agency memorandum that provided prosecutorial guidance, and the relevant Tenth

---

[16] Defendants' reliance on *Env't Def. Ctr., Inc. v. U.S. EPA*, is similarly misplaced.  *See* Mot. 19. In contrast to the "Alternative Permit option" in *EPA*, there is no alternative funding option here— Plaintiffs either bend the knee or forfeit federal funding.  *See San Francisco*, 783 F. Supp. 3d at 1195 (distinguishing *EPA*).

Amendment analysis was whether the agency policy "impose[d] a disparate impact on states." *See* 100 F. Supp. 3d 981, 1011 (E.D. Cal. 2015).

### E.  Plaintiffs Have Adequately Pleaded a Violation of the Fifth Amendment

The Executive Orders and Agency Directives violate the Fifth Amendment guarantees of due process and its void-for-vagueness doctrine. *See* SAC ¶¶ 139–58. Defendants' arguments that the challenged Executive Orders and Agency Directives threaten only "routine" government contracts and contain language that is merely imprecise, Mot. 20–23, fail to undermine Plaintiffs' adequately pleaded Fifth Amendment claims.

Plaintiffs have a protected property interest in federal funding for which they have applied and been approved. *See City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1197 (N.D. Cal. 2025) ("A state or local government has a legitimate claim of entitlement to congressionally appropriated funds, which are akin to funds owed on a contract."); *NFIB*, 567 U.S. at 576–77 ("The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."'"). This is particularly true of formula-based funding, such as the HUD funds, that have been conditioned. *See* SAC ¶ 110.

Defendants cite *Perry v. Sindermann* as an example of the "new property" that the Supreme Court has recognized as protected under the Due Process Clause. Mot. 20. Yet, *Perry* in fact supports Plaintiffs' position, because just as the respondent in *Perry* "alleged the existence of rules and understandings . . . that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause,'" Plaintiffs have alleged long-standing expectations that the federal government will fulfill funding commitments and not impose unconstitutional conditions on those funds, which, when reimbursement-based, require significant upfront expenditures. *See* 408 U.S. 593, 601–03 (1972); SAC ¶ 120. Defendants' reliance on *Redondo-Borges v. U.S.*

24

*Department of Housing and Urban Development* is similarly misplaced. *See* Mot. 20. To equate the present matter to a "simple breach of contract," such as the rescinded construction bid at issue in *Redondo-Borges*, would be a dramatic understatement. 421 F.3d 1, 10 (1st Cir. 2005); *see also Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 89 (1st Cir. 2014) ("While a government contract does not per se create a protected property interest, there may be certain 'special circumstances' that can justify an exception to this general rule."). The Executive Orders and Agency Directives violate the Fifth Amendment's guarantee of due process by failing to provide Plaintiffs with a path to seek review or challenge actions taken under their authority. SAC ¶ 145.

For the same reasons that Plaintiffs have adequately alleged that the Executive Orders and Agency Directives are unlawfully ambiguous, *see supra* Section II.C, Plaintiffs have also adequately alleged that the policies are impermissibly vague. *See* SAC ¶ 149–157; *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). Defendants' comparison to *National Endowment for the Arts v. Finley*, Mot. 22, is unpersuasive given that the grants at issue in that case there were "based on inherently subjective criteria such as artistic excellence and merit." *See City of Fresno v. Turner*, 2025 WL 2721390, at *14 (N.D. Cal. Sept. 23, 2025) (distinguishing *Finley* in the context of "grant awards . . . for housing, transportation, and health services"). Defendants' reliance on "leeway" afforded to competitive grants, Mot. 23, is similarly unconvincing, as Plaintiffs allege that the HUD grants at issue are formula-based grants. *See* SAC ¶ 110.

### F.    Plaintiffs Have Adequately Pleaded Violations of the APA

Plaintiffs also adequately allege that DOJ, DOT, DHS, and HUD each took reviewable agency action to implement the Executive Orders' commands to deny or condition federal funding to "sanctuary" jurisdictions, and that those actions are arbitrary and capricious, contrary to the

Constitution, and in excess of statutory authority. *See* SAC ¶¶ 185–95, 197–207, 209–19, 221–30. That is more than enough to state APA claims at the pleading stage.

First, the Agency Directives are final agency action. Finality exists where an agency action (1) marks the "consummation" of the "agency's decision-making process" and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiffs have pleaded finality for each agency: the Bondi Memo orders that DOJ "shall pause the distribution of all [Federal] funds," SAC ¶ 85; DOT announced and applied immigration-cooperation conditions to Somerville's nearly $4 million SS4A grant, *id.* ¶ 95; DHS directed that recipients must agree with immigration-related conditions to receive funding, *id.* ¶ 97; and HUD announced and imposed conditions requiring compliance with the Subsidization Executive Order, *id.* ¶ 96. These binding directives have concrete consequences, including Defendants' ongoing suits against sanctuary jurisdictions to enforce the challenged policies. *See, e.g.*, *City of Boston*, 2026 WL 1493706, at *1.

Defendants cannot avoid finality by merely labeling these directives as "internal" evaluations. Mot. 25. Agency directives which constitute binding commands are final. *See Biden v. Texas*, 597 U.S. 785, 810 (2022) (treating as final an OMB directive to freeze federal funding and DHS's actions to implement the funding pause); *New York v. Trump*, 769 F. Supp. 3d 119, 136 (D.R.I. 2025) (OMB directive was final agency action because it mandated that agencies "must temporarily pause all activities related to obligation or disbursement" of funds—language that constitutes a binding command, not a mere suggestion). Courts have found, for example, that the Bondi Memo was a final agency action because it commanded DOJ to pause funds to sanctuary jurisdictions, marked DOJ's final funding-ineligibility decision, and produced legal consequences. *See San Francisco*, 783 F. Supp. 3d at 1199. Defendants' reliance on *FTC v. Standard Oil*, 449 U.S. 232 (1980) is to no avail. The FTC complaint in that case merely initiated adjudicatory

26

proceedings and lacked "legal force" or "comparable effect on [Standard Oil's] daily business." *Id.* at 242.   Here, Plaintiffs allege operative directives that alter funding eligibility, impose conditions, and destabilize reimbursement-based budgeting.   SAC ¶¶ 120–23, 187, 199, 211, 223.

Second, contrary to Defendants' assertion, 5 U.S.C. § 701(a)(2) does not bar review.   The Supreme Court has explained that the APA's "basic presumption of judicial review" is displaced only in the "rare" and "limited category" of "administrative decision[s] traditionally left to agency discretion" or where there is no meaningful standard to apply.   *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020); *Dep't of Commerce*, 588 U.S. at 771–72. Defendants' chief case in support, *Lincoln v. Vigil*, 508 U.S. 182 (1993), is inapposite because it involved a lump-sum appropriation for a program Congress had not addressed.   The rationale does not apply where Congress has specifically directed how funds are to be distributed—via formula grants, eligibility criteria, and enumerated program objectives.   *See New York*, 171 F.4th at 19–20 (*Lincoln* declined judicial review "on the limited grounds that the allocation of funds from a lump-sum appropriation is an administrative decision traditionally regarded as committed to agency discretion").   Conversely, Plaintiffs challenge categorical immigration-related conditions and freezes imposed without Congressional authorization and untethered to the purposes of the grants. Such actions are clearly not immune from judicial scrutiny.   *Id.* ("*Lincoln* . . . did not hold that agencies have unreviewable discretion to categorically stop disbursing obligated funds.").

Third, Plaintiffs have adequately pleaded that the Agency Directives are contrary to the Constitution and in excess of statutory authority.   Plaintiffs plausibly allege that the directives violate the separation of powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment, and that no statute authorizes DOJ, DOT, DHS, or HUD to withdraw, pause, or condition properly appropriated funds based on entanglement with federal civil immigration enforcement.   *See New York*, 769 F. Supp. 3d at 139–40 (holding that "in implementing the funding

27

freeze, the Agency Defendants withheld funding that Congress did *not* tie to compliance with the President's policy priorities" and therefore created a likelihood of success that Defendants acted contrary to law); *cf. City of Boston*, 2026 WL 1493706, at \*10 (explaining that DHS does not have statutory authority to require localities to facilitate immigration detainers). Those allegations track the settled rule that an agency has no power to act unless Congress confers that power, and that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235; *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (same); *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025) (same).[17]

Because Defendants have failed to undermine the adequacy of Plaintiffs' APA claims, Counts XII through XV should proceed.

### G. Plaintiffs Have Adequately Pleaded Claims for Declaratory Relief

Requests for declaratory relief are generally viewed as remedies, rather than causes of action; however, pleading these requests as standalone claims is not per se improper and will not automatically result in a dismissal of the claim, as Defendants suggest. *See, e.g.*, *Voter Reference Found., LLC v. Galvin*, 2026 WL 836855, at \*13 n.6 (D. Mass. Mar. 26, 2026) (noting that two requests for declaratory relief were styled as causes of action but nevertheless analyzing the counts on the merits and granting the requested relief). Such counts must simply be supported by underlying legal rights. *See Penney v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 1015002, at \*9 (D. Mass. Mar. 15, 2017) ("Requests for declaratory judgment are analyzed under the same Rule 12(b)(6) standard as all other counts in a complaint."). Plaintiffs provide more than adequate

---

[17] Defendants have not moved to dismiss Plaintiffs' arbitrary-and-capricious APA challenge; to the extent the Court finds the threshold APA requirements are met, Counts XII through XV should proceed based on this theory.

28

support for each count of declaratory relief, *see* SAC ¶¶ 159–83, and therefore Defendants' arguments are not a basis for dismissal of these claims.

### H.        The Court Should Not Dismiss the President as a Defendant

"Contrary to Defendants' assertions, Presidential action is not inherently unreviewable." *California v. Trump*, 2026 WL 1826490, at \*10 (D. Mass. June 25, 2026) (denying motion to dismiss the President from action where the plaintiffs sought declaratory relief against the President); *see also Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 419 (D. Mass. 2018) (denying motion to dismiss the President from action as premature).  The Supreme Court has expressly found that a declaratory judgment against the President could redress injuries. *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (finding that "the case law does not support a firm prohibition on a declaratory judgment against the President").

Defendant Trump is no peripheral defendant here: he personally issued and signed each of the three challenged Executive Orders that launched and continue to drive the federal administration's campaign against sanctuary jurisdictions, and every challenged Agency Directive flows from and implements his commands.  His orders are the source of the unconstitutional conditions at issue and are aimed at ensuring that sanctuary jurisdictions "do not receive access to Federal funds."  SAC, Ex. A.  Because the President sits at the head of this campaign against Plaintiffs, declaratory relief directed at him is necessary to fully redress Plaintiffs' injuries.  The Court should accordingly decline to dismiss the declaratory relief claims against Defendant Trump.

### III.      IN THE EVENT OF DISMISSAL, PLAINTIFFS SHOULD NONETHELESS BE PROVIDED AN OPPORTUNITY TO AMEND

If the Court grants any part of Defendants' Motion, Plaintiffs respectfully request the opportunity to amend their Complaint to address any potential deficiencies identified by the Court. *See, e.g.*, *Guerra v. Teradyne Inc.*, 2004 WL 1467065, at \*28 (D. Mass. Jan. 16, 2004) (permitting

29

leave to amend). Defendants have not established—nor do Defendants even argue—that amendment would be futile in this context, and their doing so on reply would be ineffective. *See Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) ("The purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion be denied.


Dated: July 10, 2026                                  Respectfully submitted,

                                                      */s/ Jillian Lenson*
                                                      Jillian Lenson (BBO# 690653)
                                                      Iván Espinoza-Madrigal (BBO# 708080)
                                                      LAWYERS FOR CIVIL RIGHTS
                                                      61 Batterymarch Street, Fifth Floor
                                                      Boston, MA 02110
                                                      Tel:  (617) 482-1145
                                                      jlenson@lawyersforcivilrights.org
                                                      *Attorneys for Plaintiffs City of Chelsea and City of Somerville*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 10, 2026, I electronically filed the foregoing with the Clerk's Office using the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as non-registered participants.

*/s/ Jillian Lenson*

Jillian Lenson